# 26-918

*To Be Argued By*:
MIRANDA GONZALEZ

# United States Court of Appeals

**For the Second Circuit**

UNITED STATES OF AMERICA,

*Appellant,*

—against—

RONALD WASHINGTON, also known as TINARD, JAY BRYANT, also known as BRADSHAW DEWITT, also known as JASON ROBINSON, also known as MORGAN BRYANT, also known as DESHAWN SADLER, also known as JAY SADLER, also known as BIG JAY,

*Defendants,*

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee.*

**On Appeal From The United States District Court For The Eastern District of New York**

## BRIEF AND APPENDIX FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
MARK E. MISOREK,
MIRANDA GONZALEZ,
*Assistant United States Attorneys*,
*Of Counsel*.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUE ..... 2

STATEMENT OF THE CASE ..... 3

I. Jordan's Criminal Charges ..... 5

II. The Offense Conduct ..... 7

A. Counts One and Two (The Murder of Jason Mizell) ..... 7

1. Identification of Jordan as the Shooter ..... 8

2. Witness Intimidation After the Murder ..... 16

B. Counts Three Through Eleven (Drug Trafficking and Firearms) ..... 18

III. Jordan's Criminal History ..... 20

IV. The District Court's Denial of Jordan's First Bail Application ..... 22

V. The Trial and Jordan's Post-Trial Motions ..... 27

A. Grant of Jordan's Rule 29 Motion ..... 28

B. Denial of Jordan's Rule 33 Motion ..... 31

VI. The District Court's Grant of Jordan's Second Bail Application ..... 35

SUMMARY OF ARGUMENT ..... 41

ARGUMENT .......... 42

I. Applicable Law .......... 42

II. The District Court Clearly Erred in Deciding That Jordan Was No Longer a Danger to the Community or a Flight Risk .......... 45

A. The District Court Erred by Not Analyzing Counts One and Two, Including Jordan's Role as Mizell's Shooter .......... 45

B. The District Court Erred by Reversing Its Prior Positions on Dangerousness and Weight of the Evidence for Counts Three Through Eleven .......... 51

C. The District Court Erred in Reversing Its Prior Position on Uncharged Conduct .......... 59

D. The District Court Erred in Holding That the Bail Package Overcame Dangerousness and Flight Risk .......... 65

CONCLUSION .......... 69

# TABLE OF AUTHORITIES

Page(s)

## CASES

*United States v. Barone*,
387 F. App'x 88 (2d Cir. 2010) .......... 50, 56

*United States v. Belardo*,
No. 20-CR-126 (LTS),
2020 WL 1689789 (S.D.N.Y. Apr. 7, 2020) .......... 57

*United States v. Colombo*,
777 F.2d 96 (2d Cir. 1985) .......... 64

*United States v. Contreras*,
776 F.2d 51 (2d Cir. 1985) .......... 44

*United States v. Dillard*,
214 F.3d 88 (2d Cir. 2000) .......... 53

*United States v. Dono*,
275 F. App'x 35 (2d Cir. 2008) .......... 64, 68

*United States v. English*,
629 F.3d 311 (2d Cir. 2011) .......... 42

*United States v. Ferranti*,
66 F.3d 540 (2d Cir. 1995) .......... 42, 64, 65

*United States v. Florez*,
447 F.3d 145 (2d Cir. 2006) .......... 57

*United States v. Hakimi*,
No. 11-5364, ECF No. 91 (2d Cir. Mar. 5, 2012) .......... 45, 46

*United States v. Holmes*,
858 F. App'x 429 (2d Cir. 2021) .......... 60

Case: 26-918, 05/01/2026, DktEntry: 21.1, Page 5 of 448



*United States v. Jackson*,
823 F.2d 4 (2d Cir. 1987) .......................................................... 43

*United States v. Khusanov*,
731 F. App'x 19 (2d Cir. 2018) .................................................... 67

*United States v. LaFontaine*,
210 F.3d 125 (2d Cir. 2000) ........................................................ 45

*United States v. Leon*,
766 F.2d 77 (2d Cir. 1985) ...................................................... 44, 53

*United States v. Liebowitz*,
669 F. App'x 603 (2d Cir. 2016) .................................................. 69

*United States v. Marino*,
396 F. App'x 728 (2d Cir. 2010) .................................................. 60

*United States v. Maxwell*,
510 F. Supp. 3d 165 (S.D.N.Y. 2020)............................................ 57

*United States v. Mercedes*,
254 F.3d 433 (2d Cir. 2001) ........................................................ 65

*United States v. Millan*,
4 F.3d 1038 (2d Cir. 1993) ..................................................... passim

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011) ..................................................... 48, 50

*United States v. Orena*,
986 F.2d 628 (2d Cir. 1993) ................................................ 54, 66, 68

*United States v. Patterson*,
25 F.4th 123 (2d Cir. 2022)......................................................... 53

*United States v. Quartermaine*,
913 F.2d 910 (11th Cir. 1990)...................................................... 51

*United States v. Rodriguez*,
950 F.2d 85 (2d Cir. 1991) ...................................................... passim

*United States v. Sabhnani*,
493 F.3d 63 (2d Cir. 2007) .......................................................67

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008) .......................................................53

*United States v. Scali*,
738 F. App'x 32 (2d Cir. 2018).................................................67

*United States v. Shakur*,
817 F.2d 189 (2d Cir. 1987) .....................................................42

*United States v. Zhang*,
55 F.4th 141 (2d Cir. 2022)...............................................47, 59

*Zadvydas v. Davis*,
533 U.S. 678 (2001)..................................................................54

STATUTES

18 U.S.C. § 3142...................................................................45, 50, 61

18 U.S.C. § 3142(e)(1).................................................................43

18 U.S.C. § 3142(e)(3)............................................................passim

18 U.S.C. § 3142(f)......................................................................43

18 U.S.C. § 3142(g) ...............................................................43, 47

18 U.S.C. § 3143(c)................................................................45, 46

RULES

Federal Rule of Criminal Procedure 29...................................................45

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 26-918

UNITED STATES OF AMERICA,

*Appellant*,

-against-

RONALD WASHINGTON, also known as TINARD,
JAY BRYANT, also known as BRADSHAW DEWITT,
also known as JASON ROBINSON, also known as MORGAN BRYANT,
also known as DESHAWN SADLER, also known as JAY SADLER,
also known as BIG JAY,

*Defendants*,

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR THE UNITED STATES

## JURISDICTIONAL STATEMENT

The United States of America appeals from an order entered on April 6, 2026, in the United States District Court for the Eastern

District of New York (DeArcy Hall, J.), granting the motion of Defendant-Appellee Karl Jordan, Jr. for pretrial release. (SPA:2, 4-23).[1] On April 10, 2026, the district court stayed its decision until further order of this Court. (SPA:3).

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The government filed timely notice of appeal on April 9, 2026. (DE:338). This Court has jurisdiction pursuant to 18 U.S.C. §§ 3143, 3145(c), and 3731 and Rule 9(a) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUE

Whether the district court erred in its analysis under 18 U.S.C. § 3142 in ordering Jordan released from detention pending trial on nine counts involving narcotics trafficking and firearms and pending the government's appeal of the court's order granting Jordan's motion of acquittal as to two murder counts.

---

[1] "SPA," "A," "SA," and "DE" refer to the government's special appendix, the government's appendix, the government's sealed appendix, and entries on the district court's docket, respectively.

## STATEMENT OF THE CASE

After a five-week trial, on February 27, 2024, a jury convicted Jordan, also known as "Little D" and "Noid," and Ronald Washington, also known as "Tinard," of committing the October 30, 2002 murder of Jason Mizell. The jury found that they murdered Mizell while engaged in a narcotics conspiracy and while using a firearm, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One) and 18 U.S.C. § 924(j)(1) (Count Two). These convictions were based on the testimony of 38 witnesses, including eyewitnesses who identified Jordan as the shooter and testified that they initially withheld their identifications from law enforcement officials because they were afraid of retaliation and continued to be afraid at trial.

After the verdicts, Jordan and Washington moved, under Federal Rule of Criminal Procedure 29, for judgments of acquittal. On December 19, 2025, the district court addressed both defendants' motions. The court denied Washington's motion. The court granted Jordan's motion, holding that the jury could not have found that Jordan's motive for murder was related to the narcotics conspiracy, despite its holding that Jordan and Washington were co-conspirators in the same

underlying narcotics conspiracy at the time of the murder and despite their also being charged with aiding and abetting liability. Jordan's Rule 29 motion did not ask the court to decide whether Jordan fatally shot Mizell.

The government filed notices of appeal on January 5, 2026 and January 7, 2026, which are pending before this Court. *See United States v. Jordan*, Nos. 26-16, 26-41 (2d Cir.). Jordan still faces nine pending counts based on his drug trafficking and possession of a firearm from 2016 until his arrest in 2020.

On April 6, 2026, the district court orally granted Jordan's motion to be released on bond. It did so without full consideration of the evidence supporting the murder counts that led to the jury's verdict (including Jordan's role as the shooter, which the jury found beyond a reasonable doubt, a finding which was not vacated by the district court). In granting Jordan's motion, the court also reversed its position on evidence and argument it previously credited when it first denied an almost-identical bail application Jordan made in 2022.

## I. Jordan's Criminal Charges

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Jordan and Washington with one count of murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One), and one count of firearm-related murder, in violation of 18 U.S.C. § 924(j)(1), for the murder of Mizell (Count Two). (DE:1).[2] Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). (*Id.*).

On March 4, 2021, the grand jury returned a superseding indictment, which replaced the conspiracy count against Jordan with one count of conspiracy to distribute and possess with intent to distribute cocaine and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii), and 841(b)(1)(C) (Count Three), added one count charging Jordan with use of firearms in connection with Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Four), and maintained the

---

[2] Jordan and Washington were also charged with aiding and abetting liability in Counts One and Two. (DE:1 at 1-2).

seven counts against Jordan of cocaine distribution, in violation of 21 U.S.C. § 841(b)(1)(C) (Counts Five through Eleven). (DE:45).

On September 19, 2022, the district court granted Jordan's motion to sever Counts One and Two, which pertain to Mizell's murder in 2002, from Counts Three through Eleven, which pertain to Jordan's drug trafficking with a firearm between 2016 and 2020. (DE:107). Counts Three through Eleven against Jordan remain pending. On May 30, 2023, a grand jury returned a second superseding indictment (the "Indictment") to add Jay Bryant to Counts One and Two. (DE:151). The court granted Bryant's motion to sever his trial from Jordan and Washington's trial. (DE:184).

Trial began against Jordan and Washington on Counts One and Two on January 22, 2024, and concluded on February 27, 2024.

On April 28, 2026, Bryant pled guilty to Count Two of the Indictment. (A:40 (DE:343)).

## II. The Offense Conduct

### A. Counts One and Two (The Murder of Jason Mizell)[3]

On October 30, 2002, Jordan, Washington, and Bryant murdered Mizell in his recording studio (the "Studio"), which was located inside 90-10 Merrick Boulevard in Jamaica, Queens. Mizell was a member of the influential hip hop group Run-D.M.C. (A:276-77). Mizell was also Jordan's godfather. (A:278).

On the night of the murder, Bryant entered the front door of 90-10 Merrick Boulevard and let Jordan and Washington into the building through a back door. Once inside the Studio, Washington pointed a firearm at a witness and demanded she lay on the floor, as Jordan approached Mizell and fired twice at close range. One shot hit Mizell in the head, killing him. The second shot struck another witness in the leg. (A:277).

The trial evidence revealed that (1) Jordan, Washington, and Mizell were in a narcotics conspiracy together at the time of Mizell's

---

[3] A comprehensive recitation of the trial evidence is included in the government's brief appealing the district court's Rule 29 decision. (A:263-369).

murder, (2) in furtherance of that conspiracy, Mizell had received 10 kilograms of cocaine and was expecting 90 additional kilograms on consignment, (3) a lucrative narcotics deal in Baltimore the defendants anticipated fell through two months before Mizell's murder, and (4) Mizell had plans to meet with the conspiracy's cocaine supplier the day before, or day of, his murder. (*Id.*). Only a few hours before Mizell's murder, Washington arrived at the Studio, in possession of a firearm, to ask Mizell about their plans relating to the narcotics conspiracy, and Mizell sent him away. Washington then made a call from a payphone, after which, he, Jordan, and Bryant arrived at the Studio to murder Mizell. (A:277-78).

1. Identification of Jordan as the Shooter

Stephen Watford, Mizell's cousin who lived at Mizell's family residence at the same time that Washington did, testified that, days before Mizell's murder, Washington asked him for .40 caliber ammunition—the same caliber ammunition Jordan later used to shoot Mizell. (A:284).

On the afternoon of October 30, 2002, the day of Mizell's murder, Washington and his girlfriend, Daynia McDonald, visited

Jordan's brother, Tashawn Burns, from whom Washington obtained what appeared to be a firearm. That evening, Washington and McDonald went to the Studio where they saw Mizell, who was armed with a .380 caliber firearm. (A:286).

McDonald testified that Mizell appeared surprised to see Washington there, with an "oh crap" and "oh-shit kind of look" on his face. (*Id.*). Washington saw Mizell's firearm and asked Mizell, "What do you have the gun for? Why do you need a gun? You could have always called me if you need anything." (*Id.*). Washington reminded Mizell, "If you have a problem, I have a problem too." (*Id.*). Mizell then removed his firearm from his hip and placed it next to him on the couch. (*Id.*). Washington asked Mizell, "aren't we supposed to be going to Connecticut…[for] a show?" (A:287). Washington also inquired about Baltimore, a reference to their plans to distribute narcotics there. (*Id.*). This conversation contained coded language about their plans for the narcotics conspiracy. (*See* A:286-87). Mizell sent Washington and McDonald away, tasking Washington with an errand. On their return to the Studio, Washington made a call from a payphone during which he gestured "expressive[ly] with his hands," and, thereafter, Washington

told McDonald that she had to leave. (A:287-88). McDonald testified that she and Washington collected her belongings from the Studio and both left. (A:288).

A little before 7:30 p.m., Jay Bryant entered 90-10 Merrick Boulevard, where the Studio was located. (*Id.*). As detailed in the government's merits brief, Bryant enabled Jordan and Washington, who were lying in wait, to surreptitiously enter the building and access the Studio without detection on the buildings' surveillance cameras.

Tanya Davis—an employee at Primerica, a financial services firm with an office inside 90-10 Merrick Boulevard—was working that night and had a view of the hallway to the Studio and the surveillance camera footage. (A:288-90). Davis testified that on that evening of October 30, she sat at Primerica's front desk to buzz clients into the front door of 90-10 Merrick Boulevard. (A:290). After providing directions to the Studio to one woman, Davis later observed, on the television, a second young woman entering the front door of 90-10 Merrick Boulevard and a man entering behind her. (*Id.*). The young woman and man walked up the stairs, with the man behind the woman who "didn't hold the door open for him," which indicated to Davis that they were not together. (*Id.*).

Davis described the man as a "very tall…young guy" who was "lanky" and "black" with "braids," "light skin," and a "shadow beard." (*Id.*). She had never seen him before. "Shortly after that," Davis heard gunshots and a woman screaming. (*Id.*).

The jury heard testimony from Randy Allen, Lydia High, Michael Rapley, Tony Rincon, and Yarrah Concepcion, who were in the Studio with Mizell when he was murdered. (*Id.*). Rapley, Allen, and Concepcion were in the Studio's control room when Mizell was shot. (A:292). High and Rincon witnessed the murder. The witnesses all testified consistently with each other and with Davis. (A:290-94).

High testified that she arrived at 90-10 Merrick Boulevard by herself and did not remember if anyone followed her through the front door. (A:292). When she arrived at the Studio, High saw Mizell and Rincon on the couch. Rincon was seated to the right of Mizell (*i.e.*, farthest from the Studio entrance). (*Id.*). High sat across from Mizell to discuss logistics and present paperwork for Mizell to sign. Mizell had a firearm on the armrest of the couch next to him. High did not like this, so she asked Mizell why the gun was there; he told her not to worry about it. (A:292-93).

Rincon testified that, as they were all talking, Jordan entered the Studio with Washington, raised the hood on his sweatshirt, and "walked directly" to Mizell to greet him with "a potential handshake, almost like a half a handshake with the arm," at which point Rincon heard "a couple of shots" and felt pain in his leg. (A:293). Rincon saw Mizell (who had stood for the embrace) fall on Jordan, Jordan "shrug" and "shake" Mizell's body off, and Mizell fall to the floor. (*Id.*). Rincon saw Washington at the Studio's entrance telling High to stay down. Rincon testified he had no trouble seeing Jordan's and Washington's faces and could even see "a little bit of [Jordan's] tattoo on his neck." (*Id.*). The jury saw Jordan at trial, as well as photographs of Jordan, with a large tattoo on the side of his neck, which witnesses said Jordan had in 2002. (*Id.*). Police officers later brought Rincon, who had been shot in the leg, to the hospital for treatment. (*Id.*).

High similarly testified that she observed a "fair-skinned...African-American" man with a "tattoo…[o]n his neck"—consistent with Jordan's appearance—approach Mizell, who smiled, stood up, and gave the man "a pound," meaning a greeting by hand. (A:294). Mizell then said, "Oh shit," and High heard two gunshots. (*Id.*).

High screamed and ran to the Studio's entrance but was stopped by Washington, who ordered her to the ground at gunpoint. High cried and shook during her trial testimony as she recounted what occurred. (*Id.*).

Expert and law enforcement witnesses corroborated this testimony. Dr. Corinne Ambrosi, who performed the autopsy of Mizell, determined that the cause of Mizell's death was a gunshot wound to his head and the manner of death was homicide. (*Id.*). Dr. Jagjeet Bains, who performed a gunshot residue and distance determination analysis, confirmed that the gunshot that killed Mizell was a "contact shot," which meant the shooter was less than two inches away. (*Id.*). Crime scene investigators recovered two .40 caliber shell casings next to Mizell's body. (*Id.*). The jury also learned that three months after the murder, on February 3, 2003, police officers recovered a .40 caliber firearm, a .40 shell casing, and 83 .40 caliber bullets from Jordan, and that, on May 14, 2003, they also recovered a .40 caliber bullet and bullet fragment from a .40 caliber firearm possessed by Jordan. (A:294-95).

At trial, witnesses testified that Rincon and High later identified Jordan as the shooter and Washington as guarding the door to the Studio with a firearm. (A:295). Allen testified that one or two days

after Mizell's murder, Rincon told him that Jordan shot Mizell and Washington was also in the Studio. Allen also testified that High described the shooter's neck tattoo to him and that Washington ordered her to the ground at gunpoint.[4] (*Id.*). Derrick Parker, a retired police detective who acted as High's bodyguard after the murder, testified that shortly after the murder, High identified both Jordan and Washington as the perpetrators. (*Id.*).

After the gunshots, Rincon saw Jordan and Washington run out of the Studio and turn left towards the back door of the building. (A:296). Davis testified that after the gunshots, she saw the same "very tall" man who had entered the front door of 90-10 Merrick Boulevard go down the hallway and head back towards the front door. (*Id.*). He "looked like he was like dragging his leg a little bit" and he was "taking long steps as he was going," a description consistent with Bryant and inconsistent with Jordan and Washington. (*Id.*).

---

[4] Allen testified that when he tried to speak with High again about what happened in the Studio, "she cut [him] off" and "didn't speak to [him]…for two whole years." (A:295).

The trial evidence revealed that the "very tall" man who snuck into 90-10 Merrick Boulevard behind High and later fled through the front door was Bryant, and that Jordan and Washington entered and exited 90-10 Merrick Boulevard through the back door. (A:296-97). Witnesses described Bryant as approximately between 6'3" and 6'5", lacking a neck tattoo, walking with a limp due to a gunshot wound, and with braids in 2002—he could not have been mistaken for either Jordan or Washington. (A:296). In contrast, Jordan was 5'9.5" and Washington was 5'10", neither had braids or a limp in 2002, and Jordan had a prominent neck tattoo in 2002 that the jury heard about from witnesses and saw in photographs. (*Id.*). Significantly, witnesses close to Mizell, including Rincon, were shown photographs of Bryant and did not recognize him, contradicting the defense theory that Bryant would have been able to get close to Mizell to shake his hand and that Mizell would have smiled upon seeing Bryant. (A:296-97).[5]

[5] Indeed, Bryant was connected to Jordan and Washington, and not to Mizell, through a mutual friend, Atif ("Tiff") Heathington. (A:297).

Based on the testimony that witnesses did not use the back door or even know of its existence, the jury could infer that Jordan and Washington entered through the back door to avoid detection. (A:298). As the witnesses testified, the back door did not require a buzzer that would alert people inside 90-10 Merrick Boulevard, and the camera view of the back door showed Jordan and Washington could wait outside the view of the camera until Bryant let them in. (A:299).

2. Witness Intimidation After the Murder

The evening of Mizell's murder, Washington confessed to McDonald that he killed Mizell, and, the next day, he moved out of Mizell's family home to live in hotels with McDonald. (*Id.*).

After the murder, Jordan and his father attempted to tie up loose ends as to witnesses who could implicate Jordan.

The day after Mizell's murder, Jordan's father shot a firearm at Washington. (*Id.*). Less than a week after Mizell's murder, Jordan's father placed a phone call to High that left her "shaking" and "very upset." (A:299-300).

At Mizell's funeral, which was held one week after his murder, Jordan and several friends approached Rincon and his mother. Jordan

asked if Rincon saw who killed Mizell. Rincon felt that Jordan was "probing to see if I did see him" at the Studio, especially because nobody else at the funeral, which a "couple hundred" people attended, had asked him the same question. (A:300).

One month after the murder, Washington was still living in a hotel with McDonald when he told her that he "had to go meet up with Noid [Jordan]." (*Id.*). He returned from that meeting "upset." (*Id.*).

In 2003, Jordan's father and "a couple…people from the Hollis crew" approached McDonald and told her "not to say anything to the [] police." (*Id.*).

The trial evidence also showed that Jordan bragged about Mizell's murder and used it as a way to threaten others. In 2004, Cherubin Bastien, who lived with Jordan, was driving Jordan and Jordan's two friends when he overheard Jordan talking about Mizell, stating, "if I get to kill him, I'll kill him again." (*Id.*). On another occasion that year, Bastien heard Jordan threaten a woman saying he would "do [her] exactly just like him," referring to Mizell. (*Id.*).

B. Counts Three Through Eleven
(Drug Trafficking and Firearms)

Decades later, Jordan had not ceased working in the narcotics trade. Jordan was charged with narcotics distribution and firearms offenses, which continued unabated from 2016 until his arrest in 2020. (DE:9 (government motion in support of detention); A:41-53 (government opposition to Jordan's first bail application); A:179-97 (government opposition to Jordan's second bail application)).

Numerous witnesses will testify to Jordan's years-long distribution of narcotics, as well as his related firearms possession, to support Counts Three and Four. The government anticipates that these witnesses will testify that Jordan would typically sell cocaine and cocaine base to a variety of different buyers on a weekly basis. (A:43, 181, 187-88). For example, the government expects one witness to testify about purchasing crack cocaine from Jordan from the late 1990s through the summer of 2019. (A:188). This witness also observed Jordan in possession of a firearm on several occasions. (*Id.*).

Another witness will testify that Jordan was often in possession of a firearm while selling narcotics—that witness will describe

the type and color of a firearm that Jordan kept in either the driver's side door pocket or the center console of his vehicle while engaging in narcotics transactions. (A:43, 181).

Another witness, who had purchased crack cocaine from Jordan since approximately 2010, will testify that at least one of Jordan's school-aged children was present in his car as he delivered narcotics. (A:43, 187). The witness described Jordan as a very reliable source of supply, but stated that Jordan was very cautious with customers to whom he sold narcotics, constantly changing his cell phone number so that he could not be tracked by law enforcement. (*Id.*). The witness further described that Jordan instructed the witness not to give Jordan's phone number to others. Instead, Jordan insisted that the witness should be the point of contact and buy narcotics on everyone's behalf. (A:187-88).

Jordan's guilt is further corroborated by the evidence that on seven separate occasions, Jordan sold cocaine to an undercover law enforcement agent who recorded those sales using both audio- and video-recording equipment. (A:188). Those cocaine sales constitute Counts Five through Eleven and are also part of the proof of the narcotics conspiracy charged in Count Three.

In its briefs opposing Jordan's release, the government submitted to the court images from the undercover agent's video recordings during Jordan's various narcotics sales. (A:43, 188). These images depict Jordan's hand cupping a small clear bag containing a white substance and his face while sitting in a car during the sale. (*Id.*).

Moreover, subsequent to Jordan's arrest in August 2020, law enforcement officers executed a search warrant on mobile phones seized from Jordan, which yielded the following evidence of narcotics trafficking during the charged period:

- Numerous photographs and videos of Jordan holding stacks of hundred-dollar bills and other denominations of money;
- Photographs and videos of Jordan wearing and examining diamond-encrusted jewelry; and
- An incoming text message to one of Jordan's phones which stated, "J how much can you give me for a Buck? [G]ive me a good deal so I can live too and I will live with that[.]"—a reference to a quantity of narcotics that can be purchased for $100.

(A:43-44, 188-89).

III. Jordan's Criminal History

Although Jordan has no adult criminal record, he was arrested for robbery in the second degree in 1999 and was adjudicated a

juvenile delinquent. (A:44, 181). Yet, despite his lack of record, the government is aware of several incidents where Jordan has used or possessed firearms:

- On February 3, 2003, during an argument with a relative of Washington in Queens, Jordan produced a .40 semi-automatic pistol and fired one shot into the air. Responding police officers recovered the spent .40 shell casing and an additional 83 live rounds of .40 caliber ammunition. Though Jordan was initially charged with a felony firearm offense, the eyewitness refused to cooperate, and the grand jury indicted Jordan only for possession of ammunition, a misdemeanor. Jordan pled guilty to a disorderly conduct violation. (A:44, 181-82; SA:3).

- On May 14, 2003, Jordan fired several shots at Mizell's nephew, striking him once in the leg, after the nephew produced a rap song that accused Jordan of murdering Mizell. (DE:141 at 3 & n.4). Two .40 caliber discharged bullets were recovered from the scene. Jordan was arrested for criminal use of a firearm in the first degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement officials. (A:44, 182).

- On November 1, 2004, Jordan was involved in a shootout with another individual in Queens. Rounds from the exchange went through windows and walls of the surrounding houses, cars, and a nearby church. Over 27 pieces of ballistic evidence—including shell casings and spent projectiles—were recovered by responding officers. Jordan fled the scene in a gold BMW and was later arrested. The case was ultimately dismissed. (A:44-45, 182).

- On December 15, 2004, law enforcement officers executed a search warrant at Jordan's residence in Queens, predicated on Jordan's narcotics sales. During the search, officers recovered a loaded 9mm semi-automatic pistol, a loaded 9mm

> magazine, a loaded .32 caliber revolver, and a bulletproof vest. They also found over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested. Jordan eventually pled guilty to a disorderly conduct violation. (A:45, 182).

Jordan's criminal conduct continued even after his arrest in this case. On or about August 16, 2021, Jordan was found in possession of a contraband cell phone while in his cell at the Metropolitan Detention Center ("MDC"). (A:46).

IV. The District Court's Denial of Jordan's First Bail Application

On August 17, 2020, Jordan was arraigned on the initial indictment. (DE:10). Pretrial Services concluded there was "no condition or combination of conditions to reasonably assure [Jordan's] future court appearance and the safety of the community," and Jordan did not present a bail application. (SA:4). On the government's motion, Magistrate Judge Lois Bloom issued a permanent order of detention with leave to reapply. (DE:9-10).

Jordan filed a bail application on February 15, 2022. (DE:73). In that application, Jordan argued for release claiming that: (i) COVID-19 presented health risks to him in light of his donated kidney; (ii) social

distancing required by COVID-19 at the MDC made it difficult to communicate with his attorneys; (iii) the discovery did not support the murder counts, especially given his two alibi witnesses, who included his girlfriend at the time and her mother, a former New York City Correctional Officer and current school teacher; and (iv) he was not a risk of flight because he is a lifelong New Yorker and father to four daughters. Jordan sought home detention and presented a $1,000,000 bond secured by 16 suretors, $20,000 in cash, and two properties owned by his father and grandmother, collectively valued at $120,000, to serve as collateral. (A:48, 70-71, 183). The government opposed. (A:41-53).

The district court held a hearing on February 28, 2022. (A:54-98). The court denied Jordan's motion for bail in a ruling from the bench on March 3, 2022. (A:99-115).

In so ruling, the district court held that the presumption of detention applied under 18 U.S.C. § 3142(e)(3) because of Counts One through Four and that, "even assuming that the defendant met his burden of production with respect to flight, the Court cannot find that the defendant has met his burden with respect to dangerousness." (A:102, 113). It further held that "even if the defense rebutted [that]

presumption, the factors set forth in the Bail Reform Act counsel in favor of detention," because "the government has met its burden of persuasion by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance should the defendant be granted bail." (A:113).

With respect to the nature and circumstances of the offenses charged, the district court stated that "the inherent dangerousness of homicide is self-evident" and that "the narcotics offenses, too, are sufficiently serious to weigh in favor of continued detention." (A:103).

Regarding the weight of the evidence as to Counts One and Two, the district court noted that the government's case was based "primarily on eyewitnesses and coconspirator testimony" and that "the grand jury has returned an indictment based in part on such testimony." (A:107). The court also found that the *Brady* disclosure regarding the DNA evidence "found on a hat at the scene, perhaps near the body of Mr. Mizell…[did] not suggest as the defendant urges that the weight of the government's case is undermined" because "the crime took place in a location frequented by the public or at least numerous people[.]" (A:105).

As to Counts Three through Eleven, the district court stated that "the proof is significantly high, or the weight of the evidence rather." (A:105-06). It specifically noted that Jordan had not raised any issues with the sufficiency of the evidence with respect to Count Three, "which also carries the presumption" (A:107), and "[f]or the seven distribution charges which the [c]ourt acknowledges do[] not trigger the presumption, the government has surveillance recordings of the sales made to undercover law enforcement agents" (A:107-08). Therefore, the court found "the weight of the evidence factor weighs strongly in favor of a continued pretrial detention." (A:108).

With respect to Jordan's history and characteristics, the district court properly considered both charged and uncharged conduct, including the four separate instances in which Jordan used or possessed a firearm, two of which resulted in only disorderly conduct violations. (A:44-45, 108-09). It also emphasized the four-year narcotics conspiracy—including a narcotics sale by Jordan "with his daughter in tow"—that "overlap[ped]" with seven sales of cocaine to the undercover agent, suggesting "repeated activity" that constituted danger to the community. (A:109). It further noted Jordan's possession of a

contraband cell phone in his cell at MDC "suggests a propensity for noncompliance with conditions of release, as it is evidence that the defendant has not been compliant with the requirements placed on him in custody." (A:110). Despite crediting Jordan's kidney donation to his mother and his role as a father to four daughters, the court concluded that Jordan was a danger to the community. (A:108, 110).

In considering the seriousness of the danger posed by Jordan's release, the district court accepted the inherent dangerousness of the underlying offenses, as well as the government's proffer that Jordan had "endeavored to identify and silence" witnesses, and one of his proposed suretors, his father, had done the same. (A:111). During the hearing, the court also emphasized this Court's decisions stating that "the dangerousness calculation can and should include ongoing narcotics trafficking," referring to the conspiracy lasting from 2016 until Jordan's arrest in 2020. (A:89).

With respect to flight risk, the district court weighed the combined minimum custodial sentence of 25 years (referring to Counts One, Three, and Four) over the strength of Jordan's bail package, his

reliance on ties to the community, and his lack of outstanding bench warrants or history of non-appearance. (A:111-12).

Finally, the district court rejected Jordan's arguments regarding the effect of the COVID-19 pandemic because he did not offer medical evidence to suggest he faced a particular risk greater than the risk faced by any other inmate. (A:112-13).

## V. The Trial and Jordan's Post-Trial Motions

On February 27, 2024, a jury convicted Jordan and Washington of murdering Mizell. (DE:298).

On April 5, 2024, Jordan filed a Rule 29(c) motion, arguing the trial evidence was insufficient to establish: (i) that Jordan was in an ongoing narcotics conspiracy at the time of Mizell's murder, and (ii) that Jordan had a narcotics-related motive for the murder or that the murder furthered the narcotics conspiracy. Jordan's motion did not challenge the evidence proving he fatally shot Mizell. Instead, Jordan included a Rule 33 motion for a new trial, arguing that an alternate perpetrator theory of Bryant as the shooter preponderated heavily against the verdict and that replacement of a juror tainted the jury. (DE:292). The government opposed. (DE:296).

On December 19, 2025, and in a corrected decision on January 7, 2026, the district court granted Jordan's Rule 29 motion and denied his Rule 33 motion, holding the evidence was insufficient for a jury to find that Jordan had a narcotics-related motive in murdering Mizell or that his use of a firearm was intended to further the narcotics conspiracy, despite finding that Jordan was a member of the ongoing narcotics conspiracy at the time of the murder. (DE:322). The court denied Washington's post-trial motions. (DE:323).

A. Grant of Jordan's Rule 29 Motion

The district court held that Jordan was a member of Mizell's narcotics trafficking conspiracy at the time of his murder. (A:158-61). It found that Jordan joined Mizell's conspiracy "as early as 2001…[when he] requested that Mizell 'put him on'" and sold an ounce of cocaine on behalf of Mizell as a test. (A:158). In 2002, Mizell "had a line" on 100 kilograms of cocaine, which was to be sold on consignment, but he could secure only 10 kilograms at the time. (A:151-52). Mizell, Jordan, and Washington agreed they would sell those 10 kilograms in Baltimore through a drug distributer there, Yakim. (A:152, 160). The court held the conspiracy did not end when Yakim refused to work with Washington

after a trip to Baltimore in August 2002, because "Yakim's refusal was clearly limited to Washington" and there was "simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute narcotics in Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the Baltimore deal." (A:152-53, 159-60).

The court found that Jordan took no affirmative step to remove himself from the conspiracy and that there was "ample evidence of conspiratorial conduct after" Yakim refused the Baltimore deal. (A:160-61). This evidence included testimony that Mizell remained in Baltimore to negotiate with Yakim, that Mizell "had a line" on 100 kilograms of cocaine that was to be sold on consignment, that Mizell intended distribution of the cocaine would be "ongoing," and that Mizell had not paid the cocaine supplier for all of the cocaine at the time of his death. (*Id.*).

Notwithstanding the above analysis, the district court held that the evidence did not prove Jordan murdered Mizell for a narcotics-related motive or that his use of the firearm was to further the narcotics conspiracy, as would be required to sustain convictions on

Counts One and Two. (A:162-70). It did find such intent for Washington, however.

In its opinion acquitting Jordan, the court recounted the evidence against Jordan but omitted the events leading up to the murder, Jordan's role in the murder, and any conspiracy events for which Jordan was not present. (*Compare* A:163, *with* A:141). Such evidence, the court stated, "related exclusively to Washington or was otherwise unconnected to Jordan." (*Id.*). Without those facts, the court stated the remaining evidence "establishes that Jordan agreed to sell cocaine on behalf of Mizell and was friendly with Washington…[but] its reach does not extend to the motives advanced by the Government." (*Id.*).

The court stated that, because there was no evidence Jordan's role in the narcotics conspiracy was dependent on Washington and no evidence that that Jordan himself was told he could not sell in Baltimore, the jury could not have reasonably inferred that Jordan would have sought to retaliate against Mizell for the failure of the Baltimore deal—even though there was evidence that the deal would have been lucrative. (A:163-64). In contrast, the court's decision for Washington found there was a narcotics-relative motive for the murder because "Washington was

excluded from a potentially lucrative Baltimore deal and sought to retaliate against Mizell for his exclusion." (A:142). The court also found there was no evidence of Jordan's dissatisfaction with Mizell from the conspiracy or evidence permitting the inference that Jordan killed Mizell to steal cocaine or narcotics-related funds. (A:164-65).

B. Denial of Jordan's Rule 33 Motion

When denying Jordan's Rule 33 motion, the district court concluded the evidence sufficed to show that Jordan fatally shot Mizell. The court made clear, however, its belief that it was "even more reasonable" to find that Bryant, not Jordan, was the shooter, but denied the motion only because "Rule 33 requires more." (A:173). In arguing that Bryant was likely the shooter, the court recounted various evidence: (1) a hat inside the Studio contained Bryant's DNA;[6] (2) Bryant's boast to

[6] Testimony established that Bryant's DNA profile was present in a mixture of DNA found inside a knit hat recovered from the Studio near where Mizell had been shot. (A:297). Bryant's uncle, Raymond Bryant, testified that Bryant admitted his participation in Mizell's murder in two conversations, one in 2003 or 2004 and another in or around 2019. Raymond testified that in the first conversation, Bryant admitted he was involved in the murder and he "wouldn't have [done] it if [Mizell] didn't go for his gun," and Raymond believed others were at the murder based on this conversation. In the second conversation, Bryant told Raymond that he was arrested because his hat was at the

his uncle that he was part of the murder and "he 'did it' because Mizell went for his gun" (contrary to the eyewitness testimony) and a second boast that his hat was found at the scene; (3) Davis's testimony that an individual matching Bryant's description entered and exited 90-10 Merrick Boulevard before and after the shooting (consistent with the government's theory); (4) eyewitness testimony that there was a single shooter in the Studio (consistent with Jordan being the shooter); and (5) High's testimony that, when she was sitting on the couch looking at the shooter, the shooter seemed "tall" (though High testified that "the person looked tall *because* I was sitting down" (emphasis added)). (A:126, 172-73). Notably, this evidence of Bryant's purported role as the shooter was presented to and rejected by the jury.

---

scene. (A:298). Notably, eyewitness testimony contradicts Bryant's description of Mizell going for his gun. High and Rincon said that Mizell greeted the shooter and was immediately shot in the head. Similarly, Bryant's statement that he had been arrested for the hat was false, because Bryant was not arrested in connection with the murder until 2023. Significantly, the jury was presented with this evidence, and the government argued in summation that there was substantial evidence proving that Jordan was, and Bryant could not have been, the shooter, and that the government did not need to prove or explain how the hat with Bryant's DNA wound up inside the Studio. (A:298).

The court wondered why Bryant, who was unknown to Mizell, "would be given th[e] role" of walking into the front door of the building to let Jordan and Washington in through the back door (A:174)—even though testimony explained the front door's buzzer system, that Jordan and Washington had been to the Studio (implying they knew about the buzzer system and video cameras), and that Jordan and Washington were known to the people inside the Studio (implying they knew they could be identified on camera before reaching the Studio). The court also speculated why Jordan and Washington "made no effort to conceal themselves" (*id.*), despite Rincon's testimony that Jordan put his hood on as he entered the Studio.

The district court, however, found that evidence in the record supported the government's theory that Bryant's role was to open the back door to grant Jordan and Washington entry to the building, and that Jordan was the shooter. (A:173-75). It pointed to: (1) testimony from Davis, who observed Bryant enter the front door behind High and later leave through the front door; (2) Rincon's eyewitness testimony that he had "no doubt" Jordan was the shooter; (3) High's eyewitness testimony

that the shooter had a neck tattoo; and (4) Bastien's testimony regarding Jordan's statements about the murder. (*Id.*).[7]

But the court ignored other substantial evidence establishing Jordan as the shooter, including testimony from: (1) Allen that Rincon had identified Jordan as the shooter days after the murder; (2) Allen that High had described the shooter's neck tattoo; (3) Parker that High had identified Jordan as the shooter; (4) Rincon that Jordan and his friends approached him at Mizell's funeral to ask "if [he] saw who did it" which made him feel as if Jordan was "probing to see if I did see him"; (5) Parker that Jordan's father called High shortly after the murder and she was "shaking" and "very upset"; and (6) McDonald that Jordan's father told

---

[7] Yet the court also questioned High's identification of Jordan's neck tattoo, stating that there was no evidence High told officers "on the night of Mizell's murder" that the shooter had a neck tattoo. (A:173). The court ignored High's testimony that she was not honest with officers at the time of the murder because she was afraid and that she ultimately told her brother, Allen, about the neck tattoo. (A:311). Although Rincon did not initially identify Jordan as the shooter, the court recognized that the "jury clearly credited Rincon's testimony" that he "hid the truth" because he was afraid of retaliation, over Raymond Bryant's testimony that his nephew, Bryant, admitted he killed Mizell. (A:174). The court ignored that the jury could also reasonably credit Rincon because of his identification of Jordan to Allen days after the murder and his fear of Jordan, especially after he approached him at Mizell's funeral. (A:312).

her not to talk to the police; as well as (7) the major physical differences between Bryant and Jordan; and (8) the eyewitness testimony that Mizell smiled and embraced the shooter immediately prior to his execution, consistent with his knowing the killer. (A:294-97, 299-301). The court also ignored testimony that when Washington arrived at the Studio earlier that day, Mizell was surprised to see him and appeared uncomfortable. (A:286). A rational jury could reasonably infer from that reaction that, when Jordan and Washington returned to the Studio to murder Mizell, they knew they had to gain access to the building discreetly; otherwise, Mizell might not have buzzed them in, or he would have had time to prepare himself for a confrontation using his own firearm that Washington saw hours earlier.

## VI. The District Court's Grant of Jordan's Second Bail Application

On January 30, 2026, Jordan submitted a bail application based on: (i) the district court's decision to grant a motion of acquittal on Counts One and Two; (ii) the present conditions at the MDC, including an incident in which Jordan was stabbed while in custody[8]; and (iii) a bail

---

[8] On February 22, 2025, Jordan was stabbed when a fight occurred among inmates at the MDC. Jordan was treated by medical

package that was functionally the same as that he previously proposed.[9] (DE:331). The government opposed. (A:179-97).

On March 23, 2026, the district court ordered the government to "investigate Defendant Jordan's proposed bail package, including the value of the suretors' equity in the properties offered in support of Defendant Jordan's proposed bail package, and file a letter indicating its investigative findings no later than April 2, 2026." (A:39). The government filed a letter summarizing its findings as to each proposed suretor and property, continuing to argue that no combination of conditions could secure the safety of the community or Jordan's return to court. The government's letter also requested that the district court stay any release order for one week to provide the government time to

staff at the MDC and subsequently transported to NYU Langone Hospital. On February 25, 2025, Jordan was transferred to Brooklyn Hospital for continued pain management. On March 1, 2025, he returned to the MDC. (A:192).

[9] Jordan again proposed a bail package of a $1,000,000 bond. The new bail package proposed 17 suretors, rather than 16 suretors; offered three properties collectively valued at $525,500 rather than two properties collectively valued at $120,000, and did not offer $20,000 in cash. (*Compare* A:48, 70-71, 183, *with* A:208, 237-40).

determine whether to appeal, and, if the government appealed, stay the release order for the duration of that appeal. (A:237-40).

On April 6, 2026, the district court orally granted Jordan's bail application, following a hearing on March 13, 2026. (A:198-236, 241-60). It held that Jordan had rebutted the presumption as to Counts One through Four, and that the government had not sustained its burden to prove that Jordan presented either a danger or a flight risk on any of the counts. (A:246-53). It further stated it would release Jordan on location monitoring. (A:255).

With respect to dangerousness, the district court found that the majority of Jordan's violent criminal conduct was dated and that Jordan had not engaged in any violent conduct while at MDC. (A:247-48). The court justified its changed view on Jordan's dangerousness by stating that its prior decision denying bail was based "primarily…[on] Counts One and Two, while not ignoring…Counts Three through Eleven." (A:248). But now, having presided over the trial, the court found there was an insufficient basis to find probable cause on Counts One and Two, referring to its Rule 29 decision, which reversed Jordan's conviction based on insufficient evidence of Jordan's motive for Mizell's

murder. (A:248-49). Notably, in the order granting Jordan's release, the court did not consider the fact that a jury found Jordan guilty of fatally shooting Mizell—a finding that supported elements of Counts One and Two that the court's Rule 29 decision did not reverse.

Referring to Counts Three through Eleven, the district court concluded that the "bail package addresses…the drug offenses," and while the court was aware that "a history of selling drugs" can be dangerous, that factor was "not dispositive." (A:249). The court emphasized that because Jordan had been in custody for over five years, "the court can reasonably conclude that the danger associated with the then ongoing or alleged ongoing drug trafficking scheme or conspiracy has been blunted." (*Id.*). Further, the court stated that it had not previously been aware that the recordings of Jordan's sales of narcotics to undercover agents were not meant to support the drug weight element of Count Three. (A:249-50). Moreover, the court stated that "beyond the existence of the alleged drug trafficking conspiracy" in Count Three, the government had not shown conduct by Jordan in Counts Three through Eleven that was "necessarily violent." (A:250).

Turning to flight risk, the district court highlighted that Jordan was "a lifelong New Yorker" with a "family and larger community" that supported him since his arrest. (A:250-51). The court stated that a potential lengthy sentence weighed towards flight risk, but that fact was not viewed in isolation, especially when Jordan had been in custody for five-and-a-half years, and "even a conviction with respect to Counts Three and Eleven may not produce an additional custodial time that raises the inherent concerns that sentences of ten years or more raise." (A:251). Finally, the court stated that the potential bail package addressed its concerns because the suretors were putting up essentially "all that they have." (A:251-52).

The district court stated that it would stay Jordan's release until April 10, 2026, by which date the government should inform the court whether it intended to appeal its order. (A:256). The court indicated that if the government appealed the order, it would stay the order pending this Court's determination of that appeal. (*See* A:257).

On April 9, 2026, the government filed a notice of appeal and requested the district court enter a formal order memorializing its stay of the challenged order. (DE:338-39). On April 10, 2026, the district

court stayed its order releasing Jordan pending this Court's determination of this appeal. (A:40).

## SUMMARY OF ARGUMENT

The district court clearly erred when it ordered Jordan's release without considering his fatal shooting of Mizell that a jury found beyond a reasonable doubt, a finding which the court did not reverse in its decisions on Jordan's post-trial motions. It further erred in rescinding its position on the dangerousness of the narcotics trafficking and firearms counts in Counts Three through Eleven (including by suggesting that violent conduct is necessary for a finding of dangerousness), and the weight of that evidence—despite no change in the evidence to prove those counts. Additionally, it erred in holding that the length of pretrial detention weighs in favor of release because it can "blunt[]" a defendant's dangerousness. Finally, it erred by disregarding the evidence of Jordan's uncharged violent conduct that it previously credited, as well as Jordan's intimidation of eyewitness Rincon and his threats to others following the murder. Driven by these errors, the district court improperly held that Jordan's bail package—which was not materially different from the prior bail package the court previously rejected—was sufficient to overcome the government's proof of Jordan's dangerousness and flight risk.

## ARGUMENT

### I. Applicable Law

This Court ordinarily reviews a district court's bail determination, including its findings of fact pertaining to dangerousness and risk of flight, for clear error. *See United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).[10] Under this standard, the Court will reverse only if "on the entire evidence[,] we are left with the definite and firm conviction that a mistake has been committed." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987). However, this Court "review[s] rulings of law *de novo*, and the court's ultimate finding may be subject to plenary review if it rests on a predicate finding which reflects a misperception of a legal rule applicable to the particular factor involved." *English*, 629 F.3d at 319-20 (quoting *Shakur*, 817 F.2d at 197). Moreover, "[w]hether there are conditions which reasonably will assure the presence of a defendant at trial is a mixed question of law and fact." *Shakur*, 817 F.2d at 201.

---

[10] Unless otherwise noted, all case quotations omit internal quotation marks and citations and accept alterations.

Under the Bail Reform Act, a court must detain a defendant when "no condition or combination of conditions will reasonably assure the appearance of the person...and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Bail Reform Act lists the following four factors as relevant to the determination of whether the bail package is adequate to "reasonably assure the appearance of the person...and the safety of any other person and the community": (1) "the nature and circumstances of the offense[s] charged"; (2) "the weight of the evidence against the" defendant; (3) "the history and characteristics of the" defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant]'s release." 18 U.S.C. § 3142(g).

A finding of risk of flight must be supported by a preponderance of the evidence, *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987), while detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might

engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993). This includes "the harm to society caused by narcotics trafficking." *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985).

For certain offenses, including Counts One, Two, Three, and Four in the Indictment, it is presumed that no set of conditions will reasonably assure the defendant's appearance or the safety of the community if there is probable cause to believe the defendant committed those offenses. 18 U.S.C. § 3142(e)(3). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. *See United States v. Contreras*, 776 F.2d 51, 54-55 (2d Cir. 1985).

This presumption may be rebutted by the defendant, provided he can present evidence that he is neither a danger nor a risk of flight. *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991). A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. *Id.* And the "presumption does not disappear once the defendant has produced some rebuttal

evidence, but continues to be weighed along with other factors." *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000).

Under 18 U.S.C. § 3143(c), when a defendant seeks release during the government's pending appeal of a grant of a Rule 29 motion for acquittal (in this case, on Counts One and Two), the district court is still required to consider the evidence underlying those overturned counts in its detention analysis under Section 3142. *See United States v. Hakimi*, No. 11-5364, ECF No. 91 at 2 (2d Cir. Mar. 5, 2012) ("Nor did [the court following the grant of a Rule 29 motion of counts charging conspiracy and attempted possession with intent to distribute controlled substances] make specific findings that the presumption [of detention] was…inapplicable [] because the evidence was so deficient to preclude not only a finding of guilty beyond a reasonable doubt but also probable cause").

## II. The District Court Clearly Erred in Deciding That Jordan Was No Longer a Danger to the Community Or a Flight Risk

### A. The District Court Erred by Not Properly Analyzing Counts One and Two, Including Jordan's Role as Mizell's Shooter

The district court clearly erred by failing to properly analyze Counts One and Two (including Jordan's role as the shooter), in violation

of 18 U.S.C. § 3143(c) and *United States v. Hakimi*, No. 11-5364, ECF No. 91 at 2 (2d Cir. Mar. 5, 2012), that collectively require consideration of overturned counts on appeal.

*First*, the government maintains that, as the jury found, the trial evidence was sufficient to find beyond a reasonable doubt and certainly with probable cause that Jordan had a narcotics-related motive for murdering Mizell and that Jordan's use of a firearm was in furtherance of the narcotics trafficking conspiracy. The government's merits brief comprehensively describes the government's arguments and the trial evidence. (A:263-369). In sum, the evidence permitted the jury to find that Jordan killed Mizell for several narcotics-related motives, including as retaliation over the failed Baltimore deal that would have been lucrative, to assist in Washington's retaliation over the failed Baltimore deal, to cut Mizell out of the narcotics conspiracy for his and/or Washington's benefit, and to steal the remaining cocaine on consignment or narcotics-related proceeds that Jordan and Washington thought Mizell possessed in light of his meeting with the cocaine supplier's associate around the time of the murder. (*See* A:348-67).

*Second*, assuming *arguendo* that the district court's Rule 29 decision provided the basis for the court's specific findings that there was no probable cause to believe Jordan committed Counts One and Two such that the presumption was inapplicable to those counts, the court clearly erred when it failed to consider Jordan's role as the shooter in its analysis of dangerousness. Either Jordan fatally shot Mizell for a narcotics-related motive (as the jury found), or Jordan fatally shot Mizell, his godfather, for no reason at all (as follows from the district court's Rule 29 decision), the latter of which makes Jordan even more dangerous.

This Court has emphasized that murder, "by its nature involves violence and bespeaks danger to others," and "the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail." *United States v. Zhang*, 55 F.4th 141, 150 (2d Cir. 2022) (affirming detention of defendant who served as getaway driver in murder for hire case). Accordingly, the court was required to consider evidence of Jordan's role in shooting Mizell in cold blood and how that murder presented a risk of dangerousness under all of the Section 3142(g) factors. *See* 18 U.S.C. §§ 3142(g) ("nature and circumstances of the offense

charged," "weight of the evidence," "history and characteristics of the person," and the "nature and seriousness of the danger" upon release), 3143(c) (detention during government appeal).

In particular, the district court erred in not considering that a jury found beyond a reasonable doubt that Jordan killed Mizell—a fact that constituted elements of both Counts One and Two. Notably, Jordan did not challenge these elements in his Rule 29 motion. Nor could he. The evidence of Jordan's role in the murder of Mizell was overwhelming. For the court to find that Jordan was not the shooter would require it to disbelieve numerous witnesses—Rincon (who identified Jordan by name and described the embrace between Jordan and Mizell), High (who described the shooter bearing Jordan's characteristics and described Mizell's smile to the shooter), Allen (who testified Rincon identified Jordan by name and High identified Jordan by tattoo), and Parker (who testified High identified Jordan by name)—that the jury clearly credited. *Cf. United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in

some respects was nonetheless entirely credible in the essentials of his testimony.”).

A finding that Jordan was not the shooter, contrary to the jury’s verdict, would also require the district court to ignore the additional evidence of Washington’s request from Watford for .40 caliber ammunition (the same caliber ammunition Jordan used to kill Mizell and shoot Rincon) days before the murder, Washington’s acquisition of a firearm from Jordan’s brother on the day of the murder, and Jordan’s possession of .40 caliber ammunition a few months after the murder. Further, it would require the court to ignore the evidence connecting Jordan and Washington to Bryant, whereas there was no connection between Bryant and Mizell, rendering it unlikely that Mizell would have embraced the unknown Bryant in the way he greeted his killer. It would also require the court to ignore the evidence of intimidation by Jordan of Rincon and by Jordan’s father of Washington, McDonald, and High after the murder.

The only way that the district court could believe that Jordan did not fatally shoot Mizell, and that Bryant was the shooter (as the court’s Rule 33 decision suggests it believes (A:173)), was if the court

weighed more heavily the pieces of evidence pointing to Bryant over the overwhelming evidence pointing to Jordan. But just as the "weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal," *O'Connor*, 650 F.3d at 855, the jury's finding of the murder element strongly supports Jordan's continued detention under the Section 3142 analysis.

At minimum, this Court's instruction that it is clear error to reject information regarding other violent, uncharged conduct confirms that the district court was required to consider the evidence that Jordan killed Mizell. *See Rodriguez*, 950 F.2d at 88 (reversing release and ordering detention while rejecting as a matter of law the district court's "requirement that the violent conduct...be connected to the activity charged in the indictment"); *id.* ("Shooting a man in the kneecap over a small debt is probative of dangerousness, regardless of whether the incident was related to drug trafficking."); *see also United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on uncharged crimes).

Significantly, if the district court were correct that Jordan did not murder Mizell for a narcotics-related motive, then Jordan's

commission of the murder, for which he evaded prosecution for decades, makes him more dangerous—because it means he killed his godfather, Mizell, unprompted and without any motive at all. *Cf. Rodriguez*, 950 F.2d at 88 (citing *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) ("[W]e reject [defendant's] suggestion that his acts of 'domestic' violence do not support a finding of dangerousness to the community. A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness towards others.")). The district court's failure to consider Jordan's murder of Mizell, which makes him undeniably dangerous, warrants reversal of its release decision.

### B. The District Court Erred by Reversing its Prior Positions on Dangerousness and Weight of the Evidence for Counts Three Through Eleven

Setting aside Counts One and Two, the district court clearly erred in newly finding that Jordan's narcotics trafficking and firearm possession in Counts Three through Eleven were no longer dangerous and that the weight of the evidence was now weak, despite no change in that evidence.

The district court previously held that "the narcotics offenses, too, are sufficiently serious to weigh in favor of continued detention."

(A:103; *see* A:109 (describing "the dangerousness" of defendant's "involve[ment] in a narcotics conspiracy that spanned for a period of over four years which overlaps with evidence of seven separate occasions captured on video of the defendant")). Indeed, when Jordan argued at the first bail hearing that "[t]he idea of just selling drugs in and of itself, that does not show dangerousness," the court questioned, "Really?" and continued, "[W]hat I'm telling you is that there is authority in this [C]ircuit, not in this district but the Court of Appeals, that says that the dangerousness calculation can and should include ongoing narcotics trafficking. This is not about your opinion or mine." (A:87-89).

The district court now suggests that without a showing of "necessarily violent" conduct, narcotics trafficking and possession of firearms in furtherance of that trafficking—including in front of a minor—do not support a finding of dangerousness. (A:250 ("[W]ith respect to the dangerousness, I will note that the government has not, beyond the existence of the alleged drug trafficking conspiracy…come forward with evidence that suggests that while engaging…[in that conduct], that Mr. Jordan engaged in conduct that the court would view as necessarily violent.")). But, as the court had earlier appreciated, this

Court has emphasized that "the harm to society caused by narcotics trafficking is encompassed within Congress['s] definition of 'danger.'" *Millan*, 4 F.3d at 1047-48; *accord Leon*, 766 F.2d at 81; *see also United States v. Patterson*, 25 F.4th 123, 143 (2d Cir. 2022) ("This court has repeatedly acknowledged that certain crimes, notably drug trafficking, present a sufficient risk of violence[.]"). The fact that Jordan carried a firearm while possessing distribution quantities of narcotics makes the crime even more egregious. (A:109 (court noting government's proffer that Jordan "was often carrying a firearm")); *see United States v. Dillard*, 214 F.3d 88, 93 (2d Cir. 2000) (noting that "firearms are conventionally regarded as essential equipment of criminals engaged in violent crime"); *see also United States v. Santos*, 541 F.3d 63, 72-73 (2d Cir. 2008) (citing cases noting that drug trafficking is often tied to violence and that firearms can be "tools of the trade").

In addition, Jordan was engaged in ongoing narcotics trafficking and firearms use for years until stopped by his arrest in 2020, which the district court previously found significant and "suggest[ed] to the Court repeated activity, the dangerousness of which warrants consideration in this factor." (A:109; *see also* A:103). As the court then

found, Jordan's inclusion of his minor daughter during some of those sales also weighed in favor of a finding of dangerousness. (A:109 ("That is not to mention, by the way, that…witnesses observed the defendant sell drugs on occasion with his daughter in tow.")).

To counter this precedent, the district court held that any danger posed by Jordan's narcotics trafficking and firearm use has been "blunted" by his time in pretrial custody. (A:249 ("[A] history of selling drugs has been found sufficient for the court to find dangerousness warranting detention. That said, such a history is not dispositive. Indeed, in light of the fact that Mr. Jordan has been in custody…the danger associated with the [drug trafficking] has been blunted.")). But "there is no statutory basis for the conclusion that the length of a pretrial detention warrants the granting of bail where there has been a finding of danger to the community." *United States v. Orena*, 986 F.2d 628, 630 (2d Cir. 1993); *see also Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001) (noting the detention justification of "protecting the community…does not necessarily diminish in force over time"); *Millan*, 4 F.3d at 1048 (rejecting district court's conclusion, "in effect, that because drug trafficking falls within the concept of danger to the community, the prosecution's

contentions that [the defendant] posed a danger to the community should be *confined* to the likelihood that he would resume such activity").

The district court's conclusion that a defendant's detention on dangerousness grounds itself renders a defendant less dangerous is problematic. That logic invites defendants to continually challenge the propriety of earlier detention rulings on dangerousness grounds based on the passage of time alone. *Cf. Millan*, 4 F.3d at 1048 (finding district court erred in failing to "adequately examine the issue of dangerousness" where district court held that pretrial detention beyond 23 months was too long; "the constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others").[11] Moreover, in its prior bail decision, the district court did not find that the 20-year passage of time from Jordan's firearms possession and shootings in 2003 and 2004, as well as his murder of

[11] The district court should have also considered, as it previously did, that in August 2021, Jordan was found in "possession of a contraband cell phone in his cell" at MDC, which "suggests a propensity for noncompliance with conditions of release" that weighs in favor of detention. (A:110).

Mizell, had "blunted" his dangerousness. *See Barone*, 387 F. App'x at 91 (declining to grant release based on length of pretrial detention "[g]iven the serious homicide charges at issue" and "strong evidence inculpating [defendant] in those crimes").

With respect to the weight of the evidence, the district court further erred when it reversed its prior finding that "the proof is significantly high, or the weight of the evidence rather" as to Counts Three through Eleven, despite no change in that evidence. (A:105-06, 108). In contrast, in its release order, the court held that because the recordings of Jordan's sales to an undercover agent do not support the drug weight element of Count Three—even though they support other elements of Count Three, as well as all elements of Counts Five through Eleven—the evidence for Counts Three through Eleven does not support a finding of dangerousness or support Jordan's continued detention. (A:249-50).[12]

[12] As the government described during the March 13, 2026, hearing, the government expects the testimony of three to five witnesses to support the cocaine base weight in Count Three. (A:214).

The district court's position slices the evidence too finely. Courts should consider the evidence collectively when reviewing the Section 3142(g) factors. Here, the witness testimony, the recordings, the drug seizures, and the drug lab reports all work together to support detention. *See United States v. Maxwell*, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020), *aff'd*, No. 21-58, ECF No. 87 (2d Cir. Apr. 27, 2021) (where proffered evidence consisted of witness testimony and flight records, rejecting challenge to the criminal charges as relying "almost exclusively" on witness testimony because it "too easily discredits the witness testimony," and finding the weight of the evidence "supports detention"); *United States v. Belardo*, No. 20-CR-126 (LTS), 2020 WL 1689789, at *1 (S.D.N.Y. Apr. 7, 2020) (weighing in the government's favor the gravity of the narcotics and firearms counts with a 20-year statutory minimum sentence and the strength of the evidence that consisted of witness testimony and video evidence of undercover drug buys); *cf. United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) ("[A] federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").

The district court's current position—that it did not previously appreciate that the drug weight in Count Three was supported only by witness testimony and not the recordings (A:249)—is belied by its description in its first bail decision of the recordings as applying to the seven distribution charges, which did not trigger the statutory presumption of detention. After noting that Jordan had "not raised any issues with the sufficiency of the evidence" with respect to Count Three, "which also carries the presumption" (A:107), the court stated that "[f]or the seven distribution charges which the [c]ourt acknowledges does not trigger the presumption [*i.e.*, Counts Five through Eleven], the government has surveillance recordings" (A:107-08), such that the court found "the weight of the evidence factor weighs strongly in favor of a continued pretrial detention," (A:108). In fact, it seems that the court did not previously appreciate that the recordings also applied to prove certain elements of Count Three—a fact that makes the weight of the evidence now stronger than before.

For Jordan to rebut the presumption as to Counts Three and Four, he "must introduce some evidence contrary to the presumed fact." *Rodriguez*, 950 F.2d at 88. He has done no such thing here. Nor has the

district court demonstrated how the criminal conduct and evidence regarding these counts weigh in favor of release on both dangerousness and risk of flight grounds. *See Zhang*, 55 F.4th at 151 (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight").

### C. The District Court Erred in Reversing its Prior Position on Uncharged Conduct

The district court erred when it stated that Jordan's violent uncharged conduct, including four separate instances it previously credited in which Jordan discharged or possessed a firearm in 2003 and 2004, no longer supported his dangerousness because the conduct was over 20 years old. (A:247-48).

The district court did not raise such timing concerns during its first bail hearing in 2022, despite such conduct being decades-old then. In fact, the opposite: the district court heavily weighed those incidents against Jordan when considering his history and characteristics. (*See* A:109 ("the government also describes four separate instances where the defendant used or was in possession of a firearm"), 112 (noting Jordan

did not face serious charges in those cases "in part due to the witnesses' reluctances…to cooperate or testify against the defendant in those other cases")). This Court has not discounted violent conduct merely because it was "old," instead finding that such conduct can "reveal[ a defendant's] disturbing propensity for violence." *United States v. Marino*, 396 F. App'x 728, 730 (2d Cir. 2010) (considering convictions in 1963, 1975, 1994, and 1997 which "indicate that, at a younger age, [the defendant] was willing to use violence himself," and which are "aggravated by the fact that his most recent convictions were committed in connection with…an enterprise that routinely employs violence"); *cf. United States v. Holmes*, 858 F. App'x 429, 430-31 (2d Cir. 2021) (affirming denial of compassionate release and noting with approval district court's reliance on the defendant's "'even more serious uncharged criminal conduct,' which included a 1996 murder").

The district court further erred in its analysis of Jordan's dangerousness when it emphasized that Jordan had not been involved in violent conduct while in custody at MDC (as is expected of defendants while in custody or on release), and that there "there is more than a 15 year gap between Mr. Jordan's most recent alleged violent conduct [and]

when Mr. Jordan's present detainment commenced." (A:248). "Implicit in [the district court's] remarks is a belief that the government must present a record of violence or dangerous conduct in order to justify detaining a defendant on grounds of dangerousness. This is not necessary." *Rodriguez*, 950 F.2d at 89. This Court has never limited Section 3142 in such a way as to require the government to prove violent conduct by the defendant, in either charged or uncharged conduct, in order to find dangerousness. *Id.* ("Although a prior record of violence eases the government's burden of showing dangerousness, it is not essential.").

The district court also erred when it did not consider Jordan's intimidation of eyewitness Rincon or Jordan's threats to others following the murder. In its first bail decision, the court accepted the government's proffer that Jordan endeavored to identify and silence witnesses through threats and coercion. (A:111). With respect to Rincon, the district court later granted the government's motion in limine to admit, as consciousness of guilt, testimony from Rincon that Jordan and his friends approached him at Mizell's funeral and asked if Rincon knew who shot Mizell in a manner that Rincon interpreted as threatening. (DE:215

¶ 32). At trial, Rincon testified consistently with the facts proffered in the government's motion.

The court now discredits Rincon's testimony and expressed fear of Jordan, characterizing Jordan's question as simply "mean[ing] [Jordan] wanted to know if Mr. Rincon saw the perpetrator." (A:230). But Jordan's questioning of Rincon is considered in the context of the murder: Rincon was next to Mizell and near Jordan when Jordan shot Mizell in the head (and shot Rincon in the leg) (A:293); Rincon was facing Jordan and saw his face during the shooting (*id.*); Rincon subsequently "hid the truth" from law enforcement officers because his fear of retaliation (A:312); and when Jordan approached Rincon to question him about what he saw, he chose to do so at Mizell's funeral, only one week after the murder, with his friends (A:300). Rincon also testified that at Mizell's funeral, which a "couple hundred" people attended, nobody asked him the same question as Jordan. (A:300).

Even setting aside Rincon's testimony, the district court ignored the trial testimony showing Jordan used Mizell's murder to violently threaten others: one witness testified about hearing Jordan speak about Mizell, stating "if I get to kill him, I'll kill him again," and

on another occasion, heard Jordan threaten a woman by saying he would "do [her] exactly just like him," referring to Mizell. (*Id.*); *see Rodriguez*, 950 F.2d at 89 (witness testimony that defendant was bragging about being a hitman weighs "heavily" against the defendant).[13] Significantly, the district court was aware of, and ignored, that the May 2003 shooting incident involved Jordan shooting at Mizell's nephew after he accused Jordan of killing Mizell. (A:182; DE:141 at 3 & n.4). All these instances render Jordan a danger to the witnesses who have now testified against him and to the greater community. *See Millan*, 4 F.3d at 1048 (rejecting

---

[13] The district court also gave no consideration to the intimidation by Jordan's father of eyewitness High and of Washington's girlfriend McDonald because "there's a difference between doing something on someone's behalf versus their behest." (A:232). However, the context and timing of intimidation by Jordan and his father, including how they appeared to have divvyed up their intimidation among the witnesses and approached the witnesses soon after the murder, suggests that the intimidation was coordinated. At a minimum, the intimidation by Jordan's father, including his threat to McDonald to "not say anything to the [] police," necessitates his removal as a suretor as the government argued (A:194); yet the district court did not consider this fact, instead discussing the property he offered to secure the bond. (A:252 ("It is also not lost on this court that there is the value to Karl Jordan, Sr., of the…property that he owns, while not his home, [which] is still important to him.")).

the "notion that only threats to particular, specified witnesses provide a basis for detention").

Nor do release conditions reduce the risk of witness intimidation, as this Court has found that instructions to a defendant "not to harass the victims…do not ensure that [he] will comply." *United States v. Dono*, 275 F. App'x 35, 37 (2d Cir. 2008); *see United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985) (reversing district court's grant of pretrial release and noting that prohibiting a defendant from intimidating a witness "does not at all impede his ability to do so, and requires no more of him than that which the law already demands from...every other citizen"); *Ferranti*, 66 F.3d at 544 ("To the extent that the district court's order barring [the defendant] from any contact with potential witnesses would have hindered the commission of the crime of witness intimidation, we deem it insufficient to meet the clear risk posed by [the defendant]."). Requiring suretors or family members, like Jordan's father who engaged in witness intimidation himself after Mizell's murder, to "take personal responsibility for [the] defendant is likewise insufficient to ensure the safety of the community from [the defendant]." *Dono*, 275 F. App'x at 37.

### D. The District Court Erred in Holding that the Bail Package Overcame Dangerousness and Flight Risk

The district court erred when it held that the bail package was sufficient to overcome Jordan's dangerousness. This Court has "expressly held in several cases that a bail package that might 'reasonably assure the appearance of the defendant at trial, will not reasonably assure the safety of the community.'" *United States v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir. 2001) (per curiam).

The district court previously held that the presumption of dangerousness was not rebutted by the strength of Jordan's bail package or Jordan's ties to the community, including his kidney donation to his mother and his role as a father to his four daughters. (A:108). Jordan continues to rely on those same arguments, which continue to fail for the same reasons then and as discussed herein. Even if Jordan had presented a substantially new bail package, it would not deter his danger to the community and to witnesses in light of the charges of which he was convicted and which he still faces. *See Ferranti*, 66 F.3d at 543 (reversing district court's release order for defendant charged with arson who had offered to post bail of $1 million, secured by properties owned by him and

immediate family, because the bond did not "relate[] to the risk posed by [the defendant] to the community" and "would have deterred flight, not danger"); *Orena*, 986 F.2d at 630, 632 (bail conditions of $1 million bond secured by family members' residences and property with home detention did not assure the safety of the community).

The district court erred when it similarly held that the bail package was sufficient to overcome Jordan's flight risk, especially given that the new application lacked a meaningful difference from Jordan's prior application. The same pressures that the court now approvingly cites to assure Jordan's return to court (pressures the court previously rejected)—such as his community ties, including his children—were present when Jordan decided to commit his drug trafficking and firearms offenses. Jordan has not presented any new arguments to counter the flight risk he continues to pose.

Significantly, Counts One and Two may be reinstated on appeal and impose a maximum imprisonment term of life and statutory minimum imprisonment term of 20 years. Counts Three and Four similarly impose a maximum imprisonment term of life and a statutory minimum imprisonment term of 15 years. This Court has found such

lengthy prison terms to create a substantial risk of flight. *See United States v. Sabhnani*, 493 F.3d 63, 77 (2d Cir. 2007) (recognizing that a "defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom"); *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.").

Even setting aside these statutory minimums, Jordan's estimated Guidelines range on Counts Three through Eleven of 87 to 108 months' imprisonment provides a lengthy sentence that weighs in favor of a finding of risk flight. *See, e.g.*, *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [the defendant]'s Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."). This Court has noted that the defendant's sentencing exposure matters for the flight risk analysis and it "need not consider" how the district court might rule at sentencing. *Khusanov*, 731 F. App'x at 21-22 (considering "maximum sentence exposure" that "would still be sufficient to provide [the defendant] with a strong incentive to flee"). This contradicts the court's

consideration here that it might not impose on Jordan a sentence greater than the 15-year mandatory minimum sentence on Counts Three through Eleven. (*See* A:251).

Finally, the district court did not consider home detention, instead granting Jordan's request for location monitoring without discussion of how that condition addressed Jordan's dangerousness and flight risk. (A:255). Either condition, however, would fail to provide the security of custody because "electronic surveillance systems can be circumvented" and "monitoring equipment...rendered inoperative." *Orena*, 986 F.2d at 632; *see also United States v. Liebowitz*, 669 F. App'x 603, 605 (2d Cir. 2016); *Dono*, 275 F. App'x at 37.

## CONCLUSION

For the reasons stated above, this Court should vacate the district court's order releasing Jordan.

Dated: Brooklyn, New York
May 1, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*.

By: /s/ MIRANDA GONZALEZ
MIRANDA GONZALEZ
Assistant U.S. Attorney

AMY BUSA,
MARK E. MISOREK,
MIRANDA GONZALEZ,
*Assistant United States Attorneys*,
(*Of Counsel*).

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 13,232 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
May 1, 2026

/s/ AMY BUSA
AMY BUSA
Assistant U.S. Attorney

# A P P E N D I X

# TABLE OF CONTENTS

Page

Docket Sheet,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)........................ A1

Opposition to Motion for Release,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
February 22, 2022........................................................................ A41

Bail Hearing Transcript,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
February 28, 2022........................................................................ A54

Status Conference Transcript,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
March 3, 2022 ............................................................................. A99

Second Superseding Indictment,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
May 30, 2023.............................................................................. A116

Trial Transcript,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
February 5, 2024........................................................................ A124

Memorandum and Order,
*United States v. Ronald Washington*, No. 20-CR-305 (LDH)
December 19, 2025..................................................................... A127

Memorandum and Order,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
January 7, 2026 ......................................................................... A150

Opposition to Motion for Release,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
February 6, 2026........................................................................ A179

Bail Hearing Transcript,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
March 13, 2026 .......................................................................... A198

Letter Regarding Bail Package,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
April 2, 2026 .......... A237

Status Conference Transcript,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
April 6, 2026 .......... A241

Notice of Appeal,
*United States v. Karl Jordan*, No. 20-CR-305 (LDH)
April 9, 2026 .......... A261

Appellate Brief for the United States,
*United States v. Karl Jordan*, No. 26-16(L) (2d Cir.)
April 16, 2026 .......... A263

Query Reports Utilities Help Log Out

APPEAL,CUSTAPP,MAG

# U.S. District Court
# Eastern District of New York (Brooklyn)
# CRIMINAL DOCKET FOR CASE #: 1:20-cr-00305-LDH-PCG All Defendants

Case title: USA v. Jordan, et al

Date Filed: 08/13/2020

---

Assigned to: Judge LaShann DeArcy Hall

**Defendant (1)**

**Karl Jordan, Jr.**
*also known as*
Little D
*also known as*
Noid

represented by

**John A. Diaz**
Diaz & Moskowitz, PLLC
225 Broadway, Suite 715
New York, NY 10007
212-227-8208
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Mark Steven DeMarco**
Law Office of Mark S. DeMarco
100 Lafayette Street
Suite 501
New York, NY 10013
718-239-7070
Fax: 718-239-2141
Email: MSDLaw@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael O. Hueston**
Michael Hueston, Attorney at Law
26 Court Street, Suite 1504
Brooklyn, NY 11242
718-246-2900
Email: mh@michaelhueston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Emilee Ann Sahli**
Sahli Law, PLLC
195 Broadway, 4th Floor
Brooklyn, NY 11211
347-378-8132
Email: emilee@sahlilaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**John Anthony Diaz**
DIAZ & MOSKOWITZ, PLLC.
225 Broadway, Suite 715
New York, NY 10007

212-227-8208
Fax: 212-566-8165
Email: johnadiazlaw@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Monica Nejathaim**
Fischetti & Malgieri LLP
747 Third Avenue
20th Floor
Fischetti & Malgieri LLP
New York, NY 10017
212-593-7100
Email: m.nejathaim@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:848(e)(1)(A); 18:2 and 3551 et seq. - CONTINUING CRIMINAL ENTERPRISE<br>(1) | |
| Title 21, United States Code, Section 848(e)(l)(A); Title 18, Unite States Code, Sections 2 and 3551 et seq. = Murder of Jason Mizell While Engaged in Narcotics Trafficking<br>(1s) | |
| 21, Section 848(e)(1)(A); Title 18, Sections 2 and 3551 et seq. - Murder of Jason Mizell While Engaged in Narcotics Trafficking<br>(1ss) | |
| 18:924(j)(1), 2 and 3551 et seq. - VIOLENT CRIME/DRUGS/MACHINE GUN WHERE DEATH OCCURS<br>(2) | |
| Title 18, United States Code, Sections 924G){l), 2 and 3551 et seq. = Firearm Related Murder of Jason Mizell<br>(2s) | |
| 18, Sections 924(j)(1), 2 and 3551 et seq. - Firearm Related Murder of Jason Mizell<br>(2ss) | |
| 21:846 and 841(b)(1)(C); 18:3551 et seq. - CONSPIRACY TO DISTRIBUTE NARCOTICS<br>(3) | |
| Title 21, United States Code, Sections 846, 841(b)(l)(A)(iii) and 84 (b)(l)(C); Title 18, United States Code, Sections 3551 et seq. = Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances<br>(3s) | |
| 21, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C); 18, Sections 3551 et seq. - Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances<br>(3ss) | |

21:841(a)(1) and 841(b)(1)(C); 18:2 and 3551 et seq. - NARCOTICS - SELL, DISTRIBUTE, OR DISPENSE
(4-9)

Title 18, United States Code, Sections 924(c)(l)(A)(i), 2 and 3551 t seq. = Use of Firearms in Connection with a Drug Trafficking Crime
(4s)

18, Sections 924(c)(1)(A)(i), 2 and 3551 et seq. - Use of Firearms in Connection with a Drug Trafficking Crime
(4ss)

Title 21, United States Code, Sections 841(a)(l) and 84l(b)(l)(C); Title 18, United States Code, Sections 2 and 3551 et seq. = Distribution of Cocaine
(5s)

21, Sections 841 (a)(1) and 841 (b)(1) (C); Title 18, Sections 2 and 3551 et seq. - Distribution of Cocaine
(5ss-9ss)

Title 21, United States Code, Sections 841(a)(l) and 841(b)(l)(C); Title 18, United States Code, Sections 2 and 3551 et seq. = Distribution of Cocaine
(6s)

Title 21, United States Code, Sections 841(a)(l) and 84l(b)(l)(C); Title 18, United States Code, Sections 2 and 3551 et seq. = Distribution of Cocaine
(7s-9s)

21:841(a)(1) and 841(b)(1)(C); 18:2 and 3551 - NARCOTICS - SELL, DISTRIBUTE, OR DISPENSE
(10)

Title 21, United States Code, Sections 841(a)(l) and 841(b)(l)(C); Title 18, United States Code, Sections 2 and 3551 et seq. = Distribution of Cocaine
(10s)

21, Sections 841(a)(1) and 841(b)(1)(C); Title 18, Sections 2 and 3551 et seq.- Distribution of Cocaine
(10ss-11ss)

Title 21, United States Code, Sections 84l(a)(l) and 84l(b)(l)(C); Title 18, United States Code, Sections 2 and 3551 et seq. = Distribution of Cocaine
(11s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge LaShann DeArcy Hall

**Defendant (2)**

**Ronald Washington**
*also known as*
Tinard

represented by

**Deirdre Dionysia Von Dornum**
Deirdre Von Dornum
Sher Tremonte
90 Broad Street
23rd Floor
New York, NY 10004
212-202-2600
Email: dvondornum@shertremonte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Kenneth Jamal Montgomery**
Kenneth J. Montgomery PLLC
396 Waverly Ave
Brooklyn, NY 11238
718-403-9261
Fax: 614-455-9261
Email: ken@kjmontgomerylaw.com
*TERMINATED: 04/06/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Susan Gail Kellman**
Susan G. Kellman
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
Fax: 718-783-8226
Email: sgk@kellmanesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Ezra Spilke**
Law Offices of Ezra Spilke, PLLC
1825 Foster Avenue
Suite 1k
Brooklyn, NY 11230-1834
718-783-3682
Email: ezra@spilkelaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jacqueline Elaine Cistaro**
Law Offices of Jacqueline E. Cistaro

325 Broadway
Suite 505
New York, NY 10007
646-253-0583
Fax: 646-224-9618
Email: JEC@cistarolawfirm.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:848(e)(1)(A); 18:2 and 3551 et seq. - CONTINUING CRIMINAL ENTERPRISE (1) | |
| Title 21, United States Code, Section 848(e)(l)(A); Title 18, Unite States Code, Sections 2 and 3551 et seq. = Murder of Jason Mizell While Engaged in Narcotics Trafficking (1s) | |
| 21, Section 848(e)(1)(A); Title 18, Sections 2 and 3551 et seq. - Murder of Jason Mizell While Engaged in Narcotics Trafficking (1ss) | |
| 18:924(j)(1), 2 and 3551 et seq. - VIOLENT CRIME/DRUGS/MACHINE GUN WHERE DEATH OCCURS (2) | |
| Title 18, United States Code, Sections 924G){l), 2 and 3551 et seq. = Firearm Related Murder of Jason Mizell (2s) | |
| 18, Sections 924(j)(1), 2 and 3551 et seq. - Firearm Related Murder of Jason Mizell (2ss) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge LaShann DeArcy Hall
Referred to: Magistrate Judge Peggy Cross-Goldenberg

**Defendant (3)**

| | | |
|---|---|---|
| **Jay Bryant**<br>*also known as* | represented by | **Cesar De Castro**<br>The Law Firm of Cesar de Castro, P.C. |

"Bradshaw Dewitt", "Jason Robinson", "Morgan Bryant", "Deshawn Sadler", "Jay Sadler" and "Big Jay"

The District
111 Fulton Street - 602
New York, NY 10038
646-285-2077
Fax: 646-839-2682
Email: cdecastro@cdecastrolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Cesar DeCastro**
7 World Trade Center
34th Floor
New York, NY 10007
646-200-6166
Email: cdecastro@cdecastrolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Valerie Gotlib**
The Law Firm of Cesae De Castro P.C Atty at Law
7 World Trade Center, 34th Floor
New York, NY 10007
646-200-6166
Fax: 646-839-2682
*TERMINATED: 09/11/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Shannon Michael McManus**
The Law Firm of Cesar de Castro, P.C.
NY
111 Fulton Street
Ste 602
New York, NY 10038
201-572-9234
Email: smcmanus@cdecastrolaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Valerie Alice Gotlib**
Gotlib Law, PLLC
20 Vesey Street
Suite 400
New York, NY 10007
917-536-8171
Email: valerie@gotliblaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 21, Section 848(e)(1)(A); Title 18, Sections 2 and 3551 et seq. - Murder of Jason Mizell While Engaged in Narcotics Trafficking (1) | |
| 18, Sections 924(j)(1), 2 and 3551 et seq. - Firearm Related Murder of Jason Mizell | |

(2)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts** | **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints** | **Disposition**

None

---

**Plaintiff**

**USA** represented by **Artie McConnell**
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
212-589-4200
Email: amcconnell@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Mark E. Misorek**
United States Attorney's Office
Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722
631-715-7874
Fax: 631-715-7922
Email: mark.misorek@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Miranda Gonzalez**
United States Attorney Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6183
Email: Miranda.Gonzalez@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/13/2020 | 1 | SEALED INDICTMENT as to Karl Jordan, Jr (1) count(s) 1, 2, 3, 4-9, 10, Ronald Washington (2) count(s) 1, 2. (Attachments: # 1 Criminal Information Sheet, # 2 Sealing Cover Sheet) (Piper, Francine) (Entered: 08/14/2020) |
| 08/17/2020 | | ORDER REASSIGNING CASE as to Karl Jordan, Jr, Ronald Washington. Reassigned to Judge LaShann DeArcy Hall. Judge I. Leo Glasser no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are |

| | | |
|---|---|---|
| | | responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Roslynn R. Mauskopf on 8/17/2020. (Bowens, Priscilla) (Entered: 08/17/2020) |
| 08/17/2020 | 4 | Order as to Karl Jordan, Jr, Ronald Washington that the above-captioned matter in its entirety be unsealed. Ordered by Magistrate Judge Lois Bloom on 8/17/2020. (Attachments: # 1 Letter) (Piper, Francine) (Entered: 08/17/2020) |
| 08/17/2020 | 5 | CJA 30: Appointment of Attorney Michael O. Hueston for Karl Jordan, Jr in Death Penalty Proceedings as to Karl Jordan, Jr. SO Ordered by Magistrate Judge Lois Bloom on 8/17/2020. (Ramesar, Thameera) (Entered: 08/17/2020) |
| 08/17/2020 | 7 | ORDER OF DETENTION PENDING TRIAL as to Karl Jordan, Jr. SO Ordered by Magistrate Judge Lois Bloom on 8/17/2020. (Ramesar, Thameera) (Entered: 08/17/2020) |
| 08/17/2020 | 8 | CJA 23 Financial Affidavit by Karl Jordan, Jr (Ramesar, Thameera) (Entered: 08/17/2020) |
| 08/17/2020 | 9 | Letter dated August 17, 2020 to Judge Bloom regarding memo in support of motion for permanent orders of detention for defendants Karl Jordan, Jr. and Ronald Washington. (Ramesar, Thameera) (Entered: 08/17/2020) |
| 08/17/2020 | 10 | Minute Entry for proceedings held before Magistrate Judge Lois Bloom: Arraignment as to Karl Jordan Jr. (1) Count 1, 2, 3, 4-9, 10 held on 8/17/2020. Defendant arraigned on the indictment. Defendant pleads NOT GUILTY to ALL counts. At this time, defense counsel states on the record that the defendant does not have a bail application / package. Order of detention entered with leave to reapply to a Magistrate or to the District Court Judge to whom the case will be assigned. VERBAL order of Excludable Delay/Speedy Trial entered. Start 8/17/20 Stop 9/17/20. Status Conference set for 9/17/2020 at 11:00 AM before Judge LaShann DeArcy Hall. (Court Reporter Charleane Heading.) (Ramesar, Thameera) Modified on 8/18/2020 (Yuen, Sui-May). (Main Document 10 replaced on 8/18/2020) (Yuen, Sui-May). (Entered: 08/17/2020) |
| 08/18/2020 | 11 | Minute Entry for proceedings held before Magistrate Judge Lois Bloom: Arraignment as to Ronald Washington (2) Count 1,2 held on 8/18/2020.All parties present via teleconference/video conference. Pretrial Officer Shavoy Atkinson present via telephone. An order of detention entered. Defendant arraigned on the indictment. Defendant pleads NOT GUILTY to ALL counts. At this time, defense counsel states on the record that the defendant does not have a bail application / package. Order of detention entered with leave to reapply to a Magistrate or to the District Court Judge to whom the case will be assigned. Order of Excludable Delay/Speedy Trial entered. Start 8/18/2020 Stop 09/17/2020. Medical memo issued. Status Conference set for 9/17/2020 at 11:00 AM before Judge LaShann DeArcy Hall. (Court Reporter Michele Lucchese.) (Ramesar, Thameera) (Entered: 08/19/2020) |
| 08/18/2020 | 12 | ORDER OF EXCLUDABLE DELAY as to Ronald Washington: Time excluded from 8/18/2020 until 9/17/2020. SO Ordered by Magistrate Judge Lois Bloom on 8/18/2020. (Ramesar, Thameera) (Entered: 08/19/2020) |
| 08/18/2020 | 13 | ORDER OF DETENTION as to Ronald Washington. SO Ordered by Magistrate Judge Lois Bloom on 8/18/2020. (Ramesar, Thameera) (Entered: 08/19/2020) |
| 08/19/2020 | 14 | ORDER as to Ronald Washington regarding prescription glasses. SO Ordered by Magistrate Judge Lois Bloom on 8/18/2020. (Ramesar, Thameera) (Entered: 08/19/2020) |
| 08/20/2020 | 15 | MOTION to Appoint Counsel *as Learned Counsel* by Ronald Washington as to Karl Jordan, Jr, Ronald Washington. (Von Dornum, Deirdre) (Entered: 08/20/2020) |
| 08/21/2020 | 16 | CJA 30: Appointment of Attorney Mark Steven DeMarco for Karl Jordan, Jr in Death Penalty Proceedings as to Karl Jordan, Jr. Ordered by Judge LaShann DeArcy Hall on 8/21/2020. (Ramesar, Thameera) (Entered: 08/25/2020) |
| 08/21/2020 | 17 | CJA 30: Appointment of Attorney Kenneth Jamal Montgomery for Ronald Washington in Death Penalty Proceedings as to Ronald Washington. Ordered by Judge LaShann DeArcy Hall on 8/21/2020. (Ramesar, Thameera) (Entered: 08/25/2020) |
| 08/25/2020 | 18 | CJA 30: Appointment of Attorney Susan Gail Kellman for Ronald Washington in Death Penalty Proceedings as to Ronald Washington. SO Ordered by Magistrate Judge Lois Bloom on 8/25/2020. (Ramesar, Thameera) (Entered: 08/26/2020) |
| 09/09/2020 | | ORDER: The telephonic status conference previously scheduled for September 17, 2020 is ADJOURNED to September 18, 2020 at 9:00 a.m. The parties are directed to use the following |

| | | |
|---|---|---|
| | | conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Ordered by Judge LaShann DeArcy Hall on 9/9/2020. (Williams, Erica) (Entered: 09/09/2020) |
| 09/16/2020 | 21 | First MOTION for Protective Order *on consent of the parties* by USA as to Karl Jordan, Jr, Ronald Washington. (Attachments: # 1 Proposed Order) (McConnell, Artie) (Entered: 09/16/2020) |
| 09/17/2020 | 22 | STIPULATION AND ORDER re 21 Motion for Protective Order as to Karl Jordan Jr. (1), Ronald Washington (2). It is hereby ordered: Any and all discovery material designated by the government as "sensitive discovery material" and produced to the defendants KARL JORDAN, JR. and RONALD WASHINGTON (the "defendants") by the government in the above-captioned case, and any and all copies, notes, transcripts, documents or other information derived or prepared from the sensitive discovery material, may be used by the defendants and defense counsel for any purpose consistent with this order in furtherance of the representation of the defendants in connection with the above-captioned indictment. SEE ATTACHED. Ordered by Judge LaShann DeArcy Hall on 9/17/2020. (Ramesar, Thameera) (Entered: 09/17/2020) |
| 09/18/2020 | 23 | NOTICE OF ATTORNEY APPEARANCE: John Anthony Diaz appearing for Karl Jordan, Jr (Diaz, John) (Entered: 09/18/2020) |
| 09/18/2020 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on September 18, 2020. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the government. Michael Hueston and Mark DeMarco appeared on behalf of Mr. Jordan. Susan Kellman and Kenneth Montgomery appeared on behalf of Mr. Washington. Mr. Jordan and Mr. Washington were also present. Status conference shall be held on November 18, 2020 at 10:30 a.m. Time is excluded from September 18, 2020 until November 18, 2020 in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 9/18/2020. (Court Reporter Linda Danelczyk.) (Williams, Erica) (Entered: 09/23/2020) |
| 09/21/2020 | 24 | Letter *regarding Rule 16 discovery* as to Karl Jordan, Jr (McConnell, Artie) (Entered: 09/21/2020) |
| 09/21/2020 | 25 | Letter *regarding Rule 16 discovery* as to Ronald Washington (McConnell, Artie) (Entered: 09/21/2020) |
| 10/08/2020 | 28 | NOTICE OF ATTORNEY APPEARANCE: Jacqueline Elaine Cistaro appearing for Ronald Washington *Co-Counsel* (Cistaro, Jacqueline) (Entered: 10/08/2020) |
| 10/12/2020 | 29 | NOTICE OF ATTORNEY APPEARANCE: Ezra Spilke appearing for Ronald Washington (Spilke, Ezra) (Entered: 10/12/2020) |
| 10/20/2020 | 32 | Letter *supplemental Rule 16 disclosures* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 10/20/2020) |
| 11/17/2020 | 34 | Letter *supplemental Rule 16 disclosures* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 11/17/2020) |
| 11/17/2020 | | ORDER: The status conference scheduled for November 18, 2020 at 10:30 a.m. shall be held via teleconference. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Ordered by Judge LaShann DeArcy Hall on 11/17/2020. (Berenyi, Alicia) (Entered: 11/17/2020) |
| 11/18/2020 | | MINUTE ENTRY AND ORDER: A status conference as to defendants Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on November 18, 2020. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Michael Hueston, Mark DeMarco and John Diaz appeared on behalf of Mr. Jordan. Susan Kellman appeared on behalf of Mr. Washington. Mr. Jordan and Mr. Washington were also present. A status conference shall be held on February 18, 2021 at 10:30 a.m. via teleconference. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against |

| | | |
|---|---|---|
| | | photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Time is excluded from November 18, 2020 until February 18, 2021 in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 11/18/2020. (Court Reporter David Roy.) (Williams, Erica) (Entered: 11/20/2020) |
| 12/04/2020 | | ORDER: Due to limitations of scheduling teleconferences with the MDC, the status conference previously scheduled for February 18, 2021 is RESCHEDULED to February 17, 2021 at 10:30 a.m. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Ordered by Judge LaShann DeArcy Hall on 12/4/2020. (Williams, Erica) (Entered: 12/04/2020) |
| 12/11/2020 | 39 | NOTICE OF ATTORNEY APPEARANCE: Monica Nejathaim appearing for Karl Jordan, Jr (Nejathaim, Monica) (Entered: 12/11/2020) |
| 12/22/2020 | 40 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 12/22/2020) |
| 01/06/2021 | 42 | Letter *Requesting Appointment of Associate Counsel* as to Ronald Washington (Attachments: # 1 Exhibit APPROVED BUDGET) (Kellman, Susan) (Entered: 01/06/2021) |
| 02/11/2021 | 43 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 02/11/2021) |
| 02/16/2021 | | SCHEDULING ORDER: The status conference previously scheduled for February 17, 2021 is ADJOURNED. A status conference shall be held via teleconference on April 19, 2021 at 10:30am. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. The parties shall submit a joint status update by letter by February 18, 2021, which should indicate whether each party consents to the exclusion of time through April 19, 2021. Ordered by Judge LaShann DeArcy Hall on 2/16/2021. (Williams, Erica) (Entered: 02/16/2021) |
| 02/18/2021 | 44 | Letter *joint status update* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 02/18/2021) |
| 02/18/2021 | | ORDER: On February 18, 2021, the parties filed a joint status update 44 indicating that all parties agree that an exclusion of time until April 19, 2021 would serve the ends of justice. Accordingly, time is excluded from February 18, 2021 until April 19, 2021 in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 2/18/2021. (Williams, Erica) (Entered: 02/18/2021) |
| 03/04/2021 | 45 | SUPERSEDING INDICTMENT (S-1) as to Karl Jordan, Jr (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s-9s, 10s, 11s, Ronald Washington (2) count(s) 1s, 2s. (Attachments: # 1 Criminal Information Sheet) (Marziliano, August) (Entered: 03/04/2021) |
| 03/04/2021 | 46 | Letter *re: discovery demands* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 03/04/2021) |
| 03/11/2021 | 47 | Letter *re: discovery demands re: DNA Testing* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 03/11/2021) |
| 03/19/2021 | | NOTICE OF HEARING: An arraignment hearing on the superseding indictment as to Karl Jordan, Jr and Ronald Washington will be held on **3/31/2021 at 9:00 A.M. via video** before Magistrate Judge Sanket J. Bulsara. The parties are directed to contact Judge Bulsara's Deputy to retrieve the link for the video conference. (Manson, Eddie) (Entered: 03/19/2021) |
| 03/22/2021 | 48 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 03/22/2021) |
| 03/23/2021 | 49 | Letter *re: request for bill of particulars* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 03/23/2021) |

| | | |
|---|---|---|
| 03/25/2021 | | NOTICE OF HEARING: Due to a scheduling conflict the arraignment hearing on the superseding indictment as to Karl Jordan, Jr and Ronald Washington scheduled for **3/31/2021 is adjourned to 4/02/2021 at 10:30 A.M. via video** before Magistrate Judge Sanket J. Bulsara. The parties are directed to contact Judge Bulsara's Deputy to retrieve the link for the video conference. (Manson, Eddie) (Entered: 03/25/2021) |
| 03/25/2021 | | Terminate Deadlines and Hearings as to Karl Jordan, Jr, Ronald Washington: Regarding the arraignment hearing scheduled for 3/31/2021 which will now be held on 4/2/2021. (Manson, Eddie) (Entered: 03/29/2021) |
| 03/30/2021 | 50 | Letter *regarding defendant Jordan's discovery requests* as to Karl Jordan, Jr (McConnell, Artie) (Entered: 03/30/2021) |
| 04/02/2021 | | Minute Entry for proceedings held before Magistrate Judge Sanket J. Bulsara: Arraignment as to Karl Jordan Jr. (1) Count 1s,2s,3s,4s,5s,6s,7s-9s,10s,11s and Ronald Washington (2) Count 1s and 2s was held on 4/2/2021. AUSA Artie McConnel and Mark Misorek appeared on behalf of the government via video. Counsel(s) Michael Hueston Esq, Mark DeMarco Esq, and John Diaz appeared on the behalf of Defendant Karl Jordan Jr. via video. Counsel(s) Susan Kellman Esq, and Jacqueline Cistaro Esq, appeared on the behalf of Ronald Washington via video. Defendants Washington and Jordan Jr. appeared via video. Case called. Defendant Karl Jordan Jr. entered a plea of not guilty on all count(s)1s-11s of the superseding indictment. Defendant Ronald Washington entered a plea of not guilty on Count(s) 1s and 2s of the superseding indictment. (Court Reporter Georgette Betts.) (Manson, Eddie) (Entered: 04/02/2021) |
| 04/02/2021 | 51 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Karl Jordan, Jr, and Ronald Washington. See attached. So Ordered by Magistrate Judge Sanket J. Bulsara on 4/2/2021. (Manson, Eddie) (Main Document 51 replaced on 4/7/2021) (Lee, Tiffeny). (Entered: 04/02/2021) |
| 04/19/2021 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on April 19, 2021. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Michael Hueston and Mark DeMarco appeared on behalf of Mr. Jordan. Susan Kellman and Kenneth Montgomery appeared on behalf of Mr. Washington. A telephonic status conference shall be held July 7, 2021 at 9:00 a.m. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code: 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Time is excluded from April 19, 2021 until July 7, 2021 in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 4/19/2021. (Court Reporter Michele Nardone.) (Williams, Erica) (Entered: 05/07/2021) |
| 05/21/2021 | 52 | CJA 30: Appointment of Attorney John A. Diaz for Karl Jordan, Jr. in Death Penalty Proceedings as to Karl Jordan, Jr.. Ordered by Judge LaShann DeArcy Hall on 9/8/2020 (Nunc Pro Tunc date). (Layne, Monique) (Entered: 05/21/2021) |
| 06/14/2021 | 53 | Letter *to the government requesting Brady material* as to Ronald Washington (Spilke, Ezra) (Entered: 06/14/2021) |

| | | |
|---|---|---|
| 07/07/2021 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on July 7, 2021. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Michael Hueston, John Diaz, and Monica Nejathaim appeared on behalf of Mr. Jordan. Susan Kellman and Jacqueline Elaine Cistaro appeared on behalf of Mr. Washington. A telephonic status conference shall be held September 10, 2021 at 9:00 a.m. The parties are directed to use the following conference line and dial-in information: toll free number 1-888-684-8852; access code: 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Time is excluded from July 7, 2021, until September 10, 2021 in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 7/7/2021. (Court Reporter Victoria Butler.) (Williams, Erica) (Entered: 07/08/2021) |
| 08/09/2021 | 54 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 08/09/2021) |
| 08/23/2021 | 56 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 08/23/2021) |
| 09/08/2021 | 58 | Consent MOTION to Continue *Status Conference* by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (DeMarco, Mark) (Entered: 09/08/2021) |
| 09/09/2021 | | ORDER: Mr. Jordan's motion 58 for a 60-day adjournment of the September 10, 2021 status conference is GRANTED. The status conference scheduled for September 10, 2021 is ADJOURNED to November 8, 2021 at 9:00 a.m. Mr. Washington is directed to submit a letter by September 9, 2021, indicating whether he consents to the exclusion of time until November 8, 2021 at 9:00 a.m. The parties are directed to contact chambers on November 8, 2021 at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge LaShann DeArcy Hall on 9/9/2021. (Williams, Erica) (Entered: 09/09/2021) |
| 09/10/2021 | 59 | Letter *re Consent to Excludable Time* as to Karl Jordan, Jr, Ronald Washington (Cistaro, Jacqueline) (Entered: 09/10/2021) |
| 09/10/2021 | | ORDER: The Court is in receipt of Mr. Washington's letter 59 , consenting to the exclusion of time until November 8, 2021. With the consent of the parties, time is excluded from September 10, 2021 until November 8, 2021 in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 9/14/2021. (Williams, Erica) Modified on 9/15/2021 (Williams, Erica). (Entered: 09/14/2021) |
| 10/05/2021 | 60 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 10/05/2021) |
| 11/04/2021 | 61 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 11/04/2021) |
| 11/06/2021 | 62 | Letter *advising of authorization and direction to not seek the death penalty* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 11/06/2021) |
| 11/08/2021 | | ORDER: The status conference scheduled for November 8, 2021, is ADJOURNED to November 15, 2021, at 12:00 p.m. The parties are directed to submit a joint letter by November 8, 2021, not to exceed two (2) pages, indicating whether the parties consent to the exclusion of time until November 15, 2021. The parties are directed to contact chambers on November 15, 2021, at 12:00 p.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge LaShann DeArcy Hall on 11/8/2021. (Williams, Erica) (Entered: 11/08/2021) |

| | | |
|---|---|---|
| 11/08/2021 | 63 | Letter *re: consent to the exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161* as to Karl Jordan, Jr, Ronald Washington (Hueston, Michael) (Entered: 11/08/2021) |
| 11/10/2021 | | ORDER: The Court is in receipt of Defendants' letter 63 , consenting to the exclusion of time until November 15, 2021. Accordingly, time is excluded from November 8, 2021 until November 15, 2021 in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 11/10/2021. (Williams, Erica) (Entered: 11/10/2021) |
| 11/15/2021 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on November 15, 2021. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Mark DeMarco and John Diaz appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Kenneth Montgomery, and Ezra Spilke appeared on behalf of Mr. Washington, who was also present. A telephonic status conference shall be held on December 15, 2021 at 9:00 a.m. The parties are directed to call chambers on December 15, 2021, at 9:00 a.m., using the following conference line and dial-information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Time is excluded from November 15, 2021, until December 15, 2021, in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 11/15/2021. (Court Reporter Jennifer Thun.) (Williams, Erica) (Entered: 11/18/2021) |
| 11/29/2021 | | ORDER: The status conference scheduled for December 15, 2021 is ADJOURNED to January 28, 2022, at 9:00 a.m. The parties are directed to submit a joint letter by December 10, 2021, not to exceed two (2) pages, indicating the status of the case and whether the parties consent to the exclusion of time until January 28, 2022. The parties are directed to contact chambers on January 28, 2022, at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge LaShann DeArcy Hall on 11/29/2021. (Williams, Erica) (Entered: 11/29/2021) |
| 12/07/2021 | 65 | Letter *joint status update* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 12/07/2021) |
| 12/09/2021 | | ORDER: With consent of the parties, time is excluded until January 28, 2022, to allow for ongoing discovery and in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 12/9/2021. (Williams, Erica) (Entered: 12/09/2021) |
| 12/20/2021 | 67 | NOTICE *of Alibi Defense, Pursuant to Rule 12.1 of the Federal Rules of Criminal Procedure* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 12/20/2021) |
| 01/07/2022 | 68 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/07/2022) |
| 01/27/2022 | 71 | Letter *regarding supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/27/2022) |
| 01/28/2022 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan Jr., and Ronald Washington was held before Judge LaShann DeArcy Hall on January 28, 2022. Assistant United States Attorney Artie McConnell appeared on behalf of the Government. Michael Hueston, Mark DeMarco, John Diaz, and Monica Nejathaim appeared on behalf of Mr. Jordan, who was also present. Susan Kellman and Ezra Spilke appeared on behalf of Mr. Washington, who was also present. The parties are directed to submit a letter indicating a proposed motion schedule with conflict dates for trial on or before February 4, 2022. A telephonic status conference shall be held on April 1, 2022 at 9:00 a.m. The parties are directed to contact chambers on April 1, 2022, at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Time is excluded from January 28, 2022, until April 1, 2022, to allow for ongoing discovery and in the interests of justice. |

| | | |
|---|---|---|
| | | Ordered by Judge LaShann DeArcy Hall on 1/28/2022. (Court Reporter Georgette Betts.) (Williams, Erica) (Entered: 01/31/2022) |
| 02/04/2022 | 72 | Letter *joint scheduling request* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 02/04/2022) |
| 02/15/2022 | 73 | MOTION for Bond by Karl Jordan, Jr. (Diaz, John) (Entered: 02/15/2022) |
| 02/17/2022 | | ORDER: The Government shall respond to Defendant Jordan's motion for bond 73 by February 24, 2022. Ordered by Judge LaShann DeArcy Hall on 2/17/2022. (Williams, Erica) (Entered: 02/17/2022) |
| 02/17/2022 | | ORDER: The trial dates suggested by counsel are not available. Trial as to Karl Jordan and Ronald Washington, Jr. shall commence on November 23, 2022, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. The parties shall submit any severance or dismissal motions by April 11, 2022, with responses due May 9, 2022, and replies, if any, due May 16, 2022. The parties shall submit suppression, or other pretrial motions, except motions in limine, by June 17, 2022, with responses due July 8, 2022, and replies due July 15, 2022. A suppression hearing, if any, shall be held on September 13, 2022, at 10:00 a.m. in Courtroom 4H. The parties shall submit motions in limine by October 19, 2022, and responses to motions in limine, by October 26, 2022. The parties shall submit jury materials, including voir dire, proposed jury instructions, and proposed verdict sheets, by October 26, 2022; the parties shall submit a list of witnesses by November 2, 2022; and a final pre-trial conference shall be held on November 9, 2022, at 10:00 a.m., in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 2/17/2022. (Williams, Erica) (Entered: 02/17/2022) |
| 02/22/2022 | 74 | RESPONSE in Opposition re 73 MOTION for Bond (McConnell, Artie) (Entered: 02/22/2022) |
| 02/22/2022 | 75 | MOTION to Continue *November 28, 2022 trial date* by Karl Jordan, Jr. (Hueston, Michael) (Entered: 02/22/2022) |
| 02/24/2022 | | ORDER: A hearing on Defendant Jordan's motion for bond shall be held on February 28, 2022, at 11:00 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 2/24/2022. (Williams, Erica) (Entered: 02/24/2022) |
| 02/25/2022 | | ORDER: Defendant Jordan's motion 75 , made with consent of Defendant Washington and the Government, to adjourn the trial currently scheduled for November 23, 2022, is GRANTED. Trial as to Karl Jordan and Ronald Washington, Jr. shall commence on February 20, 2023, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. The parties shall submit any severance or dismissal motions by April 11, 2022, with responses due May 9, 2022, and replies, if any, due May 16, 2022. The parties shall submit suppression, or other pretrial motions, except motions in limine, by June 17, 2022, with responses due July 8, 2022, and replies due July 15, 2022. A suppression hearing, if any, shall be held on September 13, 2022, at 10:00 a.m. in Courtroom 4H. The parties shall submit motions in limine by October 19, 2022, and responses to motions in limine, by October 26, 2022. The parties shall submit jury materials, including voir dire, proposed jury instructions, and proposed verdict sheets, by October 26, 2022; the parties shall submit a list of witnesses by November 2, 2022; and a final pre-trial conference shall be held on February 13, 2023, at 10:00 a.m., in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 2/25/2022. (Williams, Erica) (Entered: 02/25/2022) |
| 02/28/2022 | | MINUTE ENTRY AND ORDER: Bail hearing as to Karl Jordan, Jr. was held before Judge LaShann DeArcy Hall on February 28, 2022. Assistant United States Attorney Artie McConnell appeared on behalf of the Government. Michael Hueston, John Diaz, and Monica Nejathaim appeared on behalf of Mr. Jordan. Robert Long appeared on behalf of pretrial services. Mr. Jordan was also present. The hearing is continued to March 3, 2022, at 1:00 p.m. in Courtroom 4H. Prior to the March 3, 2022 hearing, the Government shall apprise the Court of the dates of the photographs referenced on page 4 of the Government's submission. Ordered by Judge LaShann DeArcy Hall on 2/28/2022. (Court Reporter Rivka Teich.) (Williams, Erica) (Entered: 03/01/2022) |
| 03/02/2022 | 76 | Letter *in Response to the Court's Inquiry Regarding Bail Application* as to Karl Jordan, Jr (Misorek, Mark) (Entered: 03/02/2022) |
| 03/03/2022 | | MINUTE ENTRY AND ORDER: Bail hearing as to Karl Jordan, Jr. was continued on March 3, 2022, before Judge LaShann DeArcy Hall. Assistant United States Attorney Mark Misorek appeared on behalf of the Government. Michael Hueston, Mark DeMarco, and Monica Nejathaim appeared on behalf of Mr. Jordan. Robert Long appeared on behalf of pretrial services. Mr. Jordan was also present. For the reasons stated on the record, Mr. Jordan's motion for bond 73 is DENIED. Ordered by Judge LaShann DeArcy Hall on 3/3/2022. (Court Reporter Andronikh Barna.) (Williams, Erica) (Entered: 03/04/2022) |

| | | |
|---|---|---|
| 03/05/2022 | 77 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr held on 3/3/2022, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Andronikh Barna, Telephone number 718-613-2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/26/2022. Redacted Transcript Deadline set for 4/5/2022. Release of Transcript Restriction set for 6/3/2022. (Barna, Andronikh) (Entered: 03/05/2022) |
| 03/29/2022 | 78 | MOTION to Continue *the April 1, 2022 telephone status conference* by USA as to Karl Jordan, Jr, Ronald Washington. (McConnell, Artie) (Entered: 03/29/2022) |
| 03/29/2022 | 79 | Letter *regarding supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 03/29/2022) |
| 03/30/2022 | | ORDER: The Government's request 78 , made with consent of Defendant, to adjourn the April 1, 2022, 2021 status conference is GRANTED. The status conference currently scheduled for April 1, 2022, is adjourned to May 11, 2022, at 10:30 a.m., in Courtroom 4H North. With consent of the parties, time is excluded until May 11, 2022, to allow the parties to engage in discovery and motion practice, and in the interests of justice. Ordered by Judge LaShann DeArcy Hall on 3/30/2022. (Williams, Erica) (Entered: 03/30/2022) |
| 04/05/2022 | 80 | MOTION to Withdraw as Attorney by Kenneth J. Montgomery. by Ronald Washington. (Montgomery, Kenneth) (Entered: 04/05/2022) |
| 04/06/2022 | | ORDER: Kenneth Montgomery's motion 80 to withdraw as attorney for Ronald Washington is GRANTED. Ordered by Judge LaShann DeArcy Hall on 4/6/2022. (Williams, Erica) (Entered: 04/06/2022) |
| 04/10/2022 | 81 | First MOTION to Dismiss *PreIndictment Delay* by Ronald Washington. (Kellman, Susan) (Entered: 04/10/2022) |
| 04/10/2022 | 82 | AFFIDAVIT/AFFIRMATION by Ronald Washington (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Kellman, Susan) (Entered: 04/10/2022) |
| 04/11/2022 | 83 | MOTION to Dismiss *Pre-Indictment Delay & Severance* by Karl Jordan, Jr. (Attachments: # 1 Declaration In Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C) (Hueston, Michael) (Entered: 04/11/2022) |
| 04/11/2022 | 84 | MEMORANDUM in Support re 83 MOTION to Dismiss *Pre-Indictment Delay & Severance* (Hueston, Michael) (Entered: 04/11/2022) |
| 04/28/2022 | 85 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr held on 02/28/22, before Judge DEARCY HALL. Court Reporter/Transcriber rivka teich, Telephone number 7186132268. Email address: rivkateich@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/19/2022. Redacted Transcript Deadline set for 5/29/2022. Release of Transcript Restriction set for 7/27/2022. (Teich, Rivka) (Entered: 04/28/2022) |
| 05/09/2022 | 86 | MEMORANDUM in Opposition re 83 MOTION to Dismiss *Pre-Indictment Delay & Severance*, 81 First MOTION to Dismiss *PreIndictment Delay* (McConnell, Artie) (Entered: 05/09/2022) |
| 05/09/2022 | 87 | Letter *re: government's obligations to turn over discovery* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 05/09/2022) |
| 05/11/2022 | | MINUTE ENTRY AND ORDER: A status conference as to Karl Jordan Jr. and Ronald Washington was held before Judge LaShann DeArcy Hall on May 11, 2022. Assistant United States Attorney Artie McConnell appeared on behalf of the Government. Michael Hueston and John Diaz appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke, and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present. A telephonic status conference shall be held on August 9, 2022, at 9:00 a.m. The parties are directed to contact chambers on August 9, 2022, at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against |

| | | |
|---|---|---|
| | | photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Time is excluded from May 11, 2022, until August 9, 2022, to allow for ongoing discovery and pretrial motion practice. Ordered by Judge LaShann DeArcy Hall on 5/11/2022. (Court Reporter ToniAnn Lucatorto.) (Williams, Erica) (Entered: 05/12/2022) |
| 05/12/2022 | 88 | Letter *supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 05/12/2022) |
| 05/16/2022 | 89 | REPLY TO RESPONSE to Motion re 83 MOTION to Dismiss *Pre-Indictment Delay & Severance* (Hueston, Michael) (Entered: 05/16/2022) |
| 05/16/2022 | 90 | RESPONSE in Support re 81 First MOTION to Dismiss *PreIndictment Delay* (Kellman, Susan) (Entered: 05/16/2022) |
| 06/17/2022 | 93 | MOTION to Suppress *seized phones & statement* by Karl Jordan, Jr. (Attachments: # 1 Memorandum in Support (Redacted), # 2 Affidavit in Support, # 3 Exhibits A and B (Under Seal)) (Hueston, Michael) (Entered: 06/17/2022) |
| 06/17/2022 | 94 | MEMORANDUM in Support re 93 MOTION to Suppress *seized phones & statement (un-redacted memorandum under seal & Exhibit A under seal)* (Attachments: # 1 Exhibit A) (Hueston, Michael) (Entered: 06/17/2022) |
| 07/08/2022 | 95 | RESPONSE in Opposition re 93 MOTION to Suppress *seized phones & statement* (McConnell, Artie) (Entered: 07/08/2022) |
| 07/08/2022 | 96 | RESPONSE in Opposition re 93 MOTION to Suppress *seized phones & statement (unredacted and sealed)* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (McConnell, Artie) (Entered: 07/08/2022) |
| 07/15/2022 | 97 | REPLY TO RESPONSE to Motion re 93 MOTION to Suppress *seized phones & statement* (Hueston, Michael) (Entered: 07/15/2022) |
| 07/18/2022 | | ORDER: The telephonic status conference before Judge LaShann DeArcy Hall scheduled for August 9, 2022, at 10:00 a.m. is ADJOURNED to August 10, 2022, at 9:00 a.m. No later than August 9, 2022, the parties shall file a letter indicating their consent to an exclusion of time to August 10, 2022. The parties are directed to contact chambers on August 9, 2022, at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge LaShann DeArcy Hall on 7/18/2022. (Williams, Erica) (Entered: 07/18/2022) |
| 08/08/2022 | 99 | Letter *re: exclusion of time to 8/10/22* as to Karl Jordan, Jr, Ronald Washington (Hueston, Michael) (Entered: 08/08/2022) |
| 08/11/2022 | | ORDER: Due to an unforeseen conflict with the Court's calendar, the telephonic status conference before Judge LaShann DeArcy Hall is ADJOURNED to August 17, 2022 at 9:00 a.m. No later than August 11, 2022, the parties shall file a letter with the Court indicating their consent to exclusion of time to August 17, 2022. The parties are directed to contact chambers on August 17, 2022, at 9:00 a.m. using the following conference line and dial information: toll free number 1-888-684-8852; access code 1537693. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge LaShann DeArcy Hall on 8/11/2022. (Williams, Erica) (Entered: 08/11/2022) |
| 08/11/2022 | 100 | Letter *consenting to the exclusion of time* as to Karl Jordan, Jr, Ronald Washington (Hueston, Michael) (Entered: 08/11/2022) |
| 08/11/2022 | | ORDER: With Defendants' consent, time is excluded to August 17, 2022. Ordered by Judge LaShann DeArcy Hall on 8/11/2022. (Williams, Erica) (Entered: 08/11/2022) |
| 08/17/2022 | 101 | First MOTION for Medical Treatment , MOTION for Medical Exam by Ronald Washington. (Kellman, Susan) (Entered: 08/17/2022) |

| | | |
|---|---|---|
| 08/17/2022 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan, Jr. and Ronald Washington was held before Judge LaShann DeArcy Hall on August 17, 2022. Assistant United States Attorney Artie McConnell appeared on behalf of the Government. Mark DeMarco, Michael Hueston, and Monica Nejathaim appeared on behalf of Mr. Jordan who was also present. Susan Kellman, Ezra Spilke, and Jacqueline Cistaro appeared on behalf of Ronald Washington who was also present. A status conference shall be held on September 13, 2022 at 9:00 a.m., in Courtroom 4H North. Time is excluded from August 17, 2022, until September 13, 2022 to allow for additional discovery and consideration of pending motions. Ordered by Judge LaShann DeArcy Hall on 8/17/2022. (Court Reporter Linda Danelczyk). (Layne, Monique) (Entered: 08/18/2022) |
| 09/11/2022 | 103 | Letter *Requesting Video Appearance* as to Ronald Washington (Kellman, Susan) (Entered: 09/11/2022) |
| 09/12/2022 | 104 | Letter *Consenting to the Exclusion of Time Until September 16, 2022* as to Ronald Washington (Kellman, Susan) (Entered: 09/12/2022) |
| 09/13/2022 | 105 | Letter *re: consent exclusion of time under the Speedy Trial Act* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 09/13/2022) |
| 09/16/2022 | | MINUTE ENTRY AND ORDER: A status conference before Judge LaShann DeArcy Hall was held on September 16, 2022. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Michael Hueston appeared on behalf of Defendant Jordan, who was also present. Susan Kellman appeared on behalf of Defendant Washington, who was also present via videoconference. For the reasons stated on the record, Defendant Jordans motion 93 to suppress evidence is DENIED. A status conference shall be held before Judge LaShann DeArcy Hall on December 16, 2022, at 9:00 a.m. in Courtroom 4H North. Time is excluded to December 16, 2022 in the interest of justice and to discuss motions in limine in light of the Courts decision concerning severance of charges. Ordered by Judge LaShann DeArcy Hall on 9/16/2022. (Court Reporter Andronikh Barna.) (EW) (Entered: 10/14/2022) |
| 09/18/2022 | 106 | Letter *Regarding a Medical Order* as to Ronald Washington (Attachments: # 1 Exhibit Proposed Order) (Kellman, Susan) (Entered: 09/18/2022) |
| 09/19/2022 | 107 | MEMORANDUM AND ORDER: For the reasons set forth in the attached memorandum and order, Defendant Washingtons motion to dismiss 81 is DENIED. Jordans motion to dismiss 83 is DENIED. Jordans motion to sever 83 Counts One and Two from Counts Three through Eleven is GRANTED. Jordans motion to sever Defendants trials as to Counts One and Two is DENIED. An unredacted memorandum and order shall be filed under seal. Ordered by Judge LaShann DeArcy Hall on 9/19/2022. (Williams, Erica) (Entered: 09/19/2022) |
| 09/19/2022 | 109 | IT IS HEREBY ORDERED that the Bureau of Prisons ("BOP") give Washington anMRI no later than Friday, September 23, 2022; and IT IS FURTHER ORDERED that, if the expected timetable for examination andtreatment is later than Friday, September 23, 2022, the BOP must show cause before this Court for its delay in addressing Washingtons medical complaints. In that letter, the BOP must detail the steps it has taken to send Washington for an MRI and the steps it will take going forward. Ordered by Judge LaShann DeArcy Hall on 9/21/2022. (Williams, Erica) (Entered: 09/21/2022) |
| 10/11/2022 | 110 | Letter *regarding supplemental Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 10/11/2022) |
| 10/12/2022 | 112 | First MOTION for Leave to File Excess Pages *regarding motions in limine* by USA as to Karl Jordan, Jr, Ronald Washington. (McConnell, Artie) (Entered: 10/12/2022) |
| 10/18/2022 | | ORDER: The Government's request 112 to file a memorandum of law in support of its motions in limine is GRANTED. The memorandum of law shall be no more than 45 pages. Ordered by Judge LaShann DeArcy Hall on 10/18/2022. (EW) (Entered: 10/18/2022) |
| 10/19/2022 | 113 | First MOTION in Limine by USA as to Karl Jordan, Jr, Ronald Washington. (McConnell, Artie) (Entered: 10/19/2022) |
| 10/19/2022 | 114 | First MOTION for Discovery by USA as to Karl Jordan, Jr, Ronald Washington. (McConnell, Artie) (Entered: 10/19/2022) |
| 10/21/2022 | 115 | Consent MOTION for Extension of Time to File , MOTION to Continue by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (Hueston, Michael) (Entered: 10/21/2022) |

| | | |
|---|---|---|
| 10/25/2022 | 116 | Consent MOTION for Leave to File Excess Pages by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (Hueston, Michael) (Entered: 10/25/2022) |
| 10/26/2022 | | ORDER: Defendants motion for extensions of time is GRANTED in part. Defendants shall file their oppositions to the Governments motion in limine no later than November 9, 2022. The parties shall file their proposed verdict sheets, voir dire, and jury charges no later than January 23, 2023. The parties shall provide their witness lists no later than February 6, 2023. The pretrial conference scheduled for November 9, 2022 is ADJOURNED sine die. Ordered by Judge LaShann DeArcy Hall on 10/26/2022. (EW) (Entered: 10/26/2022) |
| 10/26/2022 | 117 | Letter *Requesting Appointment of Investigator Under CJA* as to Ronald Washington (Attachments: # 1 Exhibit Investigator's Bio) (Kellman, Susan) (Entered: 10/26/2022) |
| 10/26/2022 | | ORDER: Defendants' request 116 to each file a memorandum of law that is 25 pages in length is GRANTED. Ordered by Judge LaShann DeArcy Hall on 10/26/2022. (EW) (Entered: 10/26/2022) |
| 10/27/2022 | | ORDER: Defendants shall file their responses, if any, to the Government's letter motion for discovery no later than November 1, 2022. The Court will not entertain any extension requests. Ordered by Judge LaShann DeArcy Hall on 10/27/2022. (EW) (Entered: 10/27/2022) |
| 11/01/2022 | 118 | RESPONSE in Opposition re 114 First MOTION for Discovery (Kellman, Susan) (Entered: 11/01/2022) |
| 11/01/2022 | 119 | RESPONSE in Opposition re 114 First MOTION for Discovery *and joining co-defendant Ronald Washington's opposition at Doc. No. 118* (Hueston, Michael) (Entered: 11/01/2022) |
| 11/07/2022 | 120 | Consent MOTION for Leave to File Excess Pages *to 28 pages* by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (Hueston, Michael) (Entered: 11/07/2022) |
| 11/08/2022 | | ORDER: Defendants' request 120 to each file a memorandum of law that is 28 pages in length is GRANTED. Ordered by Judge LaShann DeArcy Hall on 11/8/2022. (EW) (Entered: 11/08/2022) |
| 11/09/2022 | 121 | MEMORANDUM in Opposition re 113 First MOTION in Limine (Hueston, Michael) (Entered: 11/09/2022) |
| 11/09/2022 | 122 | REDACTION by Karl Jordan, Jr to 121 Memorandum in Opposition (Hueston, Michael) (Entered: 11/09/2022) |
| 11/09/2022 | 123 | MEMORANDUM in Opposition re 113 First MOTION in Limine (Kellman, Susan) (Entered: 11/09/2022) |
| 11/14/2022 | 124 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on 09-16-2022, before Judge LDH. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 12/5/2022. Redacted Transcript Deadline set for 12/15/2022. Release of Transcript Restriction set for 2/13/2023. (Mace, Stacy) (Entered: 11/14/2022) |
| 11/16/2022 | 125 | REPLY TO RESPONSE to Motion re 113 First MOTION in Limine (McConnell, Artie) (Entered: 11/16/2022) |
| 12/01/2022 | 127 | NOTICE OF ATTORNEY APPEARANCE Miranda Gonzalez appearing for USA. (Gonzalez, Miranda) (Entered: 12/01/2022) |
| 12/02/2022 | | ORDER: Due to a change in the Eastern District of New York's jury return protocols, the trial scheduled to begin on February 20, 2023, must be ADVANCED to February 13, 2023, at 9:30 a.m. in Courtroom 4H North. The final pre-trial conference scheduled for February 13, 2023, must be ADVANCED to February 7, 2023, at 2:00 p.m. in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 12/2/2022. (EW) (Entered: 12/02/2022) |

| | | |
|---|---|---|
| 12/15/2022 | | ORDER: The status conference before Judge LaShann DeArcy Hall scheduled for December 16, 2022, is ADJOURNED to January 9, 2023 at 4:30 p.m., in Courtroom 4H North. The parties shall file a joint letter indicating their consent to exclusion of time to January 9, 2023. Ordered by Judge LaShann DeArcy Hall on 12/15/2022. Ordered by Judge LaShann DeArcy Hall on 12/15/2022. (EW) (Entered: 12/15/2022) |
| 12/15/2022 | 128 | Letter *consenting to the exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161, to the adjourn date of January 9, 2023* as to Karl Jordan, Jr, Ronald Washington (Hueston, Michael) (Entered: 12/15/2022) |
| 12/16/2022 | | ORDER: With consent of the Defendants, time is excluded to January 9, 2023, in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 12/16/2022. (EW) (Entered: 12/16/2022) |
| 01/03/2023 | 129 | MOTION in Limine *for an Anonymous and Partially Sequestered Jury* by USA as to Karl Jordan, Jr, Ronald Washington. (McConnell, Artie) (Entered: 01/03/2023) |
| 01/03/2023 | 130 | Letter *regarding Rule 16(a)(1)(G) expert disclosures* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/03/2023) |
| 01/03/2023 | | MINUTE ENTRY AND ORDER: A telephonic status conference as to Karl Jordan Jr. and Ronald Washington was held before Judge LaShann DeArcy Hall on January 3, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek, and Miranda Gonzalez appeared on behalf of the Government. Mark DeMarco, John Diaz, Michael Hueston, and Monica Nejathaim appeared on behalf of Mr. Jordan. Susan Kellman and Jacqueline Cistaro appeared on behalf of Mr. Washington. Defendants are directed to respond to the Governments motion for anonymous jury and partial sequestration 129 on or before January 10, 2023. The Government shall provide its proposed jury questionnaire to Defendants no later than January 10, 2023. Ordered by Judge LaShann DeArcy Hall on 1/3/2023. (Court Reporter Linda Danelcyzk.) (EW) (Entered: 01/03/2023) |
| 01/06/2023 | | ORDER: The status conference before Judge LaShann DeArcy Hall scheduled for January 9, 2023, at 4:30 p.m. is ADJOURNED to January 13, 2023, at 1:00 P.M. in Courtroom 4H North. No later than January 9, 2023, the parties shall jointly file a letter indicating whether they consent to the exclusion of time to January 13, 2023. Ordered by Judge LaShann DeArcy Hall on 1/6/2023. (EW) (Entered: 01/06/2023) |
| 01/06/2023 | 131 | Letter *re: consent to the exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161* as to Karl Jordan, Jr, Ronald Washington (Hueston, Michael) (Entered: 01/06/2023) |
| 01/09/2023 | 132 | Letter *regarding Rule 16 discovery* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/09/2023) |
| 01/09/2023 | | ORDER: With consent of Defendants, time is excluded from January 9, 2023, to January 13, 2023, in the interest of justice to allow preparation for trial. Ordered by Judge LaShann DeArcy Hall on 1/9/2023. (EW) (Entered: 01/09/2023) |
| 01/09/2023 | | ORDER: The parties should be prepared for argument on the Government's motions in limine at the status conference scheduled for January 13, 2023. As to the Government's request to admit Defendants' admissions, statements against penal interest, third-party coconspirator statements, recorded prison calls, and past recorded recollections, the Government is directed to supplement its motion no later than January 12, 2023, with the specific evidence it seeks to admit at trial for the Courts consideration. Ordered by Judge LaShann DeArcy Hall on 1/9/2023. (EW) (Entered: 01/09/2023) |
| 01/10/2023 | 133 | MEMORANDUM in Opposition re 129 MOTION in Limine *for an Anonymous and Partially Sequestered Jury* (DeMarco, Mark) (Entered: 01/10/2023) |
| 01/11/2023 | 134 | Letter *in response to the Court's January 9 Order to supplement the government's motions in limine* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/11/2023) |
| 01/12/2023 | 135 | Letter *regarding defendant Washington's Rule 16(b)(1)(C) expert notice* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/12/2023) |
| 01/12/2023 | 136 | Letter *in response to the government's supplement to its motions in limine and letter regarding expert notice* as to Ronald Washington (Spilke, Ezra) (Entered: 01/12/2023) |
| 01/13/2023 | | MINUTE ENTRY AND ORDER: A status conference before Judge LaShann DeArcy Hall was held on January 13, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek, and Miranda |

| | | |
|---|---|---|
| | | Gonzalez appeared on behalf of the Government. John Diaz, Mark DeMarco, Michael Hueston, and Monica Nejathaim appeared on behalf of Defendant Jordan, who was also present. Susan Kellman, Ezra Spilke, and Jacqueline Cistaro appeared on behalf of Defendant Washington, whose appearance was waived. The Governments motion 114 for discovery is DENIED as moot, with leave to renew for reasons stated on the record. The Governments motion 129 for an anonymous and semi-sequestered jury is GRANTED for reasons stated on the record. The Defendants' request to adjourn the trial scheduled to commence February 13, 2023 is GRANTED. No later than February 8, 2023, the parties shall file a joint letter indicating their availability for a trial beginning January 29, 2024. The Government shall supplement its motions in limine no later than February 27, 2023. Defendants shall file their responses to the Government's supplement no later than March 29, 2023. A status conference before Judge LaShann DeArcy Hall shall be held on April 3, 2023, at 1:00 p.m. in Courtroom 4H North. Time is excluded to April 3, 2023, for pending motions and to allow counsel additional time to prepare for trial. Ordered by Judge LaShann DeArcy Hall on 1/13/2023. (Court Reporter Stacy Mace & Victoria Butler.) (CG) (Entered: 01/27/2023) |
| 02/08/2023 | 137 | Letter *Responding to the Court's Order of January 13, 2023* as to Karl Jordan, Jr, Ronald Washington (Kellman, Susan) (Entered: 02/08/2023) |
| 02/08/2023 | 138 | Letter *in response to the Court's January 13, 2023 Order and request for status conference* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 02/08/2023) |
| 02/08/2023 | 139 | Letter *Responding to the Government's Letter* as to Ronald Washington (Kellman, Susan) (Entered: 02/08/2023) |
| 02/10/2023 | | ORDER: A hearing concerning the Government's motion for reconsideration shall be held before Judge LaShann DeArcy Hall on February 16, 2023, at 12:30 p.m. in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 2/10/2023. (CG) (Entered: 02/10/2023) |
| 02/16/2023 | | MINUTE ENTRY AND ORDER: A hearing before Judge LaShann DeArcy Hall was held on February 16, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek, and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Michael Hueston, and Monica Nejathaim appeared on behalf of Defendant Jordan, who was also present. Susan Kellman appeared on behalf of Defendant Washington, who was also present. The Governments motion for reconsideration is DENIED for the reasons stated on the record. Ordered by Judge LaShann DeArcy Hall on 2/16/2023. (Court Reporter Rivka Teich.) (CG) (Entered: 03/01/2023) |
| 02/27/2023 | 140 | Letter *responding to the government's relevance objection to expert testimony* as to Ronald Washington (Attachments: # 1 Exhibit Washington Expert Notice) (Spilke, Ezra) (Entered: 02/27/2023) |
| 02/27/2023 | 141 | Letter *regarding the government's second supplement to its motions in limine* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 02/27/2023) |
| 03/14/2023 | 142 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on 02/16/23, before Judge DEARCY HALL. Court Reporter/Transcriber RIVKA TEICH, Telephone number 7186132268. Email address: RIVKATEICH@GMAIL.COM. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/4/2023. Redacted Transcript Deadline set for 4/14/2023. Release of Transcript Restriction set for 6/12/2023. (Teich, Rivka) (Entered: 03/14/2023) |
| 03/21/2023 | 143 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 3, 2023, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Danelczyk, Linda) (Entered: 03/21/2023) |
| 03/28/2023 | 144 | Letter *in opposition to the governments supplemental motions in limine dated February 27, 2023* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 03/28/2023) |

| | | |
|---|---|---|
| 03/29/2023 | 145 | RESPONSE in Opposition re 113 First MOTION in Limine *Government's Supplemental Motion in LImine* (Kellman, Susan) (Entered: 03/29/2023) |
| 04/03/2023 | | MINUTE ENTRY AND ORDER: A status conference before Judge LaShann DeArcy Hall was held on April 3, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek, and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Michael Hueston, and Monica Nejathaim appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, whose appearance was waived. Trial shall commence on January 29, 2024, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. A status conference before Judge LaShann DeArcy Hall shall be held on June 1, 2023, at 2:30 p.m. in Courtroom 4H North. Time is excluded to January 29, 2024, for pending motions and to allow counsel additional time to prepare for trial. (Court Reporter Shernelle Griffith.) (CG) (Entered: 04/07/2023) |
| 04/10/2023 | 146 | MOTION to Exclude *Expert Testimony of Dr. Geoffrey Loftus* by USA as to Ronald Washington. (Gonzalez, Miranda) (Entered: 04/10/2023) |
| 04/17/2023 | 147 | RESPONSE in Opposition re 146 MOTION to Exclude *Expert Testimony of Dr. Geoffrey Loftus* (Spilke, Ezra) (Entered: 04/17/2023) |
| 04/17/2023 | 148 | Letter *enclosing exhibit* as to Ronald Washington (Spilke, Ezra) (Entered: 04/17/2023) |
| 04/28/2023 | 149 | Letter *regarding the parties' joint proposed juror questionnaire* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 04/28/2023) |
| 05/02/2023 | 150 | CJA 30: Appointment of Attorney Ezra Spilke *nunc pro tunc* date of 2/23/2023 for Ronald Washington. Ordered by Judge LaShann DeArcy Hall on 5/2/2023. (CG) (Entered: 05/02/2023) |
| 05/30/2023 | 151 | SUPERSEDING INDICTMENT (S-2) as to Karl Jordan, Jr (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss-9ss, 10ss-11ss, Ronald Washington (2) count(s) 1ss, 2ss, Jay Bryant (3) count(s) 1, 2. (Attachments: # 1 Criminal Information Sheet) (ML) (Entered: 05/30/2023) |
| 05/30/2023 | 152 | Letter *regarding detention for defendant Jay Bryant* as to Jay Bryant (McConnell, Artie) (Entered: 05/30/2023) |
| 06/01/2023 | | MINUTE ENTRY AND ORDER: A status conference before Judge LaShann DeArcy Hall was held on June 1, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek, and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Michael Hueston, Mark DeMarco and Monica Nejathaim appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present. Defendant Jordan entered a plea of not guilty to Counts 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, and 11ss, of the second superseding indictment. Defendant Washington entered a plea of not guilty to Counts 1ss and 2ss, of the second superseding indictment. No later than July 8, 2023, the Parties shall file a letter apprising the Court as to the status of ongoing Brady disclosures. A status conference before Judge LaShann DeArcy Hall shall be held on July 11, 2023, at 3:30 p.m., in Courtroom 4H North. (Court Reporter Stacy Mace.) (CG) (Entered: 06/13/2023) |
| 06/08/2023 | 155 | NOTICE OF ATTORNEY APPEARANCE: Cesar De Castro appearing for Jay Bryant (De Castro, Cesar) (Entered: 06/08/2023) |
| 06/08/2023 | 156 | NOTICE OF ATTORNEY APPEARANCE: Shannon Michael McManus appearing for Jay Bryant (McManus, Shannon) (Entered: 06/08/2023) |
| 06/08/2023 | 157 | Letter *from Cesar de Castro and Shannon McManus acknowledging receipt of the Protective Order and affirming adherence to its provisions* as to Jay Bryant (McManus, Shannon) (Entered: 06/08/2023) |
| 06/14/2023 | 158 | MOTION to Continue *January 29, 2024 Trial Date as to Jay Bryant* by Jay Bryant. (De Castro, Cesar) (Entered: 06/14/2023) |
| 06/16/2023 | 159 | Letter *regarding Rule 16 discovery* as to Jay Bryant (McConnell, Artie) (Entered: 06/16/2023) |
| 06/16/2023 | 160 | CJA 20 as to Jay Bryant: Appointment of Attorney Cesar DeCastro for Jay Bryant. Ordered by Magistrate Judge Lois Bloom on 6/16/2023. (ML) (Entered: 06/20/2023) |
| 06/16/2023 | 161 | Minute Entry for proceedings held before Magistrate Judge Lois Bloom: Arraignment, Initial Appearance as to Jay Bryant (3) Count 1,2 held on 6/16/2023. Plea entered by Jay Bryant: NOT Guilty on ALL COUNTS of the superseding indictment. Order of detention entered. Order of Excl. entered betw. 6/16-7/11/23. AUSA M. Gonzalez. CJA atty. C. DeCastro/S. McBryant for deft.. (Status |

| | | |
|---|---|---|
| | | Conference set for 7/11/2023 at 11:30 AM before Judge LaShann DeArcy Hall). (FTR Log #:11:21-11:30). (ML) (Entered: 06/20/2023) |
| 06/16/2023 | 162 | ORDER TO CONTINUE - Ends of Justice as to Jay Bryant-Time excluded from 6/16/2023 until 7/11/2023. Ordered by Magistrate Judge Lois Bloom on 6/16/2023. (ML) (Entered: 06/20/2023) |
| 06/16/2023 | 163 | ORDER OF DETENTION as to Jay Bryant. Ordered by Magistrate Judge Lois Bloom on 6/16/2023. (ML) (Main Document 163 replaced on 6/20/2023) (ML). (Entered: 06/20/2023) |
| 06/16/2023 | 164 | CJA 23 Financial Affidavit by Jay Bryant. (ML) (Entered: 06/20/2023) |
| 07/05/2023 | 165 | Letter *Advising the Court the Government is Not Seeking the Death Penalty* as to Jay Bryant (Misorek, Mark) (Entered: 07/05/2023) |
| 07/10/2023 | | ORDER: The status conference scheduled for July 11, 2023, at 3:30 p.m., is ADVANCED to July 11, 2023, at **11:30 a.m.** Ordered by Judge LaShann DeArcy Hall on 7/10/2023. (CG) (Entered: 07/10/2023) |
| 07/11/2023 | | MINUTE ENTRY AND ORDER: A status conference was held before Judge LaShann DeArcy Hall on July 11, 2023. Assistant United States Attorneys Artie McConnell and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Michael Hueston, and Monica Nejathaim appeared on behalf of Mr. Jordan, who was also present. Susan Kellman appeared on behalf of Mr. Washington, who was also present. Cesar De Castro and Shannon McMamus appeared on behalf of Mr. Bryant, who was also present. The Government is directed to respond to Defendant Bryants motion to continue no later than July 25, 2023. A status conference shall be held before Judge LaShann DeArcy Hall on September 21, 2023, at 1:00 p.m. in Courtroom 4H North. Time is excluded as to Defendant Bryant to September 21, 2023, in the interest of justice and to allow for additional plea negotiations. (Court Reporter Linda Danelczyk.) (CG) (Entered: 08/08/2023) |
| 07/13/2023 | 166 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on July 11, 2023, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/3/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/11/2023. (Danelczyk, Linda) (Entered: 07/13/2023) |
| 07/24/2023 | 167 | RESPONSE in Opposition re 158 MOTION to Continue *January 29, 2024 Trial Date as to Jay Bryant* (Gonzalez, Miranda) (Entered: 07/24/2023) |
| 07/25/2023 | 168 | REPLY TO RESPONSE to Motion re 158 MOTION to Continue *January 29, 2024 Trial Date as to Jay Bryant* (De Castro, Cesar) (Entered: 07/25/2023) |
| 07/26/2023 | 169 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 06-01-2023, before Judge LDH. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/16/2023. Redacted Transcript Deadline set for 8/28/2023. Release of Transcript Restriction set for 10/24/2023. (Mace, Stacy) (Entered: 07/26/2023) |
| 08/24/2023 | | ORDER: Any motion to sever must be filed no later than September 7, 2023. The Government shall submit a response no later than September 21, 2023. Ordered by Judge LaShann DeArcy Hall on 8/24/2023. (CG) (Entered: 08/24/2023) |
| 08/25/2023 | 174 | Letter *regarding the government's third supplement to its motions in limine* as to Karl Jordan, Jr, Ronald Washington, Jay Bryant (Gonzalez, Miranda) (Entered: 08/25/2023) |
| 09/07/2023 | 175 | First MOTION to Sever Defendant by Jay Bryant. (De Castro, Cesar) (Entered: 09/07/2023) |
| 09/07/2023 | 176 | AFFIDAVIT/AFFIRMATION by Jay Bryant 175 First MOTION to Sever Defendant filed by Jay Bryant (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (De Castro, Cesar) (Entered: 09/07/2023) |

| | | |
|---|---|---|
| 09/07/2023 | 177 | PRETRIAL MEMORANDUM *of Law in Support of Motion to Sever* as to Jay Bryant (De Castro, Cesar) (Entered: 09/07/2023) |
| 09/11/2023 | | ORDER: Terminating Attorney in case as to Jay Bryant ; representation by attorney Valerie Gotlib terminated. Ordered by Judge LaShann DeArcy Hall on 9/11/2023. (CG) (Entered: 09/12/2023) |
| 09/12/2023 | 178 | NOTICE OF ATTORNEY APPEARANCE: Valerie Alice Gotlib appearing for Jay Bryant (Gotlib, Valerie) (Entered: 09/12/2023) |
| 09/12/2023 | 179 | CJA 20: Appointment of Attorney Valerie Alice Gotlib *nunc pro tunc* date of 6/16/2023 for Jay Bryant. Ordered by Judge LaShann DeArcy Hall on 9/12/2023. (CG) (Entered: 09/12/2023) |
| 09/14/2023 | 180 | RESPONSE in Opposition re 113 First MOTION in Limine *(response to Govt's 8/25/23 letter)* (Hueston, Michael) (Entered: 09/14/2023) |
| 09/19/2023 | | ORDER: The status conference scheduled for September 21, 2023, is ADJOURNED to October 2, 2023, at 1:00 p.m., in Courtroom 4H North before Judge LaShann DeArcy Hall. Ordered by Judge LaShann DeArcy Hall on 9/19/2023. (CG) (Entered: 09/19/2023) |
| 09/21/2023 | 181 | MEMORANDUM in Opposition re 175 First MOTION to Sever Defendant *Jay Bryant* (Gonzalez, Miranda) (Entered: 09/21/2023) |
| 09/27/2023 | 182 | MOTION for Leave to File Document *reply to opposition to severance motion or for*, MOTION for Hearing *to reply to opposition to severance motion* by Jay Bryant. (Gotlib, Valerie) (Entered: 09/27/2023) |
| 10/02/2023 | | ORDER: The status conference scheduled for October 2, 2023, is ADJOURNED to October 11, 2023, at 4:00 p.m., in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 10/2/2023. (CG) (Entered: 10/02/2023) |
| 10/02/2023 | | ORDER: Defendant Bryant's request 182 to file a reply to his motion to sever is GRANTED. Defendant Bryant shall file a reply no later than October 4, 2023. Ordered by Judge LaShann DeArcy Hall on 10/2/2023. (CG) (Entered: 10/02/2023) |
| 10/04/2023 | 183 | REPLY TO RESPONSE to Motion re 175 First MOTION to Sever Defendant *Jay Bryant* (Gotlib, Valerie) (Entered: 10/04/2023) |
| 10/11/2023 | | MINUTE ENTRY AND ORDER: A status conference as to Defendants Karl Jordan, Ronald Washington and Jay Bryant was held before Judge LaShann DeArcy Hall on October 11, 2023. Assistant United States Attorneys Artie McConnell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Michael Hueston, and Mark DeMarco appeared on behalf of Mr. Jordan, who was also present. Ezra Spilke appeared on behalf of Mr. Washington, who was also present. Cesar De Castro, Shannon McMamus and Valerie Gotlib appeared on behalf of Mr. Bryant, who was also present. Time was previously excluded to January 29, 2024. Ordered by Judge LaShann DeArcy Hall on 10/11/2023. (Court Reporter Linda Danelczyk.) (CG) (Entered: 10/25/2023) |
| 10/13/2023 | 184 | MEMORANDUM AND ORDER: For the reasons stated in the attached memorandum and order, Defendant Bryant's motion to sever 175 is GRANTED. Ordered by Judge LaShann DeArcy Hall on 10/13/2023. (Entered: 10/13/2023) |
| 10/18/2023 | | ORDER: A status conference as to Defendant Bryant shall be held on October 24, 2023, at 11:00 a.m., in Courtroom 4H North before Judge LaShann DeArcy Hall. Ordered by Judge LaShann DeArcy Hall on 10/18/2023. (CG) (Entered: 10/18/2023) |
| 10/20/2023 | 185 | Letter *requesting leave to move for bifurcated trial and impanelment of two juries* as to Karl Jordan, Jr, Ronald Washington, Jay Bryant (McConnell, Artie) (Entered: 10/20/2023) |
| 10/23/2023 | | ORDER: The Government's request 185 for leave to file a motion for a bifurcated trial is GRANTED. The Government shall file its motion no later than October 24, 2023. Defendants shall file any response no later than November 1, 2023. Ordered by Judge LaShann DeArcy Hall on 10/23/2023. (CG) (Entered: 10/23/2023) |
| 10/23/2023 | | ORDER: The status conference as to Defendant Bryant scheduled for October 24, 2023, is ADJOURNED to November 8, 2023, at 4:30 p.m. in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 10/23/2023. (CG) (Entered: 10/23/2023) |

| | | |
|---|---|---|
| 10/24/2023 | 186 | MOTION in Limine *for Two-Jury Trial* by USA as to Karl Jordan, Jr, Ronald Washington, Jay Bryant. (Gonzalez, Miranda) (Entered: 10/24/2023) |
| 10/25/2023 | | ORDER: A final pre-trial conference before Judge LaShann DeArcy Hall shall be held on January 17, 2024, at 3:00 p.m., in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 10/25/2023. (CG) (Entered: 10/25/2023) |
| 10/25/2023 | 187 | RESPONSE in Opposition re 186 MOTION in Limine *for Two-Jury Trial* (Kellman, Susan) (Entered: 10/25/2023) |
| 10/26/2023 | 188 | MOTION to Continue *Due Date for Opposition to Motion for Two-Jury Trial* by Jay Bryant. (Gotlib, Valerie) (Entered: 10/26/2023) |
| 10/27/2023 | | ORDER: Defendant's request 188 , made with consent of the Government, for an extension of time to file his opposition to the Government's motion In Limine for a two-jury trial 186 is GRANTED. Any opposition to the Government's motion shall be filed by November 3, 2023. Ordered by Judge LaShann DeArcy Hall on 10/27/2023. (CG) (Entered: 10/27/2023) |
| 11/03/2023 | 189 | MEMORANDUM in Opposition re 186 MOTION in Limine *for Two-Jury Trial* (Gotlib, Valerie) (Entered: 11/03/2023) |
| 11/08/2023 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Jay Bryant was held before Judge LaShann DeArcy Hall on November 8, 2023. Assistant United States Attorneys Artie McConnell and Miranda Gonzalez appeared on behalf of the Government. Cesar De Castro, Shannon McMamus and Valerie Gotlib appeared on behalf of Mr. Bryant, who was also present. For the reasons stated on the record, the Government's motion for a two-jury trial 186 is DENIED. A status conference as to Defendant Bryant shall be held before Judge LaShann DeArcy Hall on January 11, 2024, at 2:00 p.m. in Courtroom 4H North. Time is excluded as to Defendant Bryant to January 11, 2024, in the interest of justice and to allow for additional plea negotiations. Ordered by Judge LaShann DeArcy Hall on 11/8/2023. (Court Reporter Kristi Cruz.) (CG) (Entered: 11/28/2023) |
| 11/21/2023 | 190 | Letter *Bequesting a Delay in the State of Mr. Washington's Trial til the Afternoon of 1/22/2024* as to Ronald Washington (Kellman, Susan) (Entered: 11/21/2023) |
| 11/28/2023 | | SCHEDULING ORDER: Trial in this matter scheduled to commence on January 29, 2024, at 9:30 a.m. will now begin on January 22, 2024, at 1:00 p.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 11/28/2023. (CG) (Entered: 11/28/2023) |
| 12/18/2023 | 193 | Letter *Noting the Government's Production of 3500 Material* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 12/18/2023) |
| 12/18/2023 | 194 | Letter *re: proposed clothing order for trial* as to Karl Jordan, Jr (Attachments: # 1 Proposed Clothing Order) (Hueston, Michael) (Entered: 12/18/2023) |
| 12/18/2023 | 196 | Letter *Requesting An Order Directing the MDC To aCCept Clothing* as to Ronald Washington (Attachments: # 1 PROPOSED ORDER) (Kellman, Susan) (Entered: 12/18/2023) |
| 12/20/2023 | 198 | Letter *Noting the Government's Production of Exhibits* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 12/20/2023) |
| 12/22/2023 | | ORDER: On October 26, 2022, the Court directed the parties to file their proposed verdict sheets, voir dire, and jury charges no later than January 23, 2023--eleven months ago. The parties never requested an extension of time to file these submissions, and the Court did not grant one. The Court assumes the parties' failure to file these submissions was inadvertent. Accordingly, the Court directs the parties to file them immediately or, in any event, no later than January 3, 2024. Ordered by Judge LaShann DeArcy Hall on 12/22/2023.(MFW) (Entered: 12/22/2023) |
| 12/27/2023 | 200 | ORDERED as to Karl Jordan, Jr: That the United States Marshall Service and the warden at the Metropolitan Detention Center (MDC), 80 29th Street, Brooklyn, New York, 11232, permit the defendant: KARL JORDAN, Registration No. 05124-509 to receive the following clothing items from January 8, 2024, and any date thereafter until his jury trial before the Honorable LaShann DeArcy Hall in the United States Courthouse at 225 Cadman Plaza East, Brooklyn, New York, ends. (See attached). Ordered by Judge LaShann DeArcy Hall on 12/19/2023. (MLR) (Entered: 12/27/2023) |
| 12/27/2023 | 201 | CLOTHING ORDER as to Ronald Washington. ORDERED that the defendant Ronald Washington shall appear at all trial proceedings in civilian clothing January 4, 2024. The Bureau of Prisons, and |

| | | |
|---|---|---|
| | | specifically, the MDC Brooklyn, are directed to comply with this ORDER. (See attached for details). Ordered by Judge LaShann DeArcy Hall on 12/19/2023. (MLR) (Entered: 12/27/2023) |
| 12/29/2023 | 202 | Proposed Voir Dire by Karl Jordan, Jr, Ronald Washington as to Karl Jordan, Jr, Ronald Washington, Jay Bryant (DeMarco, Mark) (Entered: 12/29/2023) |
| 12/31/2023 | 203 | Letter *Regarding Government's Proposed Jury Materials* as to Karl Jordan, Jr, Ronald Washington (Attachments: # 1 Proposed Jury Charges, # 2 Proposed Verdict Sheet, # 3 Proposed Voir Dire) (Gonzalez, Miranda) (Entered: 12/31/2023) |
| 01/01/2024 | 204 | Proposed Jury Instructions/Verdict Form by Ronald Washington (Spilke, Ezra) (Entered: 01/01/2024) |
| 01/04/2024 | 205 | Letter *regarding admission of statements pursuant to Rule 804(b)(6)* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/04/2024) |
| 01/04/2024 | 206 | Letter *Proposed Order re: Paralegal* as to Ronald Washington (Kellman, Susan) (Entered: 01/04/2024) |
| 01/05/2024 | 207 | Letter *in opposition regarding admission of statements pursuant to Rule 804(b)(6)* as to Karl Jordan, Jr (Hueston, Michael) (Entered: 01/05/2024) |
| 01/05/2024 | 209 | NOTICE OF ATTORNEY APPEARANCE: Emilee Ann Sahli appearing for Karl Jordan, Jr *Associate counsel.* (Sahli, Emilee) (Entered: 01/05/2024) |
| 01/05/2024 | 210 | CJA 30: Appointment of Attorney Emilee A. Sahli for Karl Jordan Jr. Ordered by Judge LaShann DeArcy Hall on 1/5/2024. (CG) (Entered: 01/05/2024) |
| 01/08/2024 | 211 | Letter *Noting the Government's Supplemental Production of 3500 Material* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/08/2024) |
| 01/08/2024 | 212 | Letter *Noting the Government's Supplemental Production of Exhibits* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/08/2024) |
| 01/08/2024 | 213 | Letter *to provide notice to the Court and the defendants, consistent with its obligations under Giglio v. United States, 405 U.S. 150 (1972) and, to the extent the defendants seek to cross-examine witnesses about this material, moving to preclude* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/08/2024) |
| 01/09/2024 | 214 | Letter *Noting the Government's Supplemental Production of 3500 Material* as to Karl Jordan, Jr, Ronald Washington (McConnell, Artie) (Entered: 01/09/2024) |
| 01/11/2024 | 215 | ORDER: The Governments motions in limine 113 are GRANTED, in part, and DENIED, in part. See attached chart for details. Ordered by Judge LaShann DeArcy Hall on 1/11/2024. (CG) (Entered: 01/11/2024) |
| 01/11/2024 | 216 | Letter *Opposing the Govt's MIL to Preclude Cross-Examination dated January 8, 2024* as to Karl Jordan, Jr (DeMarco, Mark) (Entered: 01/11/2024) |
| 01/11/2024 | 217 | Letter *providing supplemental Giglio disclosures and to the extent the defendants seek to cross-examine witnesses about this material, moving to preclude* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/11/2024) |
| 01/11/2024 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Jay Bryant was held before Judge LaShann DeArcy Hall on January 11, 2024. Assistant United States Attorneys Artie McConnell and Miranda Gonzalez appeared on behalf of the Government. Cesar De Castro, Shannon McManus and Valerie Gotlib appeared on behalf of Mr. Bryant, who was also present. Trial shall commence on January 26, 2026, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. A status conference as to Defendant Bryant shall be held on April 4, 2024, at 12:00 p.m. in Courtroom 4H North. Time is excluded as to Defendant Bryant to April 4, 2024, in the interest of justice and to allow for additional plea negotiations. 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 1/11/2024. (Court Reporter Anthony Frisolone.) (CG) (Entered: 01/26/2024) |
| 01/12/2024 | 218 | Letter *Opposing the Govt's MIL to Preclude Cross-Examination dated January 8, 2024 (ECF 213)* as to Ronald Washington (Spilke, Ezra) (Entered: 01/12/2024) |
| 01/16/2024 | 220 | Letter *regarding motion in limine ruling and renewed motion for defense exhibits* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/16/2024) |

| | | |
|---|---|---|
| 01/16/2024 | 221 | Letter *Noting the Government's Supplemental Production of Exhibits* as to Karl Jordan, Jr, Ronald Washington (Attachments: # 1 Appendix Letter Noting the Government's Supplemental Production of 3500 Material) (Gonzalez, Miranda) (Entered: 01/16/2024) |
| 01/16/2024 | 222 | Letter *providing supplemental Giglio disclosures and to the extent the defendants seek to cross-examine witnesses about this material, moving to preclude* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/16/2024) |
| 01/17/2024 | | MINUTE ENTRY AND ORDER: A final pre-trial conference as to Defendants Karl Jordan and Ronald Washington was held before Judge LaShann DeArcy Hall on January 17, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present. Trial shall commence on January 22, 2024, at 1:00 p.m., before Judge LaShann DeArcy Hall, in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 1/17/2024. (Court Reporter Nicole Sesta.) (CG) (Entered: 01/26/2024) |
| 01/19/2024 | 224 | Letter *in opposition to Government's renewed request to admit video* as to Karl Jordan, Jr (Diaz, John) (Entered: 01/19/2024) |
| 01/19/2024 | 225 | Order re: Electronic Devices: ORDERED that the following attorney(s) are authorized to bring the Personal Electronic Device(s) and/or the General-Purpose Computing Device(s) listed below into the Courthouse for use in a proceeding or trial in the action. The attorney(s) identified in this Order must present a copy of this Order when entering the Courthouse. Ordered by Judge LaShann DeArcy Hall on 1/18/2024. (MLR) (Entered: 01/19/2024) |
| 01/22/2024 | | MINUTE ENTRY AND ORDER: Voir Dire was held before Judge LaShann DeArcy Hall on January 22, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Voir Dire continued to January 23, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/22/2024. (Court Reporter Linda Marino.) (CG) (Entered: 01/29/2024) |
| 01/23/2024 | | MINUTE ENTRY AND ORDER: Voir Dire continued before Judge LaShann DeArcy Hall on January 23, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nata Chelidze. Voir Dire continued to January 24, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/23/2024. (Court Reporter Linda Marino.) (CG) (Entered: 01/29/2024) |
| 01/24/2024 | | MINUTE ENTRY AND ORDER: Voir Dire continued before Judge LaShann DeArcy Hall on January 24, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Voir Dire completed. Jury trial continued to January 29, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/24/2024. (Court Reporter Linda Marino.) (CG) (Entered: 01/29/2024) |
| 01/25/2024 | | SCHEDULING ORDER: A status conference as to Defendants Jordan and Washington shall be held before Judge LaShann DeArcy Hall on January 25, 2024, at 1:00 p.m. in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 1/25/2024. (CG) (Entered: 01/25/2024) |
| 01/25/2024 | | MINUTE ENTRY: A status conference as to Defendants Jordan and Washington was held before Judge LaShann DeArcy Hall on January 25, 2024. Assistant United States Attorneys Artie McConell and Miranda Gonzalez appeared on behalf of the Government. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, whose appearance was waived. Susan Kellman and Ezra Spilke appeared on behalf of Mr. Washington, whose appearance was waived. (Court Reporter Linda Marino.) (CG) (Entered: 01/29/2024) |

| | | |
|---|---|---|
| 01/26/2024 | 227 | ORDER: The Government's motions in limine to preclude cross-examination of prior witness history 213 are GRANTED, in part. See attached chart for details. Ordered by Judge LaShann DeArcy Hall on 1/26/2024. (CG) (Entered: 01/26/2024) |
| 01/27/2024 | 228 | Letter *seeking to limit scope of cross-examination* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/27/2024) |
| 01/29/2024 | 229 | Letter *regarding potential hostile witnesses* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/29/2024) |
| 01/29/2024 | 230 | Letter *regarding prior consistent statements and prior identifications* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 01/29/2024) |
| 01/29/2024 | 231 | Letter *in opposition to the government's motion in limine ECF 228* as to Ronald Washington (Spilke, Ezra) (Entered: 01/29/2024) |
| 01/29/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on January 29, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Jurors sworn. The Court provided preliminary instructions to the jury. The Government and Defendant each presented their opening statements. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to January 30, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/29/2024. (Court Reporter Sophie Nolan.) (CG) (Entered: 02/02/2024) |
| 01/29/2024 | 237 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the seventeen (17) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 1/29/2024. (CG) (Entered: 02/02/2024) |
| 01/30/2024 | 232 | MEMORANDUM AND ORDER: For the reasons set forth in the attached memorandum and order, the Government's motion to admit Defendant Karl Jordan's rap lyrics and videos 113 is DENIED. Ordered by Judge LaShann DeArcy Hall on 1/30/2024. (CG) (Entered: 01/30/2024) |
| 01/30/2024 | 234 | Letter *in response to Government's motion* as to Karl Jordan, Jr, Ronald Washington (Diaz, John) (Entered: 01/30/2024) |
| 01/30/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on January 30, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to January 31, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/30/2024. (Court Reporter Sophie Nolan.) (CG) (Entered: 02/02/2024) |
| 01/30/2024 | 238 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 1/30/2024. (CG) (Entered: 02/02/2024) |
| 01/31/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on January 31, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 1, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 1/31/2024. (Court Reporter Sophie Nolan.) (CG) (Entered: 02/02/2024) |
| 01/31/2024 | 239 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 1/31/2024. (CG) (Entered: 02/02/2024) |

| | | |
|---|---|---|
| 02/01/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 1, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 5, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/1/2024. (Court Reporter Sophie Nolan.) (CG) (Entered: 02/02/2024) |
| 02/01/2024 | 240 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/1/2024. (CG) (Entered: 02/02/2024) |
| 02/02/2024 | 242 | Letter *regarding recalcitrant witness* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 02/02/2024) |
| 02/03/2024 | 243 | Letter *in response to the government's 2/2/2024 letter re: contempt* as to Ronald Washington (Spilke, Ezra) (Entered: 02/03/2024) |
| 02/03/2024 | 244 | Letter *in support of Rule 404(b) evidence* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 02/03/2024) |
| 02/04/2024 | 245 | Letter *in further support of motion to admit 3500-MR-1 into evidence* as to Ronald Washington (Spilke, Ezra) (Entered: 02/04/2024) |
| 02/05/2024 | 246 | Letter *joining Karl Jordan's opposition* as to Ronald Washington (Spilke, Ezra) (Entered: 02/05/2024) |
| 02/05/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 5, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 6, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/5/2024. (Court Reporter Victoria Butler.) (CG) (Entered: 02/13/2024) |
| 02/05/2024 | 255 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the seventeen (17) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/5/2024. (CG) (Entered: 02/15/2024) |
| 02/06/2024 | 248 | Order Of Force as to Karl Jordan, Jr, Ronald Washington. (See attached for details). Ordered by Judge LaShann DeArcy Hall on 2/6/2024. (MLR) (Entered: 02/06/2024) |
| 02/06/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 6, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 7, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/6/2024. (Court Reporter Victoria Butler.) (CG) (Entered: 02/13/2024) |
| 02/06/2024 | 256 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/6/2024. (CG) (Entered: 02/15/2024) |
| 02/07/2024 | 249 | ORDER Of Force as to Karl Jordan, Jr, Ronald Washington (See attached for details). Ordered by Judge LaShann DeArcy Hall on 2/7/2024. (MLR) (Entered: 02/07/2024) |
| 02/07/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 7, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy |

| | | |
|---|---|---|
| | | Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 8, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/7/2024. (Court Reporter Victoria Butler.) (CG) (Entered: 02/13/2024) |
| 02/07/2024 | 257 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/7/2024. (CG) (Entered: 02/15/2024) |
| 02/08/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 8, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 12, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/8/2024. (Court Reporter Victoria Butler.) (CG) (Entered: 02/13/2024) |
| 02/08/2024 | 258 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/8/2024. (CG) (Entered: 02/15/2024) |
| 02/11/2024 | 251 | Letter MOTION in Limine *re: proposed 801(d)(2)(E) testimony* by Ronald Washington. (Spilke, Ezra) (Entered: 02/11/2024) |
| 02/11/2024 | 252 | RESPONSE in Opposition re 251 Letter MOTION in Limine *re: proposed 801(d)(2)(E) testimony and statements against penal interest* (Gonzalez, Miranda) (Entered: 02/11/2024) |
| 02/12/2024 | 253 | REPLY TO RESPONSE to Motion re 251 Letter MOTION in Limine *re: proposed 801(d)(2)(E) testimony* (Spilke, Ezra) (Entered: 02/12/2024) |
| 02/12/2024 | 259 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/12/2024. (CG) (Entered: 02/15/2024) |
| 02/12/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 12, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman and Ezra Spilke appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 14, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/12/2024. (Court Reporter Linda Danelczyk.) (CG) (Entered: 02/29/2024) |
| 02/14/2024 | 254 | Proposed Jury Charge. By Judge LaShann DeArcy Hall on 2/14/2024. (MFW) (Entered: 02/14/2024) |
| 02/14/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 14, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witnesses sworn and testified. Jury trial continued to February 15, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/14/2024. (Court Reporter Linda Danelczyk.) (CG) (Entered: 02/29/2024) |
| 02/14/2024 | 276 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/14/2024. (CG) (Entered: 03/08/2024) |

| | | |
|---|---|---|
| 02/15/2024 | 260 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 29, 2024, before Judge LaShann Dearcy Hall. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/7/2024. Redacted Transcript Deadline set for 3/18/2024. Release of Transcript Restriction set for 5/15/2024. (Nolan, Sophie) (Entered: 02/15/2024) |
| 02/15/2024 | 261 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 30, 2024, before Judge LaShann Dearcy Hall. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/7/2024. Redacted Transcript Deadline set for 3/18/2024. Release of Transcript Restriction set for 5/15/2024. (Nolan, Sophie) (Entered: 02/15/2024) |
| 02/15/2024 | 262 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 31, 2024, before Judge LaShann Dearcy Hall. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/7/2024. Redacted Transcript Deadline set for 3/18/2024. Release of Transcript Restriction set for 5/15/2024. (Nolan, Sophie) (Entered: 02/15/2024) |
| 02/15/2024 | 263 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 1, 2024, before Judge LaShann Dearcy Hall. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/7/2024. Redacted Transcript Deadline set for 3/18/2024. Release of Transcript Restriction set for 5/15/2024. (Nolan, Sophie) (Entered: 02/15/2024) |
| 02/15/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 15, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witness sworn and testified. Jury charge conference held. Jury trial continued to February 20, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/15/2024. (Court Reporter Michele Lucchese.) (CG) (Entered: 02/29/2024) |
| 02/16/2024 | 264 | Letter *re Proposed Jury Charges (Joint)* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 02/16/2024) |
| 02/20/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 20, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. Documents and physical items marked and entered into evidence. Witness sworn and testified. Government and defense rested. The Government presented final argument. Jury trial continued to February 21, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/20/2024. (Court Reporter Linda Danelczyk.) (CG) (Entered: 03/05/2024) |
| 02/20/2024 | 277 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/20/2024. (CG) (Entered: 03/08/2024) |

| | | |
|---|---|---|
| 02/21/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 21, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. The Defendants presented final argument and the Government rebutted. Jury charged. Jury trial continued to February 22, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/21/2024. (Court Reporter Linda Marino.) (CG) (Entered: 03/05/2024) |
| 02/21/2024 | 278 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the eighteen (18) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/21/2024. (CG) (Entered: 03/08/2024) |
| 02/22/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 22, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. The jury began deliberations. Jury trial continued to February 26, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/22/2024. (Court Reporter Linda Marino.) (CG) (Entered: 03/05/2024) |
| 02/22/2024 | 279 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the sixteen (16) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/22/2024. (CG) (Entered: 03/08/2024) |
| 02/26/2024 | | MINUTE ENTRY AND ORDER: Trial held before Judge LaShann DeArcy Hall on February 26, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. The jury continued deliberations. Juror #12 dismissed on consent. For the reasons stated on the record, Mr. Jordans and Mr. Washingtons motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is DENIED with leave to renew. Jury trial continued to February 27, 2024, at 9:30 a.m. Ordered by Judge LaShann DeArcy Hall on 2/26/2024. (Court Reporter Linda Danelczyk.) (CG) (Entered: 03/05/2024) |
| 02/26/2024 | 280 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the sixteen (16) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/26/2024. (CG) (Entered: 03/08/2024) |
| 02/27/2024 | | MINUTE ENTRY: Trial held before Judge LaShann DeArcy Hall on February 27, 2024. Assistant United States Attorneys Artie McConell, Mark Misorek and Miranda Gonzalez appeared on behalf of the Government and were joined by paralegal Anna November and Special Agent Kristy Doerner. Mark DeMarco, Michael Hueston, John Diaz and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. Susan Kellman, Ezra Spilke and Jacqueline Cistaro appeared on behalf of Mr. Washington, who was also present, and were joined by paralegal Nato Chelidze. The jury continued deliberations. The jury rendered a unanimous verdict of guilty on all charges as to both Defendants. Following the delivery of the verdict, the jurors were polled. Defendants renewed motion for judgment of acquittal. (Court Reporter Linda Danelczyk.) (CG) (Entered: 03/05/2024) |
| 02/27/2024 | 281 | Order of Sustenance as to Karl Jordan, Jr, Ronald Washington: It is ORDERED that the Marshal supply proper sustenance to the fifteen (15) jurors empaneled in the above entitled case. Ordered by Judge LaShann DeArcy Hall on 2/27/2024. (CG) (Entered: 03/08/2024) |
| 02/27/2024 | 298 | JURY VERDICT as to Karl Jordan Jr. and Ronald Washington. (CG) (Entered: 05/17/2024) |
| 02/27/2024 | 299 | EXHIBIT LIST and COURT EXHIBITS by Karl Jordan, Jr and Ronald Washington. (CG) (Entered: 05/17/2024) |
| 02/29/2024 | 267 | Letter *re Joint Proposal for Rule 29 Briefing Schedule* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 02/29/2024) |

| | | |
|---|---|---|
| 03/01/2024 | | SCHEDULING ORDER: The parties' proposed briefing schedule for Defendants' Rule 29 motions 267 is approved. Defendants shall file their Rule 29 motions and memoranda of law on or before April 5, 2024. The government shall file is opposition brief on or before May 10, 2024. Defendants shall file their reply briefs, if any, on or before May 24, 2024. The Court will not entertain a joint motion on behalf of Defendants. Any oral argument will be held on June 14, 2024, at 3:00 p.m. in Courtroom 4H North. Memoranda of law shall comply with this Court's Individual Rules and Practices. Ordered by Judge LaShann DeArcy Hall on 3/1/2024. (CG) (Entered: 03/01/2024) |
| 03/05/2024 | 268 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 1-17-2024, before Judge LDH. Court Reporter/Transcriber Nicole Sesta. Email address: NSestaRMR@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/26/2024. Redacted Transcript Deadline set for 4/5/2024. Release of Transcript Restriction set for 6/3/2024. (Sesta, Nicole) (Entered: 03/05/2024) |
| 03/05/2024 | 269 | Consent MOTION for Extension of Time to File *(FRCP 33)* by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (Hueston, Michael) (Entered: 03/05/2024) |
| 03/06/2024 | 270 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr held on 2/15/2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Michele Lucchese, Telephone number 718-613-2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Lucchese, Michele) (Entered: 03/06/2024) |
| 03/06/2024 | 271 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 22, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda A. Marino, Telephone number 718-613-2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Marino, Linda) (Entered: 03/06/2024) |
| 03/06/2024 | 272 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 23, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda A. Marino, Telephone number 718-613-2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Marino, Linda) (Entered: 03/06/2024) |
| 03/06/2024 | 273 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on January 24, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda A. Marino, Telephone number 718-613-2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Marino, Linda) (Entered: 03/06/2024) |
| 03/06/2024 | 274 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 21, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda A. Marino, Telephone number 718-613-2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Marino, Linda) (Entered: 03/06/2024) |
| 03/06/2024 | 275 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 22, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda A. Marino, Telephone number 718-613-2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/27/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/4/2024. (Marino, Linda) (Entered: 03/06/2024) |
| 03/07/2024 | | SCHEDULING ORDER: Defendants' request for an extension of time to file their respective motions pursuant to Federal Rule of Criminal Procedure 33 269 is GRANTED. Any memoranda in support of a Rule 33 motion shall be filed with Defendants' anticipated Rule 29 motions. The Court will not entertain a joint motion on behalf of Defendants. Ordered by Judge LaShann DeArcy Hall on 3/7/2024. (CG) (Entered: 03/07/2024) |
| 03/12/2024 | 283 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jay Bryant held on 11/8/23, before Judge DeArcy Hall. Court Reporter/Transcriber Kristi Cruz, Telephone number 718-613-2676. Email address: kristi.edny@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/2/2024. Redacted Transcript Deadline set for 4/12/2024. Release of Transcript Restriction set for 6/10/2024. (Cruz, Kristi) (Entered: 03/12/2024) |
| 03/19/2024 | 284 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 26, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/9/2024. Redacted Transcript Deadline set for 4/19/2024. Release of Transcript Restriction set for 6/17/2024. (Danelczyk, Linda) (Entered: 03/19/2024) |
| 03/19/2024 | 285 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 27, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/9/2024. Redacted Transcript Deadline set for 4/19/2024. Release of Transcript Restriction set for 6/17/2024. (Danelczyk, Linda) (Entered: 03/19/2024) |
| 03/19/2024 | 286 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 12, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/9/2024. Redacted Transcript Deadline set for 4/19/2024. Release of Transcript Restriction set for 6/17/2024. (Danelczyk, Linda) (Entered: 03/19/2024) |
| 03/19/2024 | 287 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 14, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date |

| | | |
|---|---|---|
| | | it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/9/2024. Redacted Transcript Deadline set for 4/19/2024. Release of Transcript Restriction set for 6/17/2024. (Danelczyk, Linda) (Entered: 03/19/2024) |
| 03/19/2024 | 288 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington held on February 20, 2024, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/9/2024. Redacted Transcript Deadline set for 4/19/2024. Release of Transcript Restriction set for 6/17/2024. (Danelczyk, Linda) (Entered: 03/19/2024) |
| 03/21/2024 | 290 | Consent MOTION for Speedy Trial *Time Exclusion on Counts Three through Eleven* by USA as to Karl Jordan, Jr. (Gonzalez, Miranda) (Entered: 03/21/2024) |
| 03/28/2024 | | ORDER: The Government's motion, made on consent, to exclude time under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(8)(A), 290 is GRANTED. With the consent of the parties, time is excluded from February 27, 2024, until June 14, 2024, in the interest of justice. Ordered by Judge LaShann DeArcy Hall on 3/28/2024. (CG) (Entered: 03/28/2024) |
| 04/01/2024 | 291 | MOTION for Leave to File Excess Pages by Karl Jordan, Jr as to Karl Jordan, Jr, Ronald Washington. (Diaz, John) (Entered: 04/01/2024) |
| 04/04/2024 | | ORDER: Defendants' request, made with consent of the Government, to exceed the page limit for the memoranda in support of their anticipated Rule 29 and 33 motions 291 is GRANTED. Defendants' memoranda in support of their motions and the Government's memoranda in opposition shall be no more than 40 pages in length. Ordered by Judge LaShann DeArcy Hall on 4/4/2024. (CG) (Entered: 04/04/2024) |
| 04/04/2024 | | MINUTE ENTRY AND ORDER: A status conference as to Jay Bryant was held before Judge LaShann DeArcy Hall on April 4, 2024. Assistant United States Attorneys Artie McConnell, Miranda Gonzalez and Mark Misorek appeared on behalf of the Government. Cesar De Castro and Shannon McManus appeared on behalf of Mr. Bryant, who was also present. The parties are directed to file a joint proposed briefing schedule no later than April 30, 2024. The parties are also directed to submit a joint status letter on or before August 5, 2024. A status conference as to Defendant Bryant shall be held on September 18, 2024, at 11:00 a.m. in Courtroom 4H North. Time is excluded as to Defendant Bryant to September 18, 2024, in the interest of justice and to allow for additional plea negotiations. 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 4/4/2024. (Court Reporter Andronikh Barna.) (CG) (Entered: 04/16/2024) |
| 04/05/2024 | 292 | MOTION for Acquittal *& New Trial* by Karl Jordan, Jr. (Attachments: # 1 Memorandum in Support (REDACTED)) (Hueston, Michael) (Entered: 04/05/2024) |
| 04/05/2024 | 294 | MOTION for Acquittal , MOTION for New Trial by Ronald Washington. (Spilke, Ezra) (Entered: 04/05/2024) |
| 05/05/2024 | 295 | NOTICE of Change of Office Address by Karl Jordan, Jr Once the filing has been made, you must login to www.pacer.gov and update your account. (DeMarco, Mark) (Entered: 05/05/2024) |
| 05/10/2024 | 296 | MEMORANDUM in Opposition re 294 MOTION for Acquittal MOTION for New Trial , 292 MOTION for Acquittal *& New Trial* (Gonzalez, Miranda) (Entered: 05/10/2024) |
| 05/11/2024 | 297 | MEMORANDUM in Opposition re 294 MOTION for Acquittal MOTION for New Trial , 292 MOTION for Acquittal *& New Trial (Redacted Version)* (Gonzalez, Miranda) (Entered: 05/11/2024) |
| 05/21/2024 | 300 | Letter MOTION for Extension of Time to File Response/Reply by Ronald Washington as to Karl Jordan, Jr, Ronald Washington. (Spilke, Ezra) (Entered: 05/21/2024) |
| 05/23/2024 | | ORDER: Defendant Ronald Washington's request 300 , made with the consent of the Government, for an extension of time to file his reply brief in support of his Rule 29 and 33 motions is GRANTED. Defendant shall file his reply brief on or before May 31, 2024. Ordered by Judge LaShann DeArcy Hall on 5/23/2024. (CG) (Entered: 05/23/2024) |

| | | |
|---|---|---|
| 05/31/2024 | 301 | REPLY TO RESPONSE to Motion re 292 MOTION for Acquittal *& New Trial* (Hueston, Michael) (Entered: 05/31/2024) |
| 05/31/2024 | 302 | REPLY TO RESPONSE to Motion re 294 MOTION for Acquittal MOTION for New Trial (Spilke, Ezra) (Entered: 05/31/2024) |
| 06/13/2024 | 303 | Letter MOTION to Continue *on consent and on behalf of both defendants* by Ronald Washington. (Spilke, Ezra) (Entered: 06/13/2024) |
| 06/14/2024 | | SCHEDULING ORDER: Defendants' motion 303 , made on consent, to adjourn the oral argument regarding Defendants' motions made pursuant to Federal Rules of Criminal Procedure 29 and 33 is GRANTED. The oral argument scheduled for June 14, 2024, before Judge LaShann DeArcy Hall is ADJOURNED *sine die*. Ordered by Judge LaShann DeArcy Hall on 6/14/2024. (CG) (Entered: 06/14/2024) |
| 06/18/2024 | 304 | Letter *Respectfully Requesting an Oral Argument Date (if any) on or after August 2, 2024* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 06/18/2024) |
| 06/18/2024 | 305 | Letter *Regarding Rescheduling Oral Argument* as to Karl Jordan, Jr, Ronald Washington, Jay Bryant (Kellman, Susan) (Entered: 06/18/2024) |
| 07/30/2024 | 306 | MOTION to Continue *Trial* by Jay Bryant. (Gotlib, Valerie) (Entered: 07/30/2024) |
| 09/17/2024 | | SCHEDULING ORDER: The status conference as to Defendant Jay Bryant scheduled for September 18, 2024, at 11:00 a.m. is ADJOURNED to September 18, 2024, at **12:30 p.m.** in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 9/17/2024. (CG) (Entered: 09/17/2024) |
| 09/18/2024 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Jay Bryant was held before Judge LaShann DeArcy Hall on September 18, 2024. Assistant United States Attorneys Artie McConnell and Mark Misorek appeared on behalf of the Government. Cesar De Castro, Shannon McManus and Valerie Gotlib appeared on behalf of Mr. Bryant, who was also present. Defendants motion to adjourn trial 306 is GRANTED. Trial shall commence on January 26, 2026, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. The parties are directed to file a joint status letter no later than December 17, 2024. A status conference as to Defendant Bryant shall be held on March 4, 2025, at 2:00 p.m. in Courtroom 4H North. Time is excluded to March 4, 2025, in the interest of justice and to allow for additional plea negotiations. 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 9/18/2024. (Court Reporter Rivka Teich.) (CG) (Entered: 09/19/2024) |
| 12/11/2024 | 307 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jay Bryant held on 4/4/2024, for hearing type Status Conference, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Andronikh Barna, Telephone number 718-613-2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 1/2/2025. Redacted Transcript Deadline set for 1/13/2025. Release of Transcript Restriction set for 3/11/2025. (Barna, Andronikh) (Entered: 12/11/2024) |
| 12/15/2024 | 308 | Letter *regarding joint status update* as to Jay Bryant (McConnell, Artie) (Entered: 12/15/2024) |
| 02/25/2025 | 309 | MOTION to Continue *Status Conference and Exclusion of Timr* by Jay Bryant. (Gotlib, Valerie) (Entered: 02/25/2025) |
| 03/03/2025 | | ORDER: Defendant Bryant's motion 309 , made with the consent of the Government, to adjourn the status conference scheduled for March 4, 2025, is GRANTED. The status conference scheduled for March 4, 2025 is ADJOURNED to June 4, 2025, at 3:00 p.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. Time is excluded to June 4, 2025, in the interest of justice and to allow for additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 3/3/2025. (CG) (Entered: 03/03/2025) |
| 06/03/2025 | 311 | MOTION to Continue *June 4, 2025 Status Conference & Exclude Time* by Jay Bryant. (Gotlib, Valerie) (Entered: 06/03/2025) |
| 06/03/2025 | | ORDER: The parties' joint motion 311 to adjourn the status conference scheduled for June 4, 2025, is GRANTED. The status conference scheduled for June 4, 2025, is ADJOURNED sine die. The parties are directed to file a joint status letter by 5 PM on June 4, 2025. In addition, the parties are directed to |

| | | |
|---|---|---|
| | | file a status letter on August 4, 2025. The parties shall indicate in their June 4 status letter whether they consent to exclusion of time to August 4, 2025. Ordered by Judge LaShann DeArcy Hall on 6/3/2025. (NCW) (Entered: 06/03/2025) |
| 07/17/2025 | | ORDER: The Government is directed to file a letter providing the Court with citations to the record in support of the following sentences in their Memorandum of Law in Opposition to Defendant Jordan's Post-Trial Motions for Acquittal or a New Trial ("Gov't's Opp'n.") 296 no later than July 18, 2025: "First, the eyewitnesses had 'no doubt' in their identifications of Jordan and Washington as the perpetrators, which were made in a small, well-lit indoor space from mere feet away" (Gov't's Opp'n. at 63); and "Second, the narrative provided by both Rincon and High, as well as the physical evidence showing a 'contact shot,' made plain that Mizell knew his killer -- he got up to greet the shooter, smiled and gave him an embrace or handshake immediately before the gunshots" (Gov't's Opp'n. at 63-64). Ordered by Judge LaShann DeArcy Hall on 7/17/2025. (NCW) (Entered: 07/17/2025) |
| 07/18/2025 | 312 | Letter *Containing Record Citations in Response to the Court's Order Dated July 17, 2025* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 07/18/2025) |
| 08/05/2025 | 313 | Joint MOTION for Extension of Time to File *Status Update and Request to Exclude Time Until Trial* by USA as to Jay Bryant. (Gonzalez, Miranda) (Entered: 08/05/2025) |
| 08/18/2025 | | ORDER: The parties' joint motion 311 to exclude time is GRANTED. Time is excluded from June 4, 2025, to January 26, 2026, in the interest of justice to allow for the review of discovery and additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 8/18/2025. (CG) (Entered: 08/18/2025) |
| 08/18/2025 | | ORDER: The parties' joint motion 313 for an extension of time to file a status update is GRANTED. The parties are directed to file a joint status letter no later than August 19, 2025. In addition, a status conference shall be held on September 17, 2025, at 3:00 p.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 8/18/2025. (CG) (Entered: 08/18/2025) |
| 08/19/2025 | 314 | STATUS REPORT by Jay Bryant (De Castro, Cesar) (Entered: 08/19/2025) |
| 09/17/2025 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Jay Bryant was held before Judge LaShann DeArcy Hall on September 17, 2025. Assistant United States Attorneys Mark Misorek and Miranda Gonzalez appeared on behalf of the Government. Counsel for Mr. Bryant failed to appear. The trial scheduled to commence on January 26, 2026, is ADJOURNED to May 4, 2026, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. The parties shall submit a joint briefing schedule to the Court. A status conference as to Defendant Bryant shall be held on December 17, 2025, at 2:30 p.m. in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 9/17/2025. (Court Reporter Jamie Stanton.) (CG) (Entered: 10/06/2025) |
| 09/18/2025 | 315 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 020524, for hearing type Jury Trial, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber V. Torres Butler. Email address: vbutlerrpr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/9/2025. Redacted Transcript Deadline set for 10/20/2025. Release of Transcript Restriction set for 12/17/2025. (Torres-Butler, Victoria) (Entered: 09/18/2025) |
| 09/18/2025 | 316 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 020624, for hearing type Jury Trial, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber V. Torres Butler. Email address: vbutlerrpr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/9/2025. Redacted Transcript Deadline set for 10/20/2025. Release of Transcript Restriction set for 12/17/2025. (Torres-Butler, Victoria) (Entered: 09/18/2025) |
| 09/18/2025 | 317 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 020724, for hearing type Jury Trial, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber V. Torres Butler. Email address: vbutlerrpr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File |

| | | |
|---|---|---|
| | | redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/9/2025. Redacted Transcript Deadline set for 10/20/2025. Release of Transcript Restriction set for 12/17/2025. (Torres-Butler, Victoria) (Entered: 09/18/2025) |
| 09/18/2025 | 318 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr, Ronald Washington, Jay Bryant held on 020824, for hearing type Jury Trial, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber V. Torres Butler. Email address: vbutlerrpr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/9/2025. Redacted Transcript Deadline set for 10/20/2025. Release of Transcript Restriction set for 12/17/2025. (Torres-Butler, Victoria) (Entered: 09/18/2025) |
| 10/28/2025 | 319 | Letter *re Joint Proposed Briefing Schedule* as to Jay Bryant (Gonzalez, Miranda) (Entered: 10/28/2025) |
| 11/12/2025 | | ORDER: The parties' proposed briefing schedule for motions in limine is approved. In addition, the parties' request 319 to exclude time from January 26, 2026, to May 4, 2026, is GRANTED. Time is excluded from January 26, 2026, to May 4, 2026, in the interest of justice to allow for the defense to prepare for potential pretrial motion practice and additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 11/12/2025. (CG) (Entered: 11/12/2025) |
| 12/15/2025 | | ORDER: The Government is directed to file a letter providing the Court with any citation to the record in support of the following sentence in their Memorandum of Law in Opposition to Defendants' Post-Trial Motions for Acquittal or a New Trial ("Gov't's Opp'n.") 296 no later than December 16, 2025, at 1:00 p.m.: "There was evidence that... Jordan and Washington met up together after the murder." (Gov't's Opp'n. at 50.) Ordered by Judge LaShann DeArcy Hall on 12/15/2025. (JAR) (Entered: 12/15/2025) |
| 12/16/2025 | 320 | Letter *Containing Record Citations in Response to the Court's Order Dated December 15, 2025* as to Karl Jordan, Jr, Ronald Washington (Gonzalez, Miranda) (Entered: 12/16/2025) |
| 12/16/2025 | | ORDER: The status conference scheduled for December 17, 2025, is ADJOURNED *sine die*. The parties are directed to file a joint status conference no later than December 19, 2025. Ordered by Judge LaShann DeArcy Hall on 12/16/2025. (NCW) (Entered: 12/16/2025) |
| 12/19/2025 | 321 | Letter *Status Update* as to Jay Bryant (De Castro, Cesar) (Entered: 12/19/2025) |
| 12/19/2025 | 322 | ORDER: For the reasons set forth in the attached memorandum and order, Defendant Jordan's motion 292 for a judgment of acquittal is GRANTED, and Defendant Jordan's motion 292 for a new trial is conditionally DENIED. Ordered by Judge LaShann DeArcy Hall on 12/19/2025. (JAR) (Entered: 12/19/2025) |
| 12/19/2025 | 323 | ORDER: For the reasons set forth in the attached memorandum and order, Defendant Washington's motions 294 for a judgment of acquittal and, in the alternative, a new trial are DENIED. Ordered by Judge LaShann DeArcy Hall on 12/19/2025. (JAR) (Entered: 12/19/2025) |
| 12/29/2025 | 324 | Letter *Letter jointly requesting status conference re pending counts for Jordan and seeking exclusion of time* as to Karl Jordan, Jr (Misorek, Mark) (Entered: 12/29/2025) |
| 01/02/2026 | | ORDER: The parties' joint request for a status conference to discuss the pending counts against Defendant Jordan is GRANTED. A status conference shall be held on January 21, 2026, at 3:00 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. By no later than January 2, 2026, the parties are directed to file a joint status letter indicating whether they consent to the exclusion of time until January 21, 2026. Ordered by Judge LaShann DeArcy Hall on 1/2/2026. (CG) (Entered: 01/02/2026) |
| 01/02/2026 | 325 | Letter *in Response to Court's Order, Dated January 2, 2026, Confirming Joint Consent to Exclusion of Time* as to Karl Jordan, Jr (Gonzalez, Miranda) (Entered: 01/02/2026) |
| 01/03/2026 | | ORDER: The Government and Defendant Karl Jordan, Jr's joint request 325 to exclude time is GRANTED. Time is excluded until January 21, 2026, in the interest of justice to allow for the review of discovery and additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 1/2/2026. (NCW) (Entered: 01/03/2026) |
| 01/05/2026 | 326 | NOTICE OF APPEAL (Interlocutory) by USA as to Karl Jordan, Jr re 322 Order on Motion for Acquittal,. Appeal Record due by 1/19/2026. (Gonzalez, Miranda) (Entered: 01/05/2026) |

| | | |
|---|---|---|
| 01/05/2026 | | Electronic Index to Record on Appeal as to Karl Jordan, Jr sent to US Court of Appeals 326 Notice of Appeal - Interlocutory Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 01/05/2026) |
| 01/07/2026 | 328 | **CORRECTED** ORDER: For the reasons set forth in the attached memorandum and order, Defendant Jordan's motion 292 for a judgment of acquittal is GRANTED, and Defendant Jordan's motion 292 for a new trial is conditionally DENIED. Ordered by Judge LaShann DeArcy Hall on 1/7/2026. (CG) (Entered: 01/07/2026) |
| 01/07/2026 | 329 | NOTICE OF APPEAL (Interlocutory) by USA as to Karl Jordan, Jr re 328 Memorandum Opinion,. Appeal Record due by 1/21/2026. (Gonzalez, Miranda) (Entered: 01/07/2026) |
| 01/07/2026 | | Electronic Index to Record on Appeal as to Karl Jordan, Jr sent to US Court of Appeals 329 Notice of Appeal - Interlocutory Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 01/08/2026) |
| 01/12/2026 | 330 | MOTION to Withdraw Document *ECF No. 327* by Jay Bryant as to Jay Bryant. (De Castro, Cesar) (Entered: 01/12/2026) |
| 01/21/2026 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Karl Jordan was held before Judge LaShann DeArcy Hall on January 21, 2026. Assistant United States Attorneys Mark Misorek and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Mark DeMarco, Michael Hueston and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. A status conference as to Defendant Jordan shall be held on March 13, 2026, at 12:00 p.m. in Courtroom 4H North. Time is excluded until March 13, 2026, in the interest of justice to allow for additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 1/21/2026. (Court Reporter Jamie Stanton.) (CG) (Entered: 02/09/2026) |
| 01/30/2026 | 331 | MOTION for Bond by Karl Jordan, Jr. (Diaz, John) (Entered: 01/30/2026) |
| 02/06/2026 | 332 | RESPONSE in Opposition re 331 MOTION for Bond (Attachments: # 1 Exhibit A, # 2 Exhibit B (under seal)) (Gonzalez, Miranda) (Entered: 02/06/2026) |
| 02/06/2026 | 333 | Letter *containing Exhibit B (under seal)* as to Karl Jordan, Jr, ***SEALED DOCUMENTS*** (Gonzalez, Miranda) (Entered: 02/06/2026) |
| 02/09/2026 | 334 | MOTION to Continue *Motions In Limine Due Date* by Jay Bryant. (De Castro, Cesar) (Entered: 02/09/2026) |
| 02/12/2026 | | ORDER: Parties' joint motion for an extension of time to file their respective motions in limine is GRANTED. The parties shall file any motion in limine no later than March 13, 2026. Any oppositions to the motions in limine shall be filed no later than April 3, 2026. For the avoidance of doubt, neither party is permitted to file a reply brief with respect to their motion(s) in limine. Ordered by Judge LaShann DeArcy Hall on 2/12/2026. (NCW) (Entered: 02/12/2026) |
| 03/05/2026 | | ORDER: A status conference as to Defendant Bryant shall be held on March 12, 2026, at 3:00 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. At the status conference, the parties are directed to be prepared to definitively represent to the Court whether they seek a trial on Defendant Bryants charges or seek a change of plea hearing before a Magistrate Judge. Ordered by Judge LaShann DeArcy Hall on 3/5/2026. (CG) (Entered: 03/05/2026) |
| 03/12/2026 | 335 | Letter *Respectfully Requesting Adjournment of Status Conference* as to Jay Bryant (Gonzalez, Miranda) (Entered: 03/12/2026) |
| 03/12/2026 | | ORDER: In light of the parties' representation that plea negotiations have been fruitful and that they are in the process of finalizing their negotiations, the Government's request 335 , made with the consent of Defendant Bryant, to adjourn the status conference scheduled for March 12, 2026, is GRANTED. For this same reason, the Court will release Defendant Bryant's May 4, 2026, trial date so that the Court can better accommodate other criminal matters in which the defendant seeks a trial. Accordingly, the trial scheduled to commence on May 4, 2026, is ADJOURNED *sine die*. The status conference scheduled for March 12, 2026, is ADJOURNED to April 22, 2026, at 12:00 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. On consent of the parties, time is excluded till April 22, 2026. Ordered by Judge LaShann DeArcy Hall on 3/12/2026. (CG) (Entered: 03/12/2026) |

| | | |
|---|---|---|
| 03/13/2026 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Karl Jordan was held before Judge LaShann DeArcy Hall on March 13, 2026. Assistant United States Attorneys Mark Misorek and Miranda Gonzalez appeared on behalf of the Government. John Diaz, Mark DeMarco, Michael Hueston and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. A status conference as to Defendant Jordan shall be held on May 12, 2026, at 11:00 a.m. in Courtroom 4H North. Time is excluded until May 12, 2026, in the interest of justice to allow for additional plea negotiations. *See* 18 U.S.C. § 3161(h)(7).Ordered by Judge LaShann DeArcy Hall on 3/13/2026. (Court Reporter Charleane Heading.) (CG) (Entered: 03/23/2026) |
| 03/20/2026 | | ORDER: A status conference as to Defendant Jordan shall be held on March 24, 2026, at 1:30 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 3/20/2026. (NCW) (Entered: 03/20/2026) |
| 03/23/2026 | | ORDER: The status conference as to Defendant Jordan, scheduled for March 24, 2026, is ADJOURNED to April 7, 2026, at 3:30 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. In the interim, the Government is directed to investigate Defendant Jordan's proposed bail package, including the value of the suretors' equity in the properties offered in support of Defendant Jordan's proposed bail package, and file a letter indicating its investigative findings no later than April 2, 2026. Counsel for Defendant Jordan shall instruct the suretors of Defendant Jordan's proposed bail package to faithfully comply with the Government's investigation. Ordered by Judge LaShann DeArcy Hall on 3/23/2026. (CG) (Entered: 03/23/2026) |
| 03/27/2026 | | SCHEDULING ORDER: The status conference as to Defendant Jordan, scheduled for April 7, 2026, is ADVANCED to April 6, 2026, at 3:30 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 3/27/2026. (CG) (Entered: 03/27/2026) |
| 04/01/2026 | | SCHEDULING ORDER: The status conference as to Defendant Jordan, scheduled for April 6, 2026, at 3:30 p.m. is ADVANCED to April 6, 2026, at **1:00 p.m.**, before Judge LaShann DeArcy Hall in Courtroom 4H North. Ordered by Judge LaShann DeArcy Hall on 4/1/2026. (CG) (Entered: 04/01/2026) |
| 04/02/2026 | 336 | Letter *in response to March 23, 2026 Order regarding Jordan's proposed bail package* as to Karl Jordan, Jr (Gonzalez, Miranda) (Entered: 04/02/2026) |
| 04/06/2026 | | MINUTE ENTRY AND ORDER: A status conference as to Defendant Karl Jordan was held before Judge LaShann DeArcy Hall on April 6, 2026. Assistant United States Attorney Miranda Gonzalez appeared on behalf of the Government. John Diaz, Mark DeMarco, Michael Hueston, and Emilee Sahli appeared on behalf of Mr. Jordan, who was also present. As stated on the record, the Court found that the rebuttable presumption under 18 U.S.C. § 3142(e)(3) is applicable in this case in light of the drug offenses charged in Counts Three and Four of the Second Superseding Indictment and the Government appealing Mr. Jordans judgment of acquittal on Counts One and Two of the Second Superseding Indictment. Nonetheless, the Court found that Mr. Jordan successfully rebutted the presumption under § 3142(e)(3) by meeting his limited burden of production by coming forward with evidence that he does not pose a danger to the community and is not a flight risk. The Court further found, as explained on the record, that the Government failed to sustain its burden of persuasion as to whether Mr. Jordan is sufficiently dangerous or a flight risk to warrant Mr. Jordan's detention pending trial on his outstanding charged offenses - specifically, Counts Three through Eleven of the Second Superseding Indictment. Accordingly, for the reasons stated on the record, Defendants motion 331 for bond is GRANTED. The effectuation of Mr. Jordan's release on bond is referred to the duty magistrate judge consistent with this Court's Order and what was stated on the record during the April 6, 2026 status conference. That said, and as was noted on the record, the Government's request to stay the Order granting Defendant's motion for bond until April 10, 2026, to allow it an opportunity to appeal is GRANTED. The Order granting Defendant motion is STAYED until April 10, 2026. Ordered by Judge LaShann DeArcy Hall on 4/6/2026. (Court Reporter Charleane Heading.) (CG) (Entered: 04/09/2026) |
| 04/08/2026 | 337 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Karl Jordan, Jr held on January 21, 2026, for hearing type Status Conference, before Judge Dearcy Hall. Court Reporter/Transcriber Jamie Ann Stanton, Telephone number (718) 613-2274. Email address: jamiestanton.edny@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/29/2026. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 5/11/2026. Release of Transcript Restriction set for 7/7/2026. (Stanton, Jamie) (Entered: 04/08/2026) |
| 04/09/2026 | 338 | NOTICE OF APPEAL of Conditions of Release by USA as to Karl Jordan, Jr as to Order on Motion for Bond,,,,,,,, Status Conference,,,,,,, (Gonzalez, Miranda) (Entered: 04/09/2026) |
| 04/09/2026 | 339 | Letter *Indicating Appeal and Respectfully Requesting Formal Entry of the Stay* as to Karl Jordan, Jr (Gonzalez, Miranda) (Entered: 04/09/2026) |
| 04/09/2026 | | Electronic Index to Record on Appeal as to Karl Jordan, Jr sent to US Court of Appeals 338 Notice of Appeal - Conditions of Release Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 04/10/2026) |
| 04/10/2026 | | ORDER: Consistent with the Court's determination made on the record during the April 6, 2026 status conference, the Government's request to stay this Court's Order granting Defendant Jordan's motion for bond pending a decision on its appeal of said Order is GRANTED. The Court's Order granting Defendant Jordan's motion for bond is STAYED pending the Second Circuit's ruling on the Government's appeal. The parties shall file a joint status letter within two business days of the Second Circuit's determination. Ordered by Judge LaShann DeArcy Hall on 4/10/2026. (CG) (Entered: 04/10/2026) |
| 04/15/2026 | | ORDER: Defendant Bryant's change of plea is respectfully REFERRED to Magistrate Judge Peggy Cross-Goldenberg. Ordered by Judge LaShann DeArcy Hall on 4/15/2026. (CG) (Entered: 04/15/2026) |
| 04/20/2026 | | ORDER: The status conference as to Defendant Bryant scheduled for April 22, 2026, is ADJOURNED to June 2, 2026, at 3:00 p.m., before Judge LaShann DeArcy Hall in Courtroom 4H North. The parties are directed to file a joint status letter no later than 5 p.m. on April 21, 2026. The parties' status letter shall indicate whether they consent to the exclusion of time until June 2, 2026. Ordered by Judge LaShann DeArcy Hall on 4/20/2026. (CG) (Entered: 04/20/2026) |
| 04/20/2026 | | SCHEDULING ORDER-- A Plea Hearing as to Jay Bryant will be held on **April 27, 2026 at 12:15 P.M** in Courtroom 2F North. Ordered by Magistrate Judge Peggy Cross-Goldenberg on 4/20/2026. (JHD) (Entered: 04/20/2026) |
| 04/21/2026 | 341 | Letter *Joint Request to Waive Speedy Trial* as to Jay Bryant (Misorek, Mark) (Entered: 04/21/2026) |
| 04/24/2026 | | ORDER: The parties' joint motion as to Defendant Bryant 341 to exclude time to June 2, 2026 is GRANTED. Time is excluded from April 22, 2026 to June 2, 2026, in the interest of justice to allow for a change of plea and sentencing preparation. Ordered by Judge LaShann DeArcy Hall on 4/24/2026. (CG) (Entered: 04/24/2026) |
| 04/27/2026 | | Minute Entry for proceedings held before Magistrate Judge Peggy Cross-Goldenberg: Plea Hearing as to Jay Bryant held on 4/27/2026. Appearances: Mark Misorek and Miranda Gonzalez appeared on behalf of the government; and Cesar DeCastro (*CJA*) and Shannon McManus (*Retained*) appeared on behalf of defendant Jay Bryant (*in custody*). Defendant Sworn. Discussion held. The parties consented to plea before a Magistrate Judge. After the answers to the Court's questions, the Court recommends that the District Judge accept the defendant's guilty plea to count two and further accept the parties' plea agreement. (JHD) (Entered: 04/28/2026) |
| 04/28/2026 | 342 | NOTICE to Consent to plea before a United States Magistrate Judge as to Jay Bryant. (JHD) (Entered: 04/28/2026) |
| 04/28/2026 | 343 | Letter *Respectfully Requesting Acceptance of Guilty Plea* as to Jay Bryant (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Gonzalez, Miranda) (Entered: 04/28/2026) |

**PACER Service Center**

**Transaction Receipt**

04/29/2026 10:37:27

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] |

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CCC:JAM/MEM
F. #2017R00509

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 22, 2022

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Karl Jordan, Jr., also known as "Little D" and "Noid," Criminal Docket No. 20-CR-305 (LDH) (S-1)

Dear Judge DeArcy Hall:

The government respectfully submits this letter in opposition to defendant Karl Jordan, Jr.'s motion for release on bond, ECF Docket No. 73 ("defendant's motion" or "Def. Mot."). Several of the charged crimes carry a statutory presumption of detention that Jordan cannot rebut – he is a danger to the community and a flight risk that no bail conditions can cure. Accordingly, for the reasons set forth below, the government respectfully submits that the Court deny the defendant's motion and continue the permanent order of detention.[1]

I. Procedural History

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Jordan and Ronald Washington with one count of murder while engaged in narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one count of firearm-related murder, in violation of Title 18, United States

[1] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

Code, Sections 924(j)(1), for the October 30, 2002 murder of Jason Mizell, also known as "Jam Master Jay." Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively. On August 17, 2020, both Jordan and Washington were arraigned. The Pre-Trial Services Report noted that there were "no combination of conditions to reasonably assure [Jordan's] future court appearance and the safety of the community." On the government's motion, permanent orders of detention were issued for both defendants.

On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with additional crimes, including one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C), and one count of use of firearms in connection with a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

For the charged offenses relating to Mizell's killing, Jordan faces a statutory mandatory minimum term of imprisonment of 20 years and a maximum of life.[2] Additionally, both the 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) and the 18 U.S.C. 924(c) charges carry ten and five-year mandatory minimum sentences, respectively, which must run consecutively. The combined statutory mandatory minimum is 25 years.

## II. Factual Background and Offense Conduct

The instant indictment arises from an investigation of Mizell's murder conducted by the New York City Police Department ("NYPD"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and the United States Attorney's Office for the Eastern District of New York. Mizell was a member of the influential hip hop group Run-D.M.C. Mizell, Washington and Jordan are all from Hollis, Queens.

The investigation has revealed that, prior to his murder, Mizell sought to exclude Washington from a multi-kilogram narcotics transaction. In retaliation, Washington and Jordan conspired to murder and ultimately executed Mizell.

### A. The Narcotics Conspiracy

In addition to his music career, in or about and between 1996 and 2002, Mizell was involved in transporting kilogram-quantities of cocaine for retail sale in the Eastern District of New York and elsewhere. In or about July 2002, Mizell acquired approximately ten kilograms of cocaine on consignment from a supplier in the Midwest. The cocaine was intended for distribution in Maryland by Washington, Jordan and other co-conspirators. A dispute between Washington and one of the co-conspirators resulted in Mizell telling

[2] On or about November 6, 2021, that United States Attorney General Merrick B. Garland has authorized and directed the United States Attorney's Office for the Eastern District of New York not to seek the death penalty against either defendant.

Washington that he would be cut out of the Maryland transaction. Following Washington's dispute with Mizell, Washington and Jordan conspired to murder Mizell.

B. The October 30, 2002 Murder of Mizell

On Wednesday, October 30, 2002, Mizell and several others were present at his recording studio, 24/7 Studio, located on Merrick Boulevard in Queens, New York. At approximately 7:30 p.m., Washington and Jordan, armed with firearms, entered the studio. Each brandished a firearm. Washington pointed his firearm at one of the individuals located inside the studio and demanded that the person lay on the floor. Jordan approached Mizell, pointed his firearm at him, and fired two shots at close range. One of those shots struck Mizell in the head, killing him. The second shot struck another individual in the leg.

C. Jordan's Continued Narcotics Trafficking and Firearm Usage

Subsequent to Mizell's murder, Jordan's involvement in the narcotics trade and firearms offenses continued unabated until his arrest in 2020. Jordan would typically sell cocaine and cocaine base to a variety of different buyers on a weekly basis. He would often be in possession of a firearm while doing so – one witness described the type and color of a firearm that Jordan kept in either the driver's side door pocket or the center console of his vehicle while engaging in narcotics transactions. Another witness described how one of Jordan's young children would be in the car when he would deliver narcotics.

In and around 2017, Jordan made seven separate narcotics sales to an undercover law enforcement agent. These transactions were recorded using both audio and video recording devices. A still frame from one of those sales is below:



Subsequent to his arrest in August 2020, law enforcement executed a search warrant on mobile phones seized from Jordan, which yielded the following evidence of narcotics trafficking and firearms use:

- Numerous photographs and videos of Jordan holding stacks of hundred-dollar bills and other denominations of money;

- Photographs and videos of Jordan wearing and examining diamond encrusted jewelry. In one such video, Jordan is rapping that he has "100 pounds on the flip" – a reference to reselling or "flipping" a quantity of narcotics, and "30 in the clip" – a reference to the amount of ammunition in a semi-automatic firearm.

- Music video clips where Jordan references his possession and use of firearms. For example, in one video he raps about "carrying magnums all the time, not just when I get some ass." In another, Jordan raps that "boy I a savage, bullets in my gun gonna keep n-ggas off me…I had them shooters delivered to your crib like the Amazon Prime…I'm from Hollis where I learned from my past so I move around Queens with a gun and a mask."

III. <u>Criminal History</u>

Although Jordan has no adult criminal record, he was arrested for Robbery in the Second Degree in 1999 and was adjudicated a juvenile delinquent. Despite his lack of record, the government is aware of several incidents where Jordan has used or been in possession of firearms, as described below:

- On February 3, 2003, Jordan was arguing with an individual on 203rd Street in Queens. Jordan produced a semi-automatic pistol and fired one shot in into the air. Responding police officers recovered the spent shell casing and an additional 83 live rounds. Though Jordan was initially charged with a felony firearm offense, the eyewitness refused to cooperate and testify, and the grand jury only indicted Jordan for possession of ammunition, a misdemeanor. Jordan eventually pled guilty to a disorderly conduct violation.

- On May 14, 2003, Jordan fired several shots at an individual on Hollis Avenue in Queens, striking him once in the leg. Jordan was arrested for Criminal Use of a Firearm in the First Degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.

- On November 1, 2004, Jordan was involved in a shootout with another individual on Farmers Boulevard in Queens. Rounds from the exchange went through windows and walls of the surrounding houses, cars and a nearby church. Over 27 pieces of ballistic evidence – including shell casings

and spent projectiles – were recovered by responding officers. The defendant fled the scene in a gold BMW and was later arrested. The case was ultimately dismissed.

- On December 15, 2004, a search warrant was executed at Jordan's residence on 203rd Street in Queens, predicated on Jordan's narcotics sales. During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest. Also in the residence were over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested. The defendant eventually pled guilty to a disorderly conduct violation. Notably, one of the defendant's alibi witnesses was living with Jordan at the time, was present during the search warrant execution and also arrested.

Prior to his arrest, Jordan also performed rap music under the stage name "Yadi" or "Young Yadi" as part of a group called "Rich Fly Gees." Content from Jordan and "Rich Fly Gees" is publicly available on various internet and social media sites, where Jordan brags about his narcotics dealing and use of firearms. For example:

- In one of Jordan's music videos, titled "Aim for the Head," a series of photographs are shown as Jordan raps in the background. The images include firearms (including semi-automatic pistols and assault weapons, some equipped with what appear to be silencers); pictures of Jordan and the "Rich Fly Gees" logo; individuals pointing guns; and dead bodies with apparent gunshot wounds to the head. In the song, Jordan repeatedly says "we aim for the head, no body shots, and we stick around just to see the body drop." The first verse begins with Jordan saying, "I aim for the head, I ain't a body shooter" and that "the whole team grips [carries firearms]…everybody shoots." The song continues with Jordan describing various acts of violence with firearms, including "put the metal in your mouth like a doctor would, and pull the trigger."

- In one interview, Jordan states, "the motto for 2010 is aim for the head, no body shots…that don't count…ya'll n-ggas that shoot n-ggas in the legs, the stomach and all that, we ain't respecting that…we ARs [AR-15 assault rifles] out the window, that's the new move."

- In another video, the song begins "from the scales to the pots, from the pots then I'm pitching, for that money n-gga, I be on a motherfucking mission," which refers to weighing cocaine ("the scales"), cooking the cocaine into crack cocaine ("the pots") and then selling retail quantities ("I'm pitching"). The song continues with Jordan discussing how he prepares and "slings crack;" handles kilogram quantities ("keys…that's coke talk"). The last image in the video is a

sign that says "I'm not a rapper. I'm just a hustler." Images of stacks of money and kilogram quantities of cocaine are frequently depicted.

- Another song, titled "Silver Spoon," features Jordan rapping in front of a mural commemorating Mizell. The chorus of the song is Jordan saying "I wasn't born with no silver spoon…I had to grind, grind and get it out the pot…and get it off the block…get it off the rock, my family won't eat if this phone don't pop...so its 24/7 cause this phone don't stop." In the next verse, Jordan says he "hustles hard," "like the mob," a "dealer serving hands like they cards" and brags how his "whole life" he "never had a job…I do construction, cause I be breaking down bricks."

Notably, in a publicly available interview where Jordan discusses his music, he says "I can speak on real life experiences, and I can make em make sense. I'm not just, like, you know, a drug-dealer rapper or a gangster killer rapper, I rap about reality. So that's what you hear coming through my music, what I'm going through, or what I've been through before."

The defendant's criminal conduct has even continued after his arrest and detention at the Metropolitan Detention Center ("MDC") – on or about August 16, 2021, the defendant was found in possession of a contraband cellular phone while in his cell.

IV. Legal Standard

A. The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

B. Presumption Cases

In cases such as this one, a rebuttable presumption both of flight and dangerousness arises when there is probable cause to believe the defendant committed a drug offense carrying a maximum sentence of ten years or more; a firearms offense under 18 U.S.C. § 924(c); or a violation of the controlled substances act for which the maximum penalty is life imprisonment or death. 18 U.S.C. § 3142(e)(3)(A), (B); 18 U.S.C. § 924(j) (murder "in the course of a violation of subsection (c)"); 21 U.S.C. § 848(e)(1)(A) (conviction is punishable by "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death."). Here, the defendant is charged with four such offenses. The presumption requires the Court to initially assume there are "no conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3).

When a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). To be released, a defendant facing this presumption must come "forward with evidence that he does not pose a danger to the community or a risk of flight," though the government must ultimately persuade the court that detention is warranted. Mercedes, 254 F.3d at 436. Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

C. Dangerousness

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history); United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). This includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). Indeed, because detention pending trial is considered "regulatory rather than punitive," the decision to detain a defendant pending trial "does not require proof of a threat beyond a reasonable doubt, is not subject to Sixth Amendment jury guarantees, and does not provide for the defendant's right to confront and cross-examine witnesses." United States v. Choudhry, 941 F.Supp.2d 347, 350 (E.D.N.Y. 2013) (Kuntz, J.) (citing United States v. Gallo, 653 F.Supp. 320, 334 (E.D.N.Y. 1986) (Weinstein, J.)).

V. Argument

The defendant is charged with four separate crimes that each, standing alone, carry a presumption of detention and justify remand. Nothing in the defendant's motion

sufficiently rebuts this presumption: he provides no medical records, no verifiable employment history, few specifics of how "home detention" would be implemented and enforced, and no information on the identity of the suretors.[3]

Even absent any presumption, consideration of the applicable factors overwhelmingly warrant detention in this case. Jordan's history and characteristics demonstrate that he has a propensity for criminal conduct and violence, presents a danger to potential witnesses in the instant case and to the community at large, and is a substantial flight risk. See, e.g., United States v. Ferranti, 66 F.3d 540 (2d Cir. 1995). Accordingly, the Court should deny the defendant's motion and continue the permanent order of detention pending trial.

A. The Nature and Circumstances of the Charged Offenses Support Detention

The seriousness of the charged offense cannot be overstated: the defendant participated in the ambush and execution of a renowned musician and prominent member of the Queens community in his own music studio. The inherent dangerousness of individuals who would perpetrate such an offense is self-evident. In such circumstances, the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which try to "replicate a detention facility without the confidence of security such a facility instills." Millan, 4 F.3d at 1049. If the government "does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." Id., 4 F.3d at 1049 (citation and internal quotation marks omitted). See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"). Indeed, even the confines of the MDC are insufficient to prevent Jordan from committing crimes – his possession of a contraband cell phone in the facility is separate and distinct federal offense. See 18 U.S.C. § 1791. In sum, the defendant presents an acute danger to the community that no set of bail conditions can mitigate.

Beyond this, there is a significant risk that Jordan would seek to threaten or otherwise tamper with witnesses if released. The government is aware of four separate witnesses that Jordan endeavored to identify and silence through threats and coercion and has enlisted others to do so on his behalf. Indeed, the government is aware of one of the defendant's suretors reaching out to and attempting to influence potential witnesses in the case. This "serious risk that the [defendant] will…attempt to obstruct justice, or…to threaten, injure, or intimidate, a prospective witness or juror" provides an additional basis for detention. 18

[3] Notably, the proposed $1,000,000 bond – signed by sixteen "financially responsible people" – is only securitized by $20,000 in cash. Def. Mot., p. 5-6. While "Mr. Jordan's father and maternal grandmother" may be willing to "post their properties as collateral," they have not done so, and there is no information about the ownership or represented value of the properties. Id.

U.S.C. § 3142(f)(2)(B); see United States v. Friedman, 837 F.2d 48 (2d Cir. 1988) and United States v. Jones, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008) (noting that "the release of [the defendant] on bail, thereby allowing him to return to the community where the victim's murder took place, would create a danger for all witnesses, irrespective of whether they have cooperated with the Government."). The fact that Jordan has been in possession of an untraceable and unmonitored contraband cell phone while incarcerated only exacerbates this risk.

Additionally, "when the sentence…upon conviction is likely to be long…a defendant has stronger motives to flee." United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015). Here, both the 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) and the 18 U.S.C. 924(c) charges – standing alone – carry ten and five-year mandatory minimum sentences, which must run consecutively, and conviction on either count related to Mizell's homicide would require a mandatory minimum sentence of ten or twenty years, respectively. Such significant sentencing exposure weighs in favor of detention, as it provides motive and incentive to flee the jurisdiction. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (citing 18 U.S.C. § 3142(a) and holding that, "[i]n this case, the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight); United States v. Benatar, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) ("[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.").

B. The Defendant's History and Characteristics Warrant Detention

While Jordan has no adult criminal record, the conduct he is charged with is not aberrational. As noted above, Jordan has been involved in narcotics trafficking for decades. He has carried, brandished and used firearms on numerous documented occasions, something he brags about and glorifies in his music. The fact that witnesses and complainants have refused to cooperate with law enforcement in prior cases has undoubtedly emboldened him to commit other crimes and acts of violence. See United States v. Choudhry, 941 F.Supp.2d 347, 349-50 (E.D.N.Y. 2013) (citing United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) and noting "the Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release" and rejecting that "violent conduct…be connected to the activity charged in the indictment"). In sum, Jordan's charged and uncharged conduct evinces such brazen criminality that even the most restrictive bail conditions would be insufficient.

C. The Weight of the Evidence is Considerable

Jordan cites his potential alibi witnesses, a "DNA hit identifying another suspect," and the government's disclosures pursuant to Brady v. Maryland, 373 U.S. 83 (1963),

as undercutting the strength of the government's case. This is wholly inaccurate and irrelevant for bail purposes.

First, the mere existence of alibi witnesses cannot justify release on bail, and the government does not credit their proffered testimony. United States v. Jones, 566 F.Supp.2d 288, 293-4 (S.D.N.Y. 2008) (noting that alibi witnesses who testified at a detention hearing had "significant credibility issues" where one witness was a "friend" of the defendant since childhood and the other was "in a relationship" with the defendant and had a prior contact with the criminal justice system.). Here, both witnesses have close familial and financial ties to Jordan. They both also have denied any knowledge of Jordan's narcotics trafficking and claim to be unaware of whether he had a job or how he makes a living. As noted previously, one of the alibi witnesses was living with and arrested with Jordan during the aforementioned December 15, 2004 search warrant execution, where multiple firearms, various quantities of narcotics and drug paraphernalia were recovered. In short, the government does not credit their likely testimony about Jordan's whereabouts.

Second, the fact that a hat recovered from Mizell's recording studio – a place where numerous people, including the defendant, would often congregate – contained a mixture of several other individuals' DNA is not significant or exculpatory. Regardless, it is settled law the indictment "conclusively determines the existence of probable cause" and "a grand jury indictment cannot be undermined by an independent judicial determination…in the context of a detention hearing." United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985) (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975); see also, e.g., United States v. Johnson, 547 Fed.Appx 64, 65 (2d Cir. 2013) (rejecting defendant's argument that the rebuttable presumption provided in § 3142 should not apply because "there is insufficient evidence of his guilt" as "unavailing since an indictment returned by a duly constituted grand jury" conclusively establishes the existence of probable cause.") (internal quotations omitted); see also, United States v. Jones, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008) (noting that the "weight factor" may be considered "only in terms of the likelihood that the person will fail to appear or pose a danger to any person or the community" and noting that courts generally consider the weight factor the "least important" bail factor). Indeed, the evidence adduced at trial will be substantial, including eyewitness and co-conspirator testimony establishing Jordan's relationship with Washington, his involvement in the underlying narcotics conspiracy, and his role as Mizell's shooter. While Jordan claims that there is little evidence linking him to Mizell's murder, he ignores the fact that a grand jury has heard evidence – twice – and voted an indictment charging him with these crimes. See Contreras, 776 F.2d 51, 55 (2d Cir. 1985) (probable cause and sufficiency of evidence may be established by an indictment, such that there is no need for an independent judicial probable cause determination for bail purposes).

Notably, Jordan does not argue – or even mention – the other charges against him, where the proof is unassailable. As stated previously, the government's narcotics trafficking case is underpinned by seven separate narcotics sales to an undercover law enforcement agent that were both audio and video recorded. See, e.g., United States v. Fishenko, No. 12-CR-626, 2013 WL 3934174, at *2 (evidence of "pertinent recorded

conversations" weighed against release). This evidence will be supplemented by witness testimony and other evidence, showing the scope of Jordan's narcotics and firearm-related criminality.

While the Court need not reach any conclusions about the merits of the government's case, the defendant's arguments regarding the likely evidence against him are unavailing and do not support his motion for release.

D. The COVID-19 Pandemic Does Not Provide a "Compelling Reason" for Release in These Circumstances

In the alternative, the defendant argues that the ongoing COVID-19 pandemic provides a "compelling reason" for his release pursuant to 18 U.S.C. § 3142(i). Specifically, Jordan claims that he is at heightened risk should he contract the virus, and that conditions at the MDC impede his ability to prepare for trial. Neither of these arguments has merit.

First, aside from claiming that he is at "elevated risk of complications from COVID-19 as a result of donating one of his kidneys," Def. Mot., p. 2, Jordan has provided no medical records or other documentation for the Court's consideration. By all accounts, Jordan is a healthy 39-year-old man who is neither in an at-risk category or suffering from any comorbidities.[4] Significantly, Jordan remains unvaccinated, despite widespread availability of the vaccine within MDC for over a year.

Second, while pandemic restrictions at MDC invariably complicate every defendant's ability to prepare for trial, the overwhelming majority of courts in this Circuit have refused to release defendants under Section 3142(i) in the absence of an imminent hearing or trial. See e.g., United States v. Estevez, 18-CR-669-1 (JPO), 2020 WL 1911207, at *2 (S.D.N.Y. Apr. 20, 2020); United States v. Vizcaino, 20-CR-241 (RMB), 2020 WL 1862631, at *3 (S.D.N.Y. Apr. 14, 2020); United States v. Liverman, 19-CR-761-13 (JPO), 2020 WL 1847864, at *2 (S.D.N.Y. Apr. 13, 2020) (denying bail application and finding that "[d]efendant is not likely to be prejudiced by the lack of in-person access to counsel in the near future."); United States v. Eley, 20–CR-78-3 (AT), 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) (denying temporary release under § 3142(i) and stating "with trial scheduled for nine

---

[4] In United States v. Hamilton, No. 19-Cr-54, 2020 WL 1323036 (E.D.N.Y. 2020), Judge Garaufis was confronted with facts similar to those of the instant case. The defendant in Hamilton was indicted for murder while engaged in narcotics trafficking under 21 U.S.C. § 848(e)(1)(A) – one of the offenses Jordan is charged with – for a killing that had occurred approximately 30 years ago. The defendant had minimal contact with the criminal justice system since that time. Id at *1-2. Noting the "rebuttable presumption that [the defendant] poses both a danger to the community and a flight risk," Judge Garaufis denied the defendant's motion for release based on 18 U.S.C. 3142(i)(4), stating that "this provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." Id at *2.

months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may support a defendant's temporary release"); United States v. Brown, 19–CR-792 (LTS) (S.D.N.Y. Apr. 6, 2020) (denying defendant's application for temporary release because, among other things, the defendant had not identified any specific difficulty in preparing his defense or any imminent need to do so); United States v. Chambers, 20-CR-135 (JMF), 2020 WL 1530746, at *1 (S.D.N.Y. Mar. 31, 2020) (rejecting defendant's argument that temporary release under § 3142(i) was necessary for the preparation of his defense when non-evidentiary initial pretrial conference was still a month away); United States v. Mercado, No. 19-CR-906 (JMF), 2020 WL 2765879, at *1 (S.D.N.Y. May 28, 2020) (finding temporary release unnecessary for the preparation of defense when the "trial [was] unlikely to occur for many months"); United States v. Peralta, No. 19-CR-818 (PGG), 2020 WL 2527355, at *4 (S.D.N.Y. May 18, 2020) (denying release when trial was not imminent, even though defendant spoke with counsel on the phone only once in nearly three months); United States v. Jimenez, No. 20- CR-122 (LTS), 2020 WL 1974220, at *3 (S.D.N.Y. Apr. 24, 2020) (denying release because, inter alia, trial was not imminent). Here, the Court has advised the parties that it is unavailable to conduct hearings or trial in the case prior to September 2022, and the trial schedule remains in flux.[5]

Thus, while there is no doubt that COVID-19 remains a grave public health concern, the defendant has not credibly alleged any heightened risk factors that would expose him to more serious consequences were he to become infected. Nor do the COVID-19 protocols at the MDC justify release, particularly due to the uncertainty of the trial date and Jordan's manifest risk of flight and danger to the community. See, e.g., United States v. Rico, 18 CR. 661 (PGG, 2020 WL 1934989, at *6 (S.D.N.Y. Apr. 21, 2020) (suspension of legal visits does not constitute "compelling reason" under Section 3142(i) for [defendant's] release on bail" given his risk of flight and danger to community).

[5] The government notes that conditions at MDC have recently improved. The defendant's unit is not in quarantine and the MDC is now open for in-person legal visitation. To the extent necessary, the government can facilitate in-person meetings between the defendant and his legal team at either the Courthouse or the U.S. Attorney's Office, or to consider other methods to ensure sufficient time to review discovery materials, both individually and with counsel present.

## VI. Conclusion

The defendant's motion should be denied in its entirety. The defendant is charged with multiple offenses that carry a presumption of detention, and the defendant's motion and proffered bail package is insufficient to rebut this presumption. Regardless, there is clear and convincing evidence that the defendant poses a danger to the community if released, and a preponderance of the evidence shows that he is a flight risk. No single condition or combination of conditions can adequately remediate these risks. Finally, the COVID-19 pandemic does not provide a "compelling reason" for release under the present circumstances.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Artie McConnell
Mark E. Misorek
Assistant U.S. Attorneys
(718) 254-7000

cc: All Counsel of Record (by ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
20-CR-305(LDH)

UNITED STATES OF AMERICA,

United States Courthouse
Brooklyn, New York

-versus-

February 28, 2022
11:00 a.m.

KARL JORDAN,

Defendant.

------------------------------x

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Government: UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ARTIE MCCONNELL, ESQ.
Assistant United States Attorney

For the Defendant: BY: MICHAEL HUESTON, ESQ.
JOHN DIAZ, ESQ.
MONICA NEJATHAIM, ESQ.

Also Present: ROBERT LONG, Pretrial

Court Reporter: Rivka Teich, CSR, RPR, RMR, FCRR
Phone: 718-613-2268
Email: RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court.)

THE COURTROOM DEPUTY: All Rise. Criminal cause for bail application. United States of America vs. Karl Jordan, docket 20-CR-305.

Would you all please state your appearances for the record, starting with the Government.

MR. McCONNELL: Good morning. Artie McConnell for the United States. I'm joined by Robert Long from Pretrial Services.

THE COURT: Hello.

MR. LONG: Good morning, your Honor.

THE COURT: Good to see you.

MR. LONG: Same.

MR. HUESTON: Good morning, your Honor. Michael Hueston and John Diaz and Monica Nejathaim for Karl Jordan who is standing next to me.

THE COURT: Good morning.

All right, folks, we're here today for a bail hearing determination in this matter.

This is your application, counsel, I'm going to ask that you proceed.

MR. HUESTON: Thank you, your Honor, I appreciate the opportunity.

THE COURT: If you could stand.

MR. HUESTON: Yes, your Honor.

I appreciate the opportunity to address the Court about this issue. Let me first say that I really want to focus on the strength of the package. What we propose is a million --

THE COURT: I don't think you should start with the package, that puts the cart before the horse, if I don't know a package is something I'm going to do. I think you should probably start with the basis for a bail in the first place.

MR. HUESTON: I appreciate that.

Looking at the case, clearly this is a presumption case. The issues that the Court has to consider are dangerousness and flight of risk.

We look at it in terms of the analysis in terms of -- I'll talk about dangerousness first. Clearly we have serious charges. I'm going to address the strength of the Government's case but I do want to talk about some other issues at well.

Let me talk about the strength of the Government's case. I think that's a critical factor for the Court to consider. What we pointed out in our investigation and dealing with the Government in the past 18, 19 months, we pressed for information showing that Mr. Jordan was involved in the Mizell homicide. What we've seen is the absolute absence on that point. I'm not making an overstatement. This is not hyperbole.

Our client submitted to DNA testing against evidence at the crime scene. It was negative. There has been no surveillance video. There are no text messages. There is no cell-site dates, no ballistics, no forensics, no fingerprints. It's the absence of evidence.

On top of that, we notified the Court and submitted to the Government notice of alibi. We believe our alibi witnesses are exceptionally strong. Granted the Government can take its position, but I'll say this about them. We've noted in our application that one was a former correctional officer and is a school teacher. And the other one --

THE COURT: We're talking about, so I'm clear, there are two proposed alibi witnesses, one. Of whom is Mr. Jordan's mother; is that correct? And the other is an individual with whom he is in a relationship. I want to make sure I'm clear about who we're talking about; is that right?

MR. HUESTON: Your Honor, one correction. I appreciate the question to clarify it. No, it's not his mother. It's his girlfriend at the time.

THE COURT: Girlfriend at the time.

MR. HUESTON: Mother of his oldest child and her mother.

THE COURT: And her mother. I've got it. Fair enough.

MR. HUESTON: That's the alibi that we presented.

THE COURT: Who is who? You were describing what they did, et cetera. The mom was the former correction officer?

MR. HUESTON: Yes, your Honor. The mother is the former correction officer and current school teacher. His girlfriend, or former girlfriend, is the mother of his eldest child.

THE COURT: They are prepared to testify at trial that Mr. Jordan was with them at the time of the Mizell homicide? Are you intending to put them before me today?

MR. HUESTON: No, your Honor.

THE COURT: What am I supposed to use to assess anything with respect to the credibility of the alibi witnesses to give the notion of the alibi witnesses any weight in this hearing at all? They are not here.

MR. HUESTON: Correct, they are not testifying today. We are not proffering them to testify.

THE COURT: How am I going to rely on anything about them if you're not going to proffer them so I can have the ability to assess them and what they have to say?

MR. HUESTON: Your Honor, we're proceeding by attorney proffer on this issue.

THE COURT: That's a tough one when this is, in large measure, some credibility determinations that I'd have to assess. But go ahead.

MR. HUESTON: Your Honor, I take your point. We see it in terms of the broad issue. If you look at the pieces with the lack of evidence we've been putting together, we submitted the alibi. The Government is proceeding by proffer in many respects as well.

THE COURT: And an Indictment, which creates itself probable cause. So Mr. Jordan has been indicted on a number of offenses. That Indictment itself, right, creates probable cause for the Court to be able to consider. Yes?

MR. HUESTON: Yes, your Honor. We're not disputing this is a presumption case.

THE COURT: I get that.

MR. HUESTON: We're locked into that.

THE COURT: You referenced the Government proceeding by proffer, and I'm saying it's a little bit more than that. Because I do have, against the back drop of a Grand Jury Indictment, where there was sworn testimony that was provided to a Grand Jury.

MR. HUESTON: Yes, your Honor. What I'm referring to is there are many other proffers that the Government is making. I don't want to belabor the point. They made proffers about arrests, other issues. They are proceeding by proffer. We think it's appropriate also, granted, your Honor can assess our credibility on the issue, but I don't have much more to add on it.

THE COURT: Right, but for the purposes of this case given the fact that it is a presumption case, it is your burden to come forth with evidence, right, for the Court to be able to assess. Evidence is the word.

MR. HUESTON: It's a limited presumption, your Honor. I do take your point. And it's a number of different factors.

The Government has to show by clear and convincing evidence that my client is a danger. Then also by a preponderance that he's a risk of flight. And we do have to make an assessment of the package in terms of the strength to overcome the presumption.

THE COURT: Right, but the rebuttal presumption -- I'm reading your submission: To rebut the penalty supposition by coming forth with evidence that he does not pose a danger to the community or risk of flight.

Then of course if you're able to do that, then I would be looking to the Government and then asking them what they have in response. But the starting point is for you to proffer evidence that would rebut that presumption, then I would turn to them and ask them to meet their burden.

I want to first assess that you have met yours.

MR. HUESTON: I understand, your Honor. I appreciate it. I think it's the correct way to do it.

Let me speak to other points that go to the strength

of the Government's case. For instance, I pointed out the lack of evidence in terms of forensics. What we really understand, this case is based on witness testimony. Another assessment that I think is a fair consideration for the Court, as we mentioned, is the number of Brady disclosures in this case, which is in our view, unprecedented. Our count, I don't think the Government disputes, is 14 different Brady disclosures that happened in this case. I think that's a fair assessment for the Court to look at.

THE COURT: Fourteen Brady disclosures with respect to the count which charges Mr. Jordan --

MR. HUESTON: The Mizell homicide.

Let me be fair, some of them have to do with issues that have to do with narcotics, but that's the minority, it's really the Mizell homicide.

The next issue I want to point out, your Honor, in terms of the Government's strength of the case, in terms of the assessment of -- I guess how the Government appears to want to prove its case. Reliance on rap lyrics, I want to talk about that. They said that's part of the mix.

THE COURT: It's not part of the mix for me. Let's be clear. Let me make it clear to the Government, because there are a number of pages in the Government's submission that does recount lyrics from rap music that that was performed or produced in this case as proffered by the

Government by Mr. Jordan. Certainly the lyrics are particularly violent, but let's be clear, this is a genre of music that encourages and promotes violent language in its lyrics. And this is, in part, for the profit of the artists as well for the music executives, that my personal estimation is they profit greatly off of the encouragement of violence and misogyny, et cetera, in rap music. I'm not going to hold any individual accountable for the lyrics in a rap song that is consumed by our community; and in fact, it's consumed by me. So that's not part of the total mix for this Court.

However, there is much other information contained in the Government's submission that is not reliant upon lyrics to rap songs. There are interviews that they cited to that is not a lyric to a rap song. There are other violent crimes that Mr. Jordan is at least alleged to have been involved in.

And so we can take the rap music out of the mix. This is never going to be a courtroom where I'm going to penalize any individual for participating in that artistic form.

MR. HUESTON: Understood, your Honor. I'll move on from that portion.

One other factor before addressing a couple of points you brought up. The decision not to seek the death penalty. I think that's a fair consideration for the Court to look at the strength of the case.

THE COURT: The strength of the case?

MR. HUESTON: Yes, your Honor. The decision itself, we do think that draws an inference of regarding the decision. When you look at the mitigating and aggregating factors, that's an assessment the Government makes. So clearly they made a decision not to seek, and that's an appropriate area for this Court to take note of.

THE COURT: You want me to, A, assume or make the logical leap that if the Government decides not to seek the death penalty in any death eligible case -- I have a number of death eligible cases on my docket -- that that determination in and of itself should suggest that the Government doubts the weight of the strength of its case as to the underlying crime?

MR. HUESTON: Your Honor, in terms of mitigating factors that's an assessment they look at in making that determination. That's the way --

THE COURT: One of many. I have no idea what went into the Government's determination why they didn't seek the death penalty in this case. I suspect if you examine the history of death penalty cases in this district, you would find that it is rare indeed that the Government seeks the death penalty. I don't believe that that necessarily suggests that the Government does not believe in the weight of the evidence in a particular crime. God, I hope that that's not what we're saying. Because then the suggestion should be that

we should seek the death penalty almost willy nilly just to prove that the case is strong. And we wouldn't want that. I wouldn't want that. You wouldn't want that. Defendants wouldn't want that. Rather, we would like for the death penalty determination to be made based on the consideration of a host of factors. Yes? As opposed to simply guilt or innocence.

MR. HUESTON: I'm not suggesting otherwise. I'm not. I'm sorry if I'm not stating my argument as clearly. It is a factor -- underlying that decision is the issue about the lack of evidence, the issue of alibi. And we think it's factor that it vindicates our point regarding the strength of their case. Nothing more than that. That's all I'm suggesting.

THE COURT: Okay.

MR. HUESTON: Just to move on, your Honor. To go to the points in terms of you mentioned about violent criminal past. What the Government proffered on four different incidents, I would just note that two of them were dismissed and two of them resulted in violations, which are not crimes. So we do not believe it's a fair inference to draw that Mr. Jordan is dangerous based on those incidents.

THE COURT: Let be clear what we're talking about. There are a number of instances that were highlighted in the Government's submission. You are absolutely correct in your

recitation of the disposition of those incidents. At least according to the Government, there were seven occasions, I believe, where Mr. Jordan had made sales of narcotics to an undercover officer. That's one among the incidents.

There is a February 2003 incident where Mr. Jordan was arrested in connection with a dispute that occurred where Mr. Jordan is alleged to have fired a semi-automatic pistol, and one shot into the air, for which he pled guilty to disorderly conduct.

There are incidents that it's alleged that Mr. Jordan, again in 2003, fired several shots from a gun and at an individual, one striking the individual in the leg. According to the Government, the witness refused to cooperate and, therefore, the charges were dismissed.

Then a 2004 incident where a search warrant was executed at Mr. Jordan's home. And in his home a 9-millimeter semi-automatic pistol was recovered, a loaded .32 caliber revolver, and a bullet-proof vest, along with 150 bags of marijuana, and various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Yes?

These are the incidents that you wanted to highlight that the disposition was what in those three in particular?

MR. HUESTON: Your Honor, either dismissals or as you mentioned the disorderly conduct.

What we're simply saying, your Honor, is that based on those dispositions, this Court cannot make an inference that the conduct itself was proven. The Government is proceeding by proffer. It would be different if they had a disposition to the fact. So that's the point --

THE COURT: Should I discount them all together because of the disposition? We know how the criminal justice system operates. We know there are various factors that can sometimes come into a disposition of a matter. We're not talking about one, but we're talking about many.

How should the Court view the numerosity of the alleged violent conduct notwithstanding the disposition?

MR. HUESTON: Your Honor, I think it's the same answer each time, that it should not be considered regardless of the amount. I don't think there is anything different in terms of the analysis. The lack of a disposition that ended against Mr. Jordan in a negative way is something that is just a fact. That's all I want to say about it.

THE COURT: He doesn't have an adult criminal record.

MR. HUESTON: He does not --

THE COURT: He has one juvenile.

MR. HUESTON: That's correct.

I'll talk about the 2017 issue which is, there was no arrest in that case. I do want to distinguish that. If

can you hear me out on this, your Honor. I'm going to try to explain it as best I can.

THE COURT: Am I striking you as someone who will cut you off?

MR. HUESTON: At times, yes, your Honor. I appreciate an active judge who is involved. I appreciate that you keep me thinking. I appreciate what you're asking.

THE COURT: I'll hear you out. Go ahead.

MR. HUESTON: The 2017, what I would say is, one, he wasn't arrested for it. I want to point that out. That was the basis of the (b)(1)(c) weight in the case, the initial aspect which is not a presumption case. That's the only solid evidence we have seen. I say solid in terms of, the Government has something to point to, compared to what I talked about which is general statements about narcotics activity. Here they are saying we have video, we have audio for 2017.

I note, though, they did not arrest him in 2017, or '18, or '19 or '20. That raises an issue. One, if the Government believes he's this person who is involved with continuous narcotics activity, the decision not to arrest is perplexing. It goes towards whether or not this is really an overstatement that he's a person who is involved in so much narcotics activity.

Also it goes to in terms of dangerousness. As well,

the decision not to arrest in 2017 says something about law enforcement's approach to him. It seems I think a fair inference to draw that they haven't, the deals happened, from their standpoint there was a lack of concern or bandwidth to address that issue. It cuts both ways that fact. So I want to point that out.

THE COURT: Give me a moment.

Much of your written submission focuses on your arguments concerning the Indictment as to Mr. Mizell's homicide. With respect to the remaining charges here, of which there are many, I want to make sure that I'm understanding that the thrust of your argument is that the Court should view the Government's -- if I'm putting words in your mouth you can correct me -- delay in acting upon any supposed belief in criminality here as suggesting that the strength of that case with respect to the other charges is underwhelming. That's the argument with respect to the remaining charges and that the Court should view the delay in the Government acting as somehow speaking to the strength of those charges?

MR. HUESTON: Yes, your Honor. Also I'd want to point out in terms of the cases that actually result in an arrest, I do think it's an important issue about the risk of flight. In those case there is no warrant history. I think that's a fair assessment. That Mr. Jordan was arrested on

charges and there is no issue about him returning to court. I think that's a fair consideration.

I do want to talk a bit about the narcotics aspect of the case.

THE COURT: I want to take a step back. Mr. Jordan never faced charges that carry the sort of potential consequences as these charges do. As we've discussed, he doesn't have an adult record.

So shouldn't the Court consider isn't it an appropriate consideration for the Court the amount of time that Mr. Jordan could be subject to if found guilty? I believe the statutory minimums here, and you'll correct me if I'm wrong, if convicted of these charges, 25 years as a minimum.

So while I appreciate the arguments you made, how is it that the Court should view that? Isn't it the case that the Court should view that as a consideration for the purposes of risk of flight? He didn't previously flee, he didn't have prior charges. But now he has charges that could subject him to almost as many years in prison as he's been alive.

MR. HUESTON: Your Honor, he was arrested on four occasions. One, according to the Government, involved a shooting where someone was injured. I do think they are comparable, that's a serious charge. Here we have a shooting. The Government is alleging someone was wounded. He appeared

and didn't flee. I think they are comparable to a degree.

Clearly, as you recite, your Honor, the amount of time goes into the decision, but that's also one of the reasons I do think this is a fair point to talk about the strength of the package.

We have 16 individuals who are family members and friends. You have the moral suasion. You have a bond of a million dollars and the absolute financial harm or devastation that would be set upon them if he were to violate his conditions or flee or commit a crime or violate the conditions of release. We have the issue of -- what we've proposed, is electronic monitoring, house arrest, and obviously where he would live have to be approved by Pretrial Services. We believe, that residence would be back with his girlfriend and his two children, and his girlfriend is an assistant deputy warden for the New York City Department of Corrections. We do think that's sufficient to allay -- to deal with the Court's concern, I should say, about a risk of flight. The package itself buttresses and makes sure that's not going to happen. It's a factor that this Court should look at.

For instance, if we came in here with one suretor and no package I think that's a fair consideration for the Court to look at. We have 16 suretors, financially responsible people and we propose a bond with property and cash. I do think that's a factor the Court should look at.

THE COURT: This is the property of his father in Georgia; is that right?

MR. HUESTON: His father in Georgia. And my understanding it's not the grandmother it's the aunt, your Honor.

THE COURT: Your footnote three to the submission: They may be willing to post their properties.

Words matter. Why do you caveat that with "may."

MR. HUESTON: Your Honor, my understanding is that they will do it. It's not may. We've confirmed that. We stand by that 100 percent. They are willing to do it.

A couple of other points just to mention, your Honor.

THE COURT: All right.

MR. HUESTON: The other issue I want to point out this goes to our other basis. We also put forward an alternative argument of temporary release. On large part he has one kidney. He donated a kidney; his mother needed kidney transplant.

THE COURT: Which, by the way, is incredibly honorable and commendable on Mr. Jordan's part. Go ahead.

MR. HUESTON: And so we do think that during the time of COVID there is an issue.

THE COURT: Is there a medical basis to suggest that he's at a higher risk of having a negative COVID outcome by

virtue of the fact that he has a single kidney? I understand that if the single remaining kidney were to fail, obviously, that would propose a problem medically. However, my question to you is, do you have a medical basis to suggest that because he lives with a single kidney, that he is by virtue of that fact, more susceptible to a high-risk outcome as a result of COVID?

Mr. Jordan, it's probably better if you don't interrupt your lawyer while I'm asking him a question because then he can't answer my question.

MR. HUESTON: Your Honor, it's our position that yes, because --

THE COURT: Not your position. I said do you have anything you can offer me from a doctor? I'm certain you're talented. I'm certain you're smart. So am I. But I'm not medical doctor. Neither are you.

Do you have a medical basis, something that you can provide to me from a medical expert, a doctor of any kind, who can say that the fact that he lives with a single kidney makes him more susceptible to a negative outcome if he were to contract COVID?

MR. HUESTON: The short answer is we have not submitted that application. But I do want to speak to the issue, your Honor. This is how we arrive at our conclusion and why we think there is a force to it.

He has one kidney. That basis itself puts him at risk if he were to have complications from COVID-19. That's not our circumstance right now that we're dealing with. We agree with that. He's standing next to me. He's well. We do see it as a factor in making a determination.

Also the issue in terms of lockdown --

THE COURT: Is he, in terms of his health, I understand he has one, any different than any other 36-year-old -- I think I got his age right -- healthy man? I understand if something were to happen to this kidney he would be. But as he sits here today, isn't he as healthy as any other 36-year-old? I have nothing reported in your submission, in pretrial's submission, to suggests that he has any medical issues. So he's just a healthy 36-year-old right now.

MR. HUESTON: He's a little older than that.

THE COURT: Forgive me.

MR. HUESTON: I'm not trying to be facetious. He's 38.

THE COURT: Fair enough. He was 36 at the time of his arrest. I lost two years, 38.

MR. HUESTON: The base line itself is he only has one kidney. He has higher risk if he were to have issues with COVID.

THE COURT: But you don't have a medical basis for

that.

MR. HUESTON: We do think that the lack of kidney itself is the medical basis.

THE COURT: And you're basing that on your medical expertise?

MR. HUESTON: No, your Honor, I'm not basing. I don't have medical expertise.

THE COURT: So you have nothing to offer me that I can look to to rely on to be able to say that the argument that you're making has any teeth.

MR. HUESTON: Your Honor, all I can say is that the lack of kidney is something we feel we had to present to you.

THE COURT: I understand that you have to tell me and I get that. But you could have told me that and said look at this letter from a doctor. This doctor has said that as a result of having a single functioning kidney, right, that makes him otherwise healthy right now, there is nonetheless some particular acute, unique risk that he faces different from another healthy 38-year-old.

I'm not taking issue with the fact that you raised the fact that Mr. Jordan donated a kidney to his mom; and therefore, is living with a single kidney. But what I understand is that he is living a healthy life as any other 38-year-old man at this time. And if there was something else beyond that, I would have expected for you to have provided

that to me. So that it is not just lawyer argument, but based in evidence of something.

MR. HUESTON: Your Honor, I take your point. We have no further information on that issue.

THE COURT: But you could have. You could have. You could have called a doctor. I don't know what a kidney specialist is called, it's escaping me. You could have contacted one, you could have given me information.

All I have is a healthy 38-year-old man who, again did something incredible for his mom, but nonetheless is a healthy man at 38, functioning with a single kidney with no health issues.

MR. HUESTON: Your Honor, there is nothing further I have to add on the point. But again, I do think that that statement itself in terms of his physical condition, that's what we proffered to you and told you about.

I'm prepared to move on.

THE COURT: That's fine.

MR. HUESTON: I did want to emphasize it, I think it's important --

THE COURT: I don't know how important it can be if you've given me nothing but your argument and no evidence. If it was that important I think you should have treated it with the importance that you believe it has. You can't expect me to treat it with that level of importance if you didn't.

Go ahead.

MR. HUESTON: The other issues I want to talk about with respect to COVID-19, your Honor, is in terms of quality of representation in dealing with the consistent lockdowns. That's a factor the Court should look at.

Your Honor, is fully aware of the different orders that have gone in and the issues that have occurred at MDC in this case, and we think that's a factor the Court should look at in terms of a temporary release. We ask your Honor to look at that.

THE COURT: When you say look at that, you're talking about specifically difficulties that you are having in terms of the preparation for any eventual trial in this matter, or are you talking about the conditions that Mr. Jordan has had to endure as a result of the COVID-19 virus? They are obviously related, but different. Can you tell me what you're referring to specifically with respect to this argument?

MR. HUESTON: We're talking about the conditions that he's had to endure. That's one part. The other part is for instance lockdowns, we can't have access to him. Both of them are part of that determination, your Honor.

THE COURT: Okay.

MR. HUESTON: Your Honor, unless there is specific questions that you have, there is nothing else that I have to

say. Obviously I'll wait to hear from the Government, but that concludes my opening remarks.

THE COURT: I'll give you an opportunity when the Government is done.

As you can see, I've asked you the questions that I've had for you up until now as they have come to mind, which is my style. I'm going to hear from the Government. Thank you.

MR. McCONNELL: Thank you, your Honor. I'm not going to repeat my whole submission. I think your Honor's identified some of the relevant points as far as the context that we're operating in, which is a presumption case. There are four separate counts that Mr. Jordan is charged with, that each standing on their own, carry with them a presumption of detention.

Obviously the nature and circumstances of the crime speak for themselves. This was a premeditated homicide case, 20 years old, but nevertheless shooting someone in the head while conspiring with others is such a brazen act of criminal act that I don't think time should matter when considering the severity of the conduct.

Also the attendant drug trafficking and 924(c) charges. These are very serious crimes standing on their own. The case law supports your Honor making the inference that these are both serious in terms of their potential sentencing

exposure but also in terms of the danger they present to the community.

THE COURT: What do you say to -- putting aside the homicide charge for a moment -- I'm curious to your response to defense counsel's comments regarding the delay or the dilatory nature of the Government's act with respect to pursuing any of the narcotics charges and any attendant 924(c) charges from 2016/2017 time period.

MR. McCONNELL: That's a common argument that we here during any prolonged investigation where the arrest does not occur immediately after the criminal conduct takes place. All I will say about that, is that investigations take time. There are a lot of moving pieces. As your Honor can see from the Indictment, this was not simply an undercover buy and bust operation. And I'm going to leave it at that, frankly. The Court is going to have to draw whatever inference it can.

In any case where there is a lapse between the arrest and the criminal conduct, to simply say that the Government is not concerned about the dangerousness of that individual I think is wrong.

Let me segue into the strength of the case; counsel did spend a fair amount of time on that. I want to deal with the idea that the Brady disclosures in this case somehow prove that the evidence is not sufficient to convict Mr. Jordan beyond a reasonable doubt.

This is 20-year-old murder case. It involved a very high-profile individual being gunned down in his own music studio, in his own neighborhood, by people that he knew. There has been a tremendous amount of investigation in this case, and for that reason we have given what I consider to be practically open-file discovery to the defense. Because, frankly, I'm not in a position to tell them what is going to be useful to their defense at trial.

So what we have done is virtually provide them with things I think go above and beyond our Rule 16 and Brady obligations. I strongly disagree with the insinuation that in doing so we are saying something about the strength of our case.

This is going to be a case that relies on witness testimony, both eye witnesses and co-conspirator testimony.

We do not credit the alibi witnesses. These are people who have a very close familial and financial relationship with Mr. Jordan that spans years. One of the alibi witnesses was arrested with Mr. Jordan in 2014. They were living together --

THE COURT: What was the disposition of that case? It's not in your submission.

MR. McCONNELL: With respect to the alibi witness? I don't know.

THE COURT: With respect to the arrest that took

place in Mr. Jordan's home with a 9-millimeter recovered, the .32 revolver was recovered.

MR. McCONNELL: Yes, there were several individuals who were present in that house when the search warrant was executed, seven or eight, including Mr. Jordan and one of the alibi witnesses. I could speculate as to why --

THE COURT: I'm saying, there were no charges that were ever pursued in that case? Nothing as to the disposition unless I missed it.

MR. McCONNELL: I believe it was a disorderly conduct disposition with respect to this defendant.

THE COURT: The December 2004 --

MR. McCONNELL: '14 -- excuse me, 2004, yes.

THE COURT: It's not in your submission. The 2003 disposition is in your submission where Mr. Jordan pleaded guilty to a disorderly conduct. I don't see any mention in your submission to the disposition of the --

MR. McCONNELL: That was resolved with a disorderly conduct as well.

THE COURT: As well. I see.

MR. McCONNELL: Again, there is case law to support this. I believe in the Jones case there was a hearing where the alibi witnesses were called. And the mere fact that they had a very close family relationship, obviously motive to be less than truthful about the defendant's whereabouts in that

case. The Court for purposes of a detention hearing did not credit their testimony.

THE COURT: I don't have anything to credit or not credit. I don't have anyone here so.

MR. McCONNELL: Certainly on paper there is a clear motive to fabricate, and we'll save that for trial. As far as the DNA evidence --

THE COURT: Let me take a step back. I'm not going to presume a motive to fabricate. I'm not going to presume anything. I don't have them here. I have, at least by defense counsel's account, a woman who was a former correction officer and a school teacher.

So I'm not, as I sit here today, going to make a statement to suggest that that woman, who is not the mother of Mr. Jordan, that she would fabricate, has a motive to fabricate. The Court will make no finding nor rely on any representations in that regard.

What I will say is, I don't have an alibi witness who was called to provide evidence in this bail hearing. That's as much as I can say as to the alibi witnesses.

Go ahead.

MR. McCONNELL: Moving on to the issue of what the defense as characterized as exculpatory DNA evidence. It's really nothing of the sort. This was a crime scene where lots of people are going in and out. Lots of people stayed there

and actually would live there on occasion. There was a hat that was recovered near Mr. Mizell's body with a mixture of several individual's DNA in that hat, and the defendant was not one of them. I don't view that as exculpatory. The defense can use it to make whatever arguments at trial. The fact an article of clothing containing lots of other DNA in a location where lots of people congregate and occasionally lived, to me is not significant, certainly for our purposes here today.

The other thing that I want to say is that the remaining charges, which again carry a presumption of detention, carry substantial sentencing exposure in the form of mandatory minimum sentences. Those are unassailable.

Mr. Jordan is recorded on both audio and video making narcotics sales to an undercover agent of law enforcement. We have witnesses who are going to testify not only to purchasing narcotics from him but to seeing him with a firearm such that they can even describe the type and the color of it and where he was keeping it in the car. Which by the way, some witnesses will say that one of his children was in the car while he was conducting this sort of activity as well. So this is really not an argument that I think should be given much credence.

The Grand Jury has heard evidence twice. He's been indicted for these crimes twice. That provides in and of

itself an independent determination of probable cause. And I don't think that the inquiry needs to go further, certainly in the absence of any evidence proffered by --

THE COURT: You mentioned, you make reference in your submission on page nine, about Mr. Jordan being in possession of an untraceable and unmonitored contraband cellphone while incarcerated.

MR. McCONNELL: Yes.

THE COURT: But that's all that you said. Can you provide a little bit more color?

MR. McCONNELL: Sure. Mr. Jordan's cell was searched by members of the MDC. He was found in possession of a cellphone in his cell. I can't tell you that much more about it because the SIM card had been removed. It's not clear who the defendant was calling or what he was using that phone for.

It's a good point because, number one, even subject to COVID restrictions, 23-hour lockdowns a day sometimes, he still manages to get his hands on a cellphone, which I'm told can cost several thousand dollars. It requires coordination with someone not in the facility in order to get it in. It shows the attitude that he would take towards even the most restrictive conditions that could be imposed in a home detention situation. This is not an insignificant factor. Even in prison he's committing crimes by possessing a

contraband cellphone.

THE COURT: Can you speak to -- I'm trying to have a better sense of the bases for the Government's assertions on the bottom of page eight of its submission with respect to -- you have it under the nature and circumstance of the charged offense, but it also goes to the question of dangerousness. You talk about the attempts to or efforts to threaten or and tamper with witnesses. What is the bases for your argument in that regard?

MR. McCONNELL: Witnesses telling us that.

THE COURT: In this case or prior cases?

MR. McCONNELL: No, in this case. There are lots of reasons, I'll say, that it took 20 years to finally bring this case to the position that it is now. But a lot of it does have to do with the fear that people have of Mr. Jordan. It's not just a fear that is without justification or speculative fear. Mr. Jordan has made it clear to people that they should not testify. My understanding is that even one of the suretors has reached out to potential witnesses in this case.

I think that, to go back to the cellphone, the fact that he's got an unmonitored, untraceable way to communicate with people who can act on his behalf outside of the MDC really puts a fine point on that.

I want to be careful because I don't want this to turn into a discovery hearing. I want to be careful about

what I say about particular witnesses. But that's the context that we're operating in.

Can I address a few additional points?

THE COURT: Go ahead.

MR. McCONNELL: Thank you. With respect to history and characteristics, the point has been made that these crimes were either dismissed or ended in disorderly conduct, which is a non-criminal disposition. But the case law is clear that your Honor can consider both charged and uncharged conduct when considering the issue of dangerousness. That's all I'll say on that. The case law permits the Court to do that.

On the COVID issue, I am completely sympathetic to the difficulties that the pandemic has caused, really the entire criminal justice system, in moving cases forward. I really do feel that defense counsel makes a very good point when he talks about the difficulties in preparing for a trial of this magnitude with these sorts of restrictions. However, that's not unique to Mr. Jordan, number one. Number two, the case law is very, very clear that in the absence of sort of an imminent hearing that release is just an extraordinary remedy to consider.

As the Court is well aware, we're not going to trial on this case for sometime. So I think that given the body of case law on this issue out of this courthouse and out of the Southern District of New York to release him on that basis,

one, distinguishes him in a way that I don't think is justified from other defendants. And two, is extremely premature.

I'll reiterate my offer to defense counsel that we are willing to help make whatever accommodations are necessary in order for them to meet with Mr. Jordan, whether bringing him to the courthouse, bringing him to the United States Attorney's Office, whatever can be done we will make happen. They just have to ask. But regardless I think this is premature.

Your Honor, has already brought out the point that I wanted to make about the defendant's health status. I think this is really a non-issue. It's certainly uncorroborated. I don't have anything else to say about that.

Finally, with respect to the strength of the bail package, I really don't have much to say about that either. We haven't been provided any information. I don't know the identities of the suretors. I haven't been given anything about the properties that are being put up or their potential value. We haven't been able to do any due diligence whatsoever beyond what was put in the public filing. And that's fine, but I think, again in the context of a presumption case, where the charges are this serious, it shouldn't carry the day.

Mr. Jordan presents a risk of flight and a danger to

the community that can really only be addressed by continuing remand and that's what I would ask the Court to do.

THE COURT: Thank you, counsel.

MR. HUESTON: Just a couple of points. With respect to the narcotics part of the case. I would note in the 2017 controlled buys that the Government is talking about, one thing of note is there is no allegation of any weapons or firearms and use. Again, I think this goes to the strength of the other allegations. I just want to point that out.

THE COURT: How dangerous do you think drug trafficking is to our community? I'm just curious.

MR. HUESTON: Your Honor --

THE COURT: I want to know if you're drawing the line of dangerousness only with respect to guns and only with respect to the murder charge. Or, do you view the sale of narcotics in our communities as also a danger to our community? Or, are you asking me not to?

MR. HUESTON: I'm asking you not to, your Honor. The idea of just selling drugs in and of itself, that does not show dangerousness.

THE COURT: Really?

MR. HUESTON: Yes, your Honor. I think that's a fair view of the case law.

What I'm pointing out about the 2017, here the Government is purporting there were controlled buys and in

those of those buys there is no weapons in use. That's what I'm bringing up on that, your Honor. We asked the Government particulars about any weapons used and it's not been forthcoming. We asked, can you give us a TPO, a date where Mr. Jordan actually used a firearm in relation to narcotics. It's not happened. We've asked for this information. I do think that's a fair rebuttal to what the Government said.

THE COURT: If you could repeat that?

MR. HUESTON: We asked the Government for the time place and occurrence of uses of firearms with respect to Mr. Jordan. It's not in the 2017 controlled buys, it's not there.

THE COURT: Did you look at -- I'm just curious -- the authority cited by the Government? Page seven of the submission speaks specifically to the dangerousness as to narcotics trafficking. I think you just said to me the case law is clear. I'm curious how you square your argument to the Court with the Second Circuit's determination in *U.S. vs. Millan* 1993 and *U.S. vs. Leon,* which is I believe a 1985 case, it's cited on page seven of the Government's submission, in terms of how it is that I should view narcotics trafficking for the purposes of bail, not for the purposes -- I'm not suggesting that if we were in a sentencing hearing and we were looking at enhancement, et cetera. But for these purposes, when I'm looking at a dangerousness prong, are you suggesting

that ongoing narcotics trafficking isn't something that the Court should view as falling under the umbrella of dangerousness? If not, tell me how I should view this authority that is cited by the Government on page seven of its submission.

MR. HUESTON: Your Honor, I maintain my position about that. This is my response: We're looking at dangerousness. The factors by clear and convincing evidence -- by clear and convincing that Mr. Jordan presents a physical danger to individuals. I don't see that --

THE COURT: I need you to square it with the case law. I understand what you're urging me to view it. And what I'm telling you is that there is authority in this circuit, not in this district but the Court of Appeals, that says that the dangerousness calculation can and should include ongoing narcotics trafficking. This is not about your opinion or mine. So against the case law, which you got their submission just like I did, cited at page seven of the Government's submission.

MR. HUESTON: The response is really this, your Honor, so for instance in every case involving narcotics, (b)(1)(c) weight, that is not itself put into the presumption in terms of a person being incarcerated. As we look at it, it's the weight that is pushing the presumptions in the case. That's really the gravamen of the response. It's the weights

drug dealing in and of itself --

THE COURT: When you say the weight, the quantity?

MR. HUESTON: The quantity.

THE COURT: The quantity of drugs involved.

MR. HUESTON: Yes. So in and of itself the statement "drug dealing itself is danger" --

THE COURT: We have seven controlled buys, so it's the ongoing nature, the potential ongoing nature, right. So one buy of a small quantity, I hear what you're saying. But what the Government is urging the Court to see is that we're talking about ongoing activity. So if you have a number an accumulation of small buys, to your point, you now have moved to a greater weight.

What the Government is saying is, your Honor, this is evidence of ongoing narcotics trafficking.

So for you to tell me but, Judge, there were no guns, there was no guns in the videos. But what I'm saying is I need to look at the narcotics trafficking as well. And you have to address in light of the case law why it is that that is not a consideration for dangerousness that I should undertake here.

MR. HUESTON: What I would add is this, your Honor, as well. Maybe I didn't say this as clear as I needed to say. Besides the 2017 controlled buys we have no other evidence in terms of invoices, narcotics reports --

THE COURT: I was about to make a Whitney Houston joke. No invoices, no receipts on the drug buys?

MR. HUESTON: I'm talking about New York City undercover operations, your Honor.

THE COURT: I see. Okay.

MR. HUESTON: I apologize if I'm not being as clear as I should be. That's what I'm talking. I'm not suggesting drug dealers --

THE COURT: What we do have is an Indictment where there was witnesses testimony, Grand Jury Indictment concerning ongoing drug activity that occurred over a period of some years, not an isolated drug transaction but an ongoing drug trafficking operation. That's what I have. That's what I have probable cause for. The Grand Jury Indictment itself creates probable cause as to those crimes. And the crimes are not isolated but ongoing drug trafficking.

MR. HUESTON: Your Honor, they have the Indictment. And you're correct in pointing it out. I don't have much more, other than to say what I was pointing out with the 2017 issue is that in those instances there is no guns in play.

THE COURT: I hear you.

MR. HUESTON: That's really all I'm saying about that.

I've asked for a particularization about any other guns and it's not been forthcoming from the Government.

THE COURT: I get that. And for the purposes of the trial and the Government's burden of proof and what they need to prove to sustain the charges. But for the purposes of my caliculus here and looking dangerousness, guns are not dispositive, is my point.

MR. HUESTON: Your Honor, I don't disagree with what you're saying. I think it's the accumulation of different issues. I just point out the issue.

Then I'll say this, your Honor, the Government did point out that in December 2004 they mentioned there were eight individuals arrested. I think that's a complicated mix. He has a disorderly conduct from that. That's not dispositive with respect to Mr. Jordan. With respect to the DNA mixture, we went a little bit further than that.

They identified an individual with respect to the mixture. It's not just, it was a mix, they got to a lead and actually got to a person. We point that fact out, that DNA was recovered. They tested it. They tested it against my client. It came to a different person.

That's the point we want to make. It goes to the quality of the case that they are going to present.

No one is saying that the Government has been remised. They've been giving us, as they must, Brady material in the case. They are filling their obligation, it appears to us.

We do point out it's a little bit more than just a mix that it didn't go to anywhere. It went to a person.

THE COURT: I'm sorry?

MR. HUESTON: It went to a person that they've identified.

THE COURT: I see.

MR. HUESTON: Your Honor, I'll end on this, unless there are other questions that you have. I think this goes to the risk of flight. Again we did mention there was this Netflix show in 2018.

THE COURT: I didn't see it, but okay.

MR. HUESTON: They call it a true crime documentary. Mr. Jordan is talked about as taking part in this murder. I would point out, Mr. Jordan didn't flee or run away or try to leave anywhere. He's living his life.

THE COURT: You'll forgive me, how does Netflix factor into that?

MR. HUESTON: That folks believe you're responsible for this murder. He doesn't run away or try to escape. He lives in the neighborhood. He lives in Hollis. Nothing has changed about his life. That's the point I want to make about that.

THE COURT: He knew that as of the Netflix documentary that there were more than just rumors in the neighborhood that there was focus on him, but nonetheless he

didn't flee.

MR. HUESTON: Yes, your Honor. I think that says something about his willingness to participate in this process.

THE COURT: What did Mr. Jordan receive this cash settlement from and when did he get that?

MR. HUESTON: 2018, your Honor.

THE COURT: He got a cash settlement in 2018?

MR. HUESTON: Yes, your Honor.

THE COURT: For what?

MR. HUESTON: An accident that he was involved in.

THE COURT: With whom?

MR. HUESTON: Vehicular accident.

THE COURT: When did the accident take place?

MR. HUESTON: April of 2017, your Honor.

THE COURT: He recovered the money when in 2018?

MR. HUESTON: Perhaps about 12 months later, about a year later, your Honor.

THE COURT: I am curious. To the Government, page four of your submission you talk about interviews and videos, et cetera. You didn't provide any dates of any of that.

MR. McCONNELL: No, I didn't, your Honor. They are generally anywhere from 2010 through the offense conduct through 2017, 2018 still publicly available.

THE COURT: I'd like to know whether any of the

photographs or videos of Mr. Jordan holding stacks of 100-dollar bills and other denominations, that diamond encrusted jewelry, predated 2018. Can you find that out for me?

MR. McCONNELL: I can.

THE COURT: Give me a moment, folks.

Mr. Jordan has four daughters, correct?

MR. HUESTON: Yes, your Honor.

THE COURT: They each reside with their moms?

MR. HUESTON: Yes, your Honor.

THE COURT: They have for how long since Mr. Jordan's arrest or were they residing with their mothers prior to his arrest?

MR. HUESTON: Prior to his arrest, your Honor.

Your Honor, take note, he was living with the two youngest with the mother.

THE COURT: Mr. Jordan has had songs purchased?

MR. HUESTON: Yes, your Honor.

THE COURT: By whom?

MR. HUESTON: Dead Set and Geony (ph).

THE COURT: Is that a single company entity or is that two?

MR. HUESTON: It's two artists, your Honor.

THE COURT: Dead Set and the other one is Geony(ph?)

MR. HUESTON: Sorry, G-Unit.

THE COURT: G-Unit.

MR. HUESTON: That's my mispronunciation.

THE COURT: When was that?

MR. HUESTON: 2010 and 2011. Your Honor, it's Dip Set and G-Unit. It's the mask, your Honor, I didn't hear the information. I apologize. And maybe my lack of knowledge.

THE COURT: I have what I need for now.

Anything that Pretrial Services would like to add?

MR. LONG: No, your Honor. We stand by our recommendation --

THE COURT: I know you're not talking in my courtroom without standing up. Has it been that long?

MR. LONG: We stand by our report and our recommendation. Of course we're available to your Honor any time to conference.

THE COURT: What I'd like to do is take an opportunity to digest the information that we have gone over here today. I think that the most prudent course is, or would be for the Court, to make a determination on the record as opposed to in writing which takes longer and belabors the point. Will I need to set a day and time this week to do so? I'd like to reconvene on Thursday at 1:00 o'clock.

MR. McCONNELL: Your Honor, I'm actually going to be out of town on work travel.

THE COURT: That's all right. The good thing it's a

big old Government, you can have someone come in your place, right?

Defense counsel, Thursday at 1:00 o'clock?

MR. HUESTON: That's fine, your Honor.

THE COURT: We're going to continue this over to Thursday at 1:00 o'clock. Is there anything that you wanted to add?

MR. HUESTON: Yes, your Honor. I did want to mention that we've been provided with information from Mr. Jordan's family that there has been a petition, 2400 individuals have signed a petition about him expressing their support for him. We think that's an important factor for the Court to take into consideration.

THE COURT: I do see that he has support in the courtroom today. It is not lost on me.

Anything else before we adjourn, folks?

MR. McCONNELL: Not from the Government, your Honor. Thank you.

MR. HUESTON: Nothing from the defense. Thank you.

THE COURT: Thank you. I appreciate your time. I appreciate the diligence with which you approached this hearing. I'll see you on Thursday.

Of course, I will not have the benefit of seeing you.

MR. McCONNELL: I'm going to try to get here.

THE COURT: We're adjourned.

(Whereupon, the matter was concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*
Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 20-CR-305(LDH)

Plaintiff , :

United States Courthouse
-against- : Brooklyn, New York

KARL JORDAN, :

March 3, 2022
Defendant. : 1:00 p.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF BAIL APPLICATION
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JACQUELYN M. KASULIS
United States Attorney
BY: MARK MISOREK,
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: MICHAEL O. HUESTON, ESQ.
MARK S. DEMARCO, ESQ.
MONICA NEJATHAIM, ESQ.

Court Reporter: Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE LAW CLERK: Criminal cause for bail application, United States v. Jordan, 20-CR-305.

Counsel, please state your name for the record.

MR. MISOREK: Mark Misorek for the United States. I'm accompanied by Robert Long from Pretrial Services.

Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. LONG: Good afternoon, Your Honor.

MR. HUESTON: Good afternoon, Your Honor.

Michael Hueston for Mr. Jordan, along with Mark DeMarco and Monica Nejathaim.

THE COURT: Good afternoon.

MR. DEMARCO: Hello, Your Honor.

THE COURT: Good to see you, Mr. DeMarco. It has been a while.

MR. HUESTON: Same, Your Honor.

How are you?

THE COURT: I am well. Thank you. Hanging in.

MR. DEMARCO: Yes, same here.

THE COURT: Yes.

All right. You all may be seated.

All right, folks. We are here today for a continuation of the bail hearing that the Court held -- I don't know what date that was, whatever it was -- two days ago and for the Court to render its determination.

Now, under the Bail Reform Act, rebuttable presumption both of flight and dangerousness arises when there is probable cause to believe a defendant committed a drug offense carrying a maximum sentence of ten years or more, a firearms offense under 18 U.S.C. Section 924(c) or a violation of the Controlled Substances Act for which the maximum penalty is life imprisonment or death.

Now, the grand jury indictments establish probable cause. In this case, the grand jury returned indictments charging the defendant with 11 separate counts, including four separate offenses that carry a presumption: One count of murder while engaged in narcotics trafficking, in violation of Title 21 of the United States Code, Section 848(e)(1)(A); one count of a firearm related to murder, in violation of Title 18 U.S.C. Section 924(j)(1); one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. Sections 846, 841(b)(1)(A)(iii), 841(b)(1)(C); and one count of use of firearms in connection with a drug trafficking crime, in violation of 18 U.S.C. Section 924(c)(1)(A)(i).

Now, the defendant's responsibility or burden seeking bail was to come forward with evidence to rebut the presumption of flight and dangerousness. Now, when a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forth with

evidence that contradicts notions of flight and risk of dangerousness. Now, as the defendant correctly noted in his letter submission before this Court, the defendant bears only a limited burden of production, not a burden of persuasion to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or risk of flight. If and when a defendant meets his burden of production on these two factors, the presumption favoring detention does not disappear entirely but remains a factor to be considered among those weighed by the District Court. The government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community. The government retains the ultimate burden of persuasion by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.

Here, both the defense and the government offered evidence by way of attorney proffer. Now, it's well established in this Circuit that proffers are permissible both in bail determination and bail revocation context. However, neither the government nor the defense was limited to proceeding by proffer.

Here, even assuming that the defendant met his burden of production with respect to flight, the Court cannot find that the defendant has met his burden with respect to dangerousness. And again, even if he met his burden with

respect to both flight and dangerousness, as set forth by the Second Circuit in *United States v. Mercedes*, that presumption remains a factor to be considered among those set forth in the Bail Reform Act. Those factors are the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the history and characteristics of the defendant and the seriousness of the danger posed by the defendant's release. I will address them in turn.

Now, tellingly, the defense did not address the nature and circumstances of the charged homicide offense or any other offense in his written submission. The government rightly argues that the seriousness of the charged homicide cannot be overstated and that the inherent dangerousness of homicide is self-evident. Moreover, at the bail hearing, the government argued that the narcotics offenses, too, are sufficiently serious to weigh in favor of continued detention.

Now, the grand jury returned an indictment charging the defendant with the involvement in a major narcotics conspiracy that involved the use of a firearm. Moreover, the charged conduct, including participation in a narcotics conspiracy and the distribution of narcotics, occurred over a period of nearly 20 years.

With respect to the weight of the evidence, the defendant primarily attacks the strength of the government's

case as to Counts One and Two, and that is with respect to the homicide of Mr. Mizell.

The defendant, by way of attorney proffer, made vague references to alibi witnesses, of course without offering any testimony to that effect.

Now, the defendant argues that the alibi witnesses, one of whom is a former corrections officer, will testify that the defendant was at their home at the time of the alleged murder. That the defendant has alibi witnesses who are expected to testify that the defendant was at their home the night of Mr. Mizell's homicide is unhelpful here where there is no testimony offered as to the specifics of that testimony. Contrast that to the case of *United States v. Jones*, which is a case I will refer you to at 566 F. Supp 2d 288 where alibi witnesses actually testified at the detention hearing.

Now, while the Court declines to go as far as the government urged at the hearing to find that the alibi witnesses proffered by the defense have a motivation to lie, I have no basis to make that determination without having heard from them or seen from them, have any information about them.

There are other considerations in assessing the strength of an alibi witness's testimony, such as, where were the alibi witnesses at the time of the offense in relationship to the defendant? The defendant proffers that they were in a home together. Were the alibi witnesses asleep? Were they

otherwise engaged? Does the house have a back door? Does it have a basement? Where was everybody at the time throughout the time period relevant to this case? Because the Court was given no opportunity to assess the substance of the alibi, the proffered alibi testimony, I cannot find that their expected testimony operates to undermine the strength of the government's case or the presumption of detention.

The defense also referred to numerous Brady disclosures made by the government, including DNA evidence of others, but not the defendant, found on a hat at the scene of the murder. Now, the defendant suggests that the DNA undermines the government's case. In the defendant's submission, I will note that the defendant did not offer where the DNA was found. According to the government, as I referred to, the DNA was found on a hat at the scene, perhaps near the body of Mr. Mizell. This does not suggest as the defendant urges that the weight of the government's case is undermined.

Indeed, there is no basis for the Court to be able to draw that conclusion. As the Court understands it, as represented by the government, the crime took place in a location frequented by the public or at least numerous people. The defendant does not argue that the DNA was found on an item such as the murder weapon, on the victim's person, or in some other location that might be plainly exculpatory. And as the government correctly points out, the defendant does not argue

or even mention the other charges against them where the proof is significantly high, or the weight of the evidence rather.

Now, at the hearing, the defendant's argument on the other charges boiled down to the fact that the government did not arrest the defendant on the earliest date the criminal conduct was detected. This simply does not undermine the strength of the government's case. Despite the delay, the government obtained a grand jury indictment on those offenses establishing probable cause.

The defense also argues that the government's decision not to pursue the death penalty undermines the strength of the government's case. I cannot reject this argument in stronger terms. In essence, the defense asked the Court to find that unless the government seeks the death penalty where available, it is a sign, a signal that the government lacks confidence in its case. Indeed, the defense invites the government to seek the death penalty as a means to telegraph its view of the defendant's culpability. As counsel is undoubtedly aware or should be, a determination to seek the death penalty is based on numerous considerations, including, in many situations, mitigation evidence offered and adduced by the defense. Were the government to adopt the policy consistent with the logic of defendant's argument, its other considerations and the information often provided by mitigation specialists would be abandoned in favor of a policy

driven by a potential win/loss notion. This logic is not only flawed, it is dangerous. Incredibly, defendant's arguments concerning the death penalty go further. The defendant suggests that the government's decision not to pursue death penalty is evidence that the defendant does not pose a danger to the community. I don't believe that that argument really warrants much discussion by the Court but to simply say I reject it.

Now, the government presented that its case was primarily on eyewitnesses and coconspirator testimony. Again, the grand jury has returned an indictment based in part on such testimony. As mentioned, the defendant has alibi witnesses who are expected to testify that the defendant was at their home on the night of the Mizell homicide is not particularly helpful, again, when the witnesses have offered no sworn testimony as to this fact, did not testify at the bail hearing to provide any specifics as to that alibi testimony. So because the Court has been given no opportunity to assess this testimony, it is of no use to me here.

Further, the defense has not raised any issues with the sufficiency of the evidence against the defendant in relation to the narcotics trafficking conspiracy offense, which also carries the presumption. For the seven distribution charges which the Court acknowledges does not trigger the presumption, the government has surveillance

recordings of the sales made to undercover law enforcement agents. Here, the weight of the evidence factor weighs strongly in favor of a continued pretrial detention.

Next, the Court turns to the history and characteristics of the defendant.

The defendant notes that the criminal history here consists only of one juvenile adjudication and one adult Queens County arrest which resulted in two disorderly conduct discharges and again no adult criminal convictions and no crimes of violence.

The Court recognizes that the defendant has offered his good character. And this is in part based on his, I think, which is a plain and obvious devotion to his mother. I do not know many people who would do what you did for your mom and I recognize that and it is legitimately and I think undoubtedly suggest that you, like many people, are made of many parts and many things and one is a loving son. You also have four daughters that I understand you are also devoted to and that you help support. The Court recognizes that. I find that what was represented in that regard is persuasive and it is genuine.

But there is more. A district court, as you all know, may consider both charged and uncharged conduct in making a bail determination. For this point, the Court need only look to, for example, *United States v. Barone*, where the

Second Circuit affirmed an order of detention based in part on uncharged conduct.

Furthermore, in *United States v. Rodriguez*, the Second Circuit held that in considering the dangerousness of a defendant for the purposes of bail, there is no requirement that the Court consider only conduct related to the charged offenses. Here, the government proffers that the defendant has been involved in a narcotics conspiracy that spanned for a period of over four years which overlaps with evidence of seven separate occasions captured on video of the defendant selling cocaine and cocaine base to undercover agents. These facts suggest to the Court repeated activity, the dangerousness of which warrants consideration in this factor.

On this point, I refer you to *United States v. English*. That is not to mention, by the way, that the government has also proffered that the defendant was often carrying a firearm and represented at the hearing that witnesses observed the defendant sell drugs on occasion with his daughter in tow.

The government also describes four separate instances where the defendant used or was in possession of a firearm. One witness described the type and color of defendant's firearm that he kept either in the driver's side door pocket or the center console of his car while making narcotics sales.

I will note, as I did at the last hearing, that I will not consider the defendant's rap lyrics or other forms of artistic expression as evidence of the defendant's criminality or dangerousness. This is, again, a genre of music that encourages and promotes violent language and lyrics for the profit of the artist, but also the music executives. This Court will not punish individuals merely for being participants in an industry that incentivize the use of such language.

But I will note that the defendant was found in possession of a contraband cell phone in his cell, which I also believe suggests a propensity for noncompliance with conditions of release, as it is evidence that the defendant has not been compliant with the requirements placed on him in custody.

So despite the defendant's lack of a criminal history, the defendant's history and characteristics here again weigh in favor of a continued pretrial detention.

Turning to the seriousness of the danger posed by the defendant's release. The defense raises the same arguments in relation to the defendant's dangerousness as raised in support of other factors; namely, that the defendant has alibi witnesses, that the Brady evidence -- or a number of Brady disclosures were made by the government and, as well, the government's delay in arresting the defendant, which again

the defendant contends undermines the strength of the government's case and that the defendant is not a danger because the government elected not to pursue the death penalty and that his proposed bond and conditions of release weigh, in total, against dangerousness.

Now, the government proffers that there is a significant risk that the defendant would seek to threaten or otherwise tamper with witnesses if released, given that the government is aware of four separate witnesses that the defendant has endeavored to identify and silence through threats and coercion and has enlisted others to do so on his behalf, including, I will note, one of the proposed suretors in this case. The government further responds that the inherent dangerousness of the underlying offenses also weighs in favor of continued detention. This factor, too, does indeed weigh in favor of detention.

Now, with respect to risk of flight, the defendant made attorney proffers regarding the strength of the bail package and potential conditions of release and the defendant's ties to the community, again referencing his four daughters who live in New York as well as his mother. Now, at the bail hearing, defense counsel also noted that the defendant has no outstanding warrants and indicated that there is no history with respect to any prior charges he failed to appear.

All of that may be true. However, that information must be balanced against the information provided by the government. The government points to the length of the sentence as a motive for the defendant to flee. Here, the defendant faces a minimum custodial sentence of 25 years. That the defendant has no outstanding warrants is of no moment. Certainly the defendant has been charged with serious conduct on prior occasions, but he has never before faced such serious offenses or such a significant amount of time in custody were he to be found guilty of the crimes charged here. According to the government's proffer, this is in part due to the witnesses' reluctances -- and I am referring to the fact that he has not faced the jeopardy that he faces here -- prior witnesses' reluctance to cooperate or testify against the defendant in those other cases because of threats to those witnesses by the defendant. There was no true jeopardy, therefore, in those cases. In this case, the defendant faces true jeopardy. So even where a defendant offers evidence to overcome a presumption of flight, such evidence may not be sufficient to overcome the presumption of dangerousness and here, indeed, it does not.

Finally, I want to turn to the arguments that the defendant advanced with respect to the COVID pandemic. The defendant argues that in light of the COVID-19 pandemic, the defendant's health supports bail. Here again, the defense has

offered no medical evidence to suggest that the defendant has any health issues or faces a particular risk of COVID that is greater than the risk faced by any other healthy 38-year-old man. And while the defendant may proceed with proffer, that proffer must be based on something. And other than speculation by the attorney or his -- I think you said your belief that this would pose a danger to Mr. Jordan because of the fact that he lives with one kidney, there truly is no foundation for the proffer. So I reject the defense counsel's proffers as to any arguments concerning COVID and defendant's life with a single kidney as a basis for the Court to entertain bail in this case.

Ultimately, even if the defendant has rebutted the presumption with respect to flight, the defendant has failed to rebut the presumption with respect to dangerousness. And again, even if the defense rebutted the presumption, the factors set forth in the Bail Reform Act counsel in favor of detention. The Court finds that the government has met its burden of persuasion by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance should the defendant be granted bail. That is the determination of the Court.

Yes?

MR. HUESTON: Your Honor, may I have one moment just

to confer with Mr. Jordan and Mr. DeMarco?

THE COURT: Certainly. When you say can you have a moment, would you like a brief recess or do you just want --

MR. HUESTON: A brief recess, Your Honor.

THE COURT: That is fine. What do you want?

MR. HUESTON: I think five minutes will do, Your Honor.

THE COURT: All right. We will recess for five minutes.

MR. MISOREK: Thank you, Your Honor.

(Recess taken.)

THE COURT: All right, folks, you can be seated.

Mr. Hueston, did you want to address the Court.

MR. HUESTON: Your Honor, I appreciate you giving us the time to speak with Mr. Jordan. I really do appreciate that.

At this time, we have nothing further to say, and thank you for your patience in letting us discuss the matter with our client.

THE COURT: Absolutely.

You know, look, at the end of the day there IS usually at least one party that disagrees with the outcome of my determinations, but in this courtroom, everyone will always have an opportunity to be heard and everyone will also have an opportunity to consult as necessary so that they may make a

fulsome presentation to me. So I appreciate your thanks, but I hope that you will grow to expect that of me.

MR. HUESTON: Thank you, Your Honor. You have a good afternoon.

THE COURT: You as well.

MR. MISOREK: Thank you, Your Honor.

THE COURT: We are adjourned.

(Matter concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Andronikh M. Barna — March 3, 2022

ANDRONIKH M. BARNA — DATE

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 30 2023 ★
LONG ISLAND OFFICE

NB:MEM/JAM/MG
F. #2017R00509

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------X

UNITED STATES OF AMERICA

- against -

KARL JORDAN, JR.,
also known as "Little D"
and "Noid,"
RONALD WASHINGTON,
also known as "Tinard," and
JAY BRYANT,
also known as "Bradshaw
Dewitt," "Jason Robinson,"
"Morgan Bryant," "Deshawn
Sadler," "Jay Sadler" and
"Big Jay,"

Defendants.

---------------------------X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 20-305 (S-2) (LDH)
(T. 18, U.S.C., §§ 924(c)(1)(A)(i), 924(j)(1), 2 and 3551 et seq.; T. 21, U.S.C., §§ 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(C), 846 and 848(e)(1)(A))

THE GRAND JURY CHARGES:

COUNT ONE
(Murder of Jason Mizell While Engaged in Narcotics Trafficking)

1. On or about October 30, 2002, within the Eastern District of New York and elsewhere, the defendants KARL JORDAN, JR., also known as "Little D" and "Noid," RONALD WASHINGTON, also known as "Tinard," and JAY BRYANT, also known as "Bradshaw Dewitt, "Jason Robinson," "Morgan Bryant," "Deshawn Sadler," "Jay Sadler" and "Big Jay," together with others, while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21, United States Code, to wit: a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine, a Schedule II controlled substance, did

knowingly and intentionally kill and counsel, command, induce and cause the intentional killing of an individual, to wit: Jason Mizell, also known as "Jam Master Jay," and such killing did result.

(Title 21, United States Code, Section 848(e)(1)(A); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT TWO
(Firearm Related Murder of Jason Mizell)

2. On or about October 30, 2002, within the Eastern District of New York and elsewhere, the defendants KARL JORDAN, JR., also known as "Little D" and "Noid," RONALD WASHINGTON, also known as "Tinard," and JAY BRYANT, also known as "Bradshaw Dewitt, "Jason Robinson," "Morgan Bryant," "Deshawn Sadler," "Jay Sadler" and "Big Jay," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the knowing and intentional use of one or more firearms during and in relation to a drug trafficking crime, to wit: a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(A)(i)(II), did knowingly and intentionally cause the death of a person through the use of one or more firearms, which killing was murder as defined in Title 18, United States Code, Section 1111, in that the defendants, together with others, with malice aforethought, did unlawfully kill Jason Mizell, also known as "Jam Master Jay."

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Distribute and
Possess with Intent to Distribute Controlled Substances)

3. In or about and between March 2016 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute one or more controlled substances, which offense involved (a) a substance containing cocaine base, a Schedule II controlled substance; and (b) a substance containing cocaine, a Schedule II controlled substance. The amount of cocaine base involved in the conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was 280 grams or more of a substance containing cocaine base.

(Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

COUNT FOUR
(Use of Firearms in Connection with a Drug Trafficking Crime)

4. In or about and between March 2016 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally use and carry one or more firearms during and in relation to a drug trafficking crime, to wit: the crime charged in Count Three, and did knowingly and intentionally possess said firearms in furtherance of such drug trafficking crime.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 2 and 3551 et seq.)

COUNT FIVE
(Distribution of Cocaine)

5. On or about April 19, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT SIX
(Distribution of Cocaine)

6. On or about April 24, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT SEVEN
(Distribution of Cocaine)

7. On or about May 2, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to

distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT EIGHT
(Distribution of Cocaine)

8. On or about May 9, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT NINE
(Distribution of Cocaine)

9. On or about May 18, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT TEN
(Distribution of Cocaine)

10. On or about May 24, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT ELEVEN
(Distribution of Cocaine)

11. On or about June 9, 2017, within the Eastern District of New York and elsewhere, the defendant KARL JORDAN, JR., also known as "Little D" and "Noid," together with others, did knowingly and intentionally distribute and possess with intent to

distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18, United States Code, Sections 2 and 3551 et seq.)

A TRUE BILL

FOREPERSON

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. # 2017R00509
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*KARL JORDAN, JR., also known as "Little D" and "Noid," RONALD WASHINGTON, also known as "Tinard," and JAY BRYANT, also known as "Bradshaw Dewitt, "Jason Robinson," "Morgan Bryant," "Deshawn Sadler," "Jay Sadler," and "Big Jay,"*

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 924(c)(1)(A)(i), 924(j)(1), 2 and 3551 et seq.; T. 21, U.S.C., §§ 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(C), 846 and 848(e)(1)(A))

*A true bill.*

[signature] ________________________

*Foreperson*

*Filed in open court this* __________________ *day,*

*of* _____________ *A.D. 20* _____

________________________________________ *Clerk*

*Bail, $* ____________

____________________________________

***Mark E. Misorek, Artie McConnell and Miranda Gonzalez***
***Assistant U.S. Attorneys, 718-254-7000***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA, | : 20-CR-00305(LDH) |
| -against- | : United States Courthouse<br>: Brooklyn, New York |
| KARL JORDAN JR. AND RONALD WASHINGTON, | : Monday, February 5, 2024<br>: 9:30 a.m. |
| Defendants. | : |

\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE, and a Jury

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: MIRANDA GONZALEZ, ESQ.
ARTIE MCCONNELL, ESQ.
MARK MISOREK, ESQ.
Assistant United States Attorneys

For the Defendant: Karl Jordan, Jr.
DIAZ & MOSKOWITZ PC
225 Broadway
Suite 715
New York, New York 10007
BY: JOHN A. DIAZ, ESQ.

didn't know were in the control room, correct?
A I knew there was some people in the control room, but I didn't go in the control room, so I don't know exactly who was in there. But it was some people in there.
Q How did you know that?
A Because I heard them.
Q You could hear them in this enclosed area?
A Yeah. Yeah, you can hear them. Because it's music and you can hear it.
Q Okay.
It's not soundproofed or anything?
A It was soundproof, but you can hear it. You can -- you can hear it in that, in that room.
Q Okay.
But you don't remember seeing who was in there?
A I don't recall seeing who was in there.
Q Okay.
Now, you testified on direct examination that there came a time while you were sitting on these sofas adjacent to Jay, that you saw a person come into the -- you became aware that a person came into the area where you were, correct?
A I became aware that somebody walked in the door.
Q Yeah.
Well, you weren't looking at the door, though. You were looking at Jay, and somebody approached you and Jay --

the area where you and Jay were.

And would it be fair to say that was the first time you saw that person; as the person approached the area where you and Jay were, correct?

A Yeah, I was -- I was sitting down and -- and yeah, the person walked past me.

Q And you were facing away from the door and facing Jason, correct?

A Yes.

Q Okay.

And I think you said that that person, to your recollection was -- that person was quite tall, correct?

A I was sitting down, so, yeah. I looked up. Yeah, I was sitting down. So I couldn't measure it from my height, but I was sitting down.

Q You had been interviewed by the Government and by police on a number of occasions, and you said that you thought the person was over six feet tall; is that right?

A I mean, if I'm sitting down, yeah, the person looked tall because I was sitting down.

Q And I think you said also that the person was wearing like a big sort of down kind of North Face jacket?

A It was the wintertime. I don't -- I don't recall. But it was the wintertime. So, yeah, it was a coat. Yes.

Q On direct examination I think you used the word North

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Government,

v.

KARL JORDAN, JR., and RONALD WASHINGTON,

Defendants.

**MEMORANDUM AND ORDER**

20-CR-305-LDH-2

LASHANN DEARCY HALL, United States District Judge:

Ronald Washington ("Washington"), Karl Jordan, Jr. ("Jordan"), and Jay Bryant were charged in a superseding indictment with two (2) counts: murder while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A); and firearm-related murder, in violation of 18 U.S.C. § 924(j). (Superseding Indictment ¶¶ 1, 2, ECF No. 151.) Washington pleaded not guilty to each count. The Court severed Washington and Jordan's trial on Counts One and Two from the trial of Jay Bryant on each count.

The Court held a jury trial as to Washington and Jordan commencing January 29, 2024. At the close of the Government's case, Washington moved for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure. The motion was denied. On February 27, 2024, the jury returned a verdict of guilty on each count. Washington renews his motion for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, and, in the alternative, moves for a new trial, pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure. (Def.'s Mem. L. Supp. Mot. J. Acquittal and Mot. New Trial ("Def.'s Mem."), ECF No. 294.)

## BACKGROUND

Jason Mizell, also known as Jam Master Jay, was a disk jockey and music producer who, in the 1980s, garnered wide acclaim for his musical successes with the hip-hop group "Run DMC." As the spotlight on Run DMC dimmed in the 1990s and Mizell's musical career sputtered, he entered the cocaine distribution business to offset his financial losses. (Tr. 1051:5–13, 888:10–13.) According to one of Mizell's friends, Eric James, Mizell's role in the drug trade was to act as a middleman: He obtained cocaine on consignment from his supplier, a man called Unc, then distributed it to others to sell. (*Id.* at 1751:17–20, 1752:2–12.) James, himself, was selling cocaine in the Midwest at the time he met Mizell in the 1980s. (*Id.* at 1749:13–1751:12, 1751:17–20.)

In 2001 or 2002, Jordan,[1] Mizell's godson, asked James about the price of cocaine. (*Id.* at 1755:16–1756:13, 1756:10–13.) Jordan asked James to tell Mizell to "put [him] on," which James understood to mean to give Jordan cocaine to sell. (*Id.* at 1756:24–1757:10.) Later, Mizell told James that he gave Jordan an ounce of cocaine to "try him out," and that Jordan sold it successfully. (*Id.* at 1768:6–1770:2.) Separately, in early 2002, Mizell provided Washington,[2] a lifelong friend, with cocaine to sell. (*Id.* at 1767:7–1768:1.) Mizell informed James that Washington "messed it up." (*Id.* at 1767:7–1768:1, 1812:17–24.)

Also in 2002, Mizell "had a line" on 100 kilograms of cocaine from Unc. (*Id.* at 1770:7–15.) However, at the time, Mizell only received ten kilograms from him due to a supply shortage. (*Id.* at 1770:7–22.) Mizell told James that he would "set up shop" with Jordan and Washington, to distribute those ten kilograms in Baltimore. (*Id.* at 1760:8–14, 1770:6–22,

[1] At trial, Jordan was also referred to as "Little D" and "Noid."

[2] At trial, Washington was also referred to as "Tinard."

1771:1–8.) In addition, Mizell stated that he could make more money in Baltimore due to his relationship with Yakim,[3] a childhood friend who resided in Baltimore and previously sold cocaine for Mizell. (*Id.* at 888:10–13, 1770:6–1772:2, 1776:2–1777:4.) Mizell discussed this Baltimore deal with James "maybe six, seven" times. (*Id.* at 1777:13–16.) And, James testified that, based on these conversations, he understood that the Baltimore deal was supposed to be an "ongoing" distribution arrangement. (*Id.* at 1777:17–20.) Yakim, however, was unable to recall at trial whether the Baltimore deal was meant to be one-time or ongoing. (*Id.* at 886:4–5.)

In August of 2002, Chris Burrell, a friend of Mizell, drove Mizell and Washington to Washington, D.C., ostensibly for the purpose of bringing jewelry to Unc. (*Id.* at 1228:16–1229:4, 1229:12–20.) Washington later admitted to law enforcement that the purpose of this meeting was to pick up cocaine from Unc. (*Id.* at 1616:23–1618:4, 2087:21–2088:14.) Jordan did not travel to Washington, D.C., with Mizell and Washington. (*See id.* at 1228:16–21.) Prior to the meeting, Washington advised Mizell that they should acquire the cocaine at $18,000 per kilogram. (*Id.* at 2088:19–2089:9.) After discussing the terms with Unc, Mizell left the meeting with the cocaine in his possession. (*Id.*) According to Washington, this quantity of drugs was worth $120,000. (*Id.* at 1617:2–1618:4.)

Mizell and Washington traveled to Baltimore the following day. (*Id.* at 1233:2–4.) During the drive, Mizell and Washington discussed the possibility that Washington would stay in Baltimore to sell cocaine. (*Id.* at 1233:2–24.) Upon arrival, Mizell met with Yakim to discuss his plan to "move"—that is, sell—cocaine in Baltimore. (*Id.* at 885:3–10.) During this conversation, Mizell explained that he wanted Yakim to move between ten and twenty kilograms of cocaine, for an amount between $15,000 and $20,000 per kilogram. (*Id.* at 885:3–21, 890:15–

[3] At trial, Yakim was also referred to as "Ralph Mullgrav" or "Mr. Mullgrav."

21.) Moreover, Mizell sought permission for Washington to remain in Baltimore to sell the cocaine. (*Id.* at 894:2–4.) Because of animosity between Yakim and Washington, Yakim said, "No" deal, and threatened to kill Washington. (*Id.* at 886:8–10, 1237:3–12; *see also id.* at 893:25–894:8 (Q[:] And during [the summer of 2002], Mizell visited you, right? A[:] Yes. Q[:] And he came to you for permission to put Tinard in Baltimore; am I right? A[:] Yes. Q[:] And you said no, right? A[:] Yes. Q[:] So no deal, right? A[:] No deal.").) Following this meeting, Washington returned to New York with Burrell. (*Id.* at 1237:10–1238:13.) Mizell stayed in Baltimore to negotiate the terms of the deal with Yakim. (*Id.* at 886:18–887:3.)

Mizell returned to Hollis, Queens, on October 29, 2002, (*id.* at 611:7–10), with plans to travel on October 31, 2002, to deejay as part of a local music group called Rusty Waters. (*Id.* at 1061:10–20.) Concurrently, Mizell had plans to meet with Unc's associates. (*Id.* at 1618:5–8.) The meeting was scheduled to take place on either the day of or before Mizell's death. (*Id.* at 1618:5–12.) On October 30, 2002, Washington and his girlfriend, Daynia McDonald, went to Mizell's studio (the "Studio"), where they met Mizell, who appeared surprised to see Washington. (*Id.* at 1477:16–22, 1548:23–1549:3.) Washington noticed that Mizell had a firearm and asked him why he needed the gun, before reminding Mizell, "If you have a problem, I have a problem too." (*Id.* at 1477:23–1478:2, 1550:16–1551:7.) While at the studio, Washington also asked Mizell if the two were going to a show in Connecticut and asked about Baltimore. (*Id.* at 1478:11–20.)[4] At some point, McDonald and Washington left the Studio, and Washington took a call from an unnamed individual. (*Id.* at 1480:1–1482:3.) Thereafter, Washington directed McDonald not to return to the Studio. (*Id.*)

[4] Washington had not previously discussed touring with Mizell, (*id.* at 1478:21–24), and, by all accounts, was not otherwise involved in Mizell's music, (*id.* at 519:19–23, 823:13–18, 1056:25–1057:3).

Later that night, Mizell was shot and killed in the Studio. (*See, e.g.*, *id.* at 140:16–18; 2089:25–2090:2.) In addition to Mizell, there were five other individuals in the Studio: Randy Allen, Yarrah Concepcion, and Mike Rapley, all of whom were in the control room, (*id.* at 779:23–782:15); and Uriel "Tony" Rincon and Lydia High, who were eyewitnesses to Mizell's murder, (*id.* at 514:24–516:23, 955:20–956:5).

Rincon knew Jordan and Washington prior to the murder, having interacted with each of them inside and outside of the Studio. (*Id.* at 518:1–521:11.) Rincon identified Jordan as the individual who fired the fatal shot. (*Id.* at 513:4–18.) He described having a clear view of Jordan's face and part of his neck tattoo during the brief altercation, in which Jordan approached Mizell for an "embrace," after which Rincon heard "two gunshots," felt a shot to his "left leg above the knee," and saw Mizell fall to the floor. (*Id.* at 514:24–517:2.) Rincon testified further that, at the same time of the shooting, Washington was standing at the door of the Studio and told Lydia High to get down on the ground. (*Id.* at 513:13–19.) Rincon also testified that, days after the murder, he confided in Allen that Jordan and Washington were the perpetrators. (*Id.* at 525:17–25.) This statement was corroborated by Allen's testimony. (*Id.* at 1074:19–1075:6.)

Lydia High testified that she saw a "fair-skinned . . . African-American" man with a neck tattoo give Mizell "a pound," at which point she heard Mizell say, "Oh, shit," and heard a gun fire. (*Id.* at 955:20–958:17.) High attempted to escape the Studio but was stopped by Washington, who ordered her to the ground at gunpoint. (*Id.* at 956:3–22.) High and Washington grew up on the same block during their childhood, and she testified that she saw him clearly and had no doubt that he was the one who pointed the gun at her as she tried to leave the Studio. (*Id.* at 957:3–9, 957:23–958:1.) The day after the shooting, High also told Allen that Washington ordered her to the ground at gunpoint. (*Id.* at 1075:23–1076:5.) And, although

High testified that she could not recall whether she previously provided the police with a description of Jordan's neck tattoo, (*id.* at 961:15–969:17, 980:1–982:5), Allen testified that, the day after the shooting, High told him that the shooter had a neck tattoo, (*id.* at 1075:23–25, 1076:9–14). High's bodyguard, Derrick Parker, provided additional testimony that, in November 2002, High identified both Jordan and Washington as the perpetrators. (*Id.* at 920:8–921:5, 923:3–9.)

## DISCUSSION

### I. Rule 29: Motion for Judgment of Acquittal

A defendant challenging a jury's guilty verdict "bears a heavy burden," *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted). Indeed, the standard of review has been described as "exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation omitted). As such, in considering a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the Government, *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), "crediting every inference that could have been drawn in the [G]overnment's favor," *Martoma*, 894 F.3d at 72. Most fundamentally, when considering a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. That is, the "resolution of the weight of the evidence and the credibility of the witnesses" are "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (citations omitted). Notably, "[a] 'jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Berry*, No. 20-CR-84 (AJN), 2022 WL 1515397, at *4 (S.D.N.Y. May 13, 2022) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)). "[S]o long as . . . inference[s are] reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" *United States v. Santos*,

541 F.3d 63, 70 (2d Cir. 2008). Accordingly, a Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir. 1999) (citation omitted). It is against this legal backdrop that the Court reviews Washington's Rule 29 motion.

**A. Count One**

**1. Evidence of Ongoing Drug-Related Conspiracy**

Pursuant to Count One, Washington was charged with violating 21 U.S.C. § 848(e)(1)(A), which makes it unlawful for anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." (Superseding Indictment ¶ 1.) In this case, the qualifying drug offense was "a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine." (*Id.*) Therefore, to meet its burden as to Count One, the Government was required to prove, among other things, that Washington participated in the charged drug trafficking conspiracy. *See United States v. Desinor*, 525 F. 3d 193, 202 (2d Cir. 2008) (noting as an element of 21 U.S.C. § 848(e)(1)(A) that the conspiracy was ongoing when the killing occurred). It did.

As set forth in the charge to the jury, to find that a conspiracy existed, the evidence needed to show that "at least two people joined together in a common criminal scheme . . . [and] participated . . . willfully and with knowledge of its unlawful purpose and in furtherance of its unlawful purpose." (Tr. 2543:21–22, 2545:3–6.) *See also United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) ("In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed

toward a common goal." (citation omitted)). Here, Washington concedes that he agreed to enter a conspiracy to traffic in cocaine. That is, according to Washington, as early as January 2002, but no later than March 2002, "Mizell gave [him] an unspecified amount of an unspecified drug" to sell, which Washington "messed . . . up." (Def.'s Mem. at 11.) By Washington's own admission, then, he joined Mizell in a drug trafficking conspiracy as early as January 2002, when he agreed to sell narcotics. (*Id.*) Washington also acknowledges that, as a part of the drug trafficking conspiracy, he agreed to sell, alongside Jordan, drugs in Baltimore. (*See id.*)

Washington contends that Yakim's refusal to work with him in Baltimore "ended" the "Baltimore scheme" and that the Government failed to adduce any evidence from which a jury could reasonably infer that he "was in a broader drug conspiracy, with or without Mizell". (Def.'s Mem. at 11–14.) And, as Washington's argument goes, because there was no evidence of conspiratorial conduct after Yakim said, "No" deal, there was no ongoing conspiracy when Mizell was murdered months later, or, if such a conspiracy was ongoing, there was no evidence that Washington continued to participate in it. (*See id.* at 11–13.) Not so.

As a threshold matter, and as the Government aptly argues, there was only one overarching drug conspiracy, which Mizell conducted in New York and sought to expand to Baltimore. (Gov't's Mem. L. Opp'n Defs.' Mot. Acquit. ("Gov't's Opp'n") at 39–44, ECF No. 296.) There were not, as Washington contends, separate conspiracies. (*See id.* at 12–13, 14–15.) Tellingly, in advance of trial, Washington proposed that a multiple conspiracies jury instruction be included in the final charge, "if applicable."[5] (Joint Def. Reqs. Charge at 24.) However, at

[5] Washington and Jordan submitted a joint jury charge, which proposed the following instruction as to multiple conspiracies:

the charging conference, Washington failed to argue for the instruction's inclusion or object to its omission from the final charge. Presumably, Washington's failure to argue for a multiple conspiracies jury instruction resulted from his determination that, based on the trial record, there was no basis to advance such an argument.

In any event, Washington's argument that the charged drug conspiracy ended when Yakim said, "[N]o" deal, is unconvincing. It is plain from the evidence that Yakim's refusal to work with Washington does not preclude the conclusion that the drug conspiracy was ongoing or that Washington was a member. There was simply no evidence that Washington lacked the ability to distribute narcotics on behalf of Mizell outside of Baltimore—including in New York,

---

**Request No 18: Defenses: Multiple Conspiracies [If Applicable]**

> In this case, the defendants contend that the government's proof as to Count [##] fails to show the existence of only one overall conspiracy. Rather, they claim that there was actually a separate and independent conspiracy involving themselves and other persons.
>
> Whether there existed a single unlawful agreement or many such agreements, or indeed, no agreement at all is a question of fact for you the jury to determine in accordance with the instructions I am about to give you.
>
> When two or more people join together to further one common unlawful design or purpose a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.
>
> If you find that the conspiracy charged in the indictment did not exist, you cannot find either defendant guilty of the single conspiracy charged in the indictment. This is so even if you find that some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.
>
> Similarly, if you find that the defendant you are considering was a member of another conspiracy and not the one charged in the indictment, then you must acquit that defendant of the conspiracy charges. Therefore, what you must do is determine whether the conspiracies charged in the indictment existed. If they did, you must then determine the nature of the conspiracy and who were its members.

(Joint Def. Reqs. Charge at 24, ECF No. 204.)

where he lived and had already done so.[6] Put differently, there is no evidence that Washington's involvement in the drug conspiracy was contingent on the success of the Baltimore deal.

Equally unavailing is Washington's contention that there was no evidence of conspiratorial conduct after Yakim said, "No" deal, and therefore, there was no ongoing conspiracy when Mizell was murdered. (*See* Def.'s Mem. at 12–13, 15–17.) In fact, a review of the trial record reveals that there was ample evidence of conspiratorial conduct after Yakim said, "No" deal. There was testimony that Mizell: remained in Baltimore to negotiate with Yakim, (Tr. 886:18–887:3, 1237:10–1238:10); "had a line" on 100 kilograms of cocaine, which was to be sold on consignment, (*id.* at 1770:13–14; *see id.* at 1794:24–1795:6); intended distribution of the cocaine to be "ongoing," (*id.* at 1777:13–20); and had not paid Unc for any of the cocaine as of October 2002, (*see* Tr. 1788:11–20 ("Q[:] Did you ever speak with Unc after Jason's murder? . . . A[:] Yes . . . . Q[:] Did [Unc] say anything about money? A[:] He said – he said whatever [Mizell] owed died with him."). This evidence was sufficient to establish an ongoing conspiracy to distribute narcotics. Indeed, the fact that Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy did not end in Baltimore. *See, e.g.*, *United States v. Brock*, 789 F.3d 60, 64 (2d Cir. 2015) (collecting cases where "significant indicia of a conspiratorial purpose existed: the defendants purchased drugs in significant quantities on credit from the selling organization and took substantial other steps to assist it such as facilitating resales, supplying bail money and recruiting other customers and sellers."); *United States v. Glynn*, 686 F. App'x 51, 54 (2d Cir. 2017) (purchase of drugs on credit for redistribution showed conspiratorial relationship); *United States v. Faltine*, No. 13-CR-315 (KAM), 2016 WL

[6] In his papers, Washington concedes that he resided in New York. (Def.'s Mem. at 14.) There is evidence that, specifically, Washington was residing with Mizell, sleeping on his couch, at the time Mizell provided him with drugs to sell. (*See* Tr. 693:25–694:11.)

1700385, at *4 (E.D.N.Y. Apr. 26, 2016) (drug sales on consignment "is a stand-alone factor supporting a conspiracy"). That the cocaine was not ultimately distributed by Mizell in Baltimore is of no consequence. As the Second Circuit has recognized, "the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it." *Santos*, 541 F.3d at 71.

Washington also maintains that the Government should be foreclosed from arguing that there was an ongoing conspiracy because the Government failed to elicit that fact from the only witness with personal knowledge—Yakim. (Def.'s Mem. at 13–14.) In making this argument, Washington refers the Court to *United States v. Pinckney*, 85 F.3d 4 (2d. Cir. 1996). In *Pickney*, the defendant challenged his convictions for operating a chop shop, in violation of 18 U.S.C. § 2322, and conspiring to operate a chop shop, in violation of 18 U.S.C. § 2321. 85 F.3d at 5. In moving for judgment of acquittal, the defendant argued that the government failed to provide sufficient evidence, through witness testimony or otherwise, supporting a reasonable inference that a sufficient nexus to interstate commerce was established. *See Pinckney*, 85 F.3d at 5–8. The *Pickney* court agreed. Namely, the court concluded that the government failed to ask the witness a question that "could have—and should have—been put squarely to [the witness]" and would have elicited testimony critical to the element. As a result, the court concluded that the evidence was insufficient to prove a sufficient nexus to interstate commerce. 85 F.3d at 6–7. Washington contends that a similar finding is warranted here. (Def.'s Mem. at 13–14.) Washington's argument, however, presupposes that the Baltimore deal was, itself, a standalone conspiracy. It was not. As discussed, *supra*, the Baltimore deal was simply a part of a single drug conspiracy. As such, that the Government did not question Yakim on whether the Baltimore deal ended when he refused to work with Washington is of no consequence.

As a last resort, Washington contends that acquittal as to Count One is warranted because the inferences advanced by the Government are "no more likely than other permissible inferences" advanced by Washington. (Def.'s Mem. at 17.) Stated differently, Washington relies on the theory of "equipoise" to support his contention that either the conspiracy was no longer ongoing or that he was no longer a member of the conspiracy after Yakim said, "[N]o" deal. (*See id.*) However, the Second Circuit has severely limited the application of this theory. As the Second Circuit has made plain, that inferences consistent with innocence and guilt may be drawn from circumstantial evidence "is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (citation modified). "[O]nly where evidence 'is nonexistent or so meager' as to preclude the inferences necessary to a finding favorable to the [G]overnment," does the equipoise rule apply. *Id.* at 45. Here, in advancing his argument of equipoise, Washington concedes that there is evidence to support the inferences urged by the Government. (*See* Def.'s Mem. at 17.) Specifically, Washington contends that "[t]he inference that the government advanced is simply no more likely than the other permissible inferences." (*Id.*) And, as demanded by law, on a motion made pursuant to Rule 29, the Court "draws all inferences in favor of the Government." *United States v. Preldakaj*, 489 F. App'x 507, 509 (2d Cir. 2012) (quoting *United States v. Henry*, 325 F.3d 93, 103 (2d Cir.2003)).

Certainly, it was theoretically possible for the conspiracy to have continued without Washington. However, once an individual enters a conspiracy, "the only way to exit is for him to affirmatively withdraw from it." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011). To withdraw, a defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy." *United States v. Eppolito*, 543

F.3d 25, 49 (2d Cir. 2008). And, "it is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial." *Leslie*, 658 F.3d at 143. Here, conspicuously absent from Washington's submission is any argument that he affirmatively withdrew from the charged drug conspiracy, which he concedes he entered. Nor does Washington direct the Court to any evidence that he took affirmative steps to withdraw from the charged drug conspiracy. Instead, Washington points to the lack of testimony regarding his involvement in drug dealings from August to October 2002. (Def.'s Mem. at 17–24.) However, "[h]ibernation for a few months does not signal the end of a criminal partnership," and "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1979). Given the trial evidence, Washington's concession that he entered into the conspiracy, and Washington's failure to demonstrate his withdrawal from the conspiracy, the Court concludes that Washington was a member of the charged drug conspiracy at the time of Mizell's murder. This conclusion does not end the Court's inquiry, however.

**2. Proof of Drug-Related Motive**

In assessing the sufficiency of a conviction under § 848(e)(1)(A), "[c]ourts [have] universally concluded that a substantive . . . connection" between the killing and continuing criminal enterprise is required to sustain a conviction. *United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009) (collecting cases). Therefore, in addition to proving Jordan's participation in the drug trafficking conspiracy, to meet its burden as to Count One, the Government was required to satisfy what is known as a nexus requirement. 21 U.S.C. § 848(e)(1)(A). Here, the Government only advances a drug-related motive. (Gov't's Opp'n at 48–54.) Of course, proof

of a drug-related motive for a killing fully satisfies the nexus requirement. *Aguilar*, 585 F.3d at 660. And, where the Government relies on a drug-related motive to establish the requisite nexus, it "need only prove beyond a reasonable doubt that one motive for the killing . . . was related to the drug conspiracy." *Aguilar*, 585 F.3d at 659. Put differently, "the government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose" for the killing. *Desinor*, 525 F.3d at 202. That said, it is axiomatic that in the absence of sufficient proof of any motive—here, a drug-related motive—the charge cannot be sustained. Washington argues that the Government failed to satisfy Count One's nexus requirement because it did not adduce evidence sufficient to support its theory that Washington had a drug-related motive to kill Mizell. (Def.'s Mem at 26–27.) The Court is unconvinced.

The Government maintains that Washington had at least one of a number of drug related motives. Namely, according to the Government, Washington was motivated to participate in the killing of Mizell: (1) as retaliation against Mizell for harming the conspiracy when he was unable to secure the Baltimore deal with Yakim; (2) to eliminate Mizell as the middleman in the conspiracy, to cut costs or increase his own profits, thereby benefitting the conspiracy; or (3) to steal kilograms of cocaine from Mizell to sell with Jordan. (Gov't's Opp'n at 51–54.) According to the Government "each of these 'competing inferences' is based on direct and circumstantial evidence . . . sufficient under Section 848(e)." (*Id.* at 54.) With respect to the Government's first and principal motive—retaliation by Washington for Mizell's failure to consummate the Baltimore deal with Yakim, resulting from Yakim's refusal to work with Washington—the Court agrees.

As set forth in the Government's opposition, the trial evidence from which a drug related motive could be drawn as to Washington can be summarized as follows: Washington entered a conspiracy with Mizell and Jordan to distribute ten kilograms of cocaine in Baltimore, (Gov't's Opp'n at 51; Tr. 1760:8–14, 1770:6–22, 1771:1–8, 1777:13–23); in August 2002, Mizell and Washington traveled to Baltimore to consummate a deal to distribute ten kilograms of cocaine, (Tr. at 885:3–10, 1228:16–1233:4; *see* Gov't's Opp'n at 51); Yakim refused to work with Washington, (Tr. 885:3–886:17, 893:15–894:8); Washington returned to New York while Mizell remained in Baltimore to continue negotiation discussions, (Tr. 885:3–887:3, 1238:4–10; *see* Gov't's Opp'n at 50–51); the Baltimore deal would have been lucrative, (Gov't's Opp'n at 51; *see* Tr. 1750:1–13, , 1776:12–1777:4); in October 2002, Mizell was scheduled to meet with his supplier, (Gov't's Opp'n at 50; Tr. 1618:5–12); Washington showed up to the Studio with a firearm the same day of the meeting (or the day after), (Gov't's Opp'n at 50; Tr. 1474:9–10, 1475:24–1476:21); when Washington saw Mizell at the Studio, Washington informed Mizell that Mizell did not need a firearm because he had Washington, (Gov't's Opp'n at 50; Tr. 1477:13–1478:2); Washington asked Mizell, in coded language, about his plans for the drug conspiracy, (Gov't's Opp'n at 50; *see* Tr. 1478:11–20); after leaving the Studio, Washington made a phone call and then told his girlfriend not to return to the Studio, (Gov't's Opp'n at 50; Tr. 1479:25–1481:13); the same day of Mizell's meeting with his supplier (or the day after), Mizell was murdered, (Gov't's Opp'n at 50; Tr. 1618:5–12); Washington was sleeping on Mizell's couch at the time of the murder, (Gov't's Opp'n at 51; Tr. 693:25–694:11); Washington and Jordan spent time together inside and outside of the Studio, (Gov't's Opp'n at 51; Tr. 1761:2–12); and Washington and Jordan met up after Mizell's murder, (Gov't's Opp'n at 50; Tr. 1527:18–1528:12). Based on this evidence, a jury could reasonably infer that Washington was excluded

from a potentially lucrative Baltimore deal and sought to retaliate against Mizell for his exclusion.

Courts have found a substantive connection between a killing and drug trafficking conspiracy where the jury could infer that a defendant killed a co-conspirator for cheating him out of his share of drugs and, therefore, profits. *E.g.*, *United States v. Glenn*, 312 F.3d 58, 65 (2d Cir. 2002). A drug-related motive has also been found where a drug trafficker hired a hit man to kill someone as punishment for robbing his stash house. *United States v. Acosta*, 833 F. App'x 856, 862 (2d Cir. 2020). And, in another case, a court found a drug-related motive where a drug trafficker hired a hit man to kill the men who robbed him of $316,000 in drug proceeds. *Santos*, 541 F.3d at 74–75. In each of these cases, the court found that a threat to the defendant's drug proceeds or supply constituted a motive sufficient to satisfy § 848(e)(1)(A)'s nexus requirement. So too, here, does the trial record support a reasonable inference that Washington possessed such a motive. In the face of this evidence, Washington argues that Mizell did not exclude him from the Baltimore deal; Yakim did. (Def.'s Mem. at 27.) Therefore, Washington would have no motive to kill Mizell. (*See id.*) In their opposition, the Government maintains that there is evidence that "Mizell sent Washington home and did not let him sell with Yakim." (Gov't's Opp'n at 51.) The Court has found no evidence in the record to suggest that Mizell "did not let [Washington] sell with Yakim," (*id.*), but rather that Yakim refused to work with Washington, (Tr. 886:8–10). This fact, however, does not alter the Court's view of Washington's argument. This so because the question before the Court is whether the advanced motive could reasonably be drawn from the evidence, not whether the motive itself was reasonable.

Gaps in proof do, however, pervade each of the remaining purported motives in this case. To be clear, the Court does not question that, in the abstract, each of the advanced motives could

serve as a basis to sustain Count One. However, a review of trial record reveals that the evidence—direct and circumstantial—purportedly supporting these motives is at most "meager". *Guadagna*, 183 F.3d at 130. With respect to the second motive—that Washington sought to eliminate Mizell as the middleman in the conspiracy—the Government fails to identify evidence that Washington was dissatisfied by his portion of revenue from drug sales of cocaine, was in contact with any supplier, or otherwise made arrangements to carry on Mizell's operation. Certainly, there is evidence establishing that Mizell functioned as the conspiracy's middleman. (Tr. 885:3–17, 1751:17–20, 1752:2–12). However, that fact, alone, cannot support an inference that Washington was motivated to consolidate the conspiracy's operations or spearhead an increase in his or the conspiracy's profits. Moreover, with respect to the third motive—that Washington sought to steal kilograms of cocaine from Mizell—the Government fails to point to any evidence that Washington knew that there would be kilograms of cocaine at the Studio, made arrangements to distribute any additional cocaine himself, or had the means to sell additional kilograms of cocaine. Incredibly, the Government does not identify a single specific record cite in support of these advanced motives. To draw the conclusions urged by the Government would exceed the bounds of reason and require plainly impermissible speculation.

In any event, the Court's dim view of these theories is of no consequence. The Court has already found the evidence sufficient to support a reasonable inference as to a drug-related motive for Defendant's participation in Mizell's murder—namely, retaliation for Mizell's failure to include him in the lucrative Baltimore deal. And, where a court determines that one motive is legally sufficient, a finding that the other motives are not sufficient does not alter the court's determination. *See United States v. Aguilar*, 742 F.Supp.3d 322, 331 n. 5 (E.D.N.Y. 2024) ("[W]here there is argument that multiple theories of law and evidence warrant conviction,

sufficient evidence supporting any of these theories is all that is required to uphold the conviction . . . . As a consequence, even if the government had come up short on its evidentiary showing on [its] second . . . theory, [the defendant] would not be entitled to acquittal." (internal citations omitted)). Accordingly, Washington's argument that the Government failed to adduce evidence supporting a reasonable inference that he had a drug-related motive to participate in Mizell's murder falls flat.[7]

* * *

Viewing the evidence in the light most favorable to the Government, Washington has not met his burden to persuade the Court that no reasonable juror "could have found the essential elements of the crime beyond a reasonable doubt" as to Count One. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**B. Count Two**

Pursuant to Count Two, Washington was charged with violating 18 U.S.C. § 924(j), which criminalizes causing the death of a person through the use of a firearm in the course of a violation of Section 924(c). (Superseding Indictment ¶ 2.) A violation of Section 924(c) occurs when "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm . . . ." 18 U.S.C. § 924(c)(1)(A). "[T]he phrase 'in relation to' is expansive," and it is meant to "clarif[y] that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith v. United States*, 508 U.S. 223, 238–37 (1993).

[7] Washington complains that the Government's theory as to the motive has been a "moving target," noting that, in its opening statement, the Government pointed only to retaliation. (Def.'s Mem. at 25 (citing Tr. 19).) As discussed *supra*, this motive, alone, was sufficient to support the claim.

To prove a Section 924(c) violation, "[t]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (citing *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005)) (internal quotation marks omitted). That is, "the test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of the firearm facilitated a drug trafficking crime." *Lewter*, 402 F.3d at 322. As is relevant here, courts have determined that a firearm facilitates a drug trafficking crime where the defendant uses a firearm against a co-conspirator in retaliation for the theft of drugs or drug proceeds. *See United States v. Caraballo*, No. 5:12-CR-105, 2014 WL 3535347, (D. Vt. Mar. 6, 2014) (denying defendant's Rule 29 motion pertaining to his Section 924(c) conviction because "in the course of possessing the Glock firearm, [d]efendant caused the death of [the victim], who was a member of [d]efendant's conspiracy, in retaliation for the stolen drugs"), *on reconsideration*, No. 5:12-CR-105, 2014 WL 3535348, at *6 (D. Vt. July 16, 2014) (concluding upon reconsideration that there was sufficient evidence to convict defendant for a 924(c) violation), *aff'd*, 658 F. App'x 595 (2d Cir. 2016); *United States v. Williams-Bey*, No. 3:20-CR-00172-MPS, 2023 WL 5286799 (D. Conn. Aug. 17, 2023) (explaining "murder alone 'help[s] forward, advance or promote' the crime of possession with intent to sell, at least in a limited sense, by preventing a repeat theft . . . .").

Against this backdrop, Washington argues that because the evidence was insufficient to establish a drug-related motive to satisfy Count One's nexus requirement, the evidence is necessarily insufficient to sustain Count Two's drug nexus requirement. (Def.'s Mem. at 29.) The Court's rejection of Washington's arguments regarding the sufficiency of the evidence to sustain the conviction as to Count One is fatal to this position. And, as the Government argues,

the same evidence supporting the motive of retaliation provided a sufficient basis for the jury to find that Washington used a firearm during and in relation to the ongoing drug trafficking conspiracy in retaliation for his exclusion from a potentially lucrative deal—namely, the Baltimore deal. (*See* Govt's Opp'n at 57–61.) This is because retaliation in the form of "[v]iolence furthers . . . a conspiracy . . . by sending the message that those suspected of stealing from the conspiracy would be treated harshly." *Santos*, 541 F.3d at 72 (internal quotation marks and citation omitted).

For example, in *Caraballo*, the Court concluded that there was sufficient evidence for the jury to convict the defendant for violating Section 924(j) because the defendant "threaten[ed] to kill [his co-conspirator] in an effort to recover . . . stolen drugs." No. 5:12-CR-105, 2014 WL 3535347, at *10. Similarly, in *Williams-Bey*, the court found Section 924(j)'s nexus requirement satisfied by "the connection between [the defendant murdering his co-conspirator] and [defendant's] drug trafficking because [the defendant] committed the murder in retaliation for the theft of drugs or drug proceeds." No. 3:20-CR-00172-MPS, 2023 WL 5286799, at *14. The court in *Williams-Bey*, explained that "[a] rational juror could conclude that [the defendant] intended to murder [his co-conspirator] in reprisal for [his co-conspirator's] theft of [the defendant's] drugs or drug proceeds, and that this murder furthered [the defendant's] drug trafficking business by deterring other potential thieves . . . and also by preventing [his co-conspirator] from stealing from his drug business again." *Id.* at 17. This theory of retaliation equally applies here.

In this case, a reasonable jury could conclude Washington sought to murder Mizell in reprisal for Mizell's failure to ensure Washington's promised involvement in the Baltimore deal, as well as to send a message to other co-conspirators. Or, as put by the Government, the jury

could reasonably infer that the "[u]se of [a] firearm[] to eliminate Mizell was in furtherance of [the] conspiracy as 'punishment . . . and to send a message that such affronts . . . would not be tolerated.'" (Govt's Opp'n at 59 (quoting *United States v. Campbell*, 850 F. App'x 102, 107 (2d Cir. 2021)). There was sufficient evidence for a rational jury to find that Washington's use of the firearm at the time of Mizell's murder furthered the drug trafficking conspiracy.

## II. Rule 33: Motion for a New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33, by its terms, gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). Indeed, a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29 . . . ." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414). Notwithstanding, a trial court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

"In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018). Importantly, the court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury," which is tasked with resolving conflicting evidence and assessing witness credibility. *Ferguson*, 246 F.3d at 133 (citations and quotation marks omitted);

*United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021). Thus, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020). That is, "under [Rule 33], a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *Id.* Only in "exceptional circumstances"—where, for example, "the evidence was patently incredible or defie[s] physical realities," or in a case where, for example, "an evidentiary or instructional error compromised the reliability of the verdict" or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony"—should a court grant a new trial. *Id.*; *Landesman*, 17 F.4th at 331; *see also Ferguson*, 246 F.3d at 133–34 ("It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment [under Rule 33]." (internal quotation marks omitted) (citing *Sanchez*, 969 F.2d at 1414)).

Washington moves for a new trial on the ground that "the evidence preponderates heavily against the verdict." (Def.'s Mem. at 31.) That is, Washington argues that the jury's verdict was against the weight of the evidence. (*See id.*) In moving for a new trial, Washington incorporates by reference the insufficiency-of-evidence arguments he advanced in moving for a judgment of acquittal. (*Id.*) Washington does not offer any additional basis to support his arguments. It is true that "a Rule 33 motion may properly be granted even where a Rule 29 motion is denied." *Landesman*, 17 F.4th at 331. However, when a defendant contests the weight of the evidence, "the Rule 33 inquiry requires an objective evaluation of the evidence and an assessment of whether the evidence preponderates heavily against the verdict." *Id.* Considering the "reliable trial evidence as a whole" and "defer[ring] to the jury's resolution of conflicting evidence," the

guilty verdict here was not a "manifest injustice." *Archer*, 977 F.3d 188–89. As the Court's resolution of Washington's Rule 29 motion makes clear, the weight of the evidence supported the jury's finding under both counts. Accordingly, Washington's motion for a new trial based on the weight of the evidence lacks merit. *See, e.g.*, *United States v. Napout*, 332 F. Supp. 3d 533, 575 (E.D.N.Y. 2018) (rejecting Rule 29 arguments and weight of the evidence Rule 33 arguments for the same reasons), aff'd, 963 F.3d 163 (2d Cir. 2020); *United States v. Gentile*, No. 21-CR-54, 2025 WL 777090, at *27 (E.D.N.Y. Mar. 11, 2025) (same); *United States v. Phillips*, No. 22-CR-138 (LJL), 2024 WL 1300269, at *29 (S.D.N.Y. Mar. 27, 2024) (same).

## CONCLUSION

For the foregoing reasons, Washington's motions for a judgment of acquittal and, in the alternative, a new trial are DENIED.

SO ORDERED.

Dated: Brooklyn, New York
December 19, 2025

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Government,<br>v.<br><br>KARL JORDAN, JR., and RONALD WASHINGTON,<br><br>Defendants. | **MEMORANDUM AND ORDER**<br><br>20-CR-305-LDH-1 |

LASHANN DEARCY HALL, United States District Judge:

Karl Jordan, Jr. ("Jordan") was charged in a superseding indictment with eleven (11) counts. (Superseding Indictment, ECF No. 151.) The Court severed Counts Three through Eleven of the indictment. The remaining two (2) counts of the indictment—Counts One and Two—charged Jordan, Ronald Washington ("Washington"), and Jay Bryant with murder while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A), and firearm-related murder, in violation of 18 U.S.C. § 924(j). (*Id.* at ¶¶ 1, 2.) Jordan pleaded not guilty to each count. The Court subsequently severed Jordan and Washington's trial on Counts One and Two from the trial of Jay Bryant on each count.

The Court held a jury trial as to Jordan and Washington commencing January 29, 2024. At the close of the Government's case, Jordan moved for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure. The motion was denied. On February 27, 2024, the jury returned a verdict of guilty on each count. Jordan renews his motion for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, and, in the alternative, moves for a new trial, pursuant to Rule 33(a) of the Federal Rules of Criminal

Procedure. (*See* Def.'s Mem. L. Supp. Mot. J. Acquittal and Mot. New Trial ("Def.'s Mem."), ECF No. 293.)

**BACKGROUND**

Jason Mizell, also known as Jam Master Jay, was a disk jockey and music producer who, in the 1980s, garnered wide acclaim for his musical successes with the hip-hop group "Run DMC." As the spotlight on Run DMC dimmed in the 1990s and Mizell's musical career sputtered, he entered the cocaine distribution business to offset his financial losses. (Tr. 1051:5–13, 888:10–13.) According to one of Mizell's friends, Eric James, Mizell's role in the drug trade was to act as a middleman: He obtained cocaine on consignment from his supplier, a man called Unc, then distributed it to others to sell. (*Id.* at 1751:17–20, 1752:2–12.) James, himself, was selling cocaine in the Midwest at the time he met Mizell in the 1980s. (*Id.* at 1749:13–1751:12, 1751:17–20.)

In 2001 or 2002, Jordan,[1] Mizell's godson, asked James about the price of cocaine. (*Id.* at 1755:16–1756:13, 1756:10–13.) Jordan asked James to tell Mizell to "put [him] on," which James understood to mean to give Jordan cocaine to sell. (*Id.* at 1756:24–1757:10.) Later, Mizell told James that he gave Jordan an ounce of cocaine to "try him out," and that Jordan sold it successfully. (*Id.* at 1768:6–1770:2.) Separately, in early 2002, Mizell provided Washington,[2] a lifelong friend, with cocaine to sell. (*Id.* at 1767:7–1768:1.) Mizell informed James that Washington "messed it up." (*Id.* at 1767:7–1768:1, 1812:17–24.)

Also in 2002, Mizell "had a line" on 100 kilograms of cocaine from Unc. (*Id.* at 1770:7–15.) However, at the time, Mizell only received ten kilograms from him due to a supply

[1] At trial, Jordan was also referred to as "Little D" and "Noid."

[2] At trial, Washington was also referred to as "Tinard."

shortage. (*Id.* at 1770:7–22.) Mizell told James that he would "set up shop" with Jordan and Washington, to distribute those ten kilograms in Baltimore. (*Id.* at 1760:8–14, 1770:6–22, 1771:1–8.) In addition, Mizell stated that he could make more money in Baltimore due to his relationship with Yakim,[3] a childhood friend who resided in Baltimore and previously sold cocaine for Mizell. (*Id.* at 888:10–13, 1770:6–1772:2, 1776:2–1777:4.) Mizell discussed this Baltimore deal with James "maybe six, seven" times. (*Id.* at 1777:13–16.) And, James testified that, based on these conversations, he understood that the Baltimore deal was supposed to be an "ongoing" distribution arrangement. (*Id.* at 1777:17–20.) Yakim, however, was unable to recall at trial whether the Baltimore deal was meant to be one-time or ongoing. (*Id.* at 886:4–5.)

In August of 2002, Chris Burrell, a friend of Mizell, drove Mizell and Washington to Washington, D.C., ostensibly for the purpose of bringing jewelry to Unc. (*Id.* at 1228:16–1229:4, 1229:12–20.) Washington later admitted to law enforcement that the purpose of this meeting was to pick up cocaine from Unc. (*Id.* at 1616:23–1618:4, 2087:21–2088:14.) Jordan did not travel to Washington, D.C., with Mizell and Washington. (*See id.* at 1228:16–21.) Prior to the meeting, Washington advised Mizell that they should acquire the cocaine at $18,000 per kilogram. (*Id.* at 2088:19–2089:9.) After discussing the terms with Unc, Mizell left the meeting with the cocaine in his possession. (*Id.*) According to Washington, this quantity of drugs was worth $120,000. (*Id.* at 1617:2–1618:4.)

Mizell and Washington traveled to Baltimore the following day. (*Id.* at 1233:2–4.) During the drive, Mizell and Washington discussed the possibility that Washington would stay in Baltimore to sell cocaine. (*Id.* at 1233:2–24.) Upon arrival, Mizell met with Yakim to discuss his plan to "move"—that is, sell—cocaine in Baltimore. (*Id.* at 885:3–10.) During this

---

[3] At trial, Yakim was also referred to as "Ralph Mullgrav" or "Mr. Mullgrav."

conversation, Mizell explained that he wanted Yakim to move between ten and twenty kilograms of cocaine, for an amount between $15,000 and $20,000 per kilogram. (*Id.* at 885:3–21, 890:15–21.) Moreover, Mizell sought permission for Washington to remain in Baltimore to sell the cocaine. (*Id.* at 894:2–4.) Because of animosity between Yakim and Washington, Yakim said, "No" deal, and threatened to kill Washington. (*Id.* at 886:8–10, 1237:3–12; *see also id.* at 893:25–894:8 (Q[:] And during [the summer of 2002], Mizell visited you, right? A[:] Yes. Q[:] And he came to you for permission to put Tinard in Baltimore; am I right? A[:] Yes. Q[:] And you said no, right? A[:] Yes. Q[:] So no deal, right? A[:] No deal.").) Following this meeting, Washington returned to New York with Burrell. (*Id.* at 1237:10–1238:13.) Mizell stayed in Baltimore to negotiate the terms of the deal with Yakim. (*Id.* at 886:18–887:3.)

Mizell returned to Hollis, Queens, on October 29, 2002, (*id.* at 611:7–10), with plans to travel on October 31, 2002, to deejay as part of a local music group called Rusty Waters. (*Id.* at 1061:10–20.) Concurrently, Mizell had plans to meet with Unc's associates. (*Id.* at 1618:5–8.) The meeting was scheduled to take place on either the day of or before Mizell's death. (*Id.* at 1618:5–12.) On October 30, 2002, Washington and his girlfriend, Daynia McDonald, went to Mizell's studio (the "Studio"), where they met Mizell, who appeared surprised to see Washington. (*Id.* at 1477:16–22, 1548:23–1549:3.) Washington noticed that Mizell had a firearm and asked him why he needed the gun, before reminding Mizell, "If you have a problem, I have a problem too." (*Id.* at 1477:23–1478:2, 1550:16–1551:7.) While at the studio, Washington also asked Mizell if the two were going to a show in Connecticut and asked about Baltimore. (*Id.* at 1478:11–20.)[4] At some point, McDonald and Washington left the Studio, and

[4] Washington had not previously discussed touring with Mizell, (*id.* at 1478:21–24), and, by all accounts, was not otherwise involved in Mizell's music, (*id.* at 519:19–23, 823:13–18, 1056:25–1057:3).

Washington took a call from an unnamed individual. (*Id.* at 1480:1–1482:3.) Thereafter, Washington directed McDonald not to return to the Studio. (*Id.*)

Later that night, Mizell was shot and killed in the Studio. (*See, e.g.*, *id.* at 140:16–18; 2089:25–2090:2.) In addition to Mizell, there were five other individuals in the Studio: Randy Allen, Yarrah Concepcion, and Mike Rapley, all of whom were in the control room, (*id.* at 779:23–782:15); and Uriel "Tony" Rincon and Lydia High, who were eyewitnesses to Mizell's murder, (*id.* at 514:24–516:23, 955:20–956:5).

Rincon knew Jordan and Washington prior to the murder, having interacted with each of them inside and outside of the Studio. (*Id.* at 518:1–521:11.) Rincon identified Jordan as the individual who fired the fatal shot. (*Id.* at 513:4–18.) He described having a clear view of Jordan's face and part of his neck tattoo during the brief altercation, in which Jordan approached Mizell for an "embrace," after which Rincon heard "two gunshots," felt a shot to his "left leg above the knee," and saw Mizell fall to the floor. (*Id.* at 514:24–517:2.) Rincon testified further that, at the same time of the shooting, Washington was standing at the door of the Studio and told Lydia High to get down on the ground. (*Id.* at 513:13–19.) Rincon also testified that, days after the murder, he confided in Allen that Jordan and Washington were the perpetrators. (*Id.* at 525:17–25.) This statement was corroborated by Allen's testimony. (*Id.* at 1074:19–1075:6.)

Lydia High testified that she saw a "fair-skinned . . . African-American" man with a neck tattoo give Mizell "a pound," at which point she heard Mizell say, "Oh, shit," and heard a gun fire. (*Id.* at 955:20–958:17.) High attempted to escape the Studio but was stopped by Washington, who ordered her to the ground at gunpoint. (*Id.* at 956:3–22.) High and Washington grew up on the same block during their childhood, and she testified that she saw him clearly and had no doubt that he was the one who pointed the gun at her as she tried to leave the

Studio. (*Id.* at 957:3–9, 957:23–958:1.) The day after the shooting, High also told Allen that Washington ordered her to the ground at gunpoint. (*Id.* at 1075:23–1076:5.) And, although High testified that she could not recall whether she previously provided the police with a description of Jordan's neck tattoo, (*id.* at 961:15–969:17, 980:1–982:5), Allen testified that, the day after the shooting, High told him that the shooter had a neck tattoo, (*id.* at 1075:23–25, 1076:9–14). High's bodyguard, Derrick Parker, provided additional testimony that, in November 2002, High identified both Jordan and Washington as the perpetrators. (*Id.* at 920:8–921:5, 923:3–9.)

Tanya Davis, an employee of a financial services company located in the same building as the Studio, testified that she saw a "very tall[,] . . . lanky . . . black" man with "light skin," a "shadow beard," and "braids" enter the front door of the building and walk back towards the Studio shortly before the shooting. (*Id.* at 1313:10–1314:19.) She later saw the same man exit through the front door after the shooting. (*Id.* at 1317:3–1318:10.) It is uncontested that Jay Bryant, an alleged accomplice to the killing, was at the scene at the time of the murder.

Other witnesses testified that Jordan admitted his involvement. Cherubin Bastien, a man who rented a room in Jordan's home, testified that, while driving Jordan and his friends around in 2004, he overhead a conversation about "Jam Master Jay," in which Jordan, referring to Mizell, stated, "[I]f I get to kill him, I'll kill him again." (*Id.* at 1840:24–1842:24, 1845:25–1846:14.) Bastien also recalled a second conversation in which Jordan was arguing with a woman at their shared residence. (*Id.* at 1847:16–1848:3.) In this conversation, Bastien overheard Jordan tell the woman that he would "do [her] exactly just like [Mizell]." (*Id.* at 1848:1.)

Jay Bryant's uncle, Raymond Bryant, testified that Jay Bryant is between 6'4" and 6'5" and walked with a limp. (*Id.* at 1349:1–21.) Raymond Bryant also testified about two conversations that he had with Jay Bryant related to the murder. In the first conversation, which occurred around 2003 or 2004, Jay Bryant admitted that he "did it" because Mizell went for his gun. (*Id.* at 1374:15–1375:2.) In the second conversation, Jay Bryant relayed that his hat had been found at the crime scene. (*Id.* at 1378:10–15.) That hat contained Jay Bryant's DNA. (*Id.* at 1378:16–18.)

## DISCUSSION

### I. Rule 29: Motion for Judgment of Acquittal

A defendant challenging a jury's guilty verdict "bears a heavy burden," *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted). Indeed, the standard of review has been described as "exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation omitted). As such, in considering a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the Government, *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), "crediting every inference that could have been drawn in the [G]overnment's favor," *Martoma*, 894 F.3d at 72. Most fundamentally, when considering a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. That is, the "resolution of the weight of the evidence and the credibility of the witnesses" are "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (citations omitted). Notably, "[a] 'jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Berry*, No. 20-CR-84 (AJN), 2022 WL 1515397, at *4 (S.D.N.Y. May 13, 2022) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)). "[S]o long as . . . inference[s are] reasonable, 'it is the

task of the jury, not the court, to choose among competing inferences.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). Accordingly, a Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir. 1999) (citation omitted). It is against this legal backdrop that the Court reviews Jordan's Rule 29 motion.

## A. Count One

### 1. Membership in the Drug Conspiracy

Pursuant to Count One, Jordan was charged with violating 21 U.S.C. § 848(e)(1)(A), which makes it unlawful for anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." (Superseding Indictment ¶ 1.) In this case, the qualifying drug offense was "a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine." (*Id.*) Therefore, to meet its burden as to Count One, the Government was required to prove, among other things, that Jordan participated in the charged drug trafficking conspiracy. *See United States v. Desinor*, 525 F. 3d 193, 202 (2d Cir. 2008) (noting as an element of 21 U.S.C. § 848(e)(1)(A) that the conspiracy was ongoing when the killing occurred). It did.

As set forth in the charge to the jury, to find that a conspiracy existed, the evidence needed to show that "at least two people joined together in a common criminal scheme . . . [and] participated . . . willfully and with knowledge of its unlawful purpose and in furtherance of its unlawful purpose." (Tr. 2543:21–22, 2545:3–6.) *See also United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) ("In order to prove a single conspiracy, the government must show that

each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." (citation omitted)). Here, Jordan concedes that the Government proved he agreed to enter a conspiracy to traffic in cocaine. That is, according to Jordan, there is "no evidence that Mizell conspired with Jordan to sell drugs *apart from* the Baltimore deal or New York . . . . " (Def.'s Mem. at 18 (emphasis added).) By Jordan's own admission, then, he joined Mizell in a drug trafficking conspiracy as early as 2001, when he sold an ounce of cocaine on Mizell's behalf in New York. (*See id.* at 3, 18; *see also* Tr. 1755:12–1757:7, 1769:18–22.) The trial testimony supports this conclusion; James testified that Jordan inquired about cocaine prices, requested that Mizell "put him on," and even sold some quantity—albeit small—of cocaine. (*See* Tr. 1756:24–1757:10).

Nonetheless, Jordan contends that Yakim's refusal to work with Washington in Baltimore "ended" the "Baltimore scheme" and that the Government failed to adduce any evidence from which a jury could reasonably infer that he joined, or had knowledge of, any new scheme. (Def.'s Mem. at 18–22.) And, as Jordan's argument goes, because there was no evidence of conspiratorial conduct after Yakim "said, 'No deal,'" there was no ongoing conspiracy when Mizell was murdered months later. (*Id.*) Not so.

As a threshold matter, and as the Government aptly argues, there was only one overarching drug conspiracy, which Mizell conducted in New York and sought to expand to Baltimore. (Gov't's Mem. L. Opp'n Defs.' Mot. Acquit. and Mot. New Trial ("Gov't's Opp'n") at 39–44, ECF No. 296.) There were not, as Jordan contends, separate conspiracies. (Def.'s Mem. at 18–22.) Indeed, in advance of trial, Jordan proposed that a multiple conspiracies jury instruction be included in the final charge, "if applicable."[5] (Joint Def. Reqs. Charge at 24.)

[5] Jordan and Washington submitted a joint jury charge, which proposed the following instruction as to multiple conspiracies:

However, at the charging conference, Jordan failed to argue for the instruction's inclusion or object to its omission from the final charge. Presumably, Jordan's failure to argue for a multiple conspiracies jury instruction resulted from his determination that, based on the trial record, there was no basis to advance such an argument.

In any event, Jordan's argument that the charged drug conspiracy ended when Yakim said, "No" deal, is unconvincing. It is plain from the evidence that Yakim's refusal to work with Washington does not preclude the conclusion that the drug conspiracy was ongoing or that Jordan was a member. Yakim's refusal was clearly limited to Washington. (Tr. 886:8–10, 893:25–894:8.) There was simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute narcotics in

---

**Request No 18: Defenses: Multiple Conspiracies [If Applicable]**

> In this case, the defendants contend that the government's proof as to Count [##] fails to show the existence of only one overall conspiracy. Rather, they claim that there was actually a separate and independent conspiracy involving themselves and other persons.
>
> Whether there existed a single unlawful agreement or many such agreements, or indeed, no agreement at all is a question of fact for you the jury to determine in accordance with the instructions I am about to give you.
>
> When two or more people join together to further one common unlawful design or purpose a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.
>
> If you find that the conspiracy charged in the indictment did not exist, you cannot find either defendant guilty of the single conspiracy charged in the indictment. This is so even if you find that some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.
>
> Similarly, if you find that the defendant you are considering was a member of another conspiracy and not the one charged in the indictment, then you must acquit that defendant of the conspiracy charges. Therefore, what you must do is determine whether the conspiracies charged in the indictment existed. If they did, you must then determine the nature of the conspiracy and who were its members.

(Joint Def. Reqs. Charge at 24, ECF No. 204.)

Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the Baltimore deal.[6]

Equally unavailing is Jordan's contention that there was no evidence of conspiratorial conduct after Yakim "said, 'No deal,'" and that, therefore, there was no ongoing conspiracy when Mizell was murdered. (Def.'s Mem. at 18–22.) In fact, there was ample evidence of conspiratorial conduct after Yakim said, "No" deal. There was testimony that Mizell: remained in Baltimore to negotiate with Yakim, (Tr. 886:18–887:3, 1237:10–1238:10); "had a line" on 100 kilograms of cocaine, which was to be sold on consignment, (*id.* at 1770:13–14; *see id.* at 1794:24–1795:6); intended distribution of the cocaine to be "ongoing," (*id.* at 1777:13–20); and had not paid Unc for any of the cocaine as of October 2002, (*see* Tr. 1788:11–20 ("Q[:] Did you ever speak with Unc after [Mizell's] murder? . . . A[:] Yes . . . . Q[:] Did [Unc] say anything about money? A[:] He said – he said whatever [Mizell] owed died with him."). This evidence sufficiently established an ongoing conspiracy to distribute narcotics. Indeed, the fact that Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy did not end in Baltimore. *See, e.g.*, *United States v. Brock*, 789 F.3d 60, 64 (2d Cir. 2015) (collecting cases where "significant indicia of a conspiratorial purpose existed: the defendants purchased drugs in significant quantities on credit from the selling organization and took substantial other steps to assist it such as facilitating resales, supplying bail money and recruiting other customers and sellers."); *United States v. Glynn*, 686 F. App'x 51, 54 (2d Cir. 2017) (purchase of drugs on credit for redistribution showed conspiratorial relationship); *United States v. Faltine*, No. 13-CR-315 (KAM), 2016 WL 1700385, at *4 (E.D.N.Y. Apr. 26, 2016) (drug sales on consignment "is a stand-alone factor supporting a conspiracy"). That the cocaine was

[6] As discussed, *infra*, the Government makes this very argument.

not ultimately distributed by Mizell in Baltimore is of no consequence. As the Second Circuit has recognized, "the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it." *Santos*, 541 F.3d at 71.

Certainly, it was theoretically possible for the conspiracy to have continued without Jordan. However, once an individual enters a conspiracy, the only way to exit it is for him to affirmatively withdraw from it. *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (citation omitted). To withdraw, a defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy." *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) (cleaned up). Here, Jordan fails to argue—let alone direct the Court to evidence—that he took any affirmative step to withdraw from the charged drug conspiracy. Given the trial evidence, Jordan's concession that he entered into the conspiracy, and Jordan's failure to demonstrate his withdrawal from the conspiracy, the Court concludes that Jordan was a member of a drug trafficking conspiracy at the time of Mizell's murder. This conclusion does not end the Court's inquiry, however.

### 1. Proof of Drug-Related Motive

In assessing the sufficiency of a conviction under § 848(e)(1)(A), "[c]ourts [have] universally concluded that a substantive . . . connection" between the killing and continuing criminal enterprise is required to sustain a conviction. *U.S. v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009) (collecting cases). Therefore, in addition to proving Jordan's participation in the drug trafficking conspiracy, to meet its burden as to Count One, the Government was required to satisfy what is known as a nexus requirement. 21 U.S.C. § 848(e)(1)(A).[7] Here, the Government

[7] Jordan contends that, with respect to § 848(e), the Government was required to show that "Mizell's murder furthered the conspiracy's goals." (Def.'s Mem. at 23.) As support for this contention, Jordan relies on the legal standard for a violation of 18 U.S.C. § 1959, which requires the Government to show, *inter alia*: the existence of an enterprise engaged in racketeering; the defendant's attempt to obtain a position therein; and the commission of a

only advances a drug-related motive. (Gov't's Opp'n at 48–54.) Of course, proof of a drug-related motive for a killing fully satisfies the nexus requirement. *Aguilar*, 585 F.3d at 660. And, where the Government relies on a drug-related motive to establish the requisite nexus, it "need only prove beyond a reasonable doubt that one motive for the killing . . . was related to the drug conspiracy." *Aguilar*, 585 F.3d at 659. Put differently, "the government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose" for the killing. *Desinor*, 525 F.3d at 202. That said, it is axiomatic that in the absence of sufficient proof of any motive—here, a drug-related motive—the charge cannot be sustained. Jordan argues that the Government failed to satisfy the nexus requirement because it did not adduce evidence sufficient to support the conclusion that Jordan had a drug-related motive to kill Mizell. (Def.'s Mem. at 23, 25–26). The Court agrees.

The Government maintains that Jordan had at least one of a number of drug related motives. Namely, according to the Government, Jordan was motivated to participate in the killing of Mizell: (1) as retaliation against Mizell for harming the conspiracy when he was unable to secure the Baltimore deal with Yakim; (2) to eliminate Mizell as the middleman in the conspiracy, to cut costs or increase his own profits, thereby benefitting the conspiracy; or (3) to steal kilograms of cocaine from Mizell to sell with Washington.[8] (Gov't's Opp'n at 51–54.)

---

violent act by the defendant for the purpose of maintaining or increasing his position in the enterprise or the receipt of anything of value. 18 U.S.C. § 1959(a). As the Government points out, neither § 848(e) nor § 924(j) contain any such elements. (Gov't's Opp'n at 47, n.22.) As such, Jordan's reliance on the standard applicable to 18 U.S.C. § 1959 is misplaced.

[8] Perhaps tellingly, at trial, the Government did not argue expressly the exisence of any of these three motives. Instead, in summation, the Government argued only that "[w]hatever the specific motive may have been, it doesn't matter. They're all related to narcotics, they're all related to the drug conspiracy . . . . Certainly, a cocaine deal worth hundreds of thousands of dollars with the promise of more is enough to get someone killed." (Tr. 2316:25–2317:8.)

According to the Government, "each of these 'competing inferences' is based on direct and circumstantial evidence . . . sufficient under Section 848(e)." (*Id.* at 54.) The Court is not convinced.

As set forth in the Government's opposition, the trial evidence from which a drug-related motive could be drawn as to Jordan can be summarized, in total, as follows: In 2001 or 2002, Jordan asked "Mizell to establish him as a cocaine distributer,"[9] (Gov't's Opp'n at 50); Mizell gave Jordan an ounce of cocaine to sell, which he successfully sold, (*see id.* at 50–51, 54); Jordan entered a conspiracy with Mizell and Washington to distribute ten kilograms of cocaine in Baltimore, (*id.* at 51); the Baltimore deal would have been lucrative, (*id.* at 51); Jordan and Washington spent time together inside and outside of the Studio, (*id.* at 51); and Jordan and Washington met up [one month] after Mizell's murder, (*id.* at 50). The Government adduces nothing further on this point.[10] While this evidence establishes that Jordan agreed to sell cocaine on behalf of Mizell and was friendly with Washington, as discussed *infra*, its reach does not extend to the motives advanced by the Government.

The principal motive pressed by the Government is retaliation by Jordan for Mizell's failure to consummate the Baltimore deal with Yakim, resulting from Yakim's refusal to work with Washington. But, by the Government's own account, "there was no trial testimony or physical evidence that Jordan's role in the narcotics conspiracy was dependent on Washington's

[9] Interestingly, although the government notes that Jordan asked Mizell to "put [him] on" and "begged Mizell to help establish him as a cocaine distributer," (Gov't's Opp'n at 18, 52), the Government later described Jordan as more experienced than Mizell at selling cocaine, (*see* Gov't's Opp'n at 54).

[10] In its opposition, the Government highlights further evidence that related exclusively to Washington or was otherwise unconnected to Jordan. For example, the Government highlights that Mizell was scheduled to meet with his supplier in October 2002, and that, in August 2002, Mizell and Washington attended a meeting with Yakim, to consummate the deal to distribute ten kilograms of cocaine in Baltimore, during which Yakim refused to work with Washington. However, there was no evidence that Jordan knew about the meeting between Mizell and his supplier, (*see* Gov't's Opp'n at 50), or about Yakim's refusal to work with Washington, (*id.* at 51–53).

role in Baltimore, or preconditioned on the Baltimore deal at all." (Govt's Opp'n at 41.) That is, according to the Government's opposition, "[t]here was an agreement between Mizell and Jordan to sell cocaine, and there was no evidence at trial that Washington's inability to distribute cocaine with Yakim in Baltimore negated Jordan's agreement with Mizell." (*Id.*) To put an even finer point on it, the Government states, "there were no failed negotiations between Mizell and Jordan . . . [and] no evidence that Jordan was told he could not distribute in Baltimore." (*Id.* at 41–42.) True. From what evidence, then, could the jury have reasonably inferred that Jordan sought to retaliate against Mizell for the failure of the Baltimore deal? There was none. In other words, the Government's arguments in opposition to Jordan's motion do complete violence to its claim that Jordan may have been motivated to kill Mizell as a result of the failed or compromised nature of the Baltimore deal.

The gaps in proof pervade each of the remaining purported motives in this case. To be clear, the Court does not question that, in the abstract, each of the advanced motives could serve as a basis to sustain Count One. However, a review of the trial record reveals that the evidence—direct and circumstantial—purportedly supporting these motives is at most "meager." *See Guadagna*, 183 F.3d at 130. For example, with respect to the second motive—that Jordan sought to eliminate Mizell as the middleman in the conspiracy—the Government fails to identify evidence that Jordan was dissatisfied by his portion of revenue from drug sales, was in contact with any supplier, or otherwise made arrangements to carry on Mizell's operation. Certainly, there is evidence establishing that Mizell functioned as the conspiracy's middleman. (Tr. 885:3–17, 1751:17–20, 1752:2–12). However, that fact, alone, cannot support an inference that Jordan was motivated to consolidate the conspiracy's operations or spearhead an increase in his or the conspiracy's profits. Moreover, with respect to the third motive—that Jordan sought to steal

kilograms of cocaine from Mizell—the Government fails to point to any evidence that Jordan knew about the scheduled meeting between Mizell and his supplier, knew that there would be kilograms of cocaine at the Studio, or made arrangements to distribute any additional cocaine himself. Incredibly, the Government does not identify a single specific record cite in support of these advanced motives. To draw the conclusions urged by the Government would exceed the bounds of reason and require plainly impermissible speculation. *See United States v. Pinckney,* 85 F.3d 4, 7 (2d Cir.1996).

This is not to say that there could be no case where a drug-related motive is found despite "holes in the Government's proof of motive." *E.g.*, *United States v. Glenn,* 312 F.3d 58, 65 (2d Cir. 2002). The Government cites to a number of them. This Court has mined those cases and finds them plainly distinguishable. In each, there was sufficient evidence from which a drug-related motive could be reasonably inferred. The difference between the level of proof present in those cases compared to the one at bar is stark.

For example, the Government refers the Court to *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002). In *Glenn*, the court found that the Government presented sufficient evidence that the defendant was motivated to kill his co-conspirator because the co-conspirator cheated him out of his share of stolen drugs. 312 F.3d at 65. Namely, the court highlighted that the defendant was aware of the quantity of the stolen drugs, encouraged his co-conspirator to steal the drugs, visited his co-conspirator twice to obtain his share of the stolen drugs, and that the co-conspirator lied about the amount he stole and refused to give the defendant a share based on actual proceeds. *Id.* The *Glenn* court concluded that, although there were some "holes in the Government's proof of motive," the evidence presented was sufficient for a jury to find that the defendant murdered his co-conspirator because he lied about the robbery proceeds, and the defendant's portion of the

drugs was "unacceptably small." *Id.* In this case, there is simply no evidence suggesting that Jordan felt cheated by the failure of the Baltimore deal, was disappointed by the proceeds he received from the conspiracy, or sought to steal cocaine from Mizell, much less motivated to kill Mizell because of these reasons.

The Government's reliance on *United States v. Campbell*, 850 F. App'x 102 (2d Cir. 2021), is similarly unhelpful. In pointing to *Campbell*, the Government notes that the court found that evidence that the defendant was involved in a drug conspiracy, participated in the murder, and met with co-conspirators after the murder, as well as the timing of the murder relative to drug activity, was sufficient to support a finding of nexus. (Govt's Opp'n at 51.) But, what the Government fails to acknowledge is that the court's finding also relied on evidence that: the defendant caught the murder victim attempting to steal marijuana from the stash house; co-defendants immediately relayed the murder victim's whereabouts to the defendant whenever they spotted him; the defendant committed the murder approximately two weeks after the victim attempted robbery; and after the murder, the defendant and co-defendants fled the neighborhood together with a duffle bag containing, among other things, a distribution quantity of marijuana, paraphernalia used for marijuana distribution, and the three kinds of ammunition used in the murder. *United States v. Peter*, No. 17 CR 054, 2019 WL 2918226, at *15–17 (S.D.N.Y. July 8, 2019), *aff'd sub nom. Campbell*, 850 F. App'x 102. It was only in the face of all of this evidence that the Court found that "[t]he obvious link between [the attempted marijuana robbery and the murder] was laid bare for the jury: days after [the defendant] caught [the murder victim] attempting the robbery, [co-defendants] . . . joined up with [the defendant] to stalk and execute him." *Id.* at *15. The record in this case is bereft of such an "obvious link," or any link, between

the failed Baltimore deal and Jordan's decision to participate in Mizell's murder two months later.[11]

The Government's reliance on *United States v. Gracesqui*, No. 10-CR-74, 2016 WL 11259074 (S.D.N.Y. June 3, 2016), *aff'd*, 730 F. App'x 25 (2d Cir. 2018), and *United States v. Acosta*, 833 F. App'x 856 (2d Cir. 2020), is likewise misplaced. In *Gracesqui*, the court found the evidence sufficient for the jury to infer that the charged murder was intended to "make[e] an example of the person who robbed [the defendant's co-defendant] of heroin." No. 10-CR-74, 2016 WL 11259074, at *5. But, critical to the court's conclusion was testimony that the defendant was expressly told that "[his co-defendant] wanted them to kill the guy who stole [the co-defendant's] drugs." *Id.* In *Acosta*, the court found that there was "compelling evidence that the motive for the murders was to seek revenge on those responsible for the burglary of [the defendant's] stash house." 833 F. App'x at 862. There, the Government proved that two of the defendant's workers stole roughly $200,000 in drug proceeds from one of his stash houses and that the defendant subsequently sought the help of a family friend specifically to kill the workers for the theft of the drug proceeds. *Id.* There is no such evidence here.

The Government relies on *United States v. Santiago-Ortiz*, No. 17-CR-0149, 2018 WL 4054859 (S.D.N.Y. Aug. 23, 2018), *aff'd*, 797 F. App'x 34 (2d Cir. 2019), where the court found that the jury could reasonably infer that the defendant, a member of a drug organization, murdered the victim because he felt disrespected by a personal dispute and was motivated to bolster his reputation within the organization. No. 17-CR-0149, 2018 WL 4054859, at *5.

[11] In support of its purported motives, the Government relies in part on the fact that "Jordan and Washington met up together after the murder." (Gov't's Opp'n at 50.) However, the Government fails to state is that this meeting occurred over a month after Mizell's murder. (*See* Tr. 1527:18–1528:12.) In *Campbell*, the court found evidence that defendant met with co-conspirators immediately following the murder to be probative of nexus. This fact is hardly analogous to the present case.

There, the Government proved that: the victim got into a physical altercation with the defendant's brother, who was also a member of the organization; when the defendant encountered the victim several months later at a pool hall, the defendant left the premises and returned with his drug supplier before shooting the victim; and the defendant was elevated to sole drug distributor because of the respect he commanded within the organization following the murder. *Id.* at *3. In this case, there is simply no evidence of a personal dispute between Jordan and Mizell, or any suggestion that Jordan felt slighted by his role in the conspiracy. Nor is there any evidence that Mizell's murder resulted in Jordan's promotion within the conspiracy.

The Government also refers the Court to *United States v. Santos*, 541 F.3d 63 (2d Cir. 2008), for the proposition that the murder itself can "assist in proving the substantive connection between the narcotics conspiracy and the murder." (Gov't's Opp'n at 55.) While that may be true, the evidence of the murder itself must be accompanied by other evidence supporting the requisite nexus. *Santos* is instructive here. In *Santos*, in addition to the murder itself, the court found that there was additional evidence from which the jury could reasonably infer that "one motive for the killing was related to [the drug] conspiracy. *Santos*, 541 F.3d at 74. Namely, there was evidence that the defendant asked why he was being hired, to which he was told, "[A] large-scale cocaine dealer . . . wanted two men killed for stealing $316,000." *Santos*, 541 F.3d at 74. No such evidence exists here.[12]

In view of the Government's own authority and in the face of the facts adduced at trial, to find as the Government urges would render the nexus requirement a nullity.

[12] The Government's reliance on *United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016) similarly fails. There, the court found that the jury could reasonably infer motive, because as a member of a criminal enterprise, the defendant felt disrespected as a result of a personal dispute that arose at a bar and returned with other members of the enterprise to murder the victims, "to preserv[e] (and even enhanc[e])" the enterprise's reputation." *Vernace*, 811 F.3d at 616. There is no evidence of a personal dispute between Jordan and Mizell. Nor is there any evidence suggesting that Jordan sought to enhance his reputation or that of the conspiracy by participating in the killing of Mizell.

### B. Count Two

Pursuant to Count Two, Jordan was charged with violating 18 U.S.C. § 924(j), which criminalizes causing the death of a person through the use of a firearm in the course of a violation of Section 924(c). (Superseding Indictment ¶ 2.) A violation of Section 924(c), in turn, occurs when "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm . . . ." 18 U.S.C. § 924(c)(1)(A). To prove that a firearm was used during and in relation to the drug trafficking conspiracy, the Government must prove that the firearm was an integral part of the commission of the drug conspiracy and that it furthered or facilitated the crime. *See United States v. Washington*, 48 F.3d 73, 80 (2d Cir. 1995) ("Section 924(c) applies where possession of a firearm is 'an integral part of the predicate offense and facilitates the commission of that offense." (citations omitted)). It is not enough for the use of the firearm to be inadvertent, coincidental, or for some purpose other than furthering and facilitating the drug conspiracy. *See Smith v. United States*, 508 U.S. 223, 227–28 (1993) ("By its terms, [Section 924(c)(1)] requires the prosecution to make two showings. First, the prosecution must demonstrate that the defendant used or carried a firearm. Second, it must prove that the use or carrying was during and in relation to a crime of violence or drug trafficking crime." (internal quotation marks omitted) (alterations accepted)). "[T]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (citing *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005)) (internal quotation marks omitted).

The Government maintains that "the same evidence outlined . . . in connection with the narcotics conspiracy provided a sufficient basis for the jury to rationally find that . . . Jordan used

firearms during and in relation to the narcotics conspiracy at the time of Mizell's murder." (Gov't's Opp'n at 58.) That is, "[a]ll of the motives previously described 'afforded some advantage' . . . . to the narcotics conspiracy . . . ." (*Id.*) The Court has already found that the Government's purported motives underlying Count One to be insufficient. The Court's reading of that evidence is no different when viewed through the lens of Count Two.

* * *

"While it is true that a conviction may be based solely on reasonable inferences from circumstantial evidence, a conviction cannot rest on mere speculation or conjecture." *Pinckney,* 85 F.3d at 7 (citations omitted). "In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994). Here, after a review of the trial record, the Court finds that the Government's theories of Jordan's drug-related motive to kill Mizell or drug offense-related motive to use a firearm are impermissibly speculative and just conjecture. Jordan has met the heavy burden that Rule 29 demands to be granted a judgment of acquittal on Count One and Count Two.

## II. Rule 33: Motion for a New Trial[13]

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33, by its terms, gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). Indeed, a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a

[13] Under Rule 29(d), "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted." Fed. R. Crim. P. 29(d).

motion for acquittal under Rule 29 . . . . ” *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414). Notwithstanding, a trial court “must exercise the Rule 33 authority ‘sparingly’ and in ‘the most extraordinary circumstances.’” *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

“In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice.” *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018). Importantly, the court “must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury,” which is tasked with resolving conflicting evidence and assessing witness credibility. *Ferguson*, 246 F.3d at 133 (citations and quotation marks omitted); *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021). Thus, “a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be ‘manifest injustice’ to let the verdict stand.” *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020). That is, “under [Rule 33], a district court may not ‘reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.’” *Id.* Only in “exceptional circumstances”—where, for example, “the evidence was patently incredible or defie[s] physical realities,” or in a case where, for example, “an evidentiary or instructional error compromised the reliability of the verdict” or “the government’s case depend[ed] upon strained inferences drawn from uncorroborated testimony”—should a court grant a new trial. *Id.*; *Landesman*, 17 F.4th at 331; *see also Ferguson*, 246 F.3d at 133–34 (“It is only where exceptional circumstances can be

demonstrated that the trial judge may intrude upon the jury function of credibility assessment [under Rule 33]." (internal quotation marks omitted) (citing *Sanchez*, 969 F.2d at 1414)).

### A. Alternative Perpetrator

Jordan maintains that he is entitled to relief under Rule 33 because, according to Jordan, there was "uncontested evidence" that "Jay Bryant, not Jordan, shot Mizell." (Def.'s Mem. at 29.) Specifically, Jordan directs the court to the testimony of Raymond Bryant, Jay Bryant's uncle. (*Id.* at 29–30.) Therein, the elder Bryant testified that, on two occasions—once in 2003 or 2004 and again in 2016—Bryant confessed to killing Mizell.[14] On the first occasion, Bryant

---

[14] At trial, the following testimony was elicited from Raymond Bryant:

> Q[:] Do you recall anything else about that conversation [with Jay Bryant]?
> A[:] That he wouldn't have did it if he didn't go for his gun . . . .
> Q[:] Who are the "he's" in your sentence?
> THE COURT: Who are you saying went for their gun?
> THE WITNESS: Jam Master Jay . . . .
> THE COURT: And when you said. [h]e wouldn't have done it, who was it – who wouldn't' have done it?
> THE WITNESS: Jay.

Tr. 1374:19–1375:2.

> Q[:] And the first time that Jay Bryant told you he killed [Mizel] was in 2003, 2004; isn't that correct?
> A[:] Yes . . . .
> Q[:] And as far as you can recall, you were the only one present when this conversation took place?
> A[:] Well, we were talking on the side.
> Q[:] But her was talking to you, correct?
> A[:] Yes, yes.
> Q[:] He was confiding to you, correct?
> A[:] Yes.
> Q[:] And he told you, he did it, right?
> A[:] Yes.

*Id.* at 1377:8–25.

> Q[:] And then you had a subsequent conversation around 2016, about maybe five years ago, correct?
> A[:] Yeah, give or take.
> Q[:] And this is after the – a hat was found or he told you about a hat –
> A[:] Right.
> Q[:] – that had been found at the murder scene that had DNA on it, correct?
> A[:] Yes.

admitted that he "did it" because Mizell went for his gun. (*Id.* at 1374:15–1375:2.) On the second occasion, Bryant relayed that his hat, containing his DNA, had been found at the crime scene. (*Id.* at 1378:10–21.) Jordan highlights that Raymond Bryant's testimony is corroborated by the presence of Jay Bryant's DNA at the crime scene and testimony that an individual matching Jay Bryant's description entered the building shortly before and after the shooting. (Def.'s Mem. at 29–31.) Jordan further underscores that the eyewitnesses consistently testified that there was only a single shooter in the Studio. (*Id.* at 31.)

On these facts, the Court could find the conclusion that Jay Bryant was the shooter, not Jordan, to be reasonable—even more reasonable.[15] But, Rule 33 requires more. The Court's misgivings do not render the evidence supporting Jordan's conviction "patently incredible," in "defi[ance of] physical realities," or the result of "evidentiary or instructional error [that] compromised the reliability of the verdict." *See Archer*, 977 F.3d at 188. And, of course it remains the jury's role, not the Court's to weigh conflicting evidence. Although Jordan highlights Bryant's presence at the scene at the time of the shooting, this fact is not inconsistent with the Government's theory that Jay Bryant conspired with Jordan and Washington to murder Mizell. According to the Government's theory, Jay Bryant's role in the conspiracy was to open

---

Q[:] And he said it was his hat that was at the murder scene, correct?
A[:] Yes.

*Id.* at 1378:10–21.

[15] The Court's view in this regard is reinforced by a number of facts. Lydia High reported on the night of the murder that the shooter was "tall." (Tr. 1004:11–20.) As even the Government notes, Jordan is only 5'9" tall, while Jay Bryant stands at a towering 6'4" or 6'5". (*Id.* at 2022:15–18, 2326:17–19.) Moreover, while Jay Bryant's DNA was found on the hat at the crime scene, (*id.* at 190:7–24, 192:14–193:19, 408:21–410:17), and although the Government argued that Jordan perhaps borrowed that hat from Bryant, (*id.* at 2331:10–12), Jordan's DNA was not found on the hat, (*id.* at 444:2–446:9)—only Bryant's. It is true that High testified that the shooter had a tattoo on his neck. (*Id.* at 958:4–13.) However, there was no evidence that, on the night of Mizell's murder, High included the neck tattoo in her description of the shooter to law enforcement.

the rear door of the building to grant Jordan and Washington entry.[16] The evidence adduced at trial provides support for this theory. At trial, Tanya Davis, another occupant of the building in which the Studio was located, testified that shortly before Mizell was shot, she observed Jay Bryant enter the building behind Lydia High and walk in the direction of the Studio and towards the building's back door. (*See* Tr. 1311:23–1315:1.) Shortly thereafter, she observed Jay Bryant return from the direction of the back door towards the front exit of the building. (*See id.* at 1317:7–1318:10.)

It is true that there was also trial evidence indicating that Jay Bryant confessed to Mizell's murder to his uncle, Raymond Bryant. Specifically, Raymond Bryant testified that Jay Bryant "basically told [him] that he was involved [in Mizell's murder] . . . [and] he did it," (*Id.* at 1352:24, 1353:1; *see also id.* at 1377:8–1378:2), and that he "said he would not have killed Jason Mizell if Jason Mizell didn't reach for a gun," (*id.* at 1378:3–6). However, the jury also heard testimony from Uriel "Tony" Rincon, a victim of the shooting. Specifically, Rincon, who had a previous relationship with Jordan, testified that he had no doubt that Jordan was the shooter. (*See id.* at 592:16–18 (Q[:] As you sit here, sir, is there any doubt that Karl Jordan shot Jason Mizell? A[:] No.").)[17] Lydia High also testified that the shooter was a "fair-skinned" Black man with a neck tattoo. (*Id.* at 958:6–13.) Jordan has a neck tattoo. (*Id.* at 685:11–16.) Additionally, Cherubin Bastien testified that while driving Jordan and his friends around in 2004, he overhead a conversation about Jam Master Jay, in which Jordan stated, "if I get to kill him,

[16] The Court presumes that the jury resolved any conflict that may have emerged from the fact that both Jordan and Washington had ready access to the studio and, according to eyewitness testimony, the perpetrators made no effort to conceal themselves; begging the question why Bryant, who was unknown to Mizell and had to sneak into the building behind Lydia High, would be given this role.

[17] Although Rincon did not initially identify Jordan as the shooter, he explained at trial that he hid the truth because he was weary of retaliation. (*Id.* at 525–65.) The jury clearly credited Rincon's testimony over that of Raymond Bryant.

I'll kill him again." (*Id.* at1845:25–1846:14.) Bastien also recalled another conversation in which, while arguing with a woman, Jordan told the woman that he would "do [her] exactly just like him," referring to Mizell. (*Id.* at 1847:16–1848:3.) Moreover, as the Government points out, the presence of Jay Bryant's DNA[18] at the crime scene was also "put before the jury for their consideration." (Gov't's Opp'n at 64.) As evinced by the verdict, it is plain that the jury resolved the presence of Bryant's DNA and the absence of Jordan's DNA at the crime scene and was unpersuaded by the Defense.

**B. Juror Misconduct**

As a separate basis for granting a new trial, Jordan argues that Juror No. 12 was impaired. (Def.'s Mem at 34.) By way of background, after jury deliberations began, the foreperson submitted a note indicating that Juror No. 12 asked to be excused, as "he felt like he [was] too connected being that he work[ed] in Hollis, Queens, and he [was] a regular in the barber shop." (Tr. 2600:7–10.) Shortly thereafter, with defense counsel present, the Court conducted an in-camera discussion with Juror No. 12 about his concerns. (*Id.* at 2606–07; 2615–20.) During this discussion, the juror expressed that he had frequented a barbershop near the crime scene and felt "very uncomfortable" because "generally someone in the Hollis area" could identify him. (*Id.* at 2616–2619.) Outside the presence of Juror No. 12, the Court heard from the parties. Counsel for Washington expressed that the juror's concern about potential recognition was unremarkable, as it could be held by any juror. (*Id.* at 2620:22–25.) Counsel for Jordan did not offer a separate position, and the Government noted that it would not "force the issue" if "both defendant counsel

[18] It is true that the DNA evidence retrieved from Bryant's hat was before the jury at trial suggesting that, here, too, it resolved conflicting evidence related thereto. Perhaps the jury was swayed to explain away the evidence by the Government's highly speculative, but unobjected to, argument at closing that "[m]aybe Karl Jordan Junior had it in his pocket and it fell out when he pulled out the 40-caliber pistol he used to kill Jason Mizell." (*Id.* at 2331:10–12.) Based on the evidence adduced at trial, that conclusion would necessarily require the jury to make a factual leap, not reasonable inference.

[did]n't want a more searching inquiry," although the juror "seem[ed] uncomfortable." (*Id.* at 2623:6–8.)

Having found an "agreement amongst counsel that what [Juror No. 12] articulated [was not] a basis to have him excused," as "the law does not require that jurors have no familiarity with the places that are at issue," the Court brought the juror back in-camera and explained that he would not be excused. (*Id.* at 2616:6–7; 2623:23–25; 2626:2–7.) The Court also reminded Juror No. 12 that the jury was and would remain anonymous and reiterated the juror's obligation to deliberate fairly and impartially. (*Id. at* 2626:8–15.) The juror confirmed his understanding but went on to state that his jury service in a state murder case in 2004 had prompted him to raise concerns in the instant case. (*Id.* at 2626:16; 2626:18–19; 2626:21–22.) Specifically, Juror No. 12 explained that in the prior case a witness was shot "after [he] came back to the neighborhood," which he concluded demonstrated the fundamental nature of "these people." (*Id.* at 2627:1–8; *see id.* at 2629:20–22.) The Court reminded Juror No. 12 that he had previously been questioned about prior jury service and whether it would affect his ability to be impartial. (*Id.* at 2629:25–2630:8.) In response, Juror No. 12 stated, "I'm just saying the experience of what happened." (*Id.* at 2630:9–10.) Ultimately, the Court found concerning Juror No. 12's use of the phrase "these people" when expressing his safety concerns. (*Id.* at 2632:16–18, 2634:23–2635:1.) Juror No. 12 assured the Court that he could be fair and impartial. (*See id.* at 2626:2–15 ("[Juror No. 12] explained to [his] fellow jurors that [he] can have an open mind.").) Nonetheless, the Court excused Juror No. 12. (*Id.* at 2636–2637). The jurors were subsequently informed that they should not be concerned with the Juror No. 12's excusal. (*See id.* at 2638.)

It is against this backdrop that Jordan argues that Juror No. 12 falsely and deliberately indicated on the jury questionnaire that he could be fair and impartial. (Def.'s Mem at 37–38.)

In other words, Jordan attempts to characterize Juror No. 12's late-stage expression of unease arising from his prior jury service as an issue of intentional nondisclosure triggering entitlement to a new trial. (*Id.*) It is not.

In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court explained that "to obtain a new trial in . . . a situation [involving a juror's failure to disclose], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." 464 U.S. 548, 556 (1984). Importantly, the Supreme Court made plain that a good faith, yet mistaken, response is insufficient to warrant a new trial. *Id.* at 555 (finding that "[t]o invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give" and "contrary to the practical necessities of judicial management").

Here, the questionnaire asked only one question about a potential juror's prior jury service: whether his or her prior jury service would impact his or her ability to be fair and impartial. (Tr. 2629:24–2630:3.) While Juror No. 12 described a confluence of factors that made him uncomfortable during deliberations (*e.g.*, familiarity with the Hollis area; concern about "these people"; an apparent reference to drug traffickers; generalized safety concerns; and the witness in the prior case being killed), he maintained that he, nevertheless, could be fair and impartial. (*See id.* at 2626:2–16.) That is, even in the midst of misgivings regarding his safety, Juror No. 12 conveyed his belief that he could faithfully and impartially discharge his duties. There is nothing in the record to suggest that Juror No. 12 had been duplicitous or anything other than candid. That the Court had misgivings because of Juror No. 12's reference to "these people" does not alter the Court's conclusion. And, even if Juror No. 12 overestimated his

ability to be fair and impartial as a result of his prior jury experience, it amounts to nothing more than a mistake. By Jordan's logic, any juror's overestimation of their ability to remain impartial would amount to misconduct. That would lead to an absurd result. As the Supreme Court put it, "[t]o invalidate the result of a [six]-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *McDonough*, 464 U.S. at 555.

## CONCLUSION

For the foregoing reasons, Jordan's motion for a judgment of acquittal is GRANTED, and Jordan's motion for a new trial is conditionally DENIED.

SO ORDERED.

Dated: Brooklyn, New York
January 7, 2026

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JJD/AB:MEM/MG
F. #2017R00509

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 6, 2026

By Email and ECF

Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Karl Jordan, Jr.
Criminal Docket No. 20-305 (S-2) (LDH)

Dear Judge DeArcy Hall:

The government respectfully submits this letter in opposition to defendant Karl Jordan, Jr.'s second motion for release on bond ("defendant's motion" or "Def. Mot."). ECF No. 331.

None of the reasons Jordan presents in his renewed bail application overcomes the statutory presumption of detention or otherwise warrants his release. The Section 3142 factors continue to strongly weigh in favor of detention for Counts Three through Eleven, as well as Counts One and Two that are pending on appeal. See 18 U.S.C. §§ 3143(c) and 3731; United States v. Hakimi, No. 11-5364, ECF No. 91 (2d Cir. Mar. 5, 2012) (Section 3143(c) "instructs a court to apply § 3142 in deciding whether to release or detain a defendant pending a government appeal" and staying district court's order releasing the defendant even after it had granted motion of acquittal as to all trial counts).

Because Jordan presents an extreme danger to the community and a serious risk of flight, the government respectfully submits that the Court should deny Jordan's motion for bail and maintain the permanent order of detention.

## I. The Criminal Charges

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Jordan and co-defendant Ronald Washington with one count of murder while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A), and one count of firearm-related murder, in violation of 18 U.S.C. § 924(j)(1), in connection with their October 30,

2002 murder of Jason Mizell. [1] Jordan was also charged with one count of conspiracy to distribute cocaine, and seven counts of cocaine distribution, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively.

On August 17, 2020, Jordan was arraigned. The Pretrial Services Report noted that there were "no combination of conditions to reasonably assure [Jordan's] future court appearance and the safety of the community," and Jordan did not present a bail application. On the government's motion, see ECF No. 9, a permanent order of detention was issued with leave to reapply.

On March 4, 2021, the grand jury returned a superseding indictment, which updated the narcotics conspiracy count against Jordan to charge him with one count of conspiracy to distribute cocaine and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii) (Count Three), added one count of use of firearms in connection with a narcotics trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Four) and maintained the seven cocaine distribution counts (Counts Five through Eleven).

On February 15, 2022, Jordan moved for pretrial release. ECF No. 73. The Court denied the bail application after a hearing. See Detention Hr'gs Trs. (Feb. 28, 2022 and Mar. 3, 2022), attached hereto as Exhibits A-1 and A-2.

On September 19, 2022, the Court granted Jordan's motion to sever Counts One and Two, which pertained to Mizell's murder, from Counts Three through Eleven. ECF No. 107. On May 30, 2023, a grand jury returned a second superseding indictment to add Jay Bryant as a defendant to Counts One and Two. On October 13, 2023, the Court granted Bryant's motion to sever his trial on those counts from Jordan and Washington. ECF No. 184.

For the charged offenses relating to Mizell's killing, Jordan faces a statutory mandatory minimum term of imprisonment of 20 years on Count One and maximum term of imprisonment of life on both Counts One and Two.[2] Additionally, the narcotics charge in Count Three carries a mandatory minimum term of imprisonment of 10 years, and the firearms charge in Count Four carries a mandatory minimum term of imprisonment of 5 years, which must run consecutively to any other sentence. In total, Jordan faces a combined mandatory minimum term of imprisonment of 25 years on all counts and of 15 years on Counts Three through Eleven.

---

[1] The government has filed a notice of appeal as to the Court's decision granting Jordan's Rule 29 motion for acquittal as to Counts One and Two. See United States v. Jordan, Nos. 26-16, 26-41 (2d Cir.).

[2] On or about November 6, 2021, the former United States Attorney General Merrick B. Garland authorized and directed the United States Attorney's Office for the Eastern District of New York not to seek the death penalty against either defendant. ECF No. 62.

## II. Factual Background[3]

### A. Counts One and Two Related to the 2002 Murder of Jason Mizell

The facts underlying Counts One and Two are detailed in the government's opposition to Jordan's post-motion for Rule 29 and 33 relief, and the trial transcripts cited therein. See ECF No. 296. In sum, and as discussed further below, over the five-week trial, the government presented voluminous evidence that Jordan and Washington murdered Mizell with a firearm and in connection with a narcotics conspiracy in his music studio inside 90-10 Merrick Boulevard, Queens, New York (the "Studio"). The evidence consisted of the testimony of 38 civilian, law enforcement and expert witnesses, as well as physical evidence. On February 27, 2024, the jury convicted both defendants on both counts.

### B. Counts Three Through Eleven for Narcotics Trafficking Between 2016 Until Jordan's Arrest in 2020

Jordan was also charged with narcotics trade and firearms offenses, which continued unabated from 2016 until his arrest in 2020. Jordan would typically sell cocaine and cocaine base to a variety of different buyers on a weekly basis. He would often be in possession of a firearm while doing so—one witness described the type and color of a firearm that Jordan kept in either the driver's side door pocket or the center console of his vehicle while engaging in narcotics transactions.

## III. The Defendant's Criminal History

Although Jordan has no adult criminal record, he was arrested for robbery in the second degree in 1999 and was adjudicated a juvenile delinquent. Most notably, in 2003, Jordan was arrested for criminal use of a firearm in the first degree in connection with a shooting. That case was dismissed when the complainant refused to cooperate with law enforcement. Indeed, despite his lack of record, the government is aware of several incidents where Jordan has used or been in possession of firearms, as described below:

- On February 3, 2003, Jordan was arguing with a relative of Washington on 203rd Street in Queens. Jordan produced a .40 semi-automatic pistol and fired one shot in into the air. Responding police officers recovered the spent .40 shell casing and an additional 83 live rounds of .40 caliber ammunition. Though Jordan was initially charged with a felony firearm offense, the eyewitness refused to cooperate and testify, and the grand jury only indicted Jordan for

---

[3] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendants. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

possession of ammunition, a misdemeanor. Jordan eventually pled guilty to a disorderly conduct violation.[4]

- On May 14, 2003, Jordan fired several shots at Mizell's nephew on Hollis Avenue in Queens, striking him once in the leg. Two .40 caliber discharged bullets were recovered from the scene. Jordan was arrested for criminal use of a firearm in the first degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.[5]

- On November 1, 2004, Jordan was involved in a shootout with another individual on Farmers Boulevard in Queens. Rounds from the exchange went through windows and walls of the surrounding houses, cars and a nearby church. Over 27 pieces of ballistic evidence—including shell casings and spent projectiles—were recovered by responding officers. The defendant fled the scene in a gold BMW and was later arrested. The case was ultimately dismissed.[6]

- On December 15, 2004, a search warrant was executed at Jordan's residence on 203rd Street in Queens, predicated on Jordan's narcotics sales. During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest. Also in the residence were over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested. Jordan eventually pled guilty to a disorderly conduct violation.[7] Notably, one of the defendant's noticed alibi witnesses (who did not testify) was living with Jordan at the time, was present during the search warrant execution and also arrested.

---

[4] The parties stipulated at trial that a .40 caliber shell casing from a .40 firearm possessed by Jordan was recovered on February 3, 2003, from the vicinity of Jordan's residence by the NYPD, and a bag containing eighty-three (83) .40 caliber bullets were also recovered on February 3, 2003, from Jordan's residence. See GX 912.

[5] The parties stipulated at trial that a .40 caliber bullet and bullet fragment from a .40 caliber firearm possessed by Jordan was recovered on May 14, 20023, from the vicinity of 203-11 Hollis Avenue, Queens, New York by the NYPD. See GX 913.

[6] The government did not seek to admit this evidence at trial because it was not directly pertinent to Jordan's access to firearms of the same character as the .40 caliber murder weapon. See ECF No. 113 at 16 n.2 (government's omnibus motion in limine).

[7] The Court denied the government's motion in limine to admit this evidence as direct or Rule 404(b) evidence. See ECF No. 215.

Moreover, the investigation has revealed that Jordan has been involved in narcotics trafficking for years up until his arrest. As charged in the indictments and described above, on more than half-a-dozen occasions Jordan sold cocaine to an undercover law enforcement agent. The sales that Jordan made to law enforcement were recorded using both audio and video recording devices.

IV. The Denial of Jordan's First Bail Application

Jordan filed a bail application on February 15, 2022. ECF No. 73. In that application, Jordan argued for release claiming that: (i) COVID presented health risks to him in light of his donated kidney; (ii) social distancing required by COVID in prison made it difficult to communicate with his attorneys; (iii) the discovery did not support the murder counts, especially given his two alibi witnesses, who included his girlfriend at the time and her mother, a former New York City Correctional Officer and current school teacher; and (iv) he was not a risk of flight because he is a lifelong New Yorker and father to four daughters. The government opposed. See ECF No. 74.

Jordan sought home detention and presented a $1,000,000 bond secured by 15 suretors, $20,000 in cash, and property owned by his father and grandmother to serve as collateral valued at $120,000.

The Court held a two-day detention hearing on February 28, 2022 and March 3, 2022. The Court denied Jordan's motion for bail during the second day of the hearing on March 3, 2022.

The Court held that the presumption of detention applied because of Counts One through Four, and that, "even assuming that the defendant met his burden of production with respect to flight, the Court cannot find that the defendant has met his burden with respect to dangerousness." Ex. A-2 at 4:24-25.

With respect to the nature and circumstances of the offenses charged, the Court stated that "the inherent dangerousness of homicide is self-evident" and that "the narcotics offenses, too, are sufficiently serious to weigh in favor of continued detention." Id. at 5:12-17.

Regarding the weight of the evidence, the Court noted that the government's case was "primarily on eyewitness and coconspirator testimony" and that "the grand jury has returned an indictment based in part on such testimony." Id. 9:9-12. In contrast, the fact that the defendant had alibi witnesses for the night of Mizell's murder was "unhelpful here where there is no testimony offered as to the specifics of that testimony." Id. at 6:6-15. The Court also found that the Brady disclosure regarding the DNA evidence "found on a hat at the scene, perhaps near the body of Mr. Mizell . . . [did] not suggest as the defendant urges that the weight of the government's case is undermined" because "the crime took place in a location frequented by the public or at least numerous people[.]" Id. at 7:8-21.

The Court also held that neither the timing of the arrest on the counts in the indictment nor the government's decision not to pursue the death penalty undermined the strength of the government's case. Id. at 8:3-9:8. Further, the Court stated it had no basis to assess the

defense's two alibi witnesses, whereas the government's witness testimony was presented to a grand jury that returned the indictment on the charges. Id. at 9:9-19.[8] Finally, the Court noted that the defense had not raised any issues with the sufficiency of the evidence with respect to Counts Three through Eleven, "where the proof is significantly high, or the weight of the evidence rather," id. 7:24-8:2, and it reiterated that the government had surveillance recordings of the sales made to undercover law enforcement agents, id. at 9:20-3.

With respect to the history and characteristics of the defendant, the Court properly considered both charged and uncharged conduct, including the four separate instances in which Jordan used or was in possession of a firearm. Id. at 11:20-25. It also emphasized the four-year narcotics conspiracy and seven sales of cocaine base to undercover agents—including a narcotics sale by the defendant in which he had his daughter in tow—which suggested repeated activity that constituted danger to the community. Id. at 11:3-19. The Court concluded the defendant was dangerous, despite crediting the defendant's kidney donation to his mother and his role as a father to his four daughters. Id. at 10:11-21.

In considering the seriousness of the danger posed by the defendant's release, the Court accepted the inherent dangerousness of the underlying offenses, as well as the government's proffer that there were witnesses the defendant has endeavored to identify and silence through threats and coercion and has enlisted others to do so on his behalf, including one of the proposed suretors. Id. at 13:6-16. During the hearing, the Court also emphasized the Second Circuit case law stating that "the dangerousness calculation can and should include ongoing narcotics trafficking." Ex. A-1 at 36:14-16. With respect to flight, the Court weighed the combined minimum custodial sentence of 25 years over the strength of the defendant's bail package, his reliance on his ties to the community and his lack of outstanding bench warrants or history of non-appearance. Ex. A-2 at 13:17-14:21.

Finally, the Court rejected the defendant's arguments regarding the effect of the COVID-19 pandemic because he did not offer medical evidence to suggest he faced a particular risk greater than the risk faced by any other inmate. Id. at 14:22-15:12.

Ultimately, the Court stated that "even if the defendant has rebutted the presumption with respect to flight, the defendant has failed to rebut the presumption with respect to dangerousness." Id. at 15:13-15. Moreover, "even if the defense rebutted [that] presumption, the factors set forth in the Bail Reform Act counsel in favor of detention," such that the Court could "find[] that the government has met its burden of persuasion by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance should the defendant be granted bail." Id. at 15:15-23.

---

[8] Neither alibi witness testified at trial.

V. The Trial on Counts One and Two and the Court's Grant of Jordan's Rule 29 Motion

Following a five-week trial, on February 27, 2024, a jury convicted Jordan and Washington on both counts, finding that the defendants murdered Mizell in connection with a narcotics conspiracy and using a firearm on October 30, 2002.

Jordan filed a written Rule 29(c), arguing that the trial evidence was insufficient to establish that: (i) Jordan was in an ongoing narcotics conspiracy at the time of Mizell's murder and (ii) Jordan had a narcotics-related motive for the murder or that the murder furthered the narcotics conspiracy. Jordan also included a Rule 33 motion for a new trial that argued that the alternate perpetrator theory of Bryant as the shooter preponderated heavily against the verdict and that replacement of the juror tainted the jury. See ECF No. 293.

On December 19, 2025, the Court granted Jordan's Rule 29 motion for an acquittal and conditionally denied Jordan's Rule 33 motion, holding that the evidence was not sufficient for a jury to find that Jordan had a narcotics-related motive in murdering Mizell or that his use of a firearm furthered the narcotics conspiracy. ECF No. 322. The Court denied Washington's post-trial motions. ECF No. 323.

On January 5, 2026, the government filed a notice of appeal of the Court's decision granting Jordan's Rule 29 motion. ECF No. 326. On January 7, 2026, the Court issued a corrected decision granting Jordan's Rule 29 motion. ECF No. 328. The government filed a notice of appeal on the same day. ECF No. 329.

VI. Legal Standard

The defendant seeks his release while the government's appeal as to Counts One and Two is resolved at the Second Circuit. Under 18 U.S.C. § 3143(c), when the government appeals the grant of a Rule 29 motion for acquittal, the district court is still required to consider those overturned counts in its detention analysis under Section 3142. See Hakimi, No. 11-5364, ECF No. 91 (2d Cir. Mar. 5, 2012).

Section 3142 in turn empowers federal courts to order a defendant's detention upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

Section 3142 lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the

defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). This includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).

In this case, a presumption of dangerousness and risk of flight arises because the defendant is charged with offenses under the Controlled Substances Act that carry a maximum term of imprisonment of 10 years or more, and also with firearms offenses under 18 U.S.C. § 924(c). See 18 U.S.C. § 3142(e)(3)(A). Counts One and Two (the murder counts), as well as Counts Three and Four (the narcotics conspiracy and firearms counts) require application of the presumption.

Accordingly, the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance if there is probable cause to believe that the defendant committed the offenses where the presumption applies—here, Counts One through Four. Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985). Significantly, "in construing the Bail Reform Act, [the Second Circuit] ha[s] noted that Congress was aware that the 'probable cause' standard is less demanding than a requirement of 'substantial probability.'" United States v. Gotti, 794 F.2d 773, 777 (2d Cir. 1986) (rejecting "more likely true than false" as the standard for probable cause in bail proceedings); United States v. LaFontaine, 210 F.3d 125, 133 (2d Cir. 2000) (probable cause in bail revocation hearing requires only a "practical . . . probability").

When the presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). To be released, a defendant facing this presumption must come "forward with evidence that he does not pose a danger to the community or a risk of flight," though the government must ultimately persuade the court that detention is warranted. Id. Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

## VII. Argument

The government repeats and incorporates by reference its prior discussions of the nature and circumstances of the offenses, the defendant's history and characteristics, and the weight of the evidence—all of which continue to weigh favor of Jordan's detention. See ECF Nos. 9 and 74.

The defendant submits a renewed bail application based on: (i) the Court's decision to grant a motion of acquittal on Counts One and Two; and (ii) the present conditions at the MDC,

including an incident in which Jordan was stabbed while in custody; and (iii) a bail package that is functionally the same as previously proposed by the defendant and rejected by this Court.[9]

Accordingly, only the first two factors present changed circumstances from Jordan's last bail application—neither of which warrants his release.

A. The Weight of the Evidence is Overwhelming

In relying on the Court's ruling on the Rule 29 motion, the defendant's application ignores the overwhelming strength of the evidence on the narcotics and firearm offenses in Counts Three through Eleven, which include witness testimony and video and audio recordings of the defendant engaging in narcotics sales. The strength of the evidence for Counts Three through Eleven, which carry a presumption of detention, weigh in favor of continued detention against the defendant, irrespective of the analysis on Counts One and Two. See 18 U.S.C. § 3142(e)(3).

With respect to Counts One and Two, the government respectfully disagrees with the Court's decision to grant a judgment of acquittal and has filed a notice of appeal. The government submits there is sufficient evidence to support the jury's verdict, and at least probable cause to believe that the defendant committed Counts One and Two such that the presumption applies. Even if the presumption did not apply, the evidence adduced at trial about Jordan's role in the murder should be considered for the purposes of Section 3142.

i. Counts Three Through Eleven

The evidence is significant for Counts Three through Eleven—which carry a minimum statutory term of imprisonment of 15 years and involve narcotics offenses and a firearm offense. The government has numerous witnesses who will testify to the defendant's years-long distribution of narcotics as well as his related firearms possession.[10]

For example, one witness has described how at least one of Jordan's school aged children would be present in his car when he would deliver narcotics. Notably this witness described how they had purchased cocaine base from Jordan since approximately 2010. The witness described Jordan as a very reliable source of supply, but further stated that Jordan was very cautious with who he sold narcotics to, constantly changing his cell phone number so that he could not be tracked by law enforcement. The witness further described that Jordan told the

[9] As before, the defendant continues to propose a bail package of a $1,000,000 bond and at least two properties. The only change is that the defendant now proposes 17 suretors, rather than 15 suretors, offers an additional third property, and does not offer $20,000 in cash.

[10] Contrary to the defendant's assertion in his bail application, the government's case against Jordan does not "substantially," let alone "solely," rely on the testimony of his family member. Def. Mem. 3. Rather, as detailed below, Counts Three and Four rely upon numerous witnesses who will be brought to court to testify with regard to Jordan's decades-long narcotics distribution.

witness that the witness was not to give out his phone number to others, rather the witness should be the point of contact and buy the narcotics on everyone's behalf.

In addition, at trial, the government plans to call another witness who has been purchasing cocaine base from the defendant since the late 1990s through the summer of 2019. Consistent with one of the witnesses described above, this witness also observed Jordan in possession of a firearm on several occasions. In addition to the witnesses described above, the government intends on calling additional witnesses who will testify to Jordan's narcotics dealings and firearms possession before and during the timeframe contained in Counts Three and Four.

Jordan's guilt is further corroborated by the evidence that on seven separate occasions, Jordan sold cocaine to an undercover law enforcement agent who recorded those sales using both audio and video recording equipment. The narcotics were tested and confirmed to be narcotics. Still frames from the various sales are below:







Two of the above images show Jordan's hand cupping narcotics during various sales to the undercover law enforcement agent.

The government will further corroborate the witness testimony with evidence recovered from Jordan's phones at the time of his arrest. Subsequent to his arrest in August 2020, law enforcement executed a search warrant on mobile phones seized from Jordan, which yielded the following evidence of narcotics trafficking and firearms use:

- Numerous photographs and videos of Jordan holding stacks of hundred-dollar bills and other denominations of money;

- Photographs and videos of Jordan wearing and examining diamond encrusted jewelry; and

- An incoming text message to one of Jordan's phones which stated, "J how much can you give me for a Buck? [G]ive me a good deal so I can live too and I will live with that[.]" – a reference to how many narcotics can be purchased for $100.

While there is a presumption in favor of detention, even absent that presumption, consideration of the weight of the evidence and the applicable factors discussed below overwhelmingly warrant detention in this case. Jordan's criminal conduct and violence necessitates his detention. Accordingly, the Court should continue Jordan's detention.

ii. Counts One and Two

There is also at least probable cause to believe the defendant committed Counts One and Two, which would trigger the presumption for those counts under Section 3142(e)(3).

First, there was evidence that Jordan shot Mizell in the head, which killed him—the Court can and should consider this fact in making its bail determination, regardless of the Court's finding as to the narcotics-related motive. Eyewitness Enrique Rincon, who was seated on the couch next to Mizell when he was shot, testified that Jordan entered the Studio with Washington, walked up to Mizell to greet him with "a potential handshake," Tr. 513[11], and then shot Mizell and shot Rincon in the leg. Rincon testified he had no trouble seeing Washington or Jordan's face and was even able to see "a little bit of [Jordan's] tattoo on his neck." Id. 516:24-517:2. Eyewitness Lydia High similarly testified that she observed a "fair-skinned . . . African-American man" with a "tattoo on his neck"—consistent with Jordan's description—shoot Mizell after giving Mizell "a pound [meaning a greeting by hand]." Id. 955-958. Dr. Corinne Ambrosi, who performed the autopsy of Mizell, determined that the cause of Mizell's death was the gunshot wound to his head and the manner of death was homicide. Id. 609. Randy Allen—High's brother—testified that one or two days after Mizell's murder, Rincon told him that Jordan was the one who shot Mizell. Id. 1074-75. Allen also testified that High described the shooter's neck tattoo to him. Id. 1076. Detective Derrick Parker (a retired detective from the New York City Police Department), who acted as High's bodyguard and assisted her in her interactions with law enforcement after the murder, testified that High had identified Jordan as one of the perpetrators. Id. 920, 923. Further, two years after the murder, Jordan stated, "if I get to kill him, I'll kill him again," referring to Mizell, and on another occasion, Jordan threatened a woman saying he would "do [her] exactly just like him," referring to Mizell. Id. 1845-47.

Second, as the Court held, Jordan was in an ongoing narcotics conspiracy at the time of Mizell's murder. There was evidence that Jordan joined Mizell's narcotics trafficking

[11] Citations to "Tr." refer to the trial transcript, unless otherwise indicated.

conspiracy as early as 2001 when he requested Mizell "put him on" and sold an ounce of cocaine on behalf of Mizell in New York. ECF No. 322 at 9. The conspiracy did not end when Yakim refused to work with Washington in Baltimore, because Yakim's refusal was "clearly limited to Washington" and there was "simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute to narcotics in Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the Baltimore deal." Id. at 10-11. Rather, there was testimony that the conspiracy "had a line" on 100 kilograms of cocaine that was to be sold on consignment, that the intended distribution of the cocaine was to be "ongoing," that Mizell had received only 10 kilograms of cocaine in August 2002, and that Mizell had not paid Unc for any of the cocaine by the time of his death. Id. at 11-12. The Court also found that Jordan failed to demonstrate "he took any affirmative step to withdraw from the conspiracy." Id. at 12.

Third, although the Court held otherwise, the government respectfully maintains that the evidence was sufficient for a jury to find beyond a reasonable doubt—or here, probable cause—that at least one of Jordan's motives in murdering Mizell was narcotics-related and that Jordan's use of a firearm was in furtherance of the narcotics conspiracy.

There was a reasonable inference that because Jordan and Washington were close and were partners in the narcotics conspiracy, the Baltimore slight to Washington could have also been Jordan's motive for the murder of Mizell. There was testimony that Jordan was 18 years old at the time of Mizell's murder, Tr. 1296, 1810, and spent time with Washington, who was older, inside and outside of the Studio in 2002, id. 1472-73, 1761, 1799-1802. Indeed, the jury heard Washington's own words on a jail call, shortly after his arrest in 2020 for the Mizell murder, referring to Jordan as his "little man" and his recounting Jordan telling him that he "got love for [him]." GX 811A-T. At the time of the murder, Washington was living at Mizell's family home across the street from Jordan's house and had access to him. See, e.g., Tr. 514, 683-84, 694, 697, 702, 1747-48. And when Washington needed a firearm for the murder, he went to Jordan's brother to secure it. Id. 1475-76. Given the evidence about their friendship and the difference in Jordan and Washington's ages, the jury could draw the reasonable inference that Washington had influence over Jordan and that Washington's problems were Jordan's problems—as co-conspirators and friends. As Washington said to Mizell, "If you have a problem, I have a problem too." Id. 1550.

Separate and apart, the evidence also permitted the inference that Jordan held his own resentment against Mizell. There was testimony that in 2001 or 2002, Jordan wanted to sell cocaine and asked Mizell's close friend, James, about the prices of cocaine outside of New York, followed by Jordan's request to "tell [Mizell] to put [Jordan] on," meaning "give him cocaine." Id. 1755-57. Mizell gave Jordan only one ounce to "try him out," "to see if he was good" at selling it. Id. 1769-71. There was evidence about Jordan being part of the Baltimore deal, including a discussion between Mizell, Jordan and Washington in which they discussed their intention to sell in Baltimore because they could "make more money selling [cocaine] there." Id. 1767-77. However, there was evidence that Mizell included Washington in the conspiracy to a greater degree. Although Jordan and Washington were both supposed to be involved in the Baltimore deal, only Washington traveled to Baltimore. Id. 884-94. In addition, in the summer of 2002, but before Baltimore, Washington accompanied Mizell on a ride to a deejaying job in Manhattan so Mizell and Washington could discuss the narcotics conspiracy. Id. 1219-25. Mizell gave

Washington this opportunity, and the opportunity in Baltimore, despite the fact that when Mizell gave him narcotics to sell earlier in 2002, Washington had "messed it up." Id. 1767. Yet Jordan, who was Mizell's godson, was given only an ounce of cocaine to sell and had to prove himself. Id. 1769. And even though Jordan successfully sold that ounce, he did not go to Baltimore. Id. 884-94. There was also testimony about Jordan's admission that he would "kill [Mizell] again," indicating lasting resentment towards Mizell. Id. 1846.

The timing of the murder and Jordan's role gave rise to the inference that when Jordan murdered Mizell, it was in connection with the narcotics conspiracy: (i) Mizell "had a line" on 100 kilograms of cocaine from Unc, the cocaine supplier, but received only 10 kilograms in August 2002, id. 1770:7-20; (ii) Mizell was supposed to obtain the cocaine from the Midwest, id. 887:1-12, 889:10-16; (iii) the day or two before his murder, Mizell was in Wisconsin, id. 611:7-10, 704:15-705:13; GX 201 at 4; (iv) while in Wisconsin, Mizell received a phone call from an unidentified individual who started yelling at him and Mizell mentioned "Tinard" during this call, Tr. 1780-83; (v) the day of Mizell's murder, Washington retrieved a firearm from Jordan's brother, id. 1475:22-1476:5; (vi) Washington visited the Studio and asked Mizell about their plans for the narcotics conspiracy, and Mizell sent him away on an errand to get food, id. 1477-80, 1550-51, 1548; (vii) Washington made that visit to the Studio on the same day, or day after, Washington believed Mizell was meeting an associate of Unc's, the cocaine supplier for the conspiracy, id. 1618; (viii) after Washington left the Studio, he made a phone call from a payphone, id. 1480; (ix) sometime later, Jordan and Washington arrived at the Studio together with firearms; (x) Jordan shot Mizell in the head while Washington guarded the door with a firearm, id. 513-517, 955-57; and (xi) Washington switched from living with Mizell's relatives to living in hotels, which is where he was living when he met with Jordan approximately one month after the murder, id. 1482-84, 1526-28; GX 622, 624. See United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021) ("[S]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.").

It is reasonable to conclude that Washington told Jordan about Mizell's plans to meet with the cocaine supplier, especially when there was substantial evidence that Jordan and Washington arrived together at the Studio—and only hours after Washington confronted Mizell and after Washington made a phone call from a payphone. See, e.g., United States v. Djibo, 850 F. App'x 52, 56 (2d Cir. 2021) (defendant's "conduct and his relationship with his co-conspirator[] were sufficient to support a reasonable inference that [defendant] knew" about the drugs and as part of the conspiracy); United States v. Campbell, 850 F. App'x 102, 105–06 (2d Cir. 2021) ("[J]urors may infer a defendant's knowledge of the object of a conspiracy—e.g., to possess and distribute drugs—where there is evidence of such a trust relationship."); see also Landesman, 17 F.4th at 320 ("[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."). The government need not prove precisely why Jordan was dissatisfied with Mizell, so long as the evidence could permit the reasonable inference that at least one motive for the murder was related to the narcotics conspiracy. The jury was not required to be unanimous on which narcotics-related motive applied to the murder, or that only one applied to the murder, or that Jordan and Washington even had the same narcotics-related motive. Similarly, it is sufficient for a conviction under Section 924(j) that Jordan thought murdering Mizell would benefit him in the narcotics conspiracy in some way. See United States v. Snow, 462 F.3d 55, 62-63 (2d Cir. 2006) ("[T]he ultimate

question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking.").

Alternatively, there is at least probable cause to believe that Jordan aided and abetted Washington in his plan to kill Mizell. See United States v. Walker, 142 F.3d 103, 113 (2d Cir. 1998) (recognizing aiding and abetting culpability under Section 848(e)(1)(A)). The government must prove that (i) "another person actually committed the offense with which the defendant is charged," and (ii) "that the defendant aided or abetted that person in the commission of the offense." Tr. 2548-29. As to that second element, the Court instructed the jury at trial that "to aid or abet another, to commit a crime, it is necessary that a defendant knowingly associate himself in some way with the crime, and that he participate in the crime by doing some act to help make the crime succeed." Id. 2548. "As almost every court of appeals has held, '[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense.'" Rosemond v. United States, 572 U.S. 65, 73 (2014) (quoting United States v. Sigalow, 812 F.2d 783, 785 (2d Cir. 1987)). There is "no authority for demanding that an affirmative act go toward an element considered peculiarly significant; rather, as just noted, courts have never thought relevant the importance of the aid rendered." Id. at 74-75.

The government need not prove that Jordan held any narcotics-related motive—only that he knew of Washington's motive and assisted him in murdering Mizell. The evidence described above permits this inference, and Jordan's affirmative act of arriving at the Studio with Washington, both armed with firearms, and shooting Mizell was sufficient to convict Jordan as an aider and abettor. Cf. United States v. Abozid, 257 F.3d 191, 199-200 (2d Cir. 2001) ("Here, the jury convicted appellant of the crime itself. It could hardly have reached that conclusion and have left any possibility that it would have acquitted appellant of aiding and abetting the crime. There is no element of aiding and abetting the crime that was not found by the jury."); United States v. Peterson, 768 F.2d 64, 67 (2d Cir. 1985) (conviction valid "even if some jurors believed that [the defendant] and the other jurors believed that [the co-defendant] was the aider or abettor").

B. Neither Jordan's Medical Injury Nor the Conditions at MDC Overcome the Presumption or Otherwise Warrant Release in These Circumstances

While the defendant undoubtedly was the victim of a violent attack while in custody, he has not presented evidence that his care cannot be well-managed by the MDC. On February 22, 2025, a fight occurred among inmates at the MDC in which the defendant was stabbed. He was treated by medical staff and MDC and subsequently transported to NYU Langone Hospital in Brooklyn for further treatment. Three days later, on February 25, 2025, he was discharged and transferred to Brooklyn Hospital for continued pain management. On March 1, 2025, he returned to the MDC. Three other inmates received injuries also requiring hospitalization.

The government takes seriously the concerns raised by the defendant, and has charged five defendants with the attack. However, that does not outweigh the grave risks of danger to the community or the flight risk posed by the defendant here, where no condition or combination of conditions can alleviate such risks. Moreover, there has been no showing that the MDC cannot provide adequate and ongoing treatment and monitoring of the defendant's health conditions. Indeed, at the follow-up medical visit upon his return to the MDC, the defendant reported he was not in pain and "stated that all of his medical concerns were addressed." Ex. B at 64-65 (Jordan's

MDC records attached under seal). And, only three months after he was stabbed, on May 20, 2025, the defendant was back to playing basketball at MDC, as he told doctors at the MDC, stating he was "playing basketball and accidentally got head-butted." Id. at 53. Then too, the MDC was able to transfer him to Brooklyn Hospital for assessment and minor surgery. Id. at 25, 48. The medical records show consistent medical follow-up visits and no complaints by the defendant that were not addressed by those visits. Accordingly, while it is true that the defendant suffered serious injuries during his assault, the medical records demonstrate that the defendant was treated and has recovered from those injuries.

Cognizant of this recovery, the defendant primarily rests his argument on concerns with MDC's "ongoing violence and safety issues, inadequate medical care, food not fit for human consumption, and an inconsistent ability to purchase items from the commissary, as well as decrepit facilities with inadequate heating and cooling, mold, and other health hazards such as rodents and cockroaches." Def. Mem. 6.

The defendant's numerous claims regarding the conditions at the MDC are not substantiated by any medical records (as discussed above) and are outdated as explained in a recent decision by the Honorable Jesse M. Furman, who in 2024, drafted an opinion which detailed MDC significant shortcomings in care and safety. See United States v. Chavez, 710 F. Supp. 3d 227 (S.D.N.Y. Jan. 4, 2024). However, those dated opinions do not reflect the current state of the MDC.

As Judge Furman himself recognized on May 14, 2025:

> With respect to other arguments made in the defense's submission, on the MDC front, I'm certainly more than familiar with the circumstances at the MDC, and the place has still much need for improvement, but it is also a lot better than it was in January of last year when I wrote my opinion in United States v. Chavez that is cited in the defense's submission. As it happens, I just came from a meeting involving representatives of the MDC and got [the] latest statistics, which is that staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction.

United States v. Reshard, No. 24-CR-392 (JMF) (S.D.N.Y. May 14, 2025) (filed in United States v. Burgos, No. 24-CR-650 (LTS) (S.D.N.Y.), ECF No. 10, Ex. A).

Simply put, there is no basis to release the defendant because of the unproven allegation that the MDC cannot provide him with appropriate medical care, food or lodging. Moreover, given the nature of the charges in this case and the significant term of incarceration that the defendant faces, the defendant still poses a risk of danger to the community and a flight risk such that he should not be released.

C. The Nature and Circumstances of the Offenses and the Defendant's History and Characteristics Continue to Favor Detention

As this Court previously stated, the narcotics and firearm charges in Counts Three through Eleven are sufficiently serious to warrant continued detention. The defendant's involvement in narcotics distribution alone is a serious offense that his dangerousness. See Leon, 766 F.2d at 81 ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'"). The fact that the defendant carried a firearm while he possessed distribution quantities of narcotics makes the crime even more egregious. See, e.g., United States v. Williams, No. 20-CR-293-2, 2020 WL 4719982, at *3 (E.D.N.Y. Aug. 13, 2020) ("[T]he danger of Defendant's release is demonstrated through the fact [that] Defendant's instant and past offense involved the use of a firearm"); United States v. Smalls, No. 20-CR-126, 2020 WL 1866034, at *1 (S.D.N.Y. Apr. 14, 2020) (affirming a magistrate judge's order of detention that was based, in part, on "the general danger to the community posed by [the defendant's] apparently ready access to firearms"); see also United States v. Santos, 541 F.3d 63, 72–73 (2d Cir. 2008) (holding that drug dealers often keep firearms on their premises as tools of the narcotics trade). The inherent dangers associated with possessing a firearm while selling narcotics is what motivates the consecutive 5-year mandatory minimum term of imprisonment for Count Four, and is one of the grounds that mandates the continued detention of the defendant in this case.

Compounding the defendant's dangerousness is the trial evidence demonstrating that Jordan carried out the brazen ambush and execution of a renowned musician and prominent member of the community in his own music studio. The inherent dangerousness of individuals who would perpetrate such an offense is self-evident. In such circumstances, the safety of the community has led the Second Circuit to repeatedly reject elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which try to "replicate a detention facility without the confidence of security such a facility instills." Millan, 4 F.3d at 1049. If the government "does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." Id.; see also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology").

Moreover, there is a significant risk that Jordan would seek to threaten or retaliate against witnesses if released. There was testimony at trial that Jordan and his friends approached Rincon at Mizell's murder "probing to see if [Rincon] did see him" during the murder, Tr. 526, and Jordan's father placed a phone call to High after the murder that left her "shaking" and "very upset," id. 921-22.[12] Moreover, when the government called an incarcerated family member of Jordan's to testify that Jordan kept a .40 caliber pistol hidden in a van outside that went missing at the time of Mizell's murder—something he had previously told law enforcement—that family member refused to appear for testimony. His refusal came after the government found messages

[12] Jordan has proposed his father as one of the 17 suretors. The government opposes this suretor, given the trial testimony about his phone call to eyewitness High after Mizell's murder, as well as testimony that on the day after Mizell's murder, he shot a firearm at Washington. Tr. 2106:6-9.

by the family member to others in which he stated Jordan was accusing him of cooperating with the government, which was putting him in danger at the prison. See ECF No. 205 ("Because he's pumping it, and that shit is a snowball effect in here. It's n****s I'm with right now that's doing life because somebody told on em . . . By him pumping that it's like he don't want me to make it home or something. It's like bro you going to trial, so being that ur not sure you can't pump that until after trial."). The "serious risk that the [defendant] will . . . threaten, injure, or intimidate, a prospective witness" is a basis for detention, and the same holds true for retaliation against former witnesses. 18 U.S.C. § 3142(f)(2)(B); see United States v. Jones, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008) (noting that "the release of [the defendant] on bail, thereby allowing him to return to the community where the victim's murder took place, would create a danger for all witnesses, irrespective of whether they have cooperated with the Government"); see also United States v. Maliek Miller, No. 20-CR-331 (LDH) (E.D.N.Y.) (defendant convicted for murdering former federal witness as retaliation for her trial testimony). Merely "[p]rohibiting [the defendant] from committing a crime or intimidating a witness does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [the defendant] and every other citizen." United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985); see United States v. Tripp, 22-CR-336 (MKB) (E.D.N.Y.) (defendant choked and beat his girlfriend while on location monitoring, then absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a second domestic violence incident against the same victim).

In addition to the charged counts, the defendant has a history of firearm use, including discharging firearms at others. See supra at 3-4. In sum, the defendant presents an acute danger to the community that no set of release conditions can mitigate.

D. Home Detention or Location Monitoring Cannot Mitigate the Significant Flight Risk Posed by the Defendant

Jordan faces a statutory minimum term of imprisonment of 20 years on Counts One and Two and of 15 years on Counts Three and Four, and a total combined statutory minimum term of imprisonment of 25 years on all counts. His sentencing exposure weighs in favor of detention, as it provides motive and incentive to flee the jurisdiction. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (citing 18 U.S.C. § 3142(a) and holding that, "[i]n this case, the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Home detention and/or location monitoring are inadequate to ensure that Jordan does not leave his residence and flee while the Second Circuit decides the government's appeal as to Counts One and Two, and while Counts Three through Eleven are pending. See United States v. Sinmyah Amera Ceasar, 17-CR-048, 19-CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and government discovered evidence of violation of her release conditions); United States v. Horst Jicha, 23-CR-342 (OEM) (defendant cut his location monitoring device while on pretrial release and absconded the day before he was supposed to appear for a status conference and remains at large); United States v. Joey Macario, 22-CR-342 (HG) (defendant absconded after

removing his location monitoring device and discarding it on the subway tracks moments after being released to attend drug treatment); United States v. Guanghua Shen, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK airport the day before she was required to self-surrender to the Bureau of Prisons); United States v. Akmal Narzikulov, 13-CR-601 (RJD) (defendant cut his electronic bracelet just days after being released on bail); United States v. William Bartell, 22-CR-80 (EK) (defendant charged with multiple bank robberies cut his location monitoring and absconded within one week of being released on bail due to medical issues); United States v. Herman Baron, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled the jurisdiction approximately one hour before his scheduled change-of-plea hearing; arrested five months later in the Northern District of Georgia); United States v. Michael Artis, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut off his location monitoring device and failed to appear at bail revocation hearing); United States v. Svetlana Dali, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); United States v. Tony Clanton, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); United States v. Georges Barker, 23-MJ-27 (SIL) (defendant tampered with his location monitoring bracelet on two occasions before he was remanded); United States v. Marius Lacatis, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device, fled and remains at large); United States v. Marcus Deloatch, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); United States v. Charles May, 19-CR-539 (FB) (defendant charged with several counts of armed robbery absconded while on home detention and remains at large); United States v. Theressa Riddle, 17-CR-491 (JS) (defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); United States v. Julian Tzolov, 08-CR-370 (JBW) (defendant in a securities fraud scheme attempted to flee to Spain while on location monitoring).

## VIII. Conclusion and Request for Stay of Any Release Order

For the foregoing reasons, the Court should deny Jordan's motion for release. The government respectfully submits that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's return to court.

In the event the Court grants Jordan's motion for release, the government respectfully requests that the Court stay its order for one week to give the United States an opportunity to determine whether to file an appeal. In the event that the government appeals the release order, it respectfully requests that the Court stay its order until such appeal has been

resolved by the Second Circuit, or until the Second Circuit decides the government's appeal of the Court's Rule 29 decision, whichever is earlier.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (LDH) (by ECF and Email)
Counsel for Defendant (by ECF and Email)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 20-CR-305(LDH)

-against- : United States Courthouse
Brooklyn, New York

KARL JORDAN, JR., :
March 13, 2026
Defendant. : 12:00 o'clock p.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
United States Attorney
BY: MIRANDA GONZALEZ
MARK E. MISOREK
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: JOHN A. DIAZ, ESQ.
MARK S. DeMARCO, ESQ.
MICHAEL O. HUESTON, ESQ.
EMILEE A. SAHLI, ESQ.

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: Good afternoon. This is a criminal cause for a status conference in the matter of USA versus Karl Jordan, docket number 20-CR-305.

Counsel, please state your appearances for the record starting with the government.

MS. GONZALEZ: Good afternoon, Your Honor. For the United States, Miranda Gonzalez and Mark Misorek and Special Agent Michael Zeller.

THE COURT: Good afternoon to you all.

MR. DIAZ: Good afternoon, Your Honor. John Diaz, Mark DeMarco, Michael Hueston and Emilee Sahli for defendant Karl Jordan who is standing to my right.

THE COURT: All right. Good afternoon to you all as well. You all may be seated.

All right, folks. So we are here for a status conference on this matter. Again, by way of backdrop, the court has before it remaining charges against the defendant related to the sale and solicitation and distribution of drugs through a conspiracy.

When we were last convened, it was my understanding that the parties were engaged in negotiations concerning those remaining charges. I'd like to hear first from the government on that.

MS. GONZALEZ: Yes, Your Honor. We are still in discussions with defense counsel about those charges and we're

hopeful that we can reach a disposition, however, given Your Honor's trial calendar, we might -- we discussed the possibility of asking for a trial date just to get on the calendar and hopefully reach a disposition before then, but we defer to the Court.

THE COURT: Well, reaching a disposition before you might be able to get on my trial calendar is a bit of a nothingburger. Right? If my trial calendar is set out that I can't have a trial for a year, to say that we might have a disposition before a year says nothing.

I'd like to know where are we in those discussions. Do we think that they're going to bear fruit? Do you think you'll know something in the next 30 days? 60 days? Where are we? I need information.

MS. GONZALEZ: It's still preliminary, Your Honor.

THE COURT: It's very preliminary?

MS. GONZALEZ: Yes.

THE COURT: Okay. So no offer has been extended?

MS. GONZALEZ: That's correct, Your Honor.

THE COURT: Mr. Diaz, what do you have to say on the subject?

MR. DIAZ: Thank you, Your Honor.

We've approached the government on several occasions, Your Honor. We asked for an offer. We've been trying -- we've proposed a certain disposition. I know

there's disagreement with the government with what's been proposed but, you know, it's our feeling that, you know, we could reach some middle ground here if the government is --

THE COURT: Is there an appetite by the government to find a resolution of this case short of trial or is this, are these negotiations really negotiations that are being prompted by and urged by the defense and the government is reluctantly participating? Where are we?

MS. GONZALEZ: No, Your Honor. Absolutely, there is an appetite for a disposition. We are just too far apart right now on where we stand. So can we get there? It's very possible and we're hopeful. We just --

THE COURT: When you say you're far apart, and you'll forgive me, I don't mean to cut you off but, generally, when someone tells me that they're far apart, I have an offer and a counteroffer, but it doesn't sound as if you've gotten that far. So how on earth can there be a measurement of being far apart?

MS. GONZALEZ: We have received a verbal offer from the defense counsel which we have rejected and now we have discussed possibilities somewhere between where they proposed and what we believe that they should be -- how do I phrase this?

MR. MISOREK: Your Honor, we've suggested what we believe to be reasonable.

THE COURT: You've made a counteroffer or not?

MR. MISOREK: In terms of an offer. I think what we meant to say is we haven't put a formal written offer in place. We have had many discussions. We've laid out what we believe to be reasonable dispositions, and there's been disagreement on what reasonable is here, is how I would say it.

There certainly have been discussions so it's not --

THE COURT: The government -- you're telling me the government has not failed to articulate its view of what a reasonable disposition is?

You've provided some of that information so that there could be a basis from which negotiations may ensue?

MR. MISOREK: I believe we have. I don't know if counsel objects, but I believe we've made clear general thoughts of what we believe to be reasonable and the counsel for Mr. Jordan have just disagreed with that to this point.

MR. DIAZ: That's fair to say, Judge.

THE COURT: All right. It is my hope that both parties engage in those negotiations in good faith and if, in fact, it's going to be a nonstarter, then I need to know that because it certainly changes my landscape.

You know, and this is certainly not on anyone in this room necessarily but, you know, I still have a third defendant that I was holding six weeks for on a trial that may

not come. I don't have the space on my calendar to just hold for cases that don't ultimately go to trial, particularly cases as demanding in terms of the Court's time as this one would be.

So I'm loath to just hold six weeks on the calendar as you suggest if I don't know that it's because I'm moving in that direction for real. And so I'm a little frustrated, not necessarily with the status of negotiations in this case because these are fairly new but, as a general matter, with the larger case and the way in which it has unfolded on the court's calendar.

So with that --

MR. DeMARCO: Your Honor, if it matters, may I be heard?

THE COURT: Yes.

MR. DeMARCO: I don't think this trial is going to take six weeks if that's what Your Honor --

THE COURT: No. I have a full calendar. You want me to hold one month. You want me to hold three weeks. It's time on my calendar.

MR. DeMARCO: It's not going to be six weeks.

THE COURT: You're not being helpful. You asked if it would help. It would not.

MR. DeMARCO: I just didn't know if Your Honor was expecting a six week trial.

THE COURT: No, but my point stands regardless.

MR. DeMARCO: Okay.

THE COURT: My larger point is it is my hope that right now, in this moment, the parties engage in good faith discussions to try and bring, if possible, a resolution to this matter that has been outstanding now since 2020. Right?

We're six years in and certainly the fact that the court had a trial on the other charges certainly may have slowed what could have happened with respect to these charges, but it didn't mean it needed to stop. That trial happened now two years ago.

MR. DIAZ: Yes, Judge.

THE COURT: Time to fish or cut bait. Piss or get off the pot, as it were. All right? Okay.

So, against that backdrop, I have before me a bail application. Yes? Let's talk about that.

I am in receipt of the defendant's bail application and the government's response.

In the government's response, it aptly noted that the court must entertain the application for bail in this case against the backdrop of 18 U.S.C. Section 3142(e)(3), pursuant to which there is a rebuttable presumption that no condition or a combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the court finds that there is probable cause to

believe that the person committed an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act or it's an offense under 924(c).

In this case, we all know that there was a grand jury indictment in this case and it's through which probable cause was established giving rise to the presumption under 3142(e)(3). That's the backdrop.

Against that backdrop, Mr. Diaz, I would like to hear from you, and specifically, please, if you could, tailor your argument to how it is that presumption by your estimation is rebutted.

MR. DIAZ: Thank you, Your Honor. Thank you.

As noted by Your Honor, we are moving the Court for bail pursuant to 18 U.S.C. 3142.

Your Honor, I'm going to address your points but firstly I just want to state, Judge, Mr. Jordan has been detained at the MDC for almost six years now and we submit that there has been a substantial change in circumstances since the entry of the detention order.

As the Court is aware, Judge, Mr. Jordan was initially indicted on an eleven-count indictment with the two most serious offenses being Count One and Two, relating to the murder of Mr. Jason Mizell. And I think it's fair to say, Judge, that I -- a reasonable inference can be drawn that

those two counts weighed heavily in the determination on whether Mr. Jordan should be detained pending trial during his first bail hearing.

As the Court is aware, since that time, Counts One and Two have been dismissed. In the Court's well-reasoned and articulated opinion, the Court carefully examined the record and concluded that the government had not presented any facts establishing a nexus between the murder of Mr. Mizell and a drug related motive.

Now, the government has filed an appeal. We have a schedule on that appeal. They've also threatened to file a stay depending on the outcome of this hearing. And that is their right, Your Honor, but the current state of this case is that Counts One and Two are vacated. That's the law of the case.

Now, Mr. Jordan has spent nearly six years exclusively at the MDC where he has almost lost his life. He was stabbed 18 times, Your Honor. And these are crude objects that have been sharpened to cause maximum damage on another human being.

Now, I know in the government's response, they stated that things at the MDC are better, it has improved significantly in the last six months, and I don't disagree with that or dispute that, but I think that argument is reasonable and logical when determining the risk of harm to an

inmate. Here that harm has already happened.

Mr. Jordan is lucky to be alive today and every day that he remains at the MDC is a day that he remains in danger.

Now, with that said, Your Honor, I do recognize as your Court stated that this is a presumption case. There's a rebuttable presumption that no set of conditions will reasonably assure the appearance of Mr. Jordan, however, that presumption can be rebutted with some evidence contrary to the presumed fact in order to rebut the presumption. When the defendant offers such evidence, the presumption should be weighed along with the other factors to be considered in determining whether the defendant should be released.

Firstly, Your Honor, Mr. Jordan is not a flight risk. Mr. Jordan is a lifelong resident of New York City. He's the father of four daughters. His family has been in the courtroom for every proceeding that Mr. Jordan has been produced since the inception of this case and despite everything that those folks have been through over the last six years, they've always presented with dignity and grace.

If released, Mr. Jordan will live with his girlfriend and the mother of their children in the Eastern District of New York. His girlfriend is also an assistant deputy warden at the New York City Department of Corrections. She has put her successful career on the line, not only to serve as a suretor, but also to be the primary responsible

person for housing Mr. Jordan, ensuring he complies with his bail conditions and that he appears in court. She had to obtain special permission from the DOC in order to do this and will have to immediately surrender her firearm if bail is granted.

Additionally, Your Honor, Mr. Jordan does not have a passport nor possesses any travel documents or has any contacts or resources outside of the country.

And in support of this, Your Honor, his family has gotten together and is proposing a $1 million bond, secured by 17 financially responsible suretors who are all friends and family of Mr. Jordan. Three pieces of property can also be assigned to the bond totaling a total of 525,000.

Now, what I want to mention here, Your Honor, is that this package represents the extent of the resources that this family has. They're hard working people of modest means and should this bond be revoked for any reason would result in their financial ruin. And I think that that's noteworthy for the Court to consider what these 17 individuals are doing.

Furthermore, Your Honor, Mr. Jordan -- and I believe, Your Honor, just to finish that thought, that that package and the facts that I've presented rebut the presumption that Mr. Jordan is a risk of flight.

Furthermore, Your Honor, Mr. Jordan is not a danger to the community. Mr. Jordan is a 42 year old man with no

criminal convictions. He has been incarcerated for nearly six years with limited contact to the outside world. His disciplinary record during this lengthy period of time consists of possession of contraband nearly four and a half years ago. He has had no serious infractions since that time, has worked as an orderly and worked his way up to unit orderly, Your Honor, which is a pretty big responsibility and shows that the correction officers deem you trustworthy and responsible because the unit orderly is responsible for the distribution of commissary to all the other inmates in the unit.

All the acts of violence referenced by the government in their submission are over 20 years old. Mr. Jordan has been housed in one of the most violent facilities for almost six years and he hasn't participated in any violence except when he was the victim of violence.

He's been punished for this time on allegations that have yet to be proven, Your Honor, and will continue to remain so awaiting trial if this case cannot be resolved. Mr. Jordan is not a danger to the community, but his continued detention is a danger to Mr. Jordan.

With respect to the strength of the evidence, Your Honor, the remaining counts, Three to Eleven, the defense has carefully reviewed all of the Rule 16 discovery that has been furnished in that case.

THE COURT: In your letter, you suggested that with respect to Counts Three through Eleven, that the charges rest largely on anticipated testimony from a cooperating witness who, by your submission, you say, does not intend to cooperate. Obviously, in the government's submission, they suggest that you are mistaken about that fact and that the weight of the evidence is derived not from a single witness but from many witnesses.

Please speak to that point.

MR. DIAZ: Thank you, Your Honor. That is correct, Your Honor. That's a fair representation of those facts.

Again, from our belief -- and this is from what we're reviewing, Your Honor. We only have Rule 16. We don't have 3500 material. We have not received any grand jury.

THE COURT: Fair enough.

MR. DIAZ: But the government in their submission represented that there's other witnesses to this conduct. But, again, Judge, I think that it's uncontroverted that none of these witnesses have testified in the grand jury. I don't believe that any of these witnesses have testified in prior proceedings, that the testimony of this witness was hearsay that was relayed by the agents in the grand jury.

So I don't even know what these jurors would be subject to a material witness order later on, but we have to accept the government's representation, Judge, because I have

no other way to challenge it.

The only thing that I can assess is what we have now and what we have now, Judge, what's referenced in those seven videos are (b)(1)(C) sales. (B)(1)(C) is a count that does not have a mandatory minimum and a defendant is even eligible for probation on that count.

THE COURT: But, forgive me, I just want to make sure I'm understanding your point correctly.

What you're suggesting is that the evidence about which the government relies in its submission you think would only support charges related to (b)(1)(C) sales, as opposed to the sales of narcotics that might trigger the mandatory minimum?

MR. DIAZ: That is correct, Judge. It's our belief that the evidence from this witness who we don't believe is going to testify is what, is bringing up the weight from (b)(1)(C) to (b)(1)(A), and also is the foundation for the evidence against the 924(c).

Again, the government has represented that there's other evidence. I could only analyze what we have and from our experience in the prior trial, and the Court very well knows what happened with that witness. And in order for Mr. Jordan to challenge now these unknown witnesses, Mr. Jordan would have to, again, sit at the MDC for another two years waiting to challenge that.

That's the point I'm trying to make here, Judge.

THE COURT: In the worst case scenario, would you agree -- and, again, I'm using this language purposefully.

In the worst case scenario, would you agree that this case could present or the government would proceed on charges that could potentially carry a ten year mandatory minimum?

MR. DIAZ: Absolutely, Judge, that's what he's charged with and he's charged with a 924(c).

Again, from our review of the discovery, we don't believe they can establish that and if they are representing they have additional evidence, Mr. Jordan will have to wait another year and a half to two years to be able to challenge that.

THE COURT: Yes.

MR. DIAZ: That's the point I wanted to make with that, Your Honor.

And, again, Judge, even with that, Judge, the allegations in the indictment regarding Counts Three to Eleven, these are allegations of drug sales that happened almost ten years ago.

The government's memo makes reference that during that time, Mr. Jordan continuously carried a gun. Out of the seven videos, Your Honor, there's no gun. One would think that if he always had this on him, that there would be some

indicia of that in all of these recorded transactions that they have and it's not there.

There was no gun recovered. There's no video of him having a gun. There's no ballistics. There's no evidence at all except him making (b)(1)(C) sales.

THE COURT: And those are the -- I just want to make clear.

MR. DIAZ: Yes.

THE COURT: Those are the (b)(1)(C) sales that's referenced at page 10 of the government's submission to the undercover officer; is that what you're referring to?

MR. DIAZ: Let me look at page 10 real quick, Judge, just to make sure.

(Pause.)

MR. DIAZ: Yes, Judge.

THE COURT: All right. And the amount of narcotics sold across those seven separate occasions I don't believe are specifically referenced here, but you're saying those sales alone would not be -- the amount or the quantity at issue there would not be triggering a mandatory minimum?

MS. GONZALEZ: That's correct, Your Honor.

MR. DIAZ: Thank you. Thank you.

THE COURT: So the sales about which the government would rely, if it were to argue about the triggering of the minimum, would be supported by the other government witnesses

or I think there's two who spoke of purchasing narcotics from Mr. Jordan from the late 1990s to the summer of 2019.

Is that correct, Ms. Gonzalez?

MR. DIAZ: Sorry, Your Honor. One moment. I just want to make sure we get this correct.

(Pause.)

MR. DIAZ: If I could just add, Judge, I believe the very first initial indictment against Mr. Jordan only charged (b)(1)(C).

MS. GONZALEZ: Your Honor, the witnesses would support the weight.

THE COURT: And that's -- I'm sorry.

When you say the witnesses, you're specifically referring, and I'm, again, at page 10 of the government's submission, the witness who you all represent would testify to selling cocaine to Mr. Jordan from the night -- excuse me -- purchasing cocaine from Mr. Jordan from the late 1990s to the summer of 2019?

MR. MISOREK: That's one of the witnesses, Your Honor, but I believe to answer the Court's question, there's approximately three, four, five witnesses who would testify as to the historical sales that Mr. Jordan has made and then those (b)(1)(C) counts that have been referenced, those are all the sales to the undercovers.

THE COURT: I understand.

When you say the four or five other witnesses or four or five witnesses outside of the undercover officer that will speak to the more historical sales?

MR. MISOREK: Yes, civilian witnesses.

THE COURT: Is one of those civilian witness the witness about whom the defense spoke of in their submission in terms of their reluctance to testify at trial?

MR. MISOREK: I understand now.

No, that person is not included in any of that. This is all assuming that that person is completely unavailable to the government. That person is not included in any way in our analysis at the moment.

THE COURT: You can go ahead, Mr. Diaz.

MR. DIAZ: And, like I said, I have no way of challenging that.

THE COURT: I understand.

MR. DIAZ: And just to put it into perspective, Judge, that if this does go the route that Mr. Jordan would be guilty of a (b)(1)(A), a ten year mandatory minimum.

No criminal history, category I. Even if he gets the ten years, Judge, with the time he has in, the calculation of 85 percent for good time, he's already probably served a significant portion of that, Your Honor. And if he has -- if there is a conviction and he has to come back, he can self-surrender or he can be remanded immediately. Either

option obviates the need for him to sit at the MDC for another two years awaiting trial.

Being at liberty, Judge, even if it's for a short amount of time, would allow Mr. Jordan to more meaningfully participate in his defense, including a potential disposition on these outstanding charges, assist in his appeal. And, as I stated, Judge, Mr. Jordan will self surrender or can be remanded when -- if and when there's another conviction in this case, Judge.

Mr. Jordan, under the suggested bail conditions which include a surety bond secured by the signatures of 17 financially responsible people, and any other condition that the Court may impose, the Court has a wide range of options and conditions that they can include to ensure the safety of the community and ensure Mr. Jordan's return to court.

Mr. Jordan will reside at a private residence in the Eastern District of New York with his two daughters, ages seven and ten, and their mother who works as an assistant deputy warden for the New York City Department of Corrections.

For these reasons, Your Honor, we're respectfully asking that the Court consider a bail package for Mr. Jordan.

Thank you.

THE COURT: Thank you, Mr. Diaz.

All right, Ms. Gonzalez, I will hear from you please.

MS. GONZALEZ: Thank you, Your Honor.

I want to look at the difference between this bail application and the last bail application and what has changed.

As defense counsel noted the Court reversed the verdict on Counts One and Two, but there still are remaining counts which go through 2020. Defense counsel said that there's been no violent conduct, defense counsel said, in the last I believe he said 20 years. That is contradicted by the evidence of the narcotics trafficking and the gun he had during those counts which this court noted was part of the dangerousness analysis separate from the murder.

In addition, on the murder counts, the Court reversed the reason for the murder but not whether the defendant committed the murder himself.

THE COURT: Well, let's be clear on that point. That's not the question that I was asked on Counts One and Two.

MS. GONZALEZ: Correct, Your Honor.

THE COURT: And it's not a question that you're asking me now. So that's of no moment to me.

I decided the Rule 29 motion on Counts One and Two on the legal arguments that were presented.

So I can't imagine that the government is inviting the court to opine on its view of whether Mr. Jordan committed

the crime.

You're not -- are you asking me that?

MS. GONZALEZ: I mean, Your Honor, we believe it's part of the analysis here, but we don't even need to get there. We can rely on the other counts in and of themselves.

In Your Honor's -- in the detention hearing from Your Honor for the last bail application, Your Honor discussed the proof about Counts Three through Eleven and this court said that the proof is significantly high and pointed to the surveillance recordings. We also, as my colleague said, have numerous witnesses testifying about the narcotics dealing.

THE COURT: The surveillance recordings though, I am curious, and certainly you may be able to direct me to it, but I'm not certain if I had the same sense of clarity that the recordings all told would only allow for a conviction for (b)(1)(C) sales. I'm not certain that I was clear about that fact when referring to the recorded sales. And it seems like a particularly significant fact now.

So if we assume, right? Let's assume the government can prove its case with respect to those sales as a result of those videos. Mr. Diaz's point is one that's well taken. It certainly wouldn't trigger a ten year mandatory minimum on those sales a loan.

MS. GONZALEZ: But the testimony from the numerous witnesses would, Your Honor, on Count Three as well as

Count Four, the firearm possession during those sales.

THE COURT: Right, but I'm making -- I'm trying to refer -- you wanted us to go back to the last bail hearing and I'm trying to perhaps give you a clue into my own thinking at the time which I do believe rested heavily on the fact that there were video recorded drug sales. However, I don't believe that I appreciated that those video recorded drug sales only amounted to (b)(1)(C) sales as opposed to video recordings that might support a conviction that would trigger the mandatory minimum. That was my point.

MS. GONZALEZ: In addition to the changed circumstances of the trial verdict, defense counsel also pointed to the conditions at MDC.

Obviously, the attack on Mr. Jordan was terrible and should not have happened and our office is prosecuting the individuals who were involved. In terms of the greater MDC conditions, we point to Judge Furman's opinion that notes that they have been improving and that opinion was after some of the cases that defense counsel cited as well as the attack. Other than that, we have seen -- we have not been presented with any evidence either from defense counsel or an MDC representative that attests to those worsened conditions.

THE COURT: I don't think that Mr. Diaz suggested that the conditions had worsened. I think, as a matter of fact, that he acknowledged that there have been some who have

indicated their belief that they have improved, but I don't think -- did you say that they had worsened? I didn't hear that.

MR. DIAZ: No. No, Judge.

THE COURT: I think he said Mr. Jordan has suffered under the conditions of the MDC, perhaps both the improved conditions, but certainly for a considerable amount of time, the conditions that we all know too well and which has been criticized by this court and others.

MS. GONZALEZ: Let me rephrase.

Judge Furman noted the improved conditions since 2024 in his May 2025 opinion.

Other than that --

THE COURT: What should I take from that, I guess, is my point. I'm trying to understand.

Judge Furman, who certainly criticized the conditions at MDC, has noted that the conditions are improving. Is that the words you used, "improving"?

MS. GONZALEZ: Based on his opinion, yes.

THE COURT: But improving?

MS. GONZALEZ: Yes.

THE COURT: ING.

MS. GONZALEZ: Yes.

THE COURT: So it's moving.

I'm trying to understand what I'm supposed to take

from that, right? Because if I am in critical condition in the ICU and I'm improving, I could still be in the ICU. It doesn't mean, right, that I am healthy.

So what am I supposed to take from that?

MS. GONZALEZ: Well, we haven't seen -- based on defense counsel's papers, we haven't seen evidence that the defendant is currently not being properly treated by MDC or not getting the right care or adequate food or any of it.

THE COURT: Did you all have any notification from the defense in that regard prior to Mr. Jordan being stabbed 18 times? Because I'm just trying to understand if some heads up is necessary for us to find that the conditions are poor, because I don't recall anyone getting a heads up before he was stabbed.

MS. GONZALEZ: No, Your Honor. If defense counsel would have raised any concerns with MDC, we would have --

THE COURT: I know. My point is you don't always get a heads up. So the fact that they said, Judge, this specific thing has happened to him, I have a defendant which, there's no question, was stabbed not once, not twice, not three times, I can do this all the way to the number 18.

Go ahead.

MS. GONZALEZ: Understood. Otherwise, Your Honor, we rely on the arguments in our paper and we would oppose the application for bail.

THE COURT: Mr. Diaz, I just want to make sure.

Mr. Diaz spoke to -- in your submission, you all highlighted -- I'm just trying to make sure I have the page, here it is -- violent conduct of Mr. Jordan, but at least in your submission, I believe that it dates back as, the latest is to 2004. Today, you indicated reliance on the 924(c) charge. Mr. Diaz makes the point that notwithstanding the government's representation that he always carried a gun, that none is at least apparent in the seven videos related to the undercover sales.

Aside from the 924(c) charge here, and I understand the government's position in that regard, am I correct that the violence that the government refers the court to is dated by 22 years?

MR. MISOREK: It's dated by a substantial number of years.

THE COURT: Well, 2004 to 2026. I'm not a mathematician, but that seems like that's pretty basic math. That sounds like 22 years.

MR. MISOREK: It's substantial, yes.

THE COURT: Maybe we should modify it as a very substantial --

MR. MISOREK: Yes, Your Honor.

THE COURT: -- twenty-two years.

MR. MISOREK: The only thing I would point out in

terms of the argument about the 924(c) and that that's, there's no firearm present in these videos, I would point out the videos do -- again, they're not standalone counts that charge mandatory minimums, as Your Honor pointed out, but they do corroborate the narcotics trafficking by Mr. Jordan.

THE COURT: Yes, indeed, they do, and there are narcotics traffickers that are arrested before this court on a regular basis who are released. And so --

MR. MISOREK: I just wanted to make that clear.

THE COURT: Yes, I believe those seven videos show what those seven videos show.

Mr. Diaz, you'll defend the case as you see fit, but for the purposes of this bail application, would you be able to convince me that they don't show a narcotics sale? No, you wouldn't, but I don't think you're trying to. Those show what they show.

The question is what else is there, right?

MR. MISOREK: And I think my point is that they're just corroborative of the overall conspiracy. And the grand jury also found that Mr. Jordan did possess a firearm in furtherance of narcotics. So when you corroborate that conspiracy through those videos, I think part of the government's position is even though on those occasions, admittedly, there is no gun on that video, there is corroboration to the narcotics conspiracy which lends

corroboration to the 924(c) from our perspective.

THE COURT: I hear you.

What is your argument, if you could, please, thank you, to Mr. Diaz's argument to the court that has at least some attractiveness concerning the fact that -- let's assume Mr. Jordan is subsequently convicted of the narcotics charges, which he currently does not stand convicted of, but that he has served already which would be a significant portion of any ten year mandatory minimum sentence that, at a minimum, would be imposed if the minimum were triggered. I can't speak to above the minimum, but we're using the ten years.

MR. MISOREK: And, admittedly, not being a math guy, we kept discussing a ten year mandatory minimum but there's a 15 year mandatory minimum here with the 924(c) attached.

THE COURT: Right, because of the five years consecutive. I understand.

MR. MISOREK: It's up then by 50 percent. So call it six years in custody.

I'm not in any way saying that's not a substantial amount of time. That is a substantial amount of time, but six years is not even halfway to 15 and that's assuming he gets the mandatory minimum.

THE COURT: And with respect to what would be, let's use your numbers and mine; 15 minus 6.

MS. SAHLI: Nine, Judge.

THE COURT: Thank you. So we've got nine years, right? Which would be the balance on the 15 years. And you believe that under these circumstances, that this would raise questions about a flight risk. Mr. Diaz talked about Mr. Jordan's history in terms of his ties to the community, the fact that, and I as best I can tell, this is an accurate representation, that Mr. Jordan is a lifelong New Yorker, has not lived anywhere else, he has a family here, children, a fiancee -- is it fiancee or girlfriend?

MR. DIAZ: Girlfriend, Judge.

THE COURT: A girlfriend who is here and, you know, you'd have to be blind to not see that these people have come consistently over the past six years.

So when we talk about flight risk, shouldn't the court consider those facts as well? And if I am considering those facts, might it change the court's view of his flight risk against the six years that he has already served?

MR. MISOREK: Your Honor, I think the Court is very fair to consider those facts.

We don't dispute he's a lifelong Queens resident or that he has very consistently had family here from the very beginning of this case, but what I would suggest to the Court is perhaps in using -- again, not in any way trying to be disrespectful -- but using Mr. Jordan's significant other in this example. She is a member of law enforcement. She

carries a firearm.

THE COURT: She would be surrounding the firearm if he got bail.

MR. MISOREK: My point would be I find it hard to believe that she knew he was dealing crack cocaine to an undercover law enforcement officer. So they may know one side of Mr. Jordan but not every side.

THE COURT: But the question that I'm asking is not whether or not she should have screened Mr. Jordan differently to be a spouse or a partner or a boyfriend, but whether their presence suggests that he is not a flight risk. That's a different inquiry. This is not a match-making service. I don't know if he's a good boyfriend or not.

The question is is their presence, their ongoing presence, his lifelong connection to this city where he's not lived anywhere else, he does have children here as well. I'm talking specifically and narrowly about flight risk and nothing else.

MR. MISOREK: Yes, Your Honor. If we're making a checklist of things that would support the defendant's application, then those would fall into the bucket of things that support his release. The government though is not of the opinion there's enough of those things to support his release in this instance.

THE COURT: Okay. Give me a moment, folks. I just

want to make sure that I asked all of the questions that I have. I do not want to have to bring you back.

(Pause.)

THE COURT: The government spends a considerable amount of time at pages 17 and 18 of its submission to delineate any cases in which individuals have absconded once put on location monitoring, and I was trying to ask myself what's kind of the long and short of that.

Is it the government's suggestion that location monitoring just simply doesn't work and if it just simply doesn't work, it seems like it could be a risk in all cases, would there ever be a scenario where the government agreed?

I mean we know sometimes people abscond. So I'm trying to place into context Section D where you basically listed cases where people absconded. We know that that happens. So that's kind of the given, it happens. And unless the government -- is the government suggesting that location monitoring should never be imposed or that Mr. Jordan's facts and circumstances are somehow substantially similar to the facts and circumstances presented in those other cases, and I don't think you can know that.

MR. MISOREK: No, Your Honor. The government has, at times, recommended jointly with defense attorneys obviously that in some instances, location monitoring is appropriate.

In this instance, the government is very squarely of

the opinion to the letter of the law here, that there is no combination of conditions here.

THE COURT: I understand that. I'm trying to understand how it is that I am supposed to view Subsection D of your submission.

So, for example, are you suggesting to the court that, in United States v. Michael Artis, that the individual in that case had a kind of same level of familial support that Mr. Jordan has and, nonetheless, he absconded, or that in the case of United States versus Dali, that the individual there had served 40 percent of what could be the high, likely high end sentence in the case and, nonetheless, absconded?

Contextually, what do these cases mean to me unless the government can demonstrate that somehow the defendants who absconded are similarly situated to Mr. Jordan with respect to the facts and circumstances that make up his application.

MR. MISOREK: No. As Your Honor correctly pointed out, we can't say he's similar or dissimilar in any way. We're not trying to offer that. Sometimes if we have too much time, we write too much.

THE COURT: All right. Give me a moment.

(Pause.)

THE COURT: Another moment, folks.

(Pause.)

THE COURT: Again, I just want to probe the

government's submission here a little bit.

At page 16 of the government's submission, you suggest that there is a risk that Mr. Jordan would threaten and retaliate against witnesses. You highlight, first, testimony at trial that indicated that Mr. Jordan and friends approached Mr. Rincon and asked him if he -- this is what you have written -- "probing to see if Rincon did see him"?

MR. MISOREK: I believe that referenced trial testimony when Mr. Rincon or a witness, I don't recall at the moment, Rincon suggested he was surrounded and he felt as if Mr. Jordan was probing whether --

THE COURT: But the question as I recall from trial, and maybe I don't know and I should have pulled this transcript, but you're suggesting that -- because I just don't remember this coming out in trial this way.

Mr. Jordan uttered the words to Mr. Rincon, did you see me?

MR. MISOREK: No, I believe Mr. Rincon was suggesting that the question that was occurring caused Mr. Rincon to believe that Mr. Jordan was trying to figure out did you, Mr. Rincon --

THE COURT: Right. But the question at trial as it came out at trial that was posed to Mr. Rincon was whether he saw the shooter.

MR. MISOREK: In terms --

THE COURT: And Mr. Rincon, you're saying, testified that he believed that Mr. Jordan was referencing himself, but the question by Mr. Jordan wasn't did you see me?

MR. MISOREK: Right. I think we're talking about two different things.

THE COURT: What are we talking about?

MR. MISOREK: At least, Your Honor --

THE COURT: No, it's your paper. So you tell me what you're talking about.

MR. MISOREK: I believe we're referencing after the homicide happened at the funeral, when Mr. Rincon got surrounded by Mr. Jordan and a couple of people, Mr. Rincon had testified at trial that Jordan and the friends had a quick conversation with him and had left Mr. Rincon believing that it was Jordan probing to see if Mr. Rincon was able to ID Jordan.

THE COURT: Right, but the questions that were posed in that moment were whether he saw the perpetrator?

MR. MISOREK: Yes, yes, yes.

THE COURT: Okay. Which could also mean he wanted to know if Mr. Rincon saw the perpetrator.

MR. MISOREK: Yes.

THE COURT: Just saying.

MR. MISOREK: No, I understand.

THE COURT: Next, I wanted to just -- is the

government suggesting by its submission, at the bottom of page 16 and 17, that in the conversations that Mr. Jordan had, where he referenced an individual who may be cooperating, that he had threatened or intimidated that witness? Because if I'm reading what you've cited here, it would be Mr. Jordan talking to another individual complaining about the potential witness.

I'm trying to understand if the government is asking the court or has evidence to support the notion that his complaints ultimately turned into a threat to injure or intimidate someone. I'm just trying to understand because I don't have any information based on what you've submitted here, and my recollection is certainly not serving me in this regard, that the individual was even aware of this discussion such that this discussion could provide a basis to say that the individual felt injured, threatened or intimidated. So help me out.

MR. MISOREK: Is it all right if I refer to that person as with Individual One?

THE COURT: That would make it easier, yes.

MR. MISOREK: I believe we had submitted briefings on Individual One where Individual One, it was either a phone or made communications where the individual had stated, Individual One had stated he was confirmed Jordan was pumping information in that was going to get Individual One hurt.

Now, I think Your Honor ultimately ruled we couldn't

use that at the trial, but we do think it's relevant for bail purposes.

THE COURT: And my bases -- there was a lot of rulings. You'll remind me why is it that I said that could not be used at trial?

Because there was -- this is what I recall. I recall that there was a category of conduct that I ultimately said you could not connect to Mr. Jordan, you perhaps could connect it to other people, because there was kind of a category of conduct where you wanted me to include at trial as consciousness of guilt and I recall refusing to do so because it couldn't be connected to him.

Is that, is this one of those scenarios?

MR. MISOREK: Well, not answering your question because I don't want to get it wrong, I think it fell under the category of forfeiture by wrongdoing. I just don't remember Your Honor's basis -- it might be, but I just don't want to get it wrong. It was in the forfeiture by wrongdoing. I believe that was denied almost in whole, as I recall, but I don't remember the specific --

THE COURT: My recollection is I had an issue with the fact that there was some references to conduct by Mr. Jordan's father and friends, et cetera, and I remember saying repeatedly there's a difference between doing something on someone's behalf versus their behest.

Does that sound familiar?

MR. MISOREK: I remember you saying that.

THE COURT: Me too. Go ahead.

MR. DIAZ: That's exactly correct, Your Honor.

If I can recall correctly the Court's initial ruling was there's nothing tying that text message to Mr. Jordan. Individual Number One was incarcerated. Mr. Jordan is incarcerated. There's no way he could communicate with him. This is just jail rumors that were going around. There's nothing tying what was said in that text message by Individual One directly to Mr. Jordan.

THE COURT: All right. I really don't think that I had any more questions.

Much of our discussion today was centered around Counts Three through Eleven, with only a limited touching upon Counts One and Two, and I think for the obvious reason that the court has made its ruling and I suspect that you all believe that, you know, I've read what your submission is on it, but unless there's anything that you all want to say now about Counts One and Two, I think I understand why the conversation is focused on the others. I certainly have your written submission but I just want to make sure.

MR. MISOREK: Yes, nothing else and, again, our submission very respectfully to Your Honor.

THE COURT: Absolutely.

Mr. Diaz, anything else from you?

MR. DIAZ: Nothing else, Your Honor.

THE COURT: All right. Folks. My intention is to digest the arguments here today. If you all had come with the hope that I would rule from the bench, I hate to disappoint you. This is an important decision that the court has to make and I need to make sure that I do so thoughtfully and deliberately, but I do intend to make a decision as quickly as possible. I promise you you will not wait as you did on the Rule 29 motion in terms of time. So I'm going to move thoughtfully, deliberately, but I hope quickly.

Yes.

MR. MISOREK: May I make a suggestion? And I haven't floated this by counsel.

In the interim, can we adjourn this for approximately 60 days? The government will formulate a written offer that it believes to be fair and we will begin to work through that in the next 60 days and if we can't reach an agreement together, we'll ask for a trial date.

THE COURT: Wait. Wait. What are you asking me? You're not asking me to delay a determination on the bail application?

MR. MISOREK: No.

THE COURT: You're asking that the next status conference would be set for 60 days in any event and then you

all will, hopefully, and with much appreciation of the court, follow my request that you all have some fish or cut bait.

MR. MISOREK: Yes. And to that end, I believe we've never submitted a written offer, but I will give the Court -- we will, we will submit a written offer. We'll negotiate. If we get there, we get there. If we don't, we don't.

MR. DIAZ: Judge, my colleagues have nodded.

THE COURT: Yes.

MR. DIAZ: My colleagues have nodded an indication of we're in agreement with that, judge.

THE COURT: All right, folks. We're going to set this down for a status conference on May 12th at 11 a.m. However, there is a very real chance that I may have you come before me again as I may render my decision on the bail application from the bench. I likely will render my decision about this application from the bench, so you all should expect that you will be called to appear before May 12th so I can make a decision on the bail application, but the May 12th date will stand in any event because we will, no matter what the court's ruling on the bail application, there will still work to be done.

Fair enough?

MR. DIAZ: Yes, Judge.

THE COURT: I appreciate your time, folks. We're adjourned.

Wait. No, I need the exclusion of time. Is that what you were about to say?

MR. MISOREK: Yes.

THE COURT: Do I have an application from the government?

MR. MISOREK: You do, Your Honor. As discussed on the record, we're hoping to extend the written plea offer to the defendant. It's my understanding counsel will want time to review that. Hopefully, it will facilitate negotiations. To that end, it's in the defendant's and the public's best interest to allow us to do those negotiations short of trial, if possible.

MR. DIAZ: No objection, Judge.

THE COURT: All right. The government's application for an order of excludable delay until May 12th at 11:00 a.m., I do not want to see you at 11:00 p.m., at 11 a.m. is granted for the reasons set forth by the government in its application and without objection by the defense.

Yes?

MR. MISOREK: Nothing further.

THE COURT: Did you have anything else?

MR. DIAZ: Thank you, Judge.

THE COURT: We're adjourned.

(Matter concluded.)

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AB:MEM/MG
F. #2017R00107

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 2, 2026

By ECF and Email

The Honorable LaShann DeArcy Hall
United States Distrct Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Karl Jordan, Jr.
Criminal Docket 20-305 (S-2) (LDH)

Dear Judge DeArcy Hall:

The government respectfully submits this letter in response to the Court's Order dated March 23, 2026 "to investigate Defendant Jordan's proposed bail package, including the value of the suretors' equity in the properties offered in support of Defendant Jordan's proposed bail package, and file a letter indicating its investigative findings no later than April 2, 2026." Mar. 23, 2026 Dkt. Entry. The government's findings are below.[1]

I. Suretor Information

Defense counsel provided contact information and records for all 17 of the defendant's proposed suretors (collectively the "Suretors"), and the government spoke by phone with each of the Suretors.

A. Suretors Offering Properties

1. **Marilyn Gonzales** stated she is Jordan's aunt. Ms. Gonzales stated that she owns her residence in Pooler, Georgia. Ms. Gonzales stated she would be willing to use her home as collateral for a bond for Jordan. Ms. Gonzales provided a 2025 tax statement for the property that lists the "Fair Market Value" of her residence as $183,100. Ms. Gonzales supplied a March 9, 2026 monthly bill for a mortgage from USDA Rural Development for the property, which showed a mortgage origination date of January 24, 1996 and listed a "Next Payment Due" of $754.44 and an "Unpaid or Delinquent

[1] The government confirmed with defense counsel that they do not oppose the public filing of this letter, which does not contain information required to be redacted or filed under seal pursuant to Fed. R. Crim. P. 49.1.

Amount" of $377.22. The "Principal Balance" was listed as $1,278.04. Defense counsel advised the government that Ms. Gonzales is currently retired.

2. **Karl Jordan, Sr.** stated he is Jordan's father. Mr. Jordan, Sr. stated that he resides at a rental property in Fairburn, Georgia. He further stated he owns real property in Little Rock, South Carolina that he would agree to secure the defendant's proposed bond. To that end, Mr. Jordan, Sr. provided a deed and a 2025 annual tax bill showing an annual gross property tax amount of $62.48. According to the tax bill, the real property consists of 21.77 acres. Investigation by the government revealed the property exists and is an undeveloped parcel of land. Defense counsel advised the government "that the defense estimates the value to be $75,000 based on their discussions with Karl Jordan, Sr." Defense counsel represented that Mr. Jordan, Sr. lives on savings and with the support of family members, that Mr. Jordan, Sr. farms the land in South Carolina that he owns, and that Mr. Jordan, Sr. participates in a USDA farm program in which he receives $1,500 annually.

3. **Abdul Springer** stated he is Jordan's cousin. Mr. Springer stated that he owns his residence in Washington, Georgia. Mr. Springer stated he would be willing to use his home as collateral for a bond for Jordan. Mr. Springer provided a Georgia driver's license with his residence listed. Mr. Springer provided a July 7, 2025 parcel statement for his residence that shows the total cost value of $267,400 for the land and building on it. He also provided a March 2026 mortgage statement showing the "Original principal balance" on the property as $156,900, with an "Unpaid principal balance" of $137,255.78 and "Paid Year-To-Date" of $2,148.64. Mr. Springer further provided a December 31, 2025 pay stub showing employment with Atlanta Public Schools, with a biweekly take home pay of $3,232.20.

B. <u>The Other Suretor Signatories</u>

4. **Stephanie Arrington** stated she is a family friend of Jordan's mother. Ms. Arrington provided a New York driver's license showing a residence in Hempstead, New York. Ms. Arrington provided a copy of a January 15, 2026 paystub from Grace Industries LLC showing a residence in Uniondale, New York and indicating a weekly take home pay of $909.60.

5. **Flordaliza Castillo** stated she is a longtime family friend of Jordan. Ms. Castillo provided a New York driver's license showing an address in East Elmhurst, Queens. Ms. Castillo provided a January 16, 2026 pay stub from the U.S. Department of Defense that reflected a biweekly take home pay of $1,307.54.

6. **Grace Dipalo** stated she is the grandmother of one of Jordan's children. Ms. Dipalo provided a New Jersey driver's license with an address in Englewood, New Jersey and supplied a January 9, 2026 paystub from USA Bio-Med Applications of New Jersey, Inc. showing the same address and a biweekly take home pay of $1,756.56.

7. **Tatiana Douyon** stated she is Janae Gregg's cousin. Ms. Douyon provided a driver's license with an address in Saint Albans, Queens. Ms. Douyon stated she owns a

property in Newark that is in foreclosure worth approximately $650,000. She further provided a January 2, 2026 paystub from Prestige Employee Administrators, LLC, which listed her address, and reflected a biweekly take home pay of $1,717.01.

8. **Jacqueline Gonzalez** stated she is Jordan's mother. Ms. Gonzalez advised that she resides in Saint Albans, Queens. Ms. Gonzalez provided a 2025 social security benefit statement that detailed she received $26,004 in benefits for the year. Ms. Gonzalez also provided a 2025 W-2 form that showed annual gross wages of $2,524.17 from Long Island Jewish Medical Center. In 1985, Ms. Gonzalez was convicted at trial in New York of assault with intent to cause serious injury with a weapon and criminal possession of a weapon in the fourth degree and sentenced to a determinate range of two to six years' imprisonment. She served two years in prison.

9. **Horace Gregg** stated he is the grandfather to two of Jordan's children. Mr. Gregg stated that he resides in Kingston, New York, and provided a New York driver's license that listed the address. Mr. Gregg supplied a screenshot of a December 2025 statement from his pension showing he receives a monthly payment of $3,157.52.

10. **Janae Gregg** stated she is the mother of two of Jordan's children. Ms. Gregg stated that she resides in Fresh Meadows, Queens and supplied a New York driver's license showing an address in Newburgh, New York. Ms. Gregg supplied a January 16, 2026 pay stub from the N.Y. Department of Corrections showing biweekly take home pay of $3,122.34. Ms. Gregg's paystub reflected two "TDA Saving Loan[s]" with balances due of $782.40 and $7,124.05, respectively. In addition, the pay stub reflected a "NYCERS Pension System-Loans" with 122 installments of $239.20 still outstanding.

11. **Kenneth Jordan** stated he is Jordan's cousin. Mr. Jordan supplied a Georgia driver's license showing a residence in Austell, Georgia. He further supplied a screenshot and 2026 annual registration receipt showing he is the registered agent of a moving company in Austell, Georgia. Mr. Jordan provided a transcript printout of his 2025 Form 1040 showing annual business income of $37,639 and adjusted gross income of $34,980.

12. **Cherise Martin** stated she is Jordan's cousin. Ms. Martin stated that she resides in Suwanee, Georgia and provided a Georgia driver's license with her address. Ms. Martin provided a 2025 W-2 Form that matched her address and showed employment with Bozzuto & Associates, Inc. based in Maryland with her gross annual wages listed as $49,536.85.

13. **Brian Matthews** stated he is a longtime friend of Jordan's mother. Mr. Matthews provided a January 13, 2026, paystub confirming an address in New York, New York and showing employment with Memorial Sloan Kettering Cancer Center and a biweekly take home pay of $1,445.09.

14. **Jonelle Melvin** stated Jordan is her child's uncle. Ms. Melvin provided a New Jersey driver's license with an address in Fort Lee, New Jersey. Ms. Melvin also provided a

March 13, 2026 paystub from Centene Management Company LLC confirming her address and that showed a biweekly take home pay of $1,504.41

15. **Cherrelle Ortiz** stated she is the mother of one of Jordan's children. Ms. Ortiz stated that she currently resides in Englewood, New Jersey. Ms. Ortiz supplied a copy of her U.S. passport. Ms. Ortiz provided a January 16, 2026 paystub which showed employment for a company called WDF Inc. based in Mount Vernon, New York, and reflected a biweekly take home pay of $1,158.17.

16. **Layisa Springer** stated she is Jordan's cousin. Ms. Springer provided a January 16, 2026 paystub showing a residential address in Lithonia, Georgia and employment with Northside Hospital in Atlanta, Georgia with a biweekly take home pay of $2,489.95. In addition, Ms. Springer provided a deed to a property in Lithonia, Georgia that she purchased on August 3, 2021 for $3,200. It is the government's understanding this property is not being offered to secure Mr. Jordan's proposed bond.

17. **Rashanda White** stated she is Jordan's family friend. Ms. White provided a driver's license showing an address in Medford, New York. A January 16, 2026 paystub reflected employment at Long Island Jewish Medical Center in New Hyde Park, New York confirming her address and showing a biweekly take home pay of $1,974.17.

II. <u>Conclusion and Modified Request for Stay of Release Order</u>

The government continues to maintain that there are no conditions or combination of conditions of release, including the proposed bail package, that will reasonably assure the appearance of Jordan or the safety of any other person and the community. <u>See</u> 18 U.S.C. § 3142.

Should the Court grant Jordan's bail application for release, the government respectfully requests that the Court stay its order for one week to give the government an opportunity to determine whether to file an appeal. In the event that the government appeals the release order, it respectfully requests that the Court stay its order until such appeal has been resolved by the Second Circuit.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
(631) 715-6000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 20-CR-305(LDH)

-against- : United States Courthouse
Brooklyn, New York

KARL JORDAN, JR., :
April 6, 2026
Defendant. : 2:00 o'clock p.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
United States Attorney
BY: MIRANDA GONZALEZ
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: JOHN A. DIAZ, ESQ.
MARK S. DeMARCO, ESQ.
MICHAEL O. HUESTON, ESQ.
EMILEE A. SAHLI, ESQ.

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: This is a criminal cause for a status conference in the matter of USA versus Karl Jordan, docket number 20-CR-305.

Counsel, please state your appearance for the record starting with the government.

MS. GONZALEZ: Good afternoon, Your Honor. For the United States, Miranda Gonzalez, and I'm joined by Special Agent Michael Zeller.

THE COURT: All right. Good afternoon to you.

MR. DIAZ: Good afternoon, Your Honor. For Mr. Jordan, John Diaz. Joining me is Emilee Sahli, Mark DeMarco and Michael Hueston.

THE COURT: All right. Good afternoon to you all as well.

Everyone may be seated.

All right, folks. So we are here as the court may continue the hearing concerning Mr. Jordan's renewed application for bond.

The court received from the government a letter dated April 2nd which bears its findings concerning the investigation of the bond package that was proposed by the defense.

I do have a question with respect to paragraph 1. It indicates that this particular individual is willing to post as collateral a property, however, at least as of the

date of the writing of the letter, there was a delinquency.

Has that been resolved, do we know?

MS. GONZALEZ: We don't know that, Your Honor.

THE COURT: Has that been resolved?

MR. DIAZ: One moment, Your Honor.

(Pause.)

MR. DIAZ: Yes, Your Honor.

So we've spoken to Ms. Gonzalez about this report and what she represented to us, she has one final payment left to make on her 35 year mortgage.

THE COURT: Well, God bless her, but I need her to make it though.

MR. DIAZ: And the payment is for $1,278. That's her last final payment and she is --

THE COURT: But when is it going to be made, is the question? Because as you can imagine, the court would be loathe to, even if it looks like it's the final amount, to base a surety package on a property that somehow ends up in foreclosure, even if it's for just a meager amount.

MR. DIAZ: Our understanding is that the payment has been made, Your Honor.

THE COURT: It has been made?

MR. DIAZ: It has been made.

THE COURT: That's what I want to hear.

MR. DIAZ: It has been made, Judge.

THE COURT: All right. Folks. Now, on March 13th of 2026, this court held a hearing with respect to this bond, renewed bond application, and I have considered the parties' papers in advance of this proceeding as well as those filed prior to the May 13th hearing, the arguments that were raised at the prior proceeding. I've now had the benefit of the government's findings from its investigative efforts related to the bail package and have reached a determination.

Now, by way of background, on September 19th of 2022, the court granted Mr. Jordan's motion to sever Counts One and Two from Counts Three through Eleven of the second superseding indictment for the purposes of trial.

Now, as the court explained in its memorandum and order granting the motion to sever, the court had felt that the government failed to demonstrate that the two conspiracies charged in the second superseding indictment constituted a series of acts or transactions constituting an offense or offenses.

So I considered them two separate conspiracies. Per the second superseding indictment, the first conspiracy offense for which Mr. Jordan was charged related to Counts One and Two and the second superseding indictment charged with respect to Counts Three through Eleven.

Now, on January, in January of 2024, a jury trial commenced in this case with respect to Counts One and Two as

the court, as I indicated, I granted the motion to sever, and Mr. Jordan was tried with his co-defendant Ronald Washington.

Now, on February 27th of 2024, the jury returned a verdict finding Mr. Jordan and Mr. Washington guilty of the offenses charged in Counts One and Two.

Now, following the guilty verdicts, Mr. Jordan moved for a judgment of acquittal and for a new trial. On December 19th of 2025, this court granted Mr. Jordan's motion for a new trial, but I denied -- excuse me. I have that backwards. I granted the motion for a judgment of acquittal but I denied the motion for a new trial.

Now, the government has since appealed the court's ruling with respect to the grant of the motion of acquittal and Mr. Jordan still awaits trial on the offenses charged in Counts Three through Eleven.

Now, pursuant to 18 U.S.C. Section 3142(e)(3), there is a rebuttable presumption that no condition or combinations of conditions will reasonably assure the appearance of the person as required and the safety of the community.

If the court finds there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment is ten years or more and consistent with the parties' arguments, the court agrees that the rebuttable presumption under 18 U.S.C. Section 3142(e)(3) is applicable in this case in light of the drug offenses

charged in Counts Three and Four and the government's appeal of the judgment of acquittal granted with respect to Counts One and Two. Nonetheless, the presumption is rebuttable.

Now, where, as here, the rebuttable presumption under 18 U.S.C. Section 3142(e)(3) is applicable, the defendant bears a limited burden of production. Now, it is not a burden of persuasion to rebut that presumption by coming forward with evidence that he does not pose a danger to the community and that he is not a flight risk.

I will tell you that I have concluded that Mr. Jordan has successfully rebutted the presumption under Section 3142(e)(3) and has met his limited burden of production.

That said, when a defendant meets his burden of production, the burden of presumption favoring detention does not disappear entirely but remains a factor to be considered among those weighted by the court. Specifically, the court must consider the following factors under Section 1342(g).

They are the nature and the circumstances of the crime charged; the weight of the evidence against the defendant; the history and characteristics of the defendant including family ties, employment, community ties, and past conduct; and the nature and the seriousness of the danger to the community or to an individual. And when considering these

factors, the court must determine whether the government has met its burden of persuasion by clear and convincing evidence that the defendant poses a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight.

Now, based on the parties' arguments related to each of these four factors to be considered under Section 1342(g), as well as the government's investigative findings related to the proposed bail package, I believe that, ultimately, the government has not sustained its burden of persuasion regarding whether Mr. Jordan is sufficiently a danger or poses a flight risk to warrant detention pending trial on the outstanding charged offenses against Mr. Jordan, specifically, Counts Three through Eleven of the superseding indictment.

Turning to the question of dangerousness, now, the majority of the conduct relied upon by the government in support of its argument that Mr. Jordan is a danger, the evidence of the conduct is particularly dated.

I think at the last hearing, I asked the government isn't it true that it's over some 20 years, and I think there was an agreement that it was. I think that indeed it's over 21 and approaching 22 years from the last instance of violence that the government referred to and I think that it occurred at the end of 2004. And the court notes that Mr. Jordan was first detained in connection with the offenses charged in the

second superseding indictment on August 17th of 2020. As such, there is more than a 15 year gap between Mr. Jordan's most recent alleged violent conduct when Mr. Jordan's present detainment commenced.

The court also notes that the government has not reported, and the court is a unaware of any instances involving Mr. Jordan engaging in violent conduct while in custody at the MDC over the last five and a half years notwithstanding the fact that Mr. Jordan himself was the victim of a violent attack.

Now, when the court denied Mr. Jordan's prior bail application at a hearing that took place on March 3rd of 2022, it unquestionably made its decision primarily because of the offenses charged in Counts One and Two, while not ignoring the offenses charged in Counts Three through Eleven of the superseding indictment.

Having since presided over Mr. Jordan's trials on Counts One and Two, the court believes that there is insufficient basis to support a finding of probable cause to believe that Mr. Jordan committed Counts One and Two. As explained in the court's memorandum and order granting Mr. Jordan's motion for a judgment of acquittal, the government failed to present evidence during the trial that would support any drug related motive to Mr. Jordan and also, the court believes that the government failed as well to

support Count Two.

Now, although the government is appealing these rulings, it does not change the court's view of the evidence which guided the court to find that a judgment of acquittal on each Counts One and Two was warranted.

Now, with respect to Counts Three and Four, the court believes Mr. Jordan's proposed bail package addresses questions attached to the drug offenses charged in Counts Three and Four.

Now, the Court is aware that a history of selling drugs has been found sufficient for the court to find dangerousness warranting detention. That said, such a history is not dispositive. Indeed, in light of the fact that Mr. Jordan has been in custody for the last five and a half years, the court can reasonably conclude that the danger associated with the then ongoing or alleged ongoing drug trafficking scheme or conspiracy has been blunted.

Furthermore, during Mr. Jordan's prior bond hearing, when the court determined that based on the surveillance footage of Mr. Jordan supported a finding of dangerousness, the court was not altogether clear then that the footage and what was captured on that footage would not be able to sustain an offense that might trigger a mandatory minimum in this case. That was highlighted for the court at the last bond hearing.

Give me a moment.

Certainly, the government has made clear that its evidence with respect to Counts Three through Eleven goes beyond what was captured on the footage and contrary to the assertions or representations made by the defense in its original application, the government contends that in addition to the surveillance footage, there also will be other witnesses that might provide testimony with regard to Mr. Jordan's conduct that the government believes supports the charges made out in Counts Three through Eleven.

Be that as it may, with respect to the dangerousness, I will note that the government has not, beyond the existence of the alleged drug trafficking conspiracy, has not come forward with evidence that suggests that while engaging in the second drug trafficking conspiracy alleged in Counts Three through Eleven, that Mr. Jordan engaged in conduct that the court would view as necessarily violent. Again, the conduct that the government alleges constitutes the violence ended in 2004.

With respect to flight risk, I will note that the government did not seem to challenge the question of flight risk strongly.

Now, I will note that I understand Mr. Jordan to be a lifelong New Yorker, that he has lived in New York City, specifically, I believe, in Queens all of his life.

Mr. Jordan has had a familial support that the court has observed, not just in the sense the court made its ruling on the motion for a new trial but, rather, I observed Mr. Jordan's family and larger community present since these proceedings began almost six years ago.

Now, I'm aware that a potential lengthy jail sentence can, by itself, be a basis to find that someone is a flight risk. The government has pointed out that Mr. Jordan is facing a combined total potentially of a mandatory minimum equating to 15 years, however, that number cannot be viewed in isolation and I think it has to be viewed in the context of the circumstances in which they are presented to the court.

In this case, Mr. Jordan has already been in custody for approximately five and a half years. Accordingly, even a conviction with respect to Counts Three and Eleven may not produce an additional custodial time that raises the inherent concerns that sentences of ten years or more raise. Lastly, I do believe that the bail package adequately addresses many of the concerns that this court might have with respect to a potential flee by Mr. Jordan.

Mr. Diaz, at the last hearing, I believe that the words that you used to the court in describing the collateral was that effectively, the family and community of Mr. Jordan are putting up all that they have. I think those were the words that you used.

MR. DIAZ: Correct, Your Honor.

THE COURT: So I've had an opportunity to look at that package with the benefit of the assistance from the government and the cooperation of the proposed suretors and I think that that characterization is a fair one.

The property that has been proposed at least for two individuals is, in fact, their homes. That's where they live.

I believe that the property -- I don't believe that that's the same for the property by Mr. Jordan, Sr., correct?

MR. DIAZ: Correct.

THE COURT: It's the other two properties, right?

MR. DIAZ: Yes, Judge.

THE COURT: But in any event, at least for two of the three suretors who are seeking to put up property, it is their homes and that is not lost on this court.

It is also not lost on this court that there is the value to Karl Jordan, Sr., of the home -- excuse me -- of the property that he owns, while not his home, is still important to him. And then there are, of course, additional suretors, all of whom, based on my review of the government's submission to me, appear to simply be hard working individuals that go to work on a regular basis and make modest incomes for whom being held responsible for the bond in this case would be a significant, significant burden.

Give me a second.

(Pause.)

THE COURT: Weighing all of this information that the court has before it, it does lead me to the conclusion that Mr. Jordan's renewed motion for bond should be granted, should be granted for the reasons that I set forth. They are the reasons that Mr. Jordan has successfully rebutted the presumption that was the court's starting point in this case and they are also the reasons why the court ultimately concluded that the government did not meet its burden of persuasion.

Now, before we proceed -- Mr. Diaz, can you back up? I need to talk to Mr. Jordan.

Mr. Jordan, there was a time where you appeared before me before your trial.

THE DEFENDANT: Yes.

THE COURT: And the government had said something that you didn't like too much and you said something aloud to them.

THE DEFENDANT: Yes.

THE COURT: And in response, I said to you two things. I said: "This is my house." I don't know if you remember that. I remember it.

THE DEFENDANT: Yes, I remember.

THE COURT: And what I said to you then was I am, I said if you would pay attention and quiet yourself, you would

see that I am trying my best to ensure that you receive a fair trial as is my job, as is the job of anyone who sits in this position. Right? That was my job. And I gave you my word, in effect, that day and that's what I would do.

Now, I've been talking about suretors here, I've talked about some burdens, but at the end of the day, sir, bond is about you giving me your word. That's really what this comes down to. Right?

THE DEFENDANT: Yes.

THE COURT: Say it again?

THE DEFENDANT: I said you have my word.

THE COURT: All right. Now, I need you to know because, you know, my word is my bond. I expect it is yours as well.

THE DEFENDANT: Likewise.

THE COURT: But I need everybody in this room to understand, right, because this is not now just about Mr. Jordan giving me his word. This is also about you understanding what my word means. Right? I have said on the record why it is that I believe that Mr. Jordan is not a danger and why it is that I believe that Mr. Jordan is not a flight risk, and I believe that I am right. Otherwise, I would not have granted the motion but judges have been wrong.

THE DEFENDANT: Yes.

THE COURT: So you all in the audience, particularly

those of you who represent the suretors on this list, I am giving you my word here today that if Mr. Jordan proves me wrong, I will not hesitate in the least to ensure that the government acts on the collateral in this bond package.

You all know I do not play. So I hope that you understand that Mr. Jordan is giving me his word today and I am giving mine. I don't suspect that we will have a problem but I needed to make sure that everybody was operating on the same sheet of music.

We all understood, folks?

ALL: Yes.

THE COURT: Okay. Now, what we're going to do at this point is I'm going to refer you to the Duty Magistrate because you all really do not want me to try and do the next part of this.

I'm going to direct that the Duty Magistrate grant the bail package consistent with the court's determinations. Now, I need to be clear that that would include the $1 million bond secured by the 17 financially responsible persons, an inspection of the proposed residence and approval of its suitability by Pretrial Services. It will include electronic location monitoring and will also include the direction that Mr. Jordan shall not have contact with his co-defendant, witnesses or any alleged victims.

It is also my understanding, Mr. Diaz, that -- and

you'll forgive me because her name escapes me, but the individual with whom Mr. Jordan would be residing is an officer with the Corrections Department and will be required to relinquish her weapon. Correct?

MR. DIAZ: That is correct, Your Honor.

THE COURT: All right. Am I leaving anything out? I'll hear from the government. I understand you object.

I will stay, by the way, at the government's request, the government did ask for a stay of this opinion for I believe it was one week, to allow the government to make a determination as to whether it will appeal my determination.

MS. GONZALEZ: Yes, Your Honor, that's correct. We made that request and we appreciate Your Honor granting that.

If the government decides to appeal, we can file a letter to the Court indicating that or how would you court like to proceed?

THE COURT: Yes. I would like a letter as soon as possible.

I'm going to give you a week. Today's Monday. You can make the filing -- I'm sorry. If you are going to appeal me, you've got to an appeal by Friday. I don't want it to go over into the weekend. So it must happen by Friday.

If you decide not to appeal, you are going to let me know as soon as possible.

MS. GONZALEZ: Yes, Your Honor.

THE COURT: But Friday, folks. The court will stay its ruling until Friday, April 10th.

All right. So I think that the way this has to work in light of the fact that I have granted the government's request is, let's assume for sake of argument that the government does not appeal the Court's instant determination. You would appear before the Magistrate on Friday. If the government does appeal, then, obviously, we have to await the determination by the Second Circuit.

MS. GONZALEZ: And the government will reach out to the Magistrate clerks to let them know about Friday just in case either way.

THE COURT: I'd appreciate that.

If the government is not intending to proceed, then my expectation is that the government will move quickly to ensure that Mr. Jordan does not remain in custody longer than this court's intentions would allow.

MS. GONZALEZ: Your Honor, just a question with respect to the properties.

I know sometimes there can be a delay in getting a lien on then them. I don't know if defense counsel has had time to think about how the properties would actually be secured in advance or by the time of the bond signing.

THE COURT: Have you all?

MR. DIAZ: Yes, Judge, and we'll be in contact with

the government regarding that.

THE COURT: All right. I assume that should there be any issues effectuating the collateral for the purposes of the bond, that you all will alert me as soon as possible. Fair enough?

MS. GONZALEZ: Yes, Your Honor.

MR. DIAZ: Yes, Your Honor.

THE COURT: All right. When did we exclude time until?

MS. GONZALEZ: Until the next status conference which I believe is May 12th.

THE COURT: May 12th? Okay. So I don't need to do anything for the exclusion of time.

Is there anything else from the government that I need to do?

MS. GONZALEZ: I don't believe so, Your Honor.

THE COURT: Mr. Diaz?

MR. DIAZ: No, Your Honor.

THE COURT: All right, folks. I have nothing else.

You all -- yes, Mr. Hueston?

MR. HUESTON: Your Honor, I'm going to say something to Mr. Diaz. I mean I can -- I'll just do it.

THE COURT: Go ahead. Okay.

MR. HUESTON: Your Honor, I'm just thinking about the mechanics of this.

So assuming there is no appeal, we're going to be working mightily to get the 17 folks sign onto the bond and get them prepared to do it and get the confession of judgments on the two different estates.

Some judges will say, for instance, scenario one: You can be released but then you have another week to make sure the rest of the conditions are done. Other judges say, no, you have to get all the conditions done before you're released.

THE COURT: I want the conditions met.

MR. HUESTON: Before? Understood. So we're going to work mightily to get them done by Friday.

THE COURT: As long as I'm not the holdup.

MR. HUESTON: Understood, Your Honor.

THE COURT: You see what I'm saying? You all know that for me, the conditions need to be met before he can be released.

If that means that you all don't get it done, the government doesn't appeal, you all don't get it done, then his release will happen when you all get it done.

MR. HUESTON: Understood, Your Honor. That's what I wanted to know.

THE COURT: Just so we're all on the same sheet of music. All right?

MR. HUESTON: Thank you.

THE COURT: So we'll await word from the government.

There's a very real chance, Mr. Jordan, that you may be released in the near term and I will not have an opportunity to have you before me before May 12th. I wish you luck.

THE DEFENDANT: Thank you.

THE COURT: You are welcome. And you will stay out of trouble.

THE DEFENDANT: Of course.

THE COURT: All right, folks. We're adjourned. Thank you.

MR. DIAZ: Thank you, Your Honor.

THE COURT: You're welcome.

(Matter concluded.)


*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
/s/ Charleane M. Heading April 7, 2026

# NOTICE OF APPEAL
## UNITED STATES DISTRICT COURT
**Eastern District of New York**

UNITED STATES OF AMERICA

- against -

KARL JORDAN, JR.,

Defendant.

Docket Number 20-CR-305 (S-2) (LDH)

The Honorable LaShann DeArcy Hall
(District Court Judge)

Notice is hereby given that the United States of America appeals to the United States Court of Appeals for the Second Circuit from the:

Judgment ____ ; Order X ; Other ____ ; granting the bail application by defendant Jordan.
(specify)

entered in this action on April 6, 2026.
(specify)

Offense occurred after November 1, 1987 Yes X No ____.

The appeal concerns: the release of defendant Karl Jordan, Jr. on bond. This appeal is related to United States v. Jordan, 26-16, 26-41 (2d Cir.).

Date April 9, 2026

Miranda Gonzalez, AUSA
(Counsel for Appellant)

TO: Michael O. Hueston, Esq.
Attorney At Law
26 Court Street, Suite 1504
Brooklyn, NY 11242
718-246-2900
mh@michaelhueston.com

Address: U.S. Attorney's Office - E.D.N.Y.
271 Cadman Plaza East
Brooklyn, New York, 11201

Telephone Number: 718-254-6183
E-Mail: Miranda.Gonzalez@usdoj.gov

ADD ADDITIONAL PAGE IF NECESSARY

(TO BE COMPLETED BY ATTORNEY)

| ▶ QUESTIONNAIRE | ▶ TRANSCRIPT ORDER ▶ DESCRIPTION OF PROCEEDINGS FOR WHICH TRANSCRIPT IS REQUIRED (INCLUDE DATE) |
|---|---|
| ___ I am ordering a transcript.<br>X I am not ordering a transcript.<br><br>Reason:<br>____ Daily copy is available<br>X U.S. Attorney has placed order<br>____ Other. Attach explanation | Prepare transcript of — Dates<br>____ Pre-trial proceedings ________<br>____ Trial ________<br>____ Sentence ________<br>____ Post-trial proceedings ________ |

The ATTORNEY certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript. (FRAP 10(b)) ▶ Method of payment ___ Funds ___ CJA Form 24

ATTORNEY'S signature /s/ Miranda Gonzalez — Date April 9, 2026

▶ COURT REPORTER ACKNOWLEDGMENT To be completed by Court Reporter and forwarded to Court of Appeals.

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
| | | |

Date ____________ Signature ____________
(Court Reporter)

COPY1 - ORIGINAL

*U.S. GPO: 2001-611-552/60002

**ADDITIONAL PAGE FOR DEFENSE COUNSEL**


- John A. Diaz, Esq.
  Diaz & Moskowitz, PLLC
  225 Broadway, Suite 715
  New York, NY 10007
  212-227-8208
  Fax: 212-566-8165
  Email: johnadiazlaw@gmail.com

- Mark Steven DeMarco, Esq.
  Law Office of Mark S. DeMarco
  100 Lafayette Street
  Suite 501
  New York, NY 10013
  718-239-7070
  Fax: 718-239-2141
  Email: MSDLaw@aol.com

- Emilee Ann Sahli, Esq.
  Sahli Law, PLLC
  195 Broadway, 4th Floor
  Brooklyn, NY 11211
  347-378-8132
  Email: emilee@sahlilaw.com

# 26-16(L)

**26-41(CON)**

*To Be Argued By*:
MIRANDA GONZALEZ

# United States Court of Appeals

**For the Second Circuit**

UNITED STATES OF AMERICA,

*Appellant,*

—against—

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee,*

RONALD WASHINGTON, also known as TINARD, JAY BRYANT, also known as BRADSHAW DEWITT, also known as JASON ROBINSON, also known as MORGAN BRYANT, also known as DESHAWN SADLER, also known as JAY SADLER, also known as BIG JAY,

*Defendants.*

**On Appeal From The United States District Court**
**For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
MIRANDA GONZALEZ,
MARK E. MISOREK,
*Assistant United States Attorneys*,
*Of Counsel*.

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iv

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

I. Jordan's Criminal Charges ..... 4

II. The Trial Evidence ..... 5

A. The Relationship Between Mizell, Jordan, and Washington ..... 7

B. The Narcotics Conspiracy ..... 8

C. The Failed August 2002 Baltimore Deal With Yakim ..... 10

D. The Continuing Narcotics Conspiracy Through Mizell's Murder ..... 13

E. The October 30, 2002 Murder of Mizell ..... 17

F. Jordan and Washington's Actions After the Murder ..... 28

III. Jordan's Post-Trial Motions ..... 31

IV. The District Court's Decision ..... 32

A. The District Court Held Jordan Was a Member of the Ongoing Narcotics Conspiracy at the Time of Mizell's Murder ..... 33

B. The District Court Vacated the Jury Verdict as to Jordan, Holding that Jordan Did Not

Have a Narcotics-Related Motive to Kill Mizell, But His Co-Conspirator Did ............ 34

C. The District Court Improperly Undercut the Jury's Factfinding Role in Rejecting the Identification of Jordan as Mizell's Shooter ............ 37

SUMMARY OF ARGUMENT ............ 41

ARGUMENT ............ 43

I. Applicable Law ............ 43

A. Standard of Review ............ 43

B. Rule 29 ............ 43

C. Section 848(e)(1)(A) ............ 46

D. Section 924(j)(1) ............ 47

II. The Jury's Verdict Is Supported By The Evidence And The District Court Erred By Not Considering or Crediting Certain Evidence That Supported the Jury's Verdict ............ 48

A. The District Court Refused to Consider Trial Evidence for Jordan That It Considered For Washington ............ 49

B. The District Court Ignored the Timing and Circumstances of the Murder, Including Jordan's Role as the Shooter, in Connection with Jordan's Knowledge and Motive ............ 53

C. The District Court Gave Little Weight to the Conspiratorial Relationship and Favored Direct Evidence Over Circumstantial Evidence to Prove Jordan's Knowledge ............ 62

D. The Jury Was Not Required to Be Unanimous on Which Narcotics-Related Motive Applied or How Jordan Believed the Firearm Would Further the Conspiracy ...................... 77

E. The Trial Evidence Permitted Several Possible Narcotics-Related Motives for Jordan's Murder of Mizell, All of Which Had the Potential to Further the Narcotics Conspiracy ................................................................... 82

III. The District Court Erred When It Failed to Consider Aiding and Abetting Liability ................................ 90

CONCLUSION ........................................................................... 97

# TABLE OF AUTHORITIES

Page

## CASES

*Aller v. United States*,
646 F. App'x 21 (2d Cir. 2016) ........ 81

*Jackson v. Virginia*,
443 U.S. 307 (1979) ........ 44

*Ratzlaf v. United States*,
510 U.S. 135 (1994) ........ 65

*Richardson v. United States*,
526 U.S. 813 (1999) ........ 77, 81

*Rosemond v. United States*,
572 U.S. 65 (2014) ........ 91, 92

*Smith v. United States*,
508 U.S. 223 (1993) ........ 47, 87

*United States v. Abozid*,
257 F.3d 191 (2d Cir. 2001) ........ 94

*United States v. Aguilar*,
585 F.3d 652 (2d Cir. 2009) ........ 46, 47, 78, 79

*United States v. Anderson*,
747 F.3d 51 (2d Cir. 2014) ........ 60

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) ........ 90 n.16

*United States v. Archer*,
977 F.3d 181 (2d Cir. 2020) ........ 91

*United States v. Arrington*,
941 F.3d 24 (2d Cir. 2019) ........ 83

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ........................................ 44

*United States v. Campbell*,
850 F. App'x 102 (2d Cir. 2021) ........................................ passim

*United States v. Caraballo*,
658 F. App'x 595 (2d Cir. 2016) ........................................ 95

*United States v. Caraballo*,
No. 12-CR-105,
2014 WL 3535348 (D. Vt. July 16, 2014) ........................................ 95

*United States v. Carson*,
702 F.2d 351 (2d Cir. 1983) ........................................ 45

*United States v. Coppola*,
671 F.3d 220 (2d Cir. 2012) ........................................ 89, 90

*United States v. Desinor*,
525 F.3d 193 (2d Cir. 2008) ........................................ 47, 78, 79

*United States v. Djibo*,
850 F. App'x 52 (2d Cir. 2021) ........................................ 67

*United States v. Finley*,
245 F.3d 199 (2d Cir. 2001) ........................................ 47, 80

*United States v. Frampton*,
382 F.3d 213 (2d Cir. 2004) ........................................ 93

*United States v. Gadsden*,
300 F. App'x 108 (2d Cir. 2008) ........................................ 83

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ........................................ passim

*United States v. Guadagna*,
183 F.3d 122 (2d Cir. 1999) ........................................ 43, 44

*United States v. Heinemann*,
801 F.2d 86 (2d Cir. 1986) .................................................... 86

*United States v. Heras*,
609 F.3d 101 (2d Cir. 2010) .................................................... 94

*United States v. Huezo*,
546 F.3d 174 (2d Cir. 2008) .................................................... 68

*United States v. Kemp*,
No. 21-1684-CR,
2023 WL 405763 (2d Cir. Jan. 26, 2023) .................................... 83

*United States v. Klein*,
913 F.3d 73 (2d Cir. 2019) .......................................... 44, 64-65

*United States v. Lewis*,
62 F.4th 733 (2d Cir. 2023) .................................................... 89

*United States v. MacPherson*,
424 F.3d 183 (2d Cir. 2005) ...................................... 45, 90 n.16

*United States v. Mariani*,
725 F.2d 862 (2d Cir. 1984) .................................................... 45

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) .................................................... 43

*United States v. Nina*,
734 F. App'x 27 (2d Cir. 2018) ................................................ 47

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011) .................................................... 61

*United States v. Panebianco*,
543 F.2d 447 (2d Cir. 1979) ................................................ 65-66

*United States v. Pauling*,
924 F.3d 649 (2d Cir. 2019) .................................................... 43

*United States v. Peterson*,
768 F.2d 64 (2d Cir. 1985) .......................................................... 95

*United States v. Pierce*,
785 F.3d 832 (2d Cir. 2015) .......................................................... 71, 83

*United States v. Plitman*,
194 F.3d 59 (2d Cir. 1999) .......................................................... 62

*United States v. Prado*,
815 F.3d 93 (2d Cir. 2016) .......................................................... 91, 93

*United States v. Rea*,
958 F.2d 1206 (2d Cir. 1992) .......................................................... 44

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) .......................................................... 68

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008) .......................................................... passim

*United States v. Snow*,
462 F.3d 55 (2d Cir. 2006) .......................................................... 48, 60, 89

*United States v. Stanley*,
928 F.2d 575 (2d Cir.1991) .......................................................... 58 n.10

*United States v. Sureff*,
15 F.3d 225 (2d Cir. 1994) .......................................................... 68

*United States v. Truman*,
688 F.3d 129 (2d Cir. 2012) .......................................................... 43

*United States v. Vernace*,
811 F.3d 609 (2d Cir. 2016) .......................................................... passim

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998) .......................................................... passim

*United States v. Wallace*,
447 F.3d 184 (2d Cir. 2006) .......................................................... 80

*United States v. White*,
7 F.4th 90 (2d Cir. 2021) .......... 90 n.16

STATUTES

18 U.S.C. § 924(c) .......... passim

18 U.S.C. § 924(j) .......... passim

21 U.S.C. § 841(b)(1)(C) .......... passim

21 U.S.C. § 848(e)(1)(A) .......... passim

RULES

Fed. R. Crim. P. 29 .......... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 26-16(L), 26-41(CON)

UNITED STATES OF AMERICA,

*Appellant*,

-against-

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee*,

RONALD WASHINGTON, also known as TINARD, JAY BRYANT, also known as BRADSHAW DEWITT, also known as JASON ROBINSON, also known as MORGAN BRYANT, also known as DESHAWN SADLER, also known as JAY SADLER, also known as BIG JAY,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## JURISDICTIONAL STATEMENT

The United States of America appeals from an order entered on December 19, 2025 and a corrected order entered on January 7, 2026,

in the United States District Court for the Eastern District of New York (DeArcy Hall, J.), granting the motion of Defendant-Appellee Karl Jordan, Jr. ("Jordan") for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 related to his murder of Jason Mizell on October 30, 2002. (SPA:1-29, 53-81).[1]

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The government filed timely notices of appeal on January 5, 2026 and January 7, 2026, respectively. (DE:326, 329). This Court has jurisdiction pursuant to 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUES

Whether the district court erred in entering a judgment of acquittal vacating the jury's verdict convicting Jordan of Count One (murder while engaged in a narcotics conspiracy) on the ground that the jury could not have found that at least one of Jordan's motives for murder was narcotics-related.

---

[1] "SPA," "A," "SA," "DE," and "GX" refer to the government's special appendix, the government's appendix, the government's sealed appendix, entries on the district court's docket, and the government's trial exhibits, respectively.

Whether the district court erred in entering a judgment of acquittal vacating the jury's verdict convicting Jordan of Count Two (firearm-related murder) on the ground that the jury could not have found that Jordan's use of a firearm to murder the victim was intended to further the narcotics conspiracy.

## STATEMENT OF THE CASE

After a five-week trial, on February 27, 2024, a jury convicted Jordan, also known as "Little D" and "Noid," and Ronald Washington, also known as "Tinard," of committing the October 30, 2002 murder of Mizell. The jury found that they murdered Mizell while engaged in a narcotics conspiracy and while using a firearm, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One) and 18 U.S.C. § 924(j)(1) (Count Two). These convictions were supported by the testimony of 38 witnesses, including witnesses who saw Jordan shoot Mizell, witnesses who knew of Jordan's involvement in the narcotics conspiracy, and witnesses who heard Jordan admitting to the murder.

After the verdicts, Jordan and Washington moved, under Rule 29, for judgments of acquittal. On December 19, 2025, the district court addressed both defendants' motions. The court denied Washington's

motion. Despite its holding that Jordan and Washington were co-conspirators in the same underlying narcotics conspiracy and despite their also being charged with aiding and abetting liability, the court granted Jordan's motion, holding that the jury could not have found Jordan's motive for murder was related to the narcotics conspiracy.[2]

## I. Jordan's Criminal Charges

On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One), one count of firearms-related murder, in violation of 18 U.S.C. § 924(j)(1) (Count Two), one count of conspiracy to distribute and possess with intent to distribute cocaine and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) (Count Three), one count for using firearms in connection with Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Four), and seven counts of cocaine

[2] The court filed a corrected order on January 7, 2026.

distribution, in violation of 21 U.S.C. § 841(b)(1)(C) (Counts Five through Eleven). Washington was charged in Counts One and Two.[3] (DE:45).

On September 19, 2022, the district court granted Jordan's motion to sever Counts One and Two, related to Mizell's murder in 2002, from Counts Three through Eleven, which pertain to Jordan's drug trafficking with a firearm between 2016 and 2020. (DE:107). Counts Three through Eleven against Jordan are still pending.

On May 30, 2023, a grand jury returned a second superseding indictment ("the Indictment") to add Jay Bryant as a defendant to Counts One and Two. (DE:151). The district court granted Bryant's motion to sever his trial from Jordan and Washington's trial. (DE:184).

Trial began against Jordan and Washington on Counts One and Two on January 22, 2024, and concluded on February 27, 2024.

## II. The Trial Evidence

On October 30, 2002, Jordan, Washington, and Bryant murdered Mizell in his recording studio (the "Studio"), which was located inside 90-10 Merrick Boulevard in Jamaica, Queens, New York ("90-10

---

[3] Jordan and Washington were also charged with aiding and abetting liability in Counts One and Two. (DE:45 at 1-2).

Merrick Boulevard"). Mizell was a member of the influential hip hop group Run-D.M.C.

On the night of the murder, Bryant entered the front door of 90-10 Merrick Boulevard and let Jordan and Washington into the building through a back door. Inside the Studio, Washington pointed a firearm at a witness and demanded she lay on the floor, and Jordan approached Mizell and fired two shots at close range. One shot hit Mizell in the head, killing him. The second shot struck another witness in the leg.

The trial evidence revealed that Jordan, Washington, and Mizell had been in a narcotics conspiracy together at the time of Mizell's murder, that Mizell had received 10 kilograms of cocaine and was expecting 90 additional kilograms on consignment, that a lucrative cocaine deal in Baltimore the defendants anticipated fell through two months before Mizell's murder, and that Mizell had plans to meet with the conspiracy's cocaine supplier the day before, or day of, his murder. Only a few hours before Mizell's murder, Washington, armed with a firearm, arrived at the Studio to ask Mizell about their plans for the narcotics conspiracy, and Mizell sent him away. Washington then made

a phone call from a payphone, after which, he, Jordan, and Bryant arrived at the Studio to murder Mizell.

A. The Relationship Between Mizell, Jordan, and Washington

Mizell, who was 37 years old when he was murdered, grew up and was lifelong friends with Washington in Hollis, Queens. (SPA:54; GX:201; A:280-81, 285, 289-90). At the time of Mizell's murder, Washington lived on the couch at Mizell's family home. (A:199, 201, 206). Mizell was Jordan's godfather, and Mizell's family home was across the street from the home shared by Jordan and Jordan's father, Darren Jordan, who had worked with Mizell at times. (A:106, 190-91, 254, 524-25, 566). Jordan was 18 years old when he murdered Mizell. (A:414-15, 571).

Despite their substantial age difference, Jordan and Washington became close. (A:689-91 (Washington referring to Jordan as his "little man" and Jordan telling Washington he "got love for [him]"), GX:917). One of Mizell's best friends, Eric James, who lived in Wisconsin but visited Mizell in New York, had also seen Jordan and Washington together both inside and outside of the Studio. (A:521-22, 535, 561-64).

Though Jordan and Washington visited the Studio occasionally, neither was involved in Mizell's music business. (A:111-13, 256, 349-50, 352).

B. <u>The Narcotics Conspiracy</u>

Trial testimony revealed that Mizell became involved in the cocaine business in the early 1990s. (A:527-29). Mizell acted as a middle-man between his supplier and distributors. (A:264, 267, 528-29). But Mizell kept his role in the drug business a secret from the public and even close friends who were uninvolved; Mizell's friends testified that they never knew him to sell drugs. (A:95, 206, 245, 355).

James, who sold cocaine himself, explained the concept of selling drugs "on consignment," where a supplier provides drugs on credit and the purchaser pays the supplier after selling the drugs. (A:556-57, 561). In 2002, Mizell connected James to "Unc," Mizell's cocaine supplier. (A:529-30). Unc's real name was Terry Flenory. Unc ran the Black Mafia Family ("BMF"), which was a drug empire, and regularly sold kilograms of cocaine on consignment to dealers. (A:588-95). BMF operated in 40 to 50 states. (A:594).

Ralph Mullgrav, who went by "Yakim," grew up with Mizell and Washington but moved to Baltimore, Maryland; he sold cocaine in

Baltimore and later served 12 years in federal prison for doing so. (A:264-65, 268-70, 272, 345-46). Yakim testified that in 2002, his cocaine operation sold about 30 to 40 kilograms per month, using about 25 distributors in Baltimore. (A:272). Mizell had previously asked Yakim to sell one or two kilograms of cocaine at a time in Baltimore, and prior to August 2002, Yakim had sold a "little less" than 10 to 20 kilograms of cocaine for Mizell. (A:264, 267).

On a visit to New York in 2001 or 2002, James was near the Studio with Jordan and Mizell. (A:531-33). Jordan began asking James—who lived in Wisconsin—about the price of cocaine; Jordan then nudged James and asked him to tell Mizell to "put [him] on," which James understood to mean to give him cocaine to sell. (*Id.*). Mizell later confided in James that he had agreed to have Jordan distribute cocaine, and Mizell gave Jordan an ounce to sell "to try him out"; Jordan successfully sold it. (A:537-39).

Washington was less successful than Jordan in the narcotics conspiracy. Although Mizell had given Washington drugs to sell in early 2002, Washington had "messed it up." (A:536-37, 573-74). Still, Mizell kept Washington in the narcotics conspiracy. Christopher Burell,

Mizell's friend and longtime driver, testified that in the summer of 2002, Washington accompanied Mizell and Burrell to a deejaying job in Manhattan. (A:383-84, 394-95). During the ride, Mizell agreed with Washington that when Mizell obtained more drugs, Washington would sell them. (A:397-98).

In 2002, Mizell "had a line" on 100 kilograms of cocaine, but Mizell could only get 10 kilograms at that moment because there "was a drought" in the supply. (A:539). James testified that Mizell told him that Mizell, Jordan, and Washington agreed they would distribute those 10 kilograms in Baltimore because Yakim had connections there and, therefore, they could "make more money" in Baltimore, than in other places. (A:534, 539-43). Mizell discussed with James this Baltimore deal involving Jordan, Washington, and Yakim on six or seven occasions, and he told James that the cocaine distribution was supposed to be ongoing (A:543), thus confirming Mizell would receive the remaining 90 kilograms of cocaine once they were available.

### C. The Failed August 2002 Baltimore Deal With Yakim

In August 2002, Burrell drove Mizell and Washington to Washington, D.C. (A:401-02). Jordan was not present. (A:263-73, 405-

06). Mizell met with Unc in a hotel, while Burrell and Washington stayed in the car. (A:402-04; GX:606). Washington admitted to law enforcement officers in 2019 that the purpose of this trip was to discuss the terms of obtaining 10 kilograms of cocaine from Unc at a hotel, and have Washington stay in Baltimore to sell the cocaine through Yakim. (A:602-04, 609). Washington was skeptical of partnering with Yakim because they "did not get along" but nonetheless continued with the plan. (A:604). Before meeting Unc, Washington and Mizell had discussed differences in the kilogram prices of cocaine if they decided to take possession of the cocaine now in Washington D.C., or later elsewhere where they could pay less for it. Washington advised Mizell "not to be greedy" and to accept the cocaine now, which they did. (A:603-04). Washington admitted that he had met Unc prior to this meeting. (A:603).

The day after meeting with Unc, Burrell, Mizell, and Washington drove to Baltimore. (A:406). During the car ride, Mizell and Washington discussed Washington staying behind in Baltimore to sell the cocaine. (*Id.*).

When they arrived in Baltimore, Yakim called Mizell. (A:407). Burrell overheard Yakim state that if he saw Washington, he

would kill him. (A:407-09). At that point, Burrell and Washington left Mizell in Baltimore and began to drive back to New York in Mizell's car. (A:410). As they were driving, Washington told Burrell to drive around a corner; as they pulled up to Yakim, Washington rolled down the window. (A:268, 410-11). When Yakim saw Washington, Yakim went to get his gun to shoot him, but Washington and Burrell drove away. (A:269, 411).

Mizell stayed in Baltimore and met with Yakim. (A:264, 268). Mizell asked Yakim to sell cocaine for him and to allow Washington to deal drugs in Baltimore, but Yakim declined to work with Washington. (A:264-66, 273). Yakim testified that in 2002, each kilogram of cocaine would have sold for between $15,000 and $20,000 in Baltimore. (A:269). He confirmed the deal would have made a lot of money but that ultimately there was "no deal." (A:266, 273).

After a couple of days, Mizell flew back to New York. (A:411-12). There is no evidence of what ultimately happened to the 10 kilograms of cocaine, worth approximately $120,000. (A:506).

One year after Mizell's death, Washington told *Newsday* reporter Sean Gardiner that in the summer of 2002, he and Mizell had

traveled to Washington D.C. where they met a drug dealer named Unc at a hotel. (A:505-06). Unc forwarded Mizell $120,000 worth of cocaine, which Mizell brought to Baltimore; according to Washington, drug dealers ripped Mizell off and never paid him for the cocaine. (A:506).

### D. The Continuing Narcotics Conspiracy Through Mizell's Murder

Witnesses testified that between August and October 2002, Mizell was often traveling in other states or on the road with Run-D.M.C.. (A:89, 353-55, 545-46).

Jordan and Washington used this time to plan the murder. In the days approaching Mizell's murder, Washington visited the Studio approximately every other day, even though he was not involved in the music business, and did not otherwise frequent the Studio. (A:111, 257). Stephen Watford, Mizell's cousin who resided at Mizell's family residence at the same time as Washington, testified that, a couple of days before Mizell's murder, Washington asked him for .40 caliber ammunition (the same caliber ammunition Jordan would later use to shoot Mizell). (A:200, 207-08).

On October 28 or 29, 2002, Mizell was in Wisconsin with James when he received a phone call from an unidentified individual who was "yelling into the phone," with Mizell yelling back. Mizell mentioned "Tinard" (Washington) during this call. (A:545-48). Yakim had testified that Mizell was to be supplied with the cocaine in the "Midwest." (A:266).

Mizell returned to New York on October 29, 2002. (A:180, 208, 549; GX:201 at 4). He planned to leave for South Carolina on October 31, 2002, to deejay as part of a promotional tour for "Rusty Waters," a local music group comprised of Mizell, his friend Randy Allen, and Mizell's nephew, Rodney Jones, and then travel to Georgia the next day. (A:239, 345, 354; GX:608, 904).

At the same time, however, Mizell had plans for the narcotics conspiracy. Gardiner testified that, according to Washington, Mizell was supposed to meet on October 29 or 30 with an associate of Unc, the conspiracy's cocaine supplier. (A:507). On October 29, Mizell told Watford, who previously had trouble getting paid for his work with Mizell's record label, to see Mizell's accountant to straighten out Watford's finances, suggesting Mizell had or would be coming into money. (A:209-10). Also on October 29, Washington told Watford not to go to the

Studio because "[s]omething bad is gonna happen." (A:208). On October 30, Washington and Mizell discussed the plans for the narcotics conspiracy hours before Jordan and Washington murdered Mizell.

On the afternoon of October 30—the day of Mizell's murder—Washington and his girlfriend, Daynia McDonald, visited Jordan's brother, Tashawn Burns, from whom Washington obtained what appeared to be a firearm. (A:387-89, 483-87; GX:523). That early evening, as it was getting dark outside, Washington and McDonald went to the Studio where they saw Mizell, who was armed with a .380 caliber firearm. (A:80, 115, 353, 363-364, 487-89, 518).

McDonald testified that Mizell appeared surprised to see Washington there, with an "oh crap" and "oh-shit kind of look" on his face. (A:488, 500-01). Washington saw Mizell's firearm and asked Mizell, "What do you have the gun for? Why do you need a gun? You could have always called me if you need anything." (A:488-89). Washington reminded Mizell, "If you have a problem, I have a problem too." (A:502). Mizell then removed his firearm from his hip and placed it next to him on the couch. (A:488-89).

Washington then asked Mizell, "aren't we supposed to be going to Connecticut…[for] a show?" (A:489). Washington also inquired about Baltimore. (*Id.*). This conversation contained coded language about their plans for the narcotics conspiracy. As corroboration, Mizell's calendar had entries for planned trips to "D.C." (where Mizell and Washington had obtained cocaine from Unc) on October 31, 2002, and "CT" on November 1, 2002. (GX:607, 904). Yet Washington had never previously discussed going on tour with Mizell, nor did any witness involved in Mizell's music businesses testify that Washington had a role in Mizell's music. (A:111, 256, 349-50, 489). And the only time Washington accompanied Mizell on a trip to a performance, he discussed narcotics with Mizell. (*Supra* at 9-10). Moreover, Mizell was supposed to be with Rusty Waters in South Carolina and Georgia on those days. (GX:608, 904). McDonald could not hear what else Washington and Mizell discussed. (A:502-03).

Mizell sent Washington and McDonald away from the Studio, specifically tasking Washington with getting food. (A:490). On the way back to the Studio, Washington made a phone call from a payphone during which he gestured "expressive[ly] with his hands," and,

thereafter, he told McDonald that she had to leave. (A:491-93). McDonald testified that they collected her belongings from the Studio, and both left. (A:492-93).

E. The October 30, 2002 Murder of Mizell

A few hours later, a little before 7:30 p.m., Jay Bryant entered 90-10 Merrick Boulevard, which contained the Studio. (A:220, 286, 356, 424-26).

Witnesses described 90-10 Merrick Boulevard as a two-story building with one entry/exit and one exit: the main door on the first floor, which was opened by buzzer or key, and a back door on the second floor, which was locked from the outside and opened onto a fire escape, with a staircase down to the street. (A:96-98, 201-05, 242-44, 258-61, 310, 352-53, 358, 416-20). According to witnesses, almost "[n]obody used" the back door, which could not be opened by buzzer, and even witnesses who worked at 90-10 Merrick Boulevard did not know the back door existed. (A:96, 98, 205, 244, 260, 358, 432, 439).

To enter the building, one would need to be buzzed in through the front door by either the Studio or Primerica, which was a financial services firm at 90-10 Merrick Boulevard. (A:96-98, 201-05, 242-44, 258-

61, 310, 352-53, 358, 416-20). After entering the front door, there was a staircase that led to a second-floor landing, which after a right turn, continued down a hallway. The hallway had a door to Primerica on the right and then, farther down, a door to the Studio on the left. The hallway continued past the Studio, made a left angle, and led to the back door that exited onto the fire escape. (*Id.*). The fire escape was a staircase from the street to the back door of 90-10 Merrick Boulevard, which, when opened, led directly down the hallway to the Studio without the need to walk past Primerica. (*Id.*; A:71, 96, 686).

Televisions inside the Studio and Primerica displayed video surveillance inside 90-10 Merrick Boulevard. Cameras captured views of the front door, the hallway leading from Primerica to the Studio, the back door from the outside of the building, and the street. (GX:101F; A:69-71, 204-05). The cameras did not show the hallway from the back door to the Studio, or the outdoor staircase to the back door. The jury observed the camera views, the layout of the second floor, a crime scene diagram of the Studio, and photographs from both 2002 and 2022 showing the inside and outside of the building, including inside the Studio. (GX:102A-Q, 102X-Z, 103A-Q, 103S, 104B-F, 105, 702; A:57-60, 684-86, 692-93; SA:1-3).

Primera employee Tanya Davis testified that on that evening of October 30, 2002, she sat at the front desk of Primerica to buzz clients into the front door of 90-10 Merrick Boulevard, where she could see the Primerica television and down the hallway facing the stairs (away from the Studio). (A:417-22). After providing direction to the Studio to one woman, Davis later observed, on the television, a second young woman entering the front door of 90-10 Merrick Boulevard, and a man entering behind her. (A:424-27). The young woman and man walked up the stairs, with the man behind the woman who "didn't hold the door open for him," which indicated to Davis that they were not together. (A:427-28, 433-35). Davis described the man as a "very tall…young guy" who was "lanky" and "black" with "braids," "light skin," and a "shadow beard." (A:427-28). She had never seen him before. (A:428-29). "Shortly after that," Davis heard gunshots and a woman screaming. (A:431).

The jury heard testimony from Randy Allen, Lydia High, Michael Rapley, Tony Rincon, and Yarrah Concepcion, who were in the Studio with Mizell when he was murdered. Allen, who grew up with Mizell and Washington, was Mizell's best friend and a member of Rusty Waters. He lived one block from Jordan and knew him from the

neighborhood and from when Jordan occasionally visited the Studio. (A:338-40, 345, 349-50, 352). High, who was Allen's sister, also grew up with Mizell and Washington and worked for Mizell. (A:280-81, 290, 344-45). Rapley (known as "Mike B") was a rapper from Hollis who met Mizell as an adult and knew Jordan and Washington from the neighborhood. (A:89-91, 235-38, 253-56). Rincon was a college student who worked with Mizell's record label (A:83, 348-49). Rincon knew Jordan as Mizell's godson, and had previously spoken to Jordan and seen Washington. (A:106, 112-14). Concepcion was a young singer visiting the Studio for the first time that night. (A:219-20).

They all testified consistently with each other and with Davis. Notably, none of these witnesses testified that they buzzed in the man Davis saw or any other men, and Davis testified that she did not buzz anyone nor see anyone enter the building other than the two women (Concepcion and High) and the man.

The Studio had a small central room with three couches. (SA:1-2, A:685, 687-88). On the right side of the Studio's entrance were two rooms: the control room, where "the preproduction, music, [and] vocals occurred," and the recording studio. (GX:102I-K; A:99-100, 687-

88). On the left of the Studio was a storage room. (GX:102L; A:99-100, 687-88).

Concepcion had an appointment at the Studio that evening to showcase her music. (A:219-21). Concepcion testified that she saw Mizell sitting on the farthest couch with a man sitting to the right of him (Rincon), and they were both playing a video game. (A:222, 245-47). After a few minutes, Concepcion saw a young woman (High) enter the Studio and sit down. (A:223). Concepcion saw that Mizell had a firearm next to him. (A:224). High and Rincon testified similarly, including that Mizell had a firearm next to him on the couch. (A:100-03, 286-87). Rapley, Allen, and Concepcion entered the control room to listen to music, and they were still there when Mizell was shot. (A:223-27, 245-47, 361-63).

High testified that she arrived at 90-10 Merrick Boulevard by herself and did not remember if anyone followed her through the front door. (A:286). When she got to the Studio, High saw Mizell and Rincon on the couch. (*Id.*). Rincon was seated to the right of Mizell (*i.e.*, farthest from the Studio entrance). (A:100-03, 286). High sat across from Mizell to discuss logistics and present paperwork for Mizell to sign. (A:104-05,

286-88, 687-88). Mizell had a firearm on the armrest of the couch next to him. (A:103). High did not like this, so she asked Mizell why it was there; he told her not to worry about it. (A:287).

Rincon testified that as they were all talking, Jordan entered the Studio with Washington, raised the hood on his sweatshirt, and "walked directly" to Mizell to greet him with "a potential handshake, almost like a half a handshake with the arm," at which point Rincon heard "a couple of shots" and felt pain in his leg. (A:105-08, 115). Rincon saw Mizell (who had stood for the embrace) fall on Jordan, Jordan "shrug" and "shake" Mizell's body off, and Mizell fall to the floor. (A:105, 107-08). Rincon saw Washington at the Studio's entrance and heard him tell High to stay down. (A:105). Rincon testified he had no trouble seeing Jordan's and Washington's face and could even see "a little bit of [Jordan's] tattoo on his neck." (A:105-12; GX:505-07, 519). The jury saw Jordan at trial, as well as photographs of Jordan, with a large tattoo on the side of his neck, which witnesses said Jordan had in 2002. (GX:505-507; A:109-10, 192). Rincon learned he had been shot in the leg and police officers later took him to the hospital for treatment. (A:115-17, 126).

High similarly testified that she observed a "fair-skinned...African-American" man with a "tattoo…[o]n his neck"—consistent with Jordan's description—walk to Mizell, who smiled, stood up, and gave the man "a pound," meaning a greeting by hand. (A:288-89, 291). Mizell then said, "Oh shit," and High heard two gunshots. (A:288-89, 325-26). High screamed and ran to the Studio's entrance but was stopped by Washington, who ordered her to the ground at gunpoint. (A:289). The jury could see High crying and shaking during her trial testimony as she recounted what occurred. (*Cf.* A:330 (defense counsel acknowledging testifying about "this [was] difficult" for the witness)).

Expert and law enforcement witnesses corroborated this testimony. Dr. Corinne Ambrosi, who performed the autopsy of Mizell, determined that the cause of Mizell's death was a gunshot wound to his head and the manner of death was homicide. (A:178). Dr. Jagjeet Bains, who performed a gunshot residue and distance determination analysis, confirmed that the gunshot that killed Mizell was a "contact shot," which meant the shooter was less than two inches away. (A:596-99). Crime scene investigators recovered two .40 caliber shell casings next to Mizell's body. (A:61-68, 508-18). The jury also learned that three months after

the murder, on February 3, 2003, police officers recovered a .40 caliber firearm, a .40 shell casing, and 83 .40 caliber bullets from Jordan, and that, on May 14, 2003, they also recovered a .40 caliber bullet and bullet fragment from a .40 caliber firearm possessed by Jordan. (GX:320, 324, 912, 913).

Several witnesses testified that Rincon and High later implicated Jordan as the shooter and Washington as guarding the door to the Studio with a firearm. Allen testified that one or two days after Mizell's murder, Rincon told him that Jordan shot Mizell and Washington was also in the Studio. (A:366-67). Allen also testified that High described the shooter's neck tattoo to him and that Washington ordered her to the ground at gunpoint. (A:367-68).[4] Derrick Parker, a retired detective who acted as High's bodyguard after the murder, testified that shortly after the murder, High identified both Jordan and Washington as the perpetrators. (A:274-78).

---

[4] Allen testified that when he tried to speak with High again about what happened in the Studio, "she cut [him] off" and "didn't speak to [him]...for two whole years." (A:368).

After the gunshots, Rincon saw Jordan and Washington run out of the Studio and turn left towards the back door of the building. (A:113). Davis testified that after the gunshots, she saw the same "very tall" man, who had entered the front door of 90-10 Merrick Boulevard, go down the hallway, headed back towards the front door. (A:431-32). He "looked like he was like dragging his leg a little bit" and he was "taking long steps as he was going." (A:432).

The trial evidence revealed that the "very tall" man who snuck into 90-10 Merrick Boulevard behind High and later fled through the front door was Bryant, and that Jordan and Washington entered and exited 90-10 Merrick Boulevard through the back door.

Witnesses described Bryant as approximately between 6'3" and 6'5," lacking a neck tattoo, walking with a limp due to a gunshot wound, and with braids in 2002—he could not have been mistaken for either Jordan or Washington. (GX:501, 502 (photographs of Bryant); A:369, 445, 600). In contrast, Jordan was 5'9.5" and Washington was 5'10," neither had braids or a limp in 2002, and Jordan had a prominent neck tattoo in 2002 that the jury heard about from witnesses and saw in photographs. (GX:505-09, 915, A:109-10, 192). Significantly, witnesses

close to Mizell, including Rincon, were shown photographs of Bryant and did not recognize him, contradicting the defense theory that Bryant would have been able to get close to Mizell to shake his hand and that Mizell would have smiled, before Bryant killed Mizell. (GX:501-02, 504; A:116, 197-98, 251-252, 347, 525-26).[5]

Testimony was introduced about Bryant's DNA profile being part of a mixture of DNA found inside a knit hat recovered from the Studio near where Mizell had been shot. (GX:202A, 105 (M3 knit hat);

[5] Indeed, Bryant was connected to Jordan and Washington, but not to Mizell, through a mutual friend, Atif ("Tiff") Heathington. Tiff's brother, Zaire Flournoy, testified that Flournoy and Bryant grew up together in the Baisley Projects near Hollis and that Tiff lived one block away from the Baisley Projects with their grandmother; Flournoy, who had been arrested pursuant to a material witness warrant, did not admit he had seen Bryant and Tiff together. (A:228-30). Flournoy testified "Noid" (Jordan) grew up in Hollis with Tiff but also did not admit he had seen them together. (A:232-33). In contrast, Burrell testified that Tiff, Jordan, and Jordan's brother, Burns, were "guys from the neighborhood" and he had seen them together; he also identified them together in photographs. (A:388-94; GX:542 (photo of Tiff and Bryant), 543 (photo of Tiff, Jordan and Jordan's brother, Burns), and 547 (photo of Tiff and Jordan)). Lewis Gonzalez, Bryant's friend, testified Bryant introduced him to Tiff at the Baisley Houses in 2022, and identified Bryant and Tiff in photographs together. (A:374-81; GX:542, 543). McDonald, who dated Washington, testified she had seen Tiff and Jordan together a couple of times in 2002 and Tiff occasionally socialized with Washington then as well. (A:483-85).

A:76-77). Bryant's uncle, Raymond Bryant, testified that Bryant admitted his participation in Mizell's murder in two conversations, one in 2003 or 2004 and another in or around 2019. Raymond testified that in the first conversation, Bryant admitted he was involved in the murder and he "wouldn't have did it if [Mizell] didn't go for his gun," and Raymond believed others were at the murder based on this conversation. (A:447-50, 460-61, 464). In the second conversation, Bryant told Raymond that he was arrested because his hat was at the scene. (A:449-50).[6]

Based on the testimony that witnesses did not use the back door or even know of its existence, the jury could infer that Jordan and Washington entered through the back door to avoid detection. As the

---

[6] Notably, eyewitness testimony contradicts Bryant's description of Mizell going for the gun. High and Rincon said that Mizell greeted the shooter and was immediately shot in the head. Similarly, Bryant's statement that he had been arrested for the hat was false, because Bryant was not arrested in connection with the murder until 2023. Significantly, the jury was presented with all of this evidence, and the government argued in summation that there was substantial evidence proving that Jordan was, and Bryant could not have been, the shooter, and that the government did not need to prove or explain how the hat with Bryant's DNA wound up inside the Studio. (A:654). The jury apparently agreed.

witnesses testified, the back door did not require a buzzer that would alert people inside 90-10 Merrick Boulevard, and the camera view showed Jordan and Washington could wait outside the view of the camera until Bryant let them in.[7]

After Mizell's murder, James spoke to the cocaine supplier, Unc, who appeared shocked over Mizell's death. (A:550). Unc told James that any debt Mizell owed him in connection with the cocaine had died with Mizell. (*Id.*).

F. Jordan and Washington's Actions After the Murder

The evening of Mizell's murder, Washington confessed to McDonald that he killed Mizell, and, the next day, he moved out of Mizell's family home to live in hotels with McDonald. (A:493-98).

After the murder, Jordan and his father attempted to intimidate witnesses who could implicate Jordan. The day after Mizell's murder, Jordan's father shot a firearm at Washington. (A:610). Mizell's funeral was held one week after the murder. (A:118). At some point

---

[7] Ultimately, the video tape police recovered from the Studio television that night was a recording from another date (A:79), and the video tape in Primerica did not record (A:259), so that there no was recorded video from the day of the murder.

before the funeral, but after he had shot at Washington, Jordan's father placed a phone call to High that left her "shaking" and "very upset." (A:276-77). At the funeral, Jordan and several friends approached Rincon and his mother, and Jordan asked if Rincon saw who killed Mizell. (A:118). Rincon felt that Jordan was "probing to see if I did see him" at the Studio, especially because nobody else at the funeral, which a "couple hundred" people attended, had asked him the same question. (A:118-19). One month after the murder, Washington told McDonald that he "had to go meet up with Noid [Jordan]." (A:498). He returned from that meeting "[u]pset." (*Id.*). In 2003, Jordan's father and "a couple…people from the Hollis crew" approached McDonald and told her "not to say anything to the [] police." (A:498-99).

Jordan and Washington both made admissions about their involvement with the murder. In 2004, Cherubin Bastien, who lived with Jordan and was driving Jordan and Jordan's two friends, overheard Jordan talking about Mizell, stating "if I get to kill him, I'll kill him again." (A:578-80, 582-84). On another occasion that year, Bastien heard Jordan threaten a woman by saying he would "do [her] exactly just like him," referring to Mizell. (A:585-86).

In 2011, Washington was incarcerated at the Metropolitan Detention Center ("MDC") on a different charge when he asked another inmate whether he "recognized him from news about the murder of Jam Master Jay." (A:467-70; GX:910). Washington admitted he murdered Mizell and "that there was a black girl in the studio at the time, but she was unharmed because: That wasn't what we were there to do[.]" (A:471-72, 474).

In 2019, law enforcement officers interviewed Washington, who asked them, "So you're not going to get the shooter; you're just going to get the guy who stood by the door." (A:602, 606). Washington then stated, "you guys are going to put me and another person on an indictment and see who rats first." (A:606-07).

In 2020, Washington called an unknown person and explained that his "situation" was due to "Lulu" (High's nickname). The unknown person responded, "She got both – she got y'all together, as partners." (GX:902, 917; A:523, 689-91). Washington replied that he was "just…talking to the little n***a too" who was "upstairs," but Jordan had written him a "kite" saying "I understand you was mad at my pops, but I'm – me and you – because [Jordan]'s like, yo, I never asked for a

separation or nothing because I know you got love for me," referring to the separation order between Jordan and Washington. (*Id.*). Washington called Jordan "my little man" during this call. (*Id.*).

III. Jordan's Post-Trial Motions

On February 20, 2024, following the close of the government's evidence, Washington orally moved on behalf of both defendants under Rule 29(a) for a judgment of acquittal. (A:612-34). He argued that the trial evidence proved: (1) Jordan and Washington never joined the narcotics conspiracy because Washington left Baltimore and Jordan was not in Baltimore, (2) even if Washington had joined the conspiracy, his involvement ended when Yakim excluded Washington in Baltimore, (3) the murder could not be in furtherance of the narcotics conspiracy because the conspiracy ended in Baltimore, and (4) there was no narcotics-related motive for the murder because Yakim, not Mizell, excluded Washington. On February 26, 2024, the court denied the motions with leave to renew. (A:682-83).

On February 27, 2024, the jury convicted Jordan and Washington of both counts. (DE:298).

On April 5, 2024, Jordan filed a written Rule 29(c) motion, arguing that the trial evidence was insufficient to establish that: (1) Jordan was in an ongoing narcotics conspiracy at the time of Mizell's murder, and (2) Jordan had a narcotics-related motive for the murder or that the murder furthered the narcotics conspiracy. Jordan also included a Rule 33 motion for a new trial that argued that an alternate perpetrator theory of Bryant as the shooter preponderated heavily against the verdict and that replacement of a juror tainted the jury. (DE:292).

## IV. The District Court's Decision

On December 19, 2025, the district court granted Jordan's Rule 29 motion and denied his Rule 33 motion, holding the evidence was insufficient for a jury to find that Jordan had a narcotics-related motive for murdering Mizell or that his use of a firearm was intended to further the narcotics conspiracy, despite finding that Jordan was a member of the ongoing narcotics conspiracy at the time of the murder. (DE:322). The court denied Washington's post-trial motions. (DE:323).

### A. The District Court Held Jordan Was a Member of the Ongoing Narcotics Conspiracy at the Time of Mizell's Murder

The district court held that Jordan was a member of Mizell's narcotics trafficking conspiracy at the time of his murder. (SPA:61-64). It found that Jordan joined Mizell's conspiracy "as early as 2001" when he requested Mizell "put him on" and sold an ounce of cocaine on behalf of Mizell as a test. (SPA:61). The court held the conspiracy did not end when Yakim refused to work with Washington in Baltimore because "Yakim's refusal was clearly limited to Washington" and there was "simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute narcotics in Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the Baltimore deal." (SPA:62-63).

The court rejected Jordan's argument that there was no evidence of conspiratorial conduct after Yakim refused to work with Washington, finding "there was ample evidence of conspiratorial conduct after[wards]," including the testimony that Mizell "remained in Baltimore to negotiate with Yakim," Mizell "'had a line' on 100 kilograms

of cocaine, which was to be sold on consignment," the "intended distribution of the cocaine [was] to be 'ongoing,'" and Mizell "had not paid Unc" for all of the cocaine as of his death. (SPA:63). The court explained that "the fact that Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy did not end in Baltimore." (*Id.*). The court also found that Jordan failed to demonstrate he "took any affirmative step to withdraw from the charged drug conspiracy," and concluded that he was a member of the narcotics conspiracy when he murdered Mizell. (SPA:64).

### B. The District Court Vacated the Jury Verdict as to Jordan, Holding that Jordan Did Not Have a Narcotics-Related Motive to Kill Mizell, But His Co-Conspirator Did

Notwithstanding the above analysis, the district court held the evidence did not prove Jordan murdered Mizell for a narcotics-related motive, as required to sustain a conviction on Count One. (SPA:64-71). Yet in its opinion addressing Washington's similar claims, the court held that Washington murdered Mizell for a narcotics-related motive. (SPA:44-45).

In its opinion acquitting Jordan, the court first recounted the evidence against Jordan but omitted the events leading up to the murder,

Jordan's role in the murder, and any conspiracy events for which Jordan was not present. (SPA:66). Such evidence, the court stated, "related exclusively to Washington or was otherwise unconnected to Jordan." (*Id.*). Without that evidence, the court stated the remaining evidence "establishes that Jordan agreed to sell cocaine on behalf of Mizell and was friendly with Washington, as discussed *infra*, [but] its reach does not extend to the motives advanced by the Government." (*Id.*).

The court stated that the three murder motives postulated by the government in its opposition brief were unsupported by the evidence against Jordan: (1) retaliation against Mizell when he was unable to secure the Baltimore deal with Yakim; (2) elimination of "Mizell as the middleman in the conspiracy," or (3) theft of cocaine or profits from cocaine sales from Mizell. (SPA:67-68). The court limited its review to these theories.

With respect to the first motive, the court stated that, because there was no evidence that Jordan's role in the narcotics conspiracy depended on Washington and no evidence that Jordan himself was told he could not sell in Baltimore, the jury could not have reasonably inferred that Jordan would have sought to retaliate against Mizell for the failure

of the Baltimore deal—despite evidence that the deal would have been lucrative. (SPA:66-67). In contrast, the court found Washington had a narcotics-relative motive for the murder because "Washington was excluded from a potentially lucrative Baltimore deal and sought to retaliate against Mizell for his exclusion." (SPA:45).

The court briefly addressed the second motive, finding there was no evidence "that Jordan was dissatisfied by his portion of revenue from drug sales, was in contact with any supplier, or otherwise…arrange[d] to carry on Mizell's operation." (SPA:67).

The court similarly assessed the third motive, stating there was no evidence that "Jordan knew about the scheduled meeting between Mizell and his supplier, knew that there would be…cocaine at the Studio, or made arrangements to distribute any additional cocaine himself." (SPA:67-68).

The district court described the cases relied upon by the government as featuring direct evidence of the defendant's motive—either through testimony of a defendant's admission or cooperator testimony. (SPA:68-71). In contrast, the court emphasized there was no "link" between "the failed Baltimore deal and Jordan's decision to

participate in Mizell's murder," and no direct "evidence of a personal dispute between Jordan and Mizell," or that Jordan sought to enhance his role in the conspiracy. (SPA:70-71).

Finally, the district court held that the failure to prove a narcotics-related motive for Count One doomed Count Two because the evidence did not reveal any motives that would afford some advantage to the narcotics conspiracy. (SPA:73).

### C. The District Court Improperly Undercut the Jury's Factfinding Role in Rejecting the Identification of Jordan as Mizell's Shooter

When denying Jordan's Rule 33 motion, the district court concluded the evidence sufficed to show that Jordan fatally shot Mizell. The court made clear, however, its belief that it was "even more reasonable" to find that Bryant, not Jordan, was the shooter, but denied the motion only because "Rule 33 requires more." (SPA:76). In arguing that Bryant was likely the shooter, the court recounted various evidence: (1) a hat inside the Studio with Bryant's DNA, (2) Bryant's boast to his uncle that he was part of the murder and "he 'did it' because Mizell went for his gun" (contrary to the eyewitness testimony) and a second boast that his hat was found at the scene, (3) Davis's testimony that an

individual matching Bryant's description entered and exited 90-10 Merrick Boulevard before and after the shooting (consistent with the government's theory), (4) eyewitness testimony that there was a single shooter in the Studio (consistent with Jordan being the shooter), and (5) High's testimony that (when she was sitting down on the couch looking up at the shooter) the shooter seemed "tall." (SPA:75-76; A:324). Notably, this evidence of Bryant's purported role as the shooter was presented to and rejected by the jury.

The court wondered why Bryant, who was unknown to Mizell, "would be given th[e] role" of walking into the front door of the building to let Jordan and Washington in through the back door (SPA:77)—even though testimony explained the front door's buzzer system, that Jordan and Washington had been to the Studio (implying they knew about the buzzer system and video cameras), and that Jordan and Washington were familiar to the people inside the Studio (implying they knew they would be identified on camera before they made it to the Studio). The court also speculated why Jordan and Washington "made no effort to conceal themselves" (*id.*), which contrasted with Rincon's testimony that

Jordan had put his hood on, and it failed to consider the intimidation of High, Rincon, and McDonald by Jordan and his father after the murder.

The court, however, found that evidence in the record supported the government's theory that Bryant's role was to open the back door to grant Jordan and Washington entry to the building, and that Jordan was the shooter. (SPA:76-77). It pointed to: (1) testimony from Davis who observed Bryant enter the front door behind High and later leave through the front door, (2) Rincon's eyewitness testimony that he had "no doubt" Jordan was the shooter, (3) High's eyewitness testimony that the shooter had a neck tattoo, and (4) Bastien's testimony regarding Jordan's statements about the murder. (*Id.*).

But the court ignored other substantial evidence establishing Jordan as the shooter, including testimony from (1) Allen that Rincon had identified Jordan as the shooter days after the murder, (2) Allen that High had described the shooter's neck tattoo, (3) Parker that High had identified Jordan as the shooter, (4) Rincon that Jordan and his friends approached him at Mizell's funeral to ask "if [he] saw who did it" which made him feel as if Jordan was "probing to see if I did see him," (5) Parker that Jordan's father called High shortly after the murder and she was

"shaking" and "very upset," and (6) McDonald that Jordan's father told her not to talk to the police, as well as (7) the major physical differences between Bryant and Jordan, and (8) the eyewitness testimony that Mizell smiled and embraced the shooter immediately prior to his execution, consistent with knowing the killer, Jordan. The court also ignored testimony that when Washington arrived at the Studio earlier that day, Mizell was surprised to see him and appeared uncomfortable. A rational jury could reasonably infer from that reaction that, when Jordan and Washington returned to the Studio to murder Mizell, they knew they had to gain access to the building discreetly; otherwise, Mizell might not have buzzed them in, or he would have had time to prepare himself for a confrontation using his own firearm that Washington saw hours earlier.

The court also questioned High's identification of Jordan's neck tattoo, stating that there was no evidence High told officers on the night of Mizell's murder that the shooter had a neck tattoo. (SPA:76). The court ignored High's testimony that she was not honest with officers at the time of the murder because she was afraid and that she ultimately told her brother, Allen, about the neck tattoo. (A:292, 368).

Although Rincon did not initially identify Jordan as the shooter, the court recognized that the "jury clearly credited Rincon's testimony" that he "hid the truth" because he was afraid of retaliation, over Raymond Bryant's testimony that his nephew, Bryant, admitted he killed Mizell. (SPA:77). The court ignored that the jury could also reasonably credit Rincon because of his identification of Jordan to Allen days after the murder and his fear of Jordan, especially after he approached him at Mizell's funeral. (A:117-19, 169, 366-67).

## SUMMARY OF ARGUMENT

The district court erred in granting Jordan's motion for a judgment of acquittal, and its decision should be reversed. First, the court failed to consider all the evidence in the record and further, disregarded evidence of the narcotics conspiracy if Jordan was not present at, or directly communicated about, such events. Second, the court ignored the inferences reasonably drawn from the timing of events surrounding Mizell's murder, Jordan's role as the shooter, and Jordan and Washington's conspiratorial relationship, instead requiring direct evidence of Jordan's intent. Third, while finding sufficient proof of a narcotics-related motive as to Washington, the court ignored that Jordan,

too, could have shared that same motive, in addition to having his own narcotics-related motives. Finally, the court failed to consider aiding and abetting liability. The failures to view the totality of the evidence supporting Jordan's narcotics-related motive in the light most favorable to the government, and to draw all reasonable inferences in favor of the government, led the court to erroneously substitute its own determination of the weight of the evidence for the determination of the jury. The jury's verdict regarding Jordan's intent is supported by the evidence, and the district court's order should be reversed.

# ARGUMENT

## I. Applicable Law

### A. Standard of Review

This Court reviews de novo the granting of a Rule 29 motion, "applying the same standard the district court applies in review of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019); *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012).[8] Questions related to the interpretation of a criminal statute are reviewed de novo. *United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020).

### B. Rule 29

Rule 29 provides that a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. But this Court has instructed that "[t]he jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

---

[8] Unless otherwise noted, citations, internal quotation marks, and footnotes are omitted, and all alterations are adopted.

When assessing a Rule 29 motion, a reviewing court must view "the evidence presented in the light most favorable to the prosecution," drawing all permissible inferences in the government's favor. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Guadagna*, 183 F.3d at 129. The court must also consider the evidence as a whole and not "piecemeal or in isolation," *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019), "as each fact may gain color from others," *Guadagna*, 183 F.3d at 130. In addition, "[m]atters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992). In deciding which inferences to draw, the jury is entitled to use its common sense, *Klein*, 913 F.3d at 79, and, therefore, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130. "If the court concludes that either of two results, a reasonable doubt or no reasonable doubt is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

The reviewing court must recognize that "knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005).

Moreover, this Court has emphasized that "[w]hen a defendant challenges the sufficiency of the evidence in a conspiracy case, deference to the jury's findings is especially important...because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). "[S]eemingly innocent acts" taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general. *United States v. Mariani*, 725 F.2d 862, 866 (2d Cir. 1984); *United States v. Carson*, 702 F.2d 351, 362 (2d Cir. 1983). Accordingly, a defendant challenging a jury's guilty verdict, particularly on a charge involving an underlying conspiracy, "bears a heavy burden." *Santos*, 541 F.3d at 70.

C. Section 848(e)(1)(A)

Count One applies to anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." 21 U.S.C. § 848(e)(1)(A). A defendant need not be "actively engaged in" drug dealing at the time of the murder. *Santos*, 541 F.3d at 67. Rather, a conspiracy to distribute drugs may serve as the predicate offense (as it did here), and "[s]o long as the defendant enters into the unlawful agreement before the killing, and the conspiracy is ongoing when the killing occurs," the "engaging in" element is satisfied. *Id.* at 68.

In addition to this temporal requirement, courts have "required a 'substantive connection' between the defendant's drug activities and the charged killing in part to address the concern that, absent such a requirement, § 848(e)(1)(A) would be subject to constitutional challenge on Commerce Clause grounds." *United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009). Proof of a drug-related motive "fully satisfies [the] 'nexus' requirement" of Section 848(e), *id.* at 660, but "the government has no burden to establish that a drug-related motive

was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose," *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008). Nor must the killing be committed, even in part, "in order to further" the charged drug crime. *Aguilar*, 585 F.3d at 660-61.

D. Section 924(j)(1)

Count Two criminalizes causing the death of a person through the use of a firearm "in the course of a violation of" Section 924(c). 18 U.S.C. § 924(j)(1). Section 924(c) in turn states that "any person who, during and in relation to...any…drug trafficking crime...uses or carries a firearm" is guilty of a crime. 18 U.S.C. § 924(c)(1)(A). "The phrase 'in relation to' is expansive." *Smith v. United States*, 508 U.S. 223, 237 (1993); *United States v. Nina*, 734 F. App'x 27, 30 (2d Cir. 2018). It "clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith*, 508 U.S. at 238; *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) (government need only show "some nexus between the firearm and the drug selling operation"). "[T]he ultimate question is whether the firearm afforded some advantage

(actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62-63 (2d Cir. 2006) ("[A] drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.").

## II. The Jury's Verdict Is Supported By The Evidence And The District Court Erred By Not Considering or Crediting Certain Evidence That Supported the Jury's Verdict

In overturning the jury's verdict, the district court both overlooked and minimized evidence that permitted the jury to find that Jordan had several narcotics-related motives to murder Mizell, as well as that Jordan murdered Mizell to support Washington's narcotics-related motives. The jury could have reasonably inferred that Jordan killed Mizell as retaliation for failing to secure the lucrative Baltimore deal for him and Washington, or to eliminate Mizell to further his and Washington's roles in their shared narcotics conspiracy.

A comparison of the court's decisions for Jordan and Washington reveals the court refused to consider certain evidence about the narcotics conspiracy for Jordan that it considered for Washington. The court erroneously concluded there was no evidence that Jordan knew

of such facts, despite his roles in the conspiracy and the murder—in which he was the shooter—and his close relationship with Washington. In taking this myopic view of the evidence, the court erred by requiring direct evidence of Jordan's intent, rather than relying on circumstantial evidence that this Court has stated may alone support a jury verdict.

A. The District Court Erroneously Refused to Consider Trial Evidence Against Jordan That It Considered Against Washington

The district court did not consider for Jordan any evidence about the failed Baltimore deal with Yakim or Mizell's scheduled meeting with the cocaine supplier's associate, yet it did so for Washington, despite ample evidence that Jordan and Washington were in the same narcotics conspiracy with Mizell, and both had agreed with Mizell to sell the 10 kilograms with Yakim. In its opinion for Washington, the court recounted the sufficient evidence of Washington's narcotics-related motive as the following:

> Washington entered a conspiracy with Mizell and Jordan to distribute ten kilograms of cocaine in Baltimore; in August 2002, Mizell and Washington traveled to Baltimore to consummate a deal to distribute ten kilograms of cocaine; Yakim refused to work with Washington; Washington returned to New York while Mizell remained in Baltimore to

> continue negotiation discussions; the Baltimore deal would have been lucrative; in October 2002, Mizell was scheduled to meet with his supplier; Washington showed up to the Studio with a firearm the same day of the meeting (or the day after); when Washington saw Mizell at the Studio, Washington informed Mizell that Mizell did not need a firearm because he had Washington; Washington asked Mizell, in coded language, about his plans for the drug conspiracy; after leaving the Studio, Washington made a phone call and then told his girlfriend not to return to the Studio; the same day of Mizell's meeting with his supplier (or the day after), Mizell was murdered; Washington was sleeping on Mizell's couch at the time of the murder; Washington and Jordan spent time together inside and outside of the Studio; and Washington and Jordan met up after Mizell's murder.

(SPA:44 (emphasis added)). The court did not list the underlined facts, which related to the narcotics conspiracy, in connection with Jordan. (SPA:66 (noting it would not credit the "further evidence" that "the Government highlights" because it "related exclusively to Washington or was otherwise unconnected to Jordan")).

Both decisions also omitted trial evidence crucial to establishing Jordan's motive, such as the facts that:

- Washington had met Unc prior to August 2002;
- Mizell traveled on and off between August and October 2002;

- days before the murder, Washington sought .40 caliber ammunition—the caliber ammunition that Jordan used to murder Mizell and still possessed three months after the murder;

- the day before the murder, Mizell returned to New York from the Midwest—which is where he was to receive the cocaine on consignment—and told his cousin Watford (who lived in the same house as Washington) to see Mizell's accountant, suggesting Mizell had or would be coming into money;

- while in the Midwest, Mizell angrily mentioned Washington's nickname, Tinard, while on a phone call;

- the day before the murder, Washington warned Watford to stay away from the Studio because "[s]omething bad is gonna happen";

- the day of the murder, Washington retrieved a firearm from Jordan's brother; and

- Bryant was connected to Jordan and, to a lesser extent, Washington and no other witnesses associated with Mizell knew him.

The jury heard this evidence, along with Washington's knowledge that Mizell was to meet imminently with Unc's associate, Washington's inquiry of Mizell hours before the murder about the narcotics conspiracy and travel to Baltimore, Washington's subsequent phone call that led to Jordan's arrival, Jordan and his co-conspirators' surreptitious entry into the Studio, and Jordan's fatal shooting of Mizell. Together, this proof

permits the reasonable inference—one the jury clearly drew—that Jordan and Washington planned Mizell's murder for when they anticipated that Mizell would obtain the remaining kilograms on consignment, or have profits Mizell acquired from selling the 10 kilograms without Jordan and Washington and after paying Unc (as suggested by Mizell's instruction to Watford to see his accountant).

The jury could also infer that Mizell's expressed surprise and display of his firearm when Washington arrived at the Studio earlier on October 30 confirmed Washington's concern about being cut out of further cocaine deals. Excluded from a lucrative deal in Baltimore with Yakim, Washington murdered Mizell out of retaliation and to further his role in the conspiracy. Although Jordan was not present in Baltimore, he had agreed with Mizell and Washington to participate in the Baltimore deal and stood to gain if the deal were successful. The jury could have reasonably inferred that Washington's subsequent call on the payphone was to inform Jordan of Mizell's presence at the Studio and his conversation with Mizell, and to initiate their plans to murder Mizell. Like Washington, Jordan could have thought that Mizell had sold the 10 kilograms and kept the profit for himself.

Indeed, if only Washington intended to murder Mizell, he could have fatally shot Mizell when he first visited the Studio with his girlfriend, especially as he had no qualms about obtaining the firearm from Jordan's brother in his girlfriend's presence or later admitting the murder to her. But Washington's subsequent phone call and Jordan's role as the shooter confirm Jordan agreed to commit the murder and had a motive to do so. Additionally, from Jordan and Washington's close relationship, the jury could have reasonably inferred that, under the older man's influence, Jordan would have agreed to murder Mizell to avenge the Baltimore slight to Washington.

### B. The District Court Ignored the Timing and Circumstances of the Murder, Including Jordan's Role as the Shooter, in Connection with Jordan's Knowledge and Motive

In response to the government's argument that the murder can "assist in proving the substantive connection between the narcotics conspiracy and the murder," the district court stated "[w]hile that may be true, the evidence of the murder itself must be accompanied by other evidence supporting the requisite nexus." (SPA:71). But the court failed to consider the evidence—the timing and circumstances of the murder—that supported this nexus.

First, the district court ignored the necessary coordination among the co-conspirators to effectuate the murder. As witnesses testified, Jordan and Washington had been inside the Studio. All the witnesses associated with Mizell knew about the buzzer system to gain entry to the front door of 90-10 Merrick Boulevard and that a television inside the Studio revealed whoever was headed towards the Studio from the front door. However, the evidence showed that the back door did not use a buzzer system, and nobody entered that way.

The fact that Primerica employee Davis did not see Jordan and Washington, but saw Bryant, meant that Jordan and Washington coordinated in advance to enter through the back door. This plan could not have been formulated at the last minute, because it involved Bryant, who had never been seen in the Studio and who was connected only to Jordan and, to a lesser degree, Washington. The jury could infer Bryant's participation was secured in advance, given his role in piggybacking into 90-10 Merrick Boulevard and bypassing Primerica and the Studio to open the building's back door where Jordan and Washington laid in wait.

The district court perceived a "conflict" in the government's theory of Bryant's role because Jordan and Washington had "ready

access" to the Studio and were unmasked during the murder. (SPA:77). But when Washington went to the Studio earlier that day, Mizell was surprised to see him, had an "oh-shit kind of look" on his face, and displayed his firearm, before tasking Washington with an errand that required him to leave the Studio. (*Id.*). This interaction occurred the day after Mizell was heard yelling angrily on a phone call about Washington. The jury could infer that Washington knew if he attempted to overtly re-enter the Studio, Mizell would not buzz him into the building or would be prepared with his firearm that Washington saw earlier that evening. The jury could also conclude that Jordan would not enter the front door to let in Washington through the back door because Jordan's presence would catch Mizell's attention as his godson and as Washington's narcotics co-conspirator. Moreover, the court failed to consider Rincon's testimony that Jordan wore a hood during the murder, as well as evidence of the intimidation of High, Rincon, and McDonald by Jordan and his father after the murder.

Jordan's advance preparation for the murder is further supported by the evidence showing Jordan shot and killed Mizell using .40 caliber ammunition a few days after Washington asked Watford for

such ammunition and told him to stay away from the Studio because "[s]omething bad is gonna happen." (A:200, 207). The day of the murder, Washington secured a firearm from Jordan's brother, and, when Jordan and Washington arrived at the Studio, each had a firearm. Jordan's involvement, therefore, was not coincidental or last-minute, but intentional.

Further, given that the murder was planned in advance, the district court failed to consider why Jordan and Washington chose to kill Mizell on October 30. Defense counsel argued in summation that if the murder were connected to the failed deal with Yakim, Jordan would not have waited two months to murder Mizell. (A:656-57). But testimony established that Mizell often traveled between August and October, Washington visited the Studio approximately every other day leading up to the murder, and Washington knew Mizell was meeting with Unc's

associate on October 29 or 30.[9] Further, Mizell returned from Wisconsin to New York on October 29, and Yakim had testified Mizell was to be supplied with cocaine in the Midwest.

Even though Washington arrived at the Studio with a firearm on October 30, he did not shoot Mizell immediately but rather asked him about their plans for the narcotics conspiracy in Connecticut and Baltimore. Washington's questioning revealed that he intended to gather information about the conspiracy before the defendants murdered Mizell. The jury heard evidence that Mizell and Washington went to Baltimore with 10 kilograms of cocaine but that Mizell did not sell those drugs through Yakim. There was no evidence of what happened to the 10

---

[9] Although there was no evidence about the purpose of Mizell's meeting with Unc's associate (*e.g.*, whether to receive the remaining cocaine, negotiate the price of the cocaine to be picked up later, or to pay for the cocaine), the jury could reasonably infer that when Jordan and Washington went to murder Mizell on October 30, one motive could have been to rob him of the remaining 90 kilograms on consignment that they thought Mizell was receiving from this associate, or to rob Mizell of the profits Mizell had received from cocaine sales after paying the associate as part of the consignment agreement. *See United States v. Campbell*, 850 F. App'x 102, 103-04 (2d Cir. 2021) ("[T]o the extent that appellants suggest that the sufficiency analysis as to their involvement in the marijuana conspiracy should not include the circumstances surrounding their participation in [the] murder, we disagree.").

kilograms of cocaine; yet, two months later, Washington asked Mizell about their plans, including in Baltimore.[10] Whether Washington asked these questions to (1) learn if Mizell still planned to have Jordan and Washington sell in Baltimore as previously agreed (but now without Yakim), (2) confirm their fear that Mizell had enlisted others to sell the kilograms, or (3) determine the status of the cocaine on consignment, all are reasonable inferences the jury could have drawn.

Further, after speaking with Mizell about the narcotics conspiracy, Washington, agitated, called someone on the phone. (A:491-92). Hours later, Washington and Jordan entered the Studio and shot Mizell. The jury could reasonably infer from Jordan's arrival and Washington and Jordan's relationship that Washington had called

---

[10] The jury heard testimony that Washington told a reporter that Mizell was "ripped off" by drug dealers of the 10 kilograms in Baltimore and was never paid for it. The jury could have believed this was a lie by Washington to shift suspicion, or it was the truth and caused even greater resentment by both defendants towards Mizell for mishandling the $120,000 of cocaine; either inference would support the jury's verdict. *See United States v. Stanley*, 928 F.2d 575, 577 (2d Cir. 1991) ("[T]he jury was entitled to disbelieve [the defendant's] testimony, and use its disbelief to supplement the other evidence against him.").

Jordan and relayed that it was time to proceed with Mizell's murder. *See Campbell*, 850 F. App'x at 106 (video surveillance showing Syder outside the crime scene before his co-conspirators arrived to commit the murder permitted the inference that Syder contacted them to set the plan in motion).

Once Jordan and Washington entered the Studio, Jordan shot Mizell in the head while Washington guarded the Studio door. Jordan did not wait on the sidelines while Washington committed the murder—he shot to kill. *Id.* (considering Syder's "key role in [the] murder in determining whether he was a knowing member of the [narcotics] conspiracy"). Washington could have killed Mizell when he first questioned him at the Studio; instead, he made a phone call and waited for the arrival of Jordan, who could get closest to Mizell after Washington's confrontation with him. Even if Jordan murdered Mizell at Washington's behest—which the jury could reasonably infer based on the evidence—Jordan's motive would still be related to the conspiracy.

In response to the government's reliance on the murder's circumstances to prove Jordan's motive, the district court cited *Santos*, in which the defendant was told to murder two people on behalf of a

cocaine dealer, as instructive. In *Santos*, there was direct evidence of a communication proving the defendant's intent. 541 F.3d at 66; (SPA:71). But the court's analysis improperly equated Jordan with the otherwise-uninvolved hired henchman in *Santos*, who could not have known the murder was in connection with narcotics until he was told. In contrast, Jordan was already a member of the ongoing narcotics conspiracy when he murdered Mizell.

"[W]here the government presents evidence tending to show that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal venture, a reasonable juror could conclude the defendant was a knowing and intentional criminal conspirator." *Snow*, 462 F.3d at 68. Here, evidence revealed that the lucrative deal Jordan and Washington were promised in Baltimore with Yakim did not occur and that Jordan was still involved in an ongoing narcotics relationship with Washington and Mizell when he shot Mizell. To hold that Washington's motive for participating in that murder was related to the narcotics conspiracy, but Jordan's was not, fails to consider all the trial evidence collectively. *See United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("The

government may prove the defendant's knowing participation in a conspiracy through...a defendant's association with conspirators in furtherance of the conspiracy, his presence at critical stages of the conspiracy that cannot be explained by happenstance,...[and] acts that exhibit a consciousness of guilt.").

The district court's refusal to consider the evidence of the murder for Jordan appears guided by its belief that Jordan was not the shooter. In its decision rejecting Jordan's Rule 33 motion, the court opined about how it was "even more reasonable" that Bryant, not Jordan, was the shooter. (SPA:76). For the court to believe that Jordan was not the shooter would require it to disbelieve numerous witnesses: Rincon (who identified Jordan by name and described the embrace between Jordan and Mizell), High (who described the shooter bearing Jordan's characteristics and described Mizell's smile to the shooter), Allen (who testified Rincon identified Jordan by name and High identified Jordan by tattoo), and Parker (who testified High identified Jordan by name). The court is not permitted to make such a determination on a Rule 29 sufficiency analysis. *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to

determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."); *United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999).[11]

C. The District Court Gave Little Weight to the Conspiratorial Relationship and Favored Direct Evidence Over Circumstantial Evidence to Prove Jordan's Knowledge

The district court discounted the relevance of any events for which Jordan was not physically present, which failed to grant the government every reasonable inference from the evidence. The timing of these events and Washington and Jordan's pre-existing, close conspiratorial relationship raise a reasonable inference that Washington called Jordan and that the murder was related to both Mizell's meeting with the cocaine supplier associate and Mizell's conversation with Washington about drug trafficking hours earlier. Because, as the district court found, this evidence supports Washington's motive for killing Mizell at the Studio that night, it beggars belief to suppose that Jordan,

---

11 The court also ignored testimony from Mizell's friends who had never heard of or seen Bryant and the evidence of intimidation by Jordan and his father after the murder.

who was already his narcotics co-conspirator and did the shooting with him, killed Mizell, his godfather, without any narcotics-related motive.

After determining there was "no evidence that Jordan knew about Yakim's refusal to work with Washington in August, or about the meeting between Mizell and the cocaine supplier in October," the court held that the jury could not conclude "that Jordan had a drug-related motive to kill Mizell." (SPA:65-66). But Jordan's knowledge of Yakim's refusal to work with Washington in August was not a prerequisite to his having a narcotics-related motive for the murder. Jordan agreed to sell cocaine in Baltimore together with Washington through Yakim on behalf of Mizell. (A:534, 538-40). It was reasonable for the jury to infer that, if the deal with Yakim was not completed, Jordan would have known about that failure, regardless of whether he knew the exact reason for it. As James testified, Mizell, Jordan, and Washington agreed that they would distribute the 10 kilograms in Baltimore because Yakim had connections there and, therefore, they could "make more money" there. (*Id.*). And, as Yakim testified, the deal would have been lucrative, but it did not happen. (A:266, 273). To harbor a motive against Mizell, Jordan did not need to know that Yakim refused the deal and Mizell was not able to

convince Yakim to sell. The fact that the lucrative deal did not occur meant that Jordan did not receive the expected payout in August from the deal that Mizell had promised him, providing his own narcotics-related motive for the murder.

Nor was the jury required to find Washington told Jordan about Mizell's meeting with Unc's associate in October to infer that Jordan's motive was related to the narcotics conspiracy. Even if Washington had not informed Jordan of this meeting, the evidence permitted the jury to infer that Jordan held his own resentment from the failed Baltimore deal with Yakim. It also permitted the jury to infer that Jordan was sufficiently close to Washington to aid with Washington's narcotics-related motive to murder Mizell. The finding of motive does not depend on whether Washington informed Jordan of Mizell's meeting with the cocaine supplier.

Nonetheless, the jury could reasonably infer that Jordan knew both these facts. It was "common sense" for the jury to infer that if the deal with Yakim in Baltimore was not completed, Jordan would have asked Washington why, given Jordan's promised role in that lucrative deal and Jordan's eagerness to sell cocaine outside of New York. *Klein*,

913 F.3d at 79; *see Ratzlaf v. United States*, 510 U.S. 135, 149 n.19 (1994) (noting the "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"). The jury could infer that Washington would have disclosed the conflict with Yakim to Jordan, given their close relationship and Washington's admitted skepticism about working with Yakim. Even if Washington lied about the reason for the deal's failure, Jordan would have known that the lucrative deal with Yakim had fallen through despite Mizell's promises.

Indeed, the district court ignored that Jordan and Washington participated in the same narcotics conspiracy and planned to sell cocaine together. As the court held, even though Jordan was not on the trip to Baltimore, which the evidence revealed was an initial meeting to propose the deal,[12] the narcotics conspiracy began before the Baltimore deal, was meant to be ongoing, and there was no affirmative withdrawal by Jordan from the conspiracy. (SPA:63-64); *United States*

---

[12] While Mizell, Jordan, and Washington agreed to sell in Baltimore, the trip to Baltimore was the first time Mizell asked Yakim for permission to have Washington distribute with him. (A:264-66).

*v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1979) ("Hibernation for a few months does not necessarily signal the end of a criminal partnership," and "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators").

The jury heard that, shortly after his arrest in 2020 for Mizell's murder, Washington referred to Jordan as his "little man" and recounted that Jordan told him that Jordan "got love for [him]." (A:689-91). At the time of the murder, Washington lived across the street from Jordan and had access to him. When Washington needed a firearm for the murder, he secured it from Jordan's brother. Further, Jordan and Washington were seen together in and outside the Studio throughout 2002, and Jordan met with Washington one month after the murder. Given their close co-conspirator relationship at the time of Mizell's murder and their plan to sell cocaine together, a jury could reasonably infer that Jordan and Washington shared information about the narcotics conspiracy with each other. In light of their relationship and significant difference in age, the jury could also reasonably infer that Washington had influence over Jordan and convinced him to retaliate

against Mizell because Washington's problems were Jordan's problems. (*cf*. A:502 (Washington saying to Mizell, "If you have a problem, I have a problem too.")).

For the same reasons, the jury also could have reasonably inferred that Washington told Jordan about the meeting between Mizell and the cocaine supplier's associate in October. Substantial evidence showed that Jordan and Washington arrived together at the Studio the day of, or day after, that meeting to murder Mizell—and only hours after Washington confronted Mizell about the narcotics conspiracy and then made an agitated call from a payphone. *See, e.g.*, *United States v. Djibo*, 850 F. App'x 52, 56 (2d Cir. 2021) (defendant's "conduct and his relationship with his co-conspirator were sufficient to support a reasonable inference that [defendant] knew" about the drugs as part of the conspiracy); *Campbell*, 850 F. App'x at 105-06 ("[J]urors may infer a defendant's knowledge of the object of a conspiracy…where there is evidence of such a trust relationship."). Moreover, Jordan and Washington's entry into 90-10 Merrick Boulevard and the murder itself required advance planning that required communications between Jordan and Washington. Critically, Jordan was the one to shoot Mizell.

No evidence showed a personal conflict between them, yet substantial evidence demonstrated Jordan's entry into the narcotics conspiracy through Mizell, Jordan's willingness to sell cocaine, and Mizell's agreement to include him in the Baltimore distribution. Therefore, the jury could infer that Jordan's intent in killing Mizell was related to the narcotics conspiracy. As the government argued in summation, Jordan's murder of his godfather could not be understood as anything but related to the narcotics conspiracy. (A:635, 643-44).

In ignoring this critical evidence, the district court refused to draw all inferences in the government's favor and instead effectively demanded "smoking-gun" direct evidence of motive or pre-murder discussions, contrary to this Court's guidance that jurors may draw reasonable inferences from circumstantial evidence. *See United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (per curiam) ("most evidence of intent is circumstantial"); *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (finding "baseless" the argument that "circumstantial evidence is inherently weaker than direct evidence"); *accord United States v. Huezo*, 546 F.3d 174, 182-83 (2d Cir. 2008) (jury could infer defendant's knowledge and specific intent to commit money laundering from his

participation in transporting bags he did not review, his special treatment of one such bag, and from the evidence that he resided with his co-defendants).

The district court incorrectly distinguished the cases cited by the government that did not feature direct evidence of motive, *Campbell*, *Glenn,* and *Vernace*. *Campbell* involved three defendants, Peter, Campbell, and Syder, who murdered an individual that attempted to rob the stash house used in their narcotics conspiracy. 850 F. App'x at 102-04. This Court found that while there was substantial direct evidence connecting the roles of defendants Campbell and Peter in the murder to the narcotics conspiracy, the evidence was circumstantial as to defendant Syder. *Id.* at 103-06.

For Syder, the "only pre-murder evidence" of his role in the narcotics conspiracy was that he was seen at a known marijuana hangout, which was, on its own, insufficient to prove his role in the conspiracy. *Id.* at 106. But this Court stated the jury could consider Syder's "key role in the murder," specifically that he was the one "leading the armed charge" and "first to fire his gun," in determining whether he was a "knowing member of the marijuana conspiracy." *Id.* Further,

surveillance video showed Syder standing outside a deli where the victim was and Syder's co-conspirators arriving and opening fire a few minutes later. *Id.* at 104, 106. From this evidence, this Court held that the jury could "infer" that Syder was the first to identify the victim and notified his co-conspirators of the victim's location so they could execute the murder plan.[13]

The same inference from *Campbell* can be drawn here. After Washington left the Studio to make a call, he and Jordan arrived at the Studio together to murder Mizell. From this evidence, the jury could infer that Washington relayed to Jordan that it was time to execute the murder they had planned. Like Syder, Jordan's arrival and his role in the murder similarly demonstrated that he used a firearm to further the narcotics conspiracy; he helped to achieve the defendants' purpose of retaliation or of robbery of the cocaine or funds. *Campbell*, 850 F. App'x at 107; *see also Santos*, 541 F.3d at 69 ("[A]cts—including killings—may and often do serve as powerful circumstantial evidence that the charged

[13] The district court described evidence in *Campbell* for the wrong defendant (Peter) and incorrectly described the jury's inferences regarding circumstantial evidence as direct evidence. (SPA:69).

conspiracy existed and that the actor joined it. Thus, although a murder committed by the defendant in furtherance of a drug conspiracy cannot itself satisfy the drug-offense element of section 848(e)(1)(A), it can, in appropriate circumstances, persuade the jury that the defendant was a member of the drug conspiracy in furtherance of which the killing was committed.").

While, following certain evidentiary rulings, no trial evidence showed Jordan with narcotics or newfound wealth immediately after Mizell's murder, such evidence was unnecessary because there was already evidence that Jordan agreed to be part of the narcotics conspiracy to sell cocaine and had already done so. *See United States v. Pierce*, 785 F.3d 832, 839 (2d Cir. 2015) ("Section 848(e)(1)(A) liability does not require active involvement in drug distribution.").

The district court also differentiated the timing between the murder and the impetus for the murder in *Campbell* from this case. In *Campbell*, the murder occurred two weeks after the victim's attempted robbery of the stash house; here, the murder was two months after the failed Baltimore deal. (SPA:69-70). But the court did not address the evidence explaining Mizell's whereabouts outside of New York during

that time, and, importantly, the evidence that Washington believed Mizell was meeting with the cocaine supplier's associate on October 29 or 30 and that Mizell returned from the Midwest on October 29, supporting the reasonable inference that they planned to murder Mizell after he met with his drug supplier.

The district court also discounted Jordan and Washington's meeting after the murder because they met one month after the murder, as opposed to hours after like in *Campbell*.[14] (SPA:70). In *Campbell*, the three defendants fled to Peter's apartment, left that apartment with Peter carrying a bag containing essential items for the drug operation, and drove to the hospital in a van driven by a cooperating witness because Peter had been shot during the murder. Here, there was no

---

[14] The district court also accused the government of "fail[ing] to state...that this meeting occurred over a month after Mizell's murder." (SPA:70). But the government explained the timing in its opposition brief, and it provided that timing again on December 16, 2025, when the court asked for a record citation about that meeting. (*See* DE:296 at 11 ("McDonald also testified that about one month after the murder, Washington said he 'had to go meet up with Noid [Jordan]' after the murder and returned 'upset.'"), 320 (citing to the same record and GX 624 as a hotel receipt for that meeting on December 7, 2002)). The court's decision fails to account for this part of the record.

evidence of such an injury to either Jordan or Washington and therefore no need to meet immediately after the murder. Instead, Washington stopped living at Mizell's family home and stayed in hotels with McDonald, which is where he lived when he met Jordan one month later. (A:497). At minimum, the evidence indicates that Jordan's delayed meeting with Washington was designed to avoid suspicion. And the jury could have also considered evidence that Jordan and his father engaged in witness intimidation during that time to tie off loose ends.

The district court made similar errors when describing *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), in which the defendant murdered his co-conspirator for failing to give him a share of drugs the co-conspirator had robbed from a drug dealer. This Court held the evidence was sufficient to establish the defendant had a narcotics-related motive despite the "holes in the Government's proof of motive." *Id.* at 65. It explained there was no evidence of an agreement to share the stolen drugs with the defendant nor any disagreement by the defendant regarding the division of the stolen drugs. *Id.* "Nevertheless," this Court stated, "the evidence presented was sufficient so that a rational jury could find that [the defendant] had a motive to kill [the victim]." *Id.* The

evidence, "which was entirely circumstantial," was that: (1) the defendant suggested to the murder victim that he could likely rob the drug dealer, (2) the victim robbed the dealer of his drugs and a car at gunpoint, (3) the robbed dealer told several people he had been robbed of sixteen ounces, (4) the victim told the defendant twice he had stolen only four ounces and ultimately gave him two quarter ounces, (5) the defendant searched the car from which the drugs were stolen and did not find additional drugs, (6) the defendant notified a co-conspirator that he wanted to talk to the victim, (7) two hours later, the victim was dead, and (8) a witness saw the defendant with a bulge at his waist after the murder. *Id.* at 61-62, 65.

The district court held that *Glenn* was not comparable because this evidence showed the defendant had a narcotics motive since the victim "lied about the robbery proceeds, and the defendant's portion of drugs was 'unacceptably small,'" whereas here, there was "simply no evidence suggesting that Jordan felt cheated by the failure of the Baltimore deal, was disappointed by the proceeds he received from the conspiracy, or sought to steal cocaine from Mizell, much less motivated to kill Mizell because of these reasons." (SPA:68-69). But, in *Glenn*, there

was no direct evidence the defendant knew that the victim lied or that the defendant felt aggrieved by the amount of drugs he had received. *See* 312 F.3d at 61-62, 65. The jury there could infer that motive based on evidence that the defendant received conflicting accounts regarding the quantity of drugs stolen and then wanted to talk to the victim. Here, the jury could similarly infer that Jordan, like Washington, was aggrieved by the failure of the lucrative deal with Yakim, given his subsequent murder of Mizell. In that deal, Jordan was promised—unlike the defendant in *Glenn*—a distribution role. Even more, Jordan committed that murder on the same day, or day after, Mizell was to meet with an associate of the cocaine supplier. Unlike in *Glenn*, there was no evidence here that permitted the inference that anyone else had a motive to kill Mizell—or that Jordan's motive could have been anything other than related to the narcotics conspiracy.

The district court also rejected the government's reliance on *United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016), but its analysis misread the facts in *Vernace*. The court stated that in *Vernace*, "the defendant felt disrespected as a result of a personal dispute," whereas here, there was "no evidence of a personal dispute between Jordan and

Mizell." (SPA:71). But Vernace was not the person who felt disrespected; it was Vernace's fellow Gambino associate, Riccardi, and the government never argued that Vernace had felt disrespected. *Vernace*, 811 F.3d at 616 ("During his interactions at the Shamrock Bar, Riccardi suffered an affront (real or perceived) to himself and to his authority as a Gambino associate, and, by extension, to the family. Vernace, in turn, helped him address the affront. That is, a reasonable jury could have concluded Vernace went so far as to commit murder in a crowded bar because such a public display related to preserving (and even enhancing) the reputation of the Gambino crime family and its members.").

Here, the evidence revealed that the Baltimore deal failed due to Yakim's animosity with Washington. It was reasonable, based on Jordan and Washington's role in the narcotics conspiracy, their close conspiratorial relationship, and their involvement in the murder, to infer that Jordan "helped [Washington] address the affront," as Vernace helped Riccardi. *Id.* In fact, this Court found the fact that Vernace was uninvolved and not present during the dispute at the bar necessarily meant that "the spilled drink was not entirely personal," which meant there could have been no reason for Vernace's involvement other than to

assist a fellow Gambino member, which satisfied the nexus between the murder and the racketeering enterprise. *Id.* at 617.

Simply put, the district court ignored this Court's reminder that seemingly innocent acts taken individually may indicate complicity when viewed collectively. It refused, despite this considerable evidence, to draw the inferences that Jordan knew about the failed deal and blamed Mizell for not receiving the payout he was promised, or that Washington told Jordan about Mizell's plans to meet with the cocaine supplier in October and Jordan wanted to exploit that opportunity for him and Washington. Here, the jurors were entitled to rely on their common sense and experience in drawing inferences of Jordan's knowledge and his criminal intent.

### D. The Jury Was Not Required to Be Unanimous on Which Narcotics-Related Motive Applied or How Jordan Believed the Firearm Would Further the Conspiracy

"[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999).

Count One required proof of a drug-related motive for the murder, but the jury was not required to be unanimous on which drug-related motive applied to the murder, or whether Jordan and Washington had the same narcotics-related motive. Unanimity as to the particular narcotics-related motive is not required because a narcotics-related motive is not an element of Section 848(e)(1)(A). Rather, it is one means of satisfying the "substantive connection" requirement of the "engaging in" element of Section 848(e). *See Aguilar*, 585 F.3d at 660 ("Proof of a Drug-Related Motive Is Sufficient, But Not Necessary, To Satisfy the 'Substantive Connection' Requirement"). This Court explained that "[n]either *Desinor* nor *Santos* [] ruled that only proof of a drug-related motive could satisfy this [substantive connection] requirement" of Section 848(e). *Id.* at 660. *Aguilar* thus confirmed that how the substantive connection requirement is satisfied is a question of means.

In support of its conclusion that the evidence did not prove a narcotics-related motive that applied to Jordan, the district court noted that "tellingly, at trial, the Government did not argue expressly the existence of any of these three motives" that were proposed in the

government's opposition brief. (SPA:65). But the government was not required to do so.

Indeed, the government did not cabin Jordan's intent to one specific motive, instead telling the jury that "whatever the specific motive may have been, it doesn't matter" because they were "all related to the drug conspiracy" and therefore "sufficient under the law." (A:643-44).[15] The government intentionally did not limit the evidence to specific motives before the jury because the evidence permitted several narcotics-related motives for the jury to find. The government was not required to prove which of the possible narcotics-related motives was the motive behind the murder. *See Desinor*, 525 F.3d at 202 ("[T]he government need only prove beyond a reasonable doubt that *one* motive for the killing (or conspiracy to kill) was related to the drug conspiracy. The existence of other motives does not affect the government's ability to satisfy the 'engaging in' element."); *Aguilar*, 585 F.3d at 660 ("a single drug-related motive for a killing, even among many non-drug-related motives"

---

[15] The government added: "Certainly, a cocaine deal worth hundreds of thousands of dollars with the promise of more to come is enough to get someone killed." (A:644).

satisfies Section 848(e)). So long as the jury was unanimous that the trial evidence satisfied the "substantive connection" requirement of the "engaging in" element of Section 848(e), it did not need to be unanimous as to which means (*i.e.*, which drug-related motive) satisfied that element.

Similarly, the jury was not required to unanimously find how each defendant believed the firearm, which was used to murder Mizell, would further the conspiracy in Count Two. Section 924(j)(1) requires that the use of the firearm be "during and in relation to" the commission of the underlying narcotics conspiracy, which is satisfied by evidence that the defendant used the firearm in a manner calculated to further the narcotics conspiracy. *United States v. Wallace*, 447 F.3d 184, 186-87 (2d Cir. 2006); *see Finley*, 245 F.3d at 203 ("[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation [at issue]."). Here, the evidence could have permitted some jurors to believe that Jordan murdered Mizell to punish him, while others may have thought Jordan wanted to steal the remaining cocaine on consignment to sell it, given his desire to be "put on" and questioning of

James as to pricing. The jury needed only to unanimously find that Jordan's use of the firearm to murder Mizell was at least in part to further the narcotics conspiracy.

That the evidence permitted several narcotics-related motives—all of which were interrelated here and provided proof of furtherance of the conspiracy—does not cast the government's evidence into doubt. *See Richardson*, 526 U.S. at 817 ("disagreement about means" among the jurors as to whether the defendant used a gun or a knife "would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force"); *Aller v. United States*, 646 F. App'x 21, 23 (2d Cir. 2016) (unanimity not required as to which motive applied because motive did not represent an element of the crime of murder in-aid-of racketeering under 18 U.S.C. § 1959(a)).

Significantly, the district court read the case law too narrowly to suggest that Jordan himself must have a narcotics-related motive separate from Washington's. Rather, precedent instructs that there can also be "a" narcotics-related motive for the murder that both co-conspirators worked to achieve. As a matter of law, it is sufficient to meet

the substantive nexus if one motive for the murder was because (1) Washington felt aggrieved by Mizell's inability to close the lucrative Baltimore deal with Yakim, or (2) Washington's concerns about exclusion from the narcotics conspiracy were confirmed when Mizell sent him away on October 30, or (3) Washington wanted to steal what he believed was cocaine or money Mizell had in his possession after he met with the cocaine supplier's associate on October 29 or 30—and Jordan knew that motive and shot Mizell as part of that plan. *See Santos*, 541 F.3d at 74-75 (defendant hired to murder two people based on drug dealer's desire for retaliation was properly convicted); *United States v. Walker*, 142 F.3d 103, 113-14 (2d Cir. 1998) (conviction of two defendants based on their co-conspirator's motive to rob the victim who he believed had drugs and money).

E. The Trial Evidence Permitted Several Possible Narcotics-Related Motives for Jordan's Murder of Mizell, All of Which Had the Potential to Further the Narcotics Conspiracy

Based on the trial evidence, the jury could find that at least one motive for Jordan's murder of Mizell was related to the narcotics conspiracy, and that Jordan's use of the firearm was intended to further the narcotics conspiracy.

If Washington's own motives for killing Mizell stemmed from Mizell's failure to convince Yakim to accept the lucrative deal, or from Mizell seemingly excluding Washington from his plans for the narcotics conspiracy, Jordan can be convicted of violating Count One, so long as Jordan knew of that motive and committed the murder. Under this theory, the jury reasonably concluded that Washington wanted to kill Mizell in connection with the narcotics conspiracy, and that he convinced Jordan to do it. *See, e.g.*, *United States v. Kemp*, No. 21-1684-CR, 2023 WL 405763, at *3 (2d Cir. Jan. 26, 2023) (summary order) (Polanco murdered victim drug dealer at Gonzalez's direction because victim was a rival to Gonzalez, even if Polanco's own motive was personal); *United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019) ("[A] reasonable jury could have found that [defendant's] role and offers to serve as 'muscle' assisted his co-conspirators' drug trafficking activities."); *Pierce*, 785 F.3d at 839 ("That [the defendant] did not participate in the narcotics conspiracy in some way other than carrying out the murders does not undermine the sufficiency of the evidence that he was a co-conspirator."); *United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) ("[T]estimony about violent acts and firearm possession during or around

the time of a narcotics conspiracy appropriately establishe[s] [a co-conspirator's] conduct during the charged conspiracy."). The murder and its advance planning, coupled with Jordan and Washington's relationship, Washington's questioning of Mizell, and Washington's subsequent phone call, allowed the jury to conclude that Washington secured Jordan's participation through the narcotics conspiracy rather than over the competing inference that Jordan committed such murder for a personal reason (of which there was no evidence), or no reason at all. *See Vernace*, 811 F.3d at 616 ("Vernace's theory carries with it an air of implausibility. A jury need not credit a theory that is not supported 'by reason and common sense.'").

Yet, there was ample evidence that permitted Jordan to have his own narcotics-related motive. Even though Jordan did not travel with Mizell and Washington to Baltimore, Jordan, like Washington, lost a money-making opportunity when Yakim rejected Mizell's distribution plan for Baltimore. Moreover, like Washington, Jordan could have thought that Mizell was cutting Jordan out of other deals to sell the cocaine and keep the profit for himself. If it was logical for the jury to conclude that this supplied a sufficient narcotics-related motive for

Washington, it is difficult to see how it would not also be sufficient for Jordan.

There was also evidence that supported the conclusion that the defendants murdered Mizell due to the belief that Mizell was in possession of cocaine or drug-related money on October 30. There was evidence that Jordan and Washington planned the murder in advance, and for when Washington believed Mizell was meeting with Unc's associate. There was evidence about how delivery and payment of drugs on consignment works and the potential profits from cocaine sales, and that the day before the murder, Mizell told Watford, who lived at his family home with Washington, to see his accountant, suggesting that Mizell believed he was coming into money. There was evidence that Jordan was interested in expanding his cocaine sales outside of New York when he asked James, who was from Wisconsin, about the prices of cocaine and begged for Mizell to "put [him] on." (A:533). The murder occurred shortly after Washington asked Mizell questions about their upcoming plans for the narcotics conspiracy and Jordan arrived.

The same evidence could also have led the jury to reasonably infer that the defendants killed Mizell to benefit themselves in the

conspiracy. *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir. 1986) ("It is not inconsistent with such an ongoing, unitary conspiracy that disputes might arise...and that switches in affiliation might occur from time to time."). Additionally, there was testimony that Washington knew Unc prior to the August meeting in D.C., and, that, before that meeting, Washington advised Mizell about cocaine pricing in different cities and recommended the price point for the 10 kilograms to which Mizell had agreed, but Mizell left Washington behind in the car when Mizell met with Unc to obtain the cocaine. There was evidence that Washington asked Mizell about the plans for the narcotics conspiracy, even though Washington had already prepared to murder Mizell by then, implying he was seeking information about the conspiracy. There was similar evidence that permitted the inference that Jordan held resentment against Mizell related to his role in the narcotics conspiracy. After all, Jordan had successfully sold his test-run of cocaine and was eager to sell, but Mizell took Washington (who had "messed" up selling his sample), and not Jordan, to Baltimore and on a separate trip to Manhattan where Mizell and Washington discussed the narcotics conspiracy. (A:394-98). And Mizell was unsuccessful in securing the lucrative deal with Yakim.

Jordan admitted two years after the murder that he would "kill [Mizell] again," indicating lasting resentment. (A:584). Drawing all inferences in the government's favor, the jury could have concluded that the defendants murdered Mizell to further their role in the narcotics conspiracy. *See Walker*, 142 F.3d at 114 (rejecting claim of "personal vengeance contrary to the interests of the conspiracy" because robbery and subsequent murder would "strengthen[] the aggressor's position in the local drug trade"). That motive was reasonable, even if Jordan and Washington's belief that they could succeed in the narcotics conspiracy with Unc and without Mizell was not. *See Smith*, 508 U.S. at 238 (stating the firearm under Section 924(c) "at least must facilitate, or have the *potential* of facilitating, the drug trafficking offense") (emphasis added).

As explained above, the government did not need to prove precisely why Jordan was dissatisfied with Mizell, so long as the evidence could permit the reasonable inference that at least one motive for the murder was related to the narcotics conspiracy. The jury was not required to be unanimous on which narcotics-related motive applied to the murder, or that only one applied to the murder, or that the defendants held the same motive.

The evidence does not permit any innocuous competing inference for Jordan's motive for the murder, which was committed with his narcotics co-conspirator. As the district court acknowledged, there was "no evidence of a personal dispute between Jordan and Mizell." (SPA:71). Nor was there any evidence of others who had an equally compelling motive to kill Mizell, as there was in *Glenn* (which led this Court to reverse his conviction). *Glenn*, 312 F.3d at 65. Here, none of the witnesses testified about Mizell harboring animosity towards them or others or about anyone harboring animosity towards Mizell. Instead, numerous witnesses testified about Mizell's generosity with his money and success. (A:184, 218, 237-39, 341-42). Unc also forgave Mizell's outstanding debt when he was killed.

Similarly, it is sufficient for a conviction under Section 924(j) that Jordan thought murdering Mizell would benefit him in the narcotics conspiracy, or the conspiracy itself, in some way. The same evidence outlined above provided a sufficient basis for the jury to rationally find that Jordan used a firearm during and in relation to the narcotics conspiracy at the time of Mizell's murder. All of the motives previously described "afforded some advantage (actual or potential, real or

contingent)" to the narcotics conspiracy—by punishing the co-conspirator who did not complete the promised deal with Yakim, or by killing the co-conspirator to steal narcotics-related money or the cocaine on consignment for the defendants to distribute themselves. *Snow*, 462 F.3d at 62; *see United States v. Lewis*, 62 F.4th 733, 745-46 (2d Cir. 2023); *see also Vernace*, 811 F.3d at 616 (murder that furthers own reputation can enable one "to more effectively carry out the activities of the [organization]"). The jury need not be unanimous on how the use of the firearms furthered the narcotics conspiracy so long as it found that it did. Nor does it matter that Mizell was a member of the same conspiracy if Jordan thought his removal would benefit the conspiracy in some way. *See Glenn*, 312 F.3d at 65.

In sum, the district court's view of the record ignored the evidence at trial and the reasonable inferences to be drawn therefrom. "Nor are the interpretations and inferences urged by the government so speculative as to preclude adoption by a reasonable jury familiar with the totality of the evidence. Indeed, the inferences are entirely consistent with the totality of the evidence[.]" *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012). Jordan was "free to argue—and in fact did

argue—alternative inferences" to the jury in summation, but this Court "cannot conclude that a reasonable jury was compelled as a matter of law to adopt [his] arguments." *Id.*[16]

## III. The District Court Erred When It Failed to Consider Aiding and Abetting Liability

The district court also erred in failing to address the jury's alternative basis for guilt against Jordan—aiding and abetting liability—

---

[16] Without saying so, the district court applied the "equipoise" rule to review the evidence as to Jordan (it disavowed it was doing so as to Washington. (SPA:41). That theory, which has been severely limited by this Court, "appl[ies] only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *United States v. Aquart*, 912 F.3d 1, 45 (2d Cir. 2018). Accordingly, the equipoise rule and "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *MacPherson*, 424 F.3d at 190. The equipoise rule is inapplicable here because the evidence was neither "nonexistent" nor "so meager as to preclude the inference necessary to a finding favorable to the government." *United States v. White*, 7 F.4th 90, 102-03 (2d Cir. 2021). Even if the equipoise rule applied, the district court did not—and could not—draw any inferences consistent with innocence given the evidence of Jordan shooting Mizell; it stated only that the evidence did not permit a narcotics-related motive. Tellingly, the court never identified a possible reason for why Jordan would have participated in murdering Mizell alongside Washington other than something related to their drug trafficking operation. (SPA:71 (admitting "there is simply no evidence of a personal dispute between Jordan and Mizell")).

that had been charged in the Indictment, briefed by the government, and on which the court had instructed the jury. Aiding and abetting liability provided an additional basis to maintain Jordan's convictions on Counts One and Two.

Aiding and abetting liability requires the government to prove that "[the defendant] willfully and knowingly associate[d] himself in some way with the crime, and [sought] by some act to help make the crime succeed." *United States v. Prado*, 815 F.3d 93, 100 (2d Cir. 2016); *see Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("[A] person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission."). A "defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *Rosemond*, 572 U.S. at 73. There is "no authority for demanding that an affirmative act go toward an element considered peculiarly significant; rather, as just noted, courts have never thought relevant the importance of the aid rendered." *Id.* at 75. In terms of intent, the evidence must show the defendant had "at least the degree of criminal intent necessary for the substantive offense itself, but was not required to show that he knew all of the details...so

long as he knew its general nature and extent." *United States v. Archer*, 977 F.3d 181, 190 (2d Cir. 2020); *Rosemond*, 572 U.S. at 78 (aiding and abetting liability for Section 924(c) requires a "defendant's knowledge of a firearm must be advance knowledge…that enables him to make the relevant legal (and indeed, moral) choice").

Jordan was charged in Counts One and Two with aiding and abetting liability. (A:48-49). The district court accordingly instructed the jury about using aiding and abetting liability to convict either defendant of Counts One and Two. (A:658-59, 667-69, 672-76).

Count One provides aiding and abetting liability for "any person...who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual" and "such killing results." 21 U.S.C. § 848(e)(1)(A); *Walker*, 142 F.3d at 113-14. Therefore, even though Washington was not the shooter, he can be found guilty of a substantive violation of Count One based on his role in the murder. Specifically, if Washington caused the killing, due to his narcotics-related motive, his procurement of .40 caliber ammunition and a firearm, and his inducement of Jordan to shoot Mizell, that evidence permits him to be held accountable as a principal under Count One.

Jordan aided and abetted Washington's commission of the offense by doing "some act to help make the crime succeed," which, at a minimum, was by shooting Mizell in the head. *Prado*, 815 F.3d at 100.

The government was required to show that Jordan had the criminal intent to murder Mizell, but not that he knew Washington's narcotics-related motive for doing so. If it were otherwise, and Jordan were required to share the narcotics-related motive, aiding and abetting liability under Section 848(e)(1)(A) would be subsumed into the substantive offense. *See, e.g.*, *Santos*, 541 F.3d at 66 (hired henchman liable as principal). The objective of Section 848(e)(1)(A) is that the killing results; a narcotics conspiracy is one way to satisfy the substantive connection, but the objective of the narcotics conspiracy is not the objective of Section 848(e)(1)(A). *See Walker*, 142 F.3d at 113-14; *see also United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004) (holding that conviction for aiding and abetting depends on defendant's "specific intent of facilitating or advancing the principal's commission of the underlying crime").

Under this theory of liability, Washington wanted to kill Mizell in connection with the narcotics conspiracy, and he recruited

Jordan to do it. The evidence revealed that "[Jordan] knew that [Mizell] would be killed in the confrontation, that he aided in preparations for the murder, and that he accompanied [Washington] to [Mizell's Studio] with the shared intent of carrying out the killing." *Walker*, 142 F.3d at 114. Jordan did not need to know Washington's reason for the murder. *United States v. Heras*, 609 F.3d 101, 108 (2d Cir. 2010) ("[A] defendant need not know all the details of a criminal scheme to be guilty of...aiding and abetting.").

Nonetheless, even under a narrower interpretation that Jordan was required to know Washington had some motive related to narcotics for the murder even if he did not know the exact reason, or, further, was required to know Washington's specific narcotics-related motive, Jordan's role as a co-conspirator in the narcotics conspiracy and the evidence discussed herein, coupled with his affirmative act of shooting Mizell, provided ample evidence to convict him of Count One as an aider and abettor. *See United States v. Abozid*, 257 F.3d 191, 199-200 (2d Cir. 2001) ("Here, the jury convicted appellant of the crime itself. It could hardly have reached that conclusion and have left any possibility that it would have acquitted appellant of aiding and abetting the crime.

There is no element of aiding and abetting the crime that was not found by the jury."); *United States v. Peterson*, 768 F.2d 64, 67 (2d Cir. 1985) (conviction valid "even if some jurors believed that [the defendant] and the other jurors believed that [the co-defendant] was the aider or abettor").

Jordan can be held liable as an aider and abettor under Section 924(j) for the same reasons, even as the shooter. In *United States v. Caraballo*, No. 12-CR-105, 2014 WL 3535348, at *6, 8-10 (D. Vt. July 16, 2014), there was conflicting testimony as to whether the defendant discharged the firearm that killed the victim or his co-conspirator shot the victim at the defendant's direction. The jury credited the latter theory, and indicated on the verdict form that it found the defendant caused the death of the victim, but that he did not discharge the firearm, which still permitted a conviction as principal under Section 924(j) in connection with the defendant's "us[ing], carr[ying] a firearm...or possess[ing] a firearm." *Id.* at *1-2; 18 U.S.C. § 924(c)(1)(A). This Court affirmed the defendant's conviction as a principal under Section 924(j), even though he was not the shooter. *United States v. Caraballo*, 658 F. App'x 595, 597 (2d Cir. 2016). Here, Washington

gathered ammunition and a firearm and pointed his firearm at High to block her from escaping the Studio to seek help. If Washington wanted Mizell dead to further the narcotics conspiracy, as the evidence demonstrated, then Jordan can be found guilty as aiding and abetting Washington, even if he was the person who shot Mizell.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court's judgment of acquittal on Counts One and Two and reinstate the jury's guilty verdict against Jordan.

Dated: Brooklyn, New York
April 16, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*.

By: /s/ MIRANDA GONZALEZ
MARK E. MISOREK
MIRANDA GONZALEZ
Assistant U.S. Attorneys

AMY BUSA,
MARK E. MISOREK,
MIRANDA GONZALEZ,
*Assistant United States Attorneys*,
(*Of Counsel*).

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Second Circuit Rule 32.1(a)(4), and this Court's order of April 8, 2026, permitting the filing of an oversized brief of no more than 20,000 words because the brief contains 18,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
April 16, 2026

/s/ AMY BUSA
AMY BUSA
Assistant U.S. Attorney