# 26-918-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellant,*

– v. –

RONALD WASHINGTON, AKA Tinard, JAY BRYANT, AKA Bradshaw Dewitt, AKA Jason Robinson, AKA Morgan Bryant, AKA Deshawn Sadler, AKA Jay Sadler, AKA Big Jay,

*Defendants,*

KARL JORDAN, JR., AKA Little D, AKA Noid,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLEE**

JOHN A. DIAZ
DIAZ & MOSKOWITZ, PLLC
225 Broadway, Suite 715
New York, New York 10007
(212) 227-8208

EMILEE A. SAHLI,
SAHLI LAW, PLLC
195 Broadway, 4th Floor
Brooklyn, New York 11211
(347) 378-8132

MICHAEL HUESTON, ATTORNEY AT LAW
26 Court Street, Suite 1504
Brooklyn, New York 11242
(718) 246-2900

MARK S. DEMARCO
LAW OFFICE OF MARK S. DEMARCO
100 Lafayette Street, Suite 501
New York, New York 10013
(718) 239-7070

*Attorneys for Defendant-Appellee*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394369)

# TABLE OF CONTENTS

**Page**


Table of Authorities .......... v

Statement of Subject Matter and Appellate Jurisdiction .......... 1

Preliminary Statement .......... 1

Statement of Facts .......... 5

A. The Charges and Severance .......... 5

B. The 2022 Detention Proceedings .......... 6

C. In Limine and Anonymous Jury Proceedings .......... 7

D. Jay Bryant Proceedings .......... 10

E. The Trial on Counts One and Two .......... 12

1. Preliminary Statement .......... 12

2. Conspiracy and Motive Witnesses .......... 14

a. Ralph Mullgrav .......... 14

b. Eric James .......... 16

c. John Gardiner .......... 18

d. Daynia McDonald .......... 20

e. Christopher Burrell .......... 23

f. Detective John Roberts .......... 25

g. Stephon Watford .......... 28

h. William Marshall .......... 32

i. Special Agent Andrew Tummino .......... 33

3. Homicide Investigation Witnesses ........................................ 34

a. Tanya Davis ........................................................... 35

b. Lydia High ............................................................. 37

c. Detective Thomas Lockwood ..................................... 39

d. Derrick Parker ........................................................ 41

e. Tony Rincon ........................................................... 42

f. Yarrah Concepcion .................................................. 45

g. Randy Allen ........................................................... 47

h. Michael Rapley ....................................................... 50

i. Marc Stay ............................................................... 51

4. Jordan's Alleged Confession ............................................. 53

5. Evidence that Jay Bryant was the Shooter and Two Confessions ........................................................................ 55

a. Raymond Bryant ..................................................... 55

b. Criminal Lisa Faber ................................................ 57

c. Assistant Director Tiffany Vasquez ......................... 58

6. Government's Attempt to Connect Bryant to Jordan ............. 60

a. Lewis Gonzalez ....................................................... 60

b. Zaire Flournay ........................................................ 61

7. Law Enforcement Response and Crime Scene ...................... 62

a. Lieutenant William Egan .......................................... 62

b. Detective James Lusk ............................................... 63

c. Detective Robert Sorensen ........................................ 65

d. Detective William Lappe .......... 66

e. Detective Lydia Cruz-King .......... 67

f. Detective John Reynolds .......... 68

g. Detective Jessica Ortiz .......... 69

h. Examiner Therese Moynihan .......... 70

i. Dr. Corinne Ambrosi .......... 71

j. Jagjeet Bains, Gunshot Residue Expert .......... 72

8. Ammunition Experts .......... 73

a. Steven Rodgers .......... 73

b. George Kass .......... 74

9. Case Agent Kristy Doerner .......... 75

10. Notable Stipulations .......... 77

F. Post Trial Motion and Decision .......... 79

1. Rule 29 .......... 79

2. Rule 33 .......... 80

G. Second Bond Application .......... 81

Summary of Argument .......... 82

Argument .......... 84

I. Applicable Law and Standard of Review .......... 84

II. The District Court Did Not Clearly Err in Ruling That the Government Failed to Meet its Burden of Persuasion to Prove That Jordan Posed a Danger to the Community and Was a Flight Risk Review .......... 87

A. The Nature and Circumstances of the Charged Offenses, Together with the Weight of the Evidence, Favored Release ........ 88

1. Preliminary Statement ........ 88

2. Rule 29 Dismissal of Counts One and Two........ 91

a. The Failure to Prove Jordan's Narcotics Related Motive ........ 92

b. Lack of Proof of Motive........ 96

c. Further Discussion of Count Two ........ 113

d. Recent Rule 29 Decisions ........ 117

e. The Equipoise Rule ........ 121

f. Newly Advanced Aiding-and-Abetting Theory ........ 124

g. The Homicide Evidence Was Not One Sided........ 129

B. The District Court Did Not Cleary Err in Assessing Counts Three Through Eleven ........ 131

C. The District Court Did Not Cleary Err in Assessing the Government's Uncharged Evidence........ 133

D. The District Court Did Not Cleary Err Regarding Flight Risk........ 139

E. The District Court Did Not Cleary Err in Finding the Bail Package Adequate........ 142

Conclusion........ 145

# TABLE OF AUTHORITIES

**CASES** **Page**

*Anderson v. Bessemer City*,
470 U.S. 564 (1985) .......................................................................... 86

*Delaney v. Farley*,
623 F. App'x 14 (2d Cir. 2015) ...................................................... 121

*Johnson v. United States*,
144 F.4th 133 (2d Cir. 2025) .......................................................... 118

*Norton v. Sam's Club*,
145 F.3d 114, 117 (2d Cir. 1998) ................................................... 121

*Richardson v. United States*,
526 U.S. 813 (1999) ............................................................... 114, 115

*Rosemond v. United States,*
572 U.S. 65 (2014) .................................................. 124, 125, 126, 128

*Smith v. United States,*
508 U.S. 223 (1993) ............................................................... 105, 106

*United States v. Abozid*,
257 F.3d 191 (2d Cir. 2001) ........................................................... 128

*United States v. Abuhamra*,
389 F.3d 309 (2d Cir. 2004) ............................................................. 86

*United States v. Archer*,
977 F.3d 181 (2d Cir. 2020) ........................................................... 128

*United States v. Aguilar*,
585 F.3d 652 (2d Cir. 2009) ........................................................... 104

*United States v. Aller*,
646 F. App'x 21 (2d Cir. 2016) ...................................................... 114

*United States v. Anderson*,
747 F.3d 51 (2d Cir. 2014) ...................................................... 107, 108

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) .......... 122

*United States v. Arrington*,
941 F.3d 24 (2d Cir. 2019) .......... 102

*United States v. Barone*,
387 F. App'x 88 (2d Cir. 2010) .......... 136

*United States v. Belardo*,
No. 20-CR-126-LTS, 2020 U.S. Dist. LEXIS 61450 (S.D.N.Y. Apr. 7, 2020) .......... 136

*United States v. Blondet*,
No. S13 16-CR-387 (JMF),
2022 U.S. Dist. LEXIS 217762 (S.D.N.Y. Dec. 2, 2022) .......... 119, 120

*United States v. Bruno*,
383 F.3d 65 (2d Cir. 2004) .......... 119

*United States v. Campbell*,
850 F. App'x 102 (2d Cir. 2021) .......... 96, 97, 100

*United States v. Caraballo*,
658 F. App'x 595 (2d Cir. 2016) .......... 128

*United States v. Carson*,
702 F.2d 351 (2d Cir. 1983) .......... 111

*United States v. Cole*,
158 F.4th 113 (2d Cir. 2025) .......... 111

*United States v. Colombo*,
777 F.2d 96 (2d Cir. 1985) .......... 137

*United States v. Desinor*,
525 F.3d 193 (2d Cir. 2008) .......... 103

*United States v. Dillard*,
214 F.3d 88 (2d Cir. 2000) .......... 136

*United States v. Diaz*,
176 F.3d 52 (2d Cir. 1999) .......... 119

*United States v. Dono*,
275 F. App'x 35 (2d Cir. 2008) ............................................ 137, 138

*United States v. English*,
629 F.3d 311(2d Cir. 2011) ............................................................ 86

*United States v. Ferranti*,
66 F.3d 540, (2d Cir. 1995)............................................ 85, 137, 144

*United States v. Finley*,
245 F.3d 199 (2d Cir. 2001) ......................................................... 115

*United States v. Florez*,
447 F.3d 145 (2d Cir. 2006) ......................................................... 136

*United States v. Frampton*,
382 F.3d 213 (2d Cir. 2004) ............................................... 117, 127

*United States v. Friedman*,
837 F.2d 48 (2d Cir. 1988) ............................................................ 85

*United States v. Guadagna*,
183 F.3d 122 (2d Cir. 1999) ......................................................... 119

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ......................................... 96, 97, 99, 100

*United States v. Heras*,
609 F.3d 101 (2d Cir. 2010) ............................................... 127, 128

*United States v. Heinemann*,
801 F.2d 86 (2d Cir. 1986) ........................................................... 107

*United States v. Holmes*,
858 F. App'x 429 (2d Cir. 2021) .................................................. 134

*United States v. Jackson*,
335 F.3d 170 (2d Cir. 2003) ................................................. 96, 123

*United States v. Kemp*,
No. 21-1684-cr (CON), 2023 U.S. App. LEXIS 2009
(2d Cir. Jan. 26, 2023) ................................................................. 103

*United States v. Klein*,
913 F.3d 73 (2d Cir. 2019) .......................................................... 108

*United States v. Khusanov*,
731 F. App'x 19 (2d Cir. 2018) ...................................................... 141

*United States v. LaFontaine*,
210 F.3d 125 (2d Cir. 2000) .......................................................... 86

*United States v. Leon*,
766 F.2d 77 (2d Cir. 1985) ............................................................ 135

*United States v. Lewis*,
62 F.4th 733 (2d Cir. 2023) ........................................................... 108

*United States v. Liebowitz*,
669 F. App'x 603 (2d Cir. 2016) .................................................... 141

*United States v. MacPherson*,
424 F.3d 183 (2d Cir. 2005) ................................................... 108, 122

*United States v. MacKey*,
143 F.4th 129 (2d Cir. 2025) ................................................. 118, 119

*United States v. Marino*,
396 F. App'x 728 (2d Cir. 2010) ........................................... 134, 138

*United States v. Martir*,
782 F.2d 1141, (2d Cir. 1986)......................................................... 85

*United States v. Mattis*,
963 F.3d 285 (2d Cir. 2020) ................................................... 143, 144

*United States v. Mercedes*,
254 F.3d 433, (2d Cir. 2001)............................................... 85, 87, 138

*United States v. Millan*,
4 F.3d 1038 (2d Cir. 1993) ............................................................ 135

*United States v. Nina,*
734 F. App'x 27 (2d Cir. 2018) ...................................................... 105

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011) ........................................................ 111

*United States v. Orena*,
986 F.2d 628 (2d Cir. 1993) ........................................................ 135

*United States v. Panebianco*,
543 F.2d 447 (2d Cir. 1976) ........................................................ 107

*United States v. Patterson*,
25 F.4th 123 (2d Cir. 2022) ........................................................ 136

*United States v. Pauling*,
924 F.3d 649 (2d Cir. 2019) ........................................................ 110

*United States v. Peterson*,
768 F.2d 64 (2d Cir. 1985) .......................................................... 128

*United States v. Pierce*,
785 F.3d 832 (2d Cir. 2015) .................................................... 97, 101

*United States v. Plitman*,
194 F.3d 59 (2d Cir. 1999) .......................................................... 111

*United States v. Rodriguez*,
950 F.2d 85, (2d Cir. 1991)...................................................... 85, 134

*United States v. Sabhnani*,
493 F.3d 63 (2d Cir. 2007)........................................................ passim

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) .......................................................... 106

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008) .................................... 104, 115, 116, 128

*United States v. Santiago-Ortiz*,
No. 17-cr-0149 (LAK),
2018 U.S. Dist. LEXIS 144280 (S.D.N.Y. Aug. 23, 2018) .... 119, 120

*United States v. Scali*,
738 F. App'x 32 (2d Cir. 2018) ..................................................... 141

*United States v. Shakur*,
817 F.2d 189 (2d Cir. 1987)........................................................ 85, 86

*United States v. Snow*,
462 F.3d 55 (2d Cir. 2006) .................................................... 108, 109

*United States v. Stanley*,
928 F.2d 575 (2d Cir. 1991) .................................................. 111, 112

*United States v. Sureff*,
15 F.3d 225 (2d Cir. 1994) ............................................................ 108

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994) ............................................................ 119

*United States v. Truman*,
688 F.3d 129 (2d Cir. 2012) .......................................................... 110

*United States v. Valle*,
807 F.3d 508 (2d Cir. 2015) .......................................................... 119

*United States v. Vernace*,
811 F.3d 609 (2d Cir. 2016) ............................................ 96, 97, 119

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998) ...................................................... passim

*United States v. Wallace*,
447 F.3d 184 (2d Cir. 2006) .......................................................... 115

*United States v. White*,
7 F.4th 90 (2d Cir. 2021) .............................................................. 122

*United States v. Zhe Zhang*,
55 F.4th 141 (2d Cir. 2022) ............................................................ 135

**RULES, REGULATIONS AND GUIDELINES**

18 U.S.C. § 848 ................................................................................ passim

18 U.S.C. § 924 ................................................................................ passim

18 U.S.C. § 3142 .............................................................................. passim

18 U.S.C. § 3143 .............................................................. 85, 86, 141

18 U.S.C. § 3582 .............................................................................. 134

21 U.S.C. § 848 ........................................................................ passim

Fed. R. Crim. P. 29. .................................................................. passim

Fed. R. Crim. P. 33. .................................................................. passim

Fed. R. Evid. 403 ................................................................................ 8

Fed. R. Evid. 404 .............................................................. 7, 8, 9, 10

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The United States of America ("Appellant" or "the Government") appeals from an order entered on April 6, 2026, in the United States District Court for the Eastern District of New York (DeArcy Hall, J.), granting Defendant-Appellee Karl Jordan, Jr.'s renewed motion for release pending further proceedings. (SPA4-23).[1]

## PRELIMINARY STATEMENT

The Government's appeal rests on a single, mistaken premise: that Judge DeArcy Hall "reversed" herself when she granted Karl Jordan's renewed application for release. The record demonstrates precisely the opposite. Rather than departing from her earlier rulings, the district court faithfully applied the Bail Reform Act to a materially different procedural posture and a substantially expanded factual record.

In 2022, the district court denied Jordan's initial bail application before resolving extensive motions in limine, before trial, before deciding the Fed. R. Crim. P. 29 and Fed. R. Crim. P. 33 motions, and while Jordan faced two intact homicide charges carrying extraordinary penalties. At that

[1]References to "A", "Br.," "SPA," "SA," and "DE" refer to the Governments' appendixes and briefs, Jordan's supplemental appendix, the trial transcript and entries on the district court docket, respectively.

stage, the court evaluated detention through the lens of the indictment, the statutory presumption, and the Government's proffers. Indeed, the court repeatedly recognized that many of Jordan's challenges to the Government's proof could not yet be meaningfully evaluated because no trial record existed.

Four years later, the case looked fundamentally different. Judge DeArcy Hall had presided over a five-week trial, observed the witnesses firsthand, considered extensive post-trial briefing, granted Jordan's Rule 29 motion on the very counts that had driven his detention, and issued detailed findings explaining why the Government's narcotics-motive theory was legally insufficient. The court also considered the Rule 33 record, including evidence that co-defendant Jay Bryant—not Jordan—could reasonably be viewed as the shooter. Although Rule 33 relief was denied under its demanding standard, the court's analysis confirmed that the homicide evidence was substantially more complex than the Government's appellate brief suggests.

By then, Jordan had spent approximately five and one-half years in federal custody without any reported violent incident, despite himself having been the victim of violence while incarcerated. The alleged violent conduct on which the Government relied on to oppose bail was more than twenty

years old. Although Counts Three through Eleven remained pending, those counts had been severed from the homicide trial, and the alleged narcotics and firearm offenses were from 2016 through 2020, not ongoing violent conduct through 2026. Additionally, the proposed release package was substantial and included a $1 million bond, seventeen financially responsible sureties, pledged real property, electronic location monitoring, and numerous additional court-imposed conditions.

Judge DeArcy Hall did exactly what the Bail Reform Act requires. She recognized the statutory presumption, heard argument as to whether Jordan had rebutted it, evaluated the remaining charges, reconsidered Counts One and Two in light of the evidence presented at trial and the Rule 29 judgment of acquittal, assessed the Government's allegations concerning Counts Three through Eleven and the alleged uncharged conduct, evaluated the risk of flight and danger to the community, and carefully considered the proposed release conditions. She then made the predictive judgment entrusted to district courts under 18 U.S.C. § 3142, that the Government had failed to establish that no condition or combination of conditions could reasonably assure Jordan's appearance and the safety of the community.

On appeal, the Government argues that the district court: (1) failed to give sufficient weight to Counts One and Two, including the evidence

identifying Jordan as the shooter; (2) improperly departed from its earlier assessment of the evidence and Jordan's dangerousness with respect to Counts Three through Eleven; (3) improperly reconsidered its prior evaluation of the alleged uncharged conduct and witness-tampering evidence; and (4) erred in concluding that the proposed release conditions reasonably assured Jordan's appearance and the safety of the community. Each argument mischaracterizes both the district court's decision and the record developed over years of litigation.

Ultimately, the Government identifies no legal error. It does not credibly contend that the district court misunderstood § 3142, failed to apply the statutory presumption, overlooked Jordan's sentencing exposure, ignored the proposed release conditions, or applied the wrong legal standard. Instead, it asks this Court to reweigh the same record and substitute its own predictive judgment for that of the district judge who managed this prosecution for years, presided over the trial, observed the witnesses firsthand, resolved the post-trial motions, and conducted the renewed detention hearing.

That is not the function of clear-error review. As a result of the district court's correct application of the legal standard, careful consideration of the

relevant statutory factors, and reasoned conclusion supported by the record, its release order should be affirmed.

## STATEMENT OF FACTS

### A. The Charges and Severance

Jordan was charged with two distinct sets of offenses arising from different time periods. Counts One and Two stemmed from the October 30, 2002 murder of Jason Mizell. Count One charged murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A), and Count Two charged firearm-related murder, in violation of 18 U.S.C. § 924(j). DE 151.

Counts Three through Eleven alleged narcotics and firearm offenses occurring between 2016 and 2020, including a narcotics conspiracy, a related firearm offense, and substantive distribution counts. DE 151.

The district court severed Counts One and Two from Counts Three through Eleven. DE 107. Accordingly, the 2024 trial involved only the homicide-related counts, while Counts Three through Eleven remain pending and have not yet been tried. That severance is significant because the release order on appeal was entered only after the district court had presided over the homicide trial and entered a Rule 29 judgment of acquittal on Counts One and Two, leaving only the severed counts awaiting trial.

Jay Bryant was later charged in Counts One and Two, but the district court severed his trial from that of Jordan and Ronald Washington. Bryant was therefore not tried with either defendant. DE 184.

**B. <u>The 2022 Detention Proceedings</u>**

In 2022, Jordan moved for pretrial release. DE 73. The district court denied that application. DE 77.

The Government now treats the 2022 detention order as though it resolved the same question presented in 2026 on the same record. It did not. The 2022 proceeding occurred in a materially different procedural posture.

At that time, Counts One and Two remained intact, no trial had occurred, and the district court had not yet evaluated the Government's evidence through live testimony, cross-examination, or post-trial motions. Also, the Court had yet to determine whether the Government's proof established the legally required nexus between the charged narcotics and the murder, nor had it considered the Rule 29 and Rule 33 records that ultimately shaped its later rulings. Additionally, Jordan had not yet spent nearly six years in federal custody without any reported violent incident.

Accordingly, the 2022 ruling necessarily rested on the indictment, the statutory presumption, and the Government's proffers. The district court expressly recognized that many of the defense's challenges to the

Government's evidence could not yet be meaningfully evaluated because the witnesses had not testified and the evidence had not been tested at trial.

Those limitations matter. A detention determination based largely on an indictment and proffer does not permanently fix the Bail Reform Act analysis. Section 3142 requires the district court to assess, based on the information available at the time of its decision, whether any condition or combination of conditions can reasonably assure the defendant's appearance and the safety of the community. When the factual record materially changes, the court is not only permitted to revisit that determination, but it is expected to do so.

### C. In Limine and Anonymous Jury Proceedings

Beginning in October 2022, the parties engaged in more than a year of extensive in limine litigation concerning the admissibility of the Government's proposed evidence. The Government sought advance rulings admitting broad categories of alleged co-conspirator statements, defendant admissions, Rule 404(b) evidence, alleged firearms possession, narcotics trafficking, witness intimidation, recorded jail calls, rap lyrics and videos, recorded recollections, and evidence concerning alternative perpetrators. DE 113. Jordan and Washington opposed many of those requests, arguing that the proposed evidence lacked a sufficient nexus to the charged homicide,

constituted impermissible propensity evidence, or should be excluded under Rules 403 and 404(b). DE 121, 123. The Government replied, while acknowledging that the defense had established a sufficient evidentiary basis to argue that Jay Bryant was the shooter. DE 125.

While those motions remained pending, the Government sought an anonymous and partially sequestered jury based largely on the same allegations of dangerousness, firearms possession, witness intimidation, and obstruction that later reappeared in its opposition to bail. DE 129. Judge DeArcy Hall convened an emergency conference, expressed concern over the Government's late filing, established an expedited briefing schedule, and ultimately granted the motion only after extensive briefing and oral argument. SA80-115; SA1-79. The late filing required adjournment of the scheduled February 2023 trial, and the court later explained that the delay resulted from the Government's untimely motion—not any lack of diligence by the court. SA94-115.

The evidentiary litigation continued throughout 2023. At the court's direction, the Government filed multiple supplemental submissions identifying the specific Rule 404(b) evidence, witness-intimidation evidence, jail calls, and other materials it sought to introduce. DE 134 (sealed), 141, 144, 145, 174 (sealed), 180. Jordan and Washington responded with detailed

objections challenging the admissibility, foundation, authentication, hearsay, relevance, and prejudicial effect of that evidence. Throughout the process, Judge DeArcy Hall repeatedly required the Government to particularize its evidentiary theories and justify the admissibility of individual categories of proof.

On January 11, 2024, after more than a year of briefing, supplemental submissions, hearings, and oral argument, Judge DeArcy Hall issued a comprehensive written order resolving fifty-two separate evidentiary requests. DE 215. Rather than ruling categorically, the court addressed each request individually, admitting some evidence, excluding other categories entirely, limiting the scope of others, reserving certain issues for trial, and requiring portions of the Government's proposed proof to be presented in sanitized form. Among other rulings, the court substantially narrowed the Government's proposed Rule 404(b) evidence, excluded significant portions of its witness-intimidation evidence, limited firearms evidence, and rejected numerous categories of alleged uncharged conduct. DE 215.

These rulings are significant because they encompass the same categories of alleged uncharged conduct and witness intimidation that the Government later relied upon in opposing Jordan's renewed bail application. Compare DE 215 (Order Chart, In Limine Nos. 24, 26, 27, 30, 34) with DE

332 at 3-4. Notably, although the Government initially sought to introduce evidence that Jordan had participated in a Farmers Boulevard shooting for which the charges had been dismissed, it ultimately abandoned that request before trial. DE 332 at 4.

The parties continued litigating evidentiary issues immediately before and during trial. DE 216, 218, 220, 224, 228-245 (including DE 244 (sealed)). At the January 17, 2024 pretrial conference, Judge DeArcy Hall further refined the scope of admissible evidence, directed that portions of the Rule 404(b) evidence be sanitized before presentation to the jury, and resolved the remaining evidentiary issues immediately preceding jury selection. SA116-51.

Accordingly, by the time the district court considered Jordan's renewed bail application in 2026, it had already spent more than a year carefully evaluating the Government's allegations of prior violence, firearms possession, narcotics trafficking, witness intimidation, obstruction, jail calls, rap lyrics, and other alleged misconduct through extensive briefing, hearings, and individualized evidentiary rulings.

## D. Jay Bryant Proceedings

During the pendency of this case, the Government substantially expanded the prosecution by obtaining a Second Superseding Indictment,

adding Jay Bryant as a third defendant charged with the same homicide counts as Jordan and Washington. DE 152. The Government alleged that Bryant entered Studio 24/7 with Jordan and Washington, that Bryant's DNA was recovered from evidence at the crime scene, and that Bryant later admitted participating in the homicide and claimed to have been the shooter, although the Government continued to maintain that Jordan fired the fatal shots. DE 152.

Bryant's addition generated extensive litigation concerning severance, antagonistic defenses, trial scheduling, and the admissibility of evidence relating to Bryant's alleged confession. Bryant argued that Jordan and Washington intended to defend themselves by presenting evidence that Bryant alone committed the homicide, including testimony from a neutral witness concerning Bryant's alleged confession. DE 175-177, 183. The Government opposed severance, characterizing the anticipated defenses as ordinary blame shifting. DE 181.

Judge DeArcy Hall granted Bryant's motion to sever. DE 184. The court concluded that the anticipated confession evidence and the defendants' mutually antagonistic defenses created a substantial risk of prejudice that could not be adequately cured through limiting instructions. In reaching that conclusion, the court relied in part on the Government's earlier

acknowledgment that Bryant, previously identified as "Co-Conspirator 1", provided a sufficient evidentiary basis for the defense to pursue an alternative-perpetrator theory. DE 184.

The Government later sought to reunite the cases through a dual-jury trial, which Bryant opposed as inconsistent with the severance ruling and fraught with constitutional and practical concerns. DE 186, 189.

Accordingly, long before ruling on Jordan's Rule 29 motion or renewed application for release, Judge DeArcy Hall had already devoted substantial attention to Bryant's alleged role in the homicide, including the Government's evidence concerning Bryant's DNA, Bryant's alleged confession, the defendants' alternative-perpetrator theory, and the constitutional implications of trying all three defendants together. That history, along with the trial evidence, was set by the time of the second detention hearing.

## E. <u>The Trial on Counts One and Two</u>

### 1. Preliminary Statement

The trial on Counts One and Two began in January 2024 and lasted approximately five weeks. The Government presented thirty-eight witnesses. The theory was that Jordan and Ronald Washington murdered Jason Mizell because of a narcotics conspiracy. Specifically, the Government contended

that Mizell, Washington, and Jordan were involved in a cocaine-distribution arrangement; that a lucrative Baltimore cocaine venture involving Ralph Mullgrav had collapsed; that Jordan and Washington expected to profit from that venture; and that the homicide was committed because of that failed narcotics arrangement. SA1608-10, SA1615-16.

The Government's proof addressed two distinct issues: first, whether Jordan was one of the shooters; and second, whether the homicide was committed because of the charged narcotics conspiracy. The evidence supporting those issues differed substantially.

Much of the Government's narcotics evidence focused on Washington, including his relationship with Mizell, his involvement in the proposed Baltimore transaction, his alleged frustration following its collapse, and his own statements. SA498-99, SA677, SA681, SA685, SA952, SA955, SA957, SA1551-53; SA1691. By contrast, the Government introduced comparatively little evidence connecting Jordan to Washington's alleged narcotics-related motive.

The Government also presented evidence identifying Jordan as the shooter. That evidence, however, was vigorously disputed. The defense presented substantial evidence supporting the alternative theory that Jay Bryant was the shooter, including evidence concerning Bryant's presence at

the scene, eyewitness descriptions, DNA recovered from a hat found at the scene, and testimony regarding Bryant's alleged admissions.

The Government's narcotics case rested principally on the testimony of Ralph Mullgrav, Eric James, Daynia McDonald, and Sean Gardiner. The evidence presented by those witnesses and its significance to the issues before this Court is summarized below.

**2. Conspiracy and Motive Witnesses**

**a. Ralph Mullgrav**

Ralph Mullgrav, who was also known as "Yak" or "Yakim," testified that he had known Jason Mizell for many years and considered him a friend. In August 2002, while living in Baltimore, Mizell proposed that Mullgrav distribute approximately ten to twenty kilograms of cocaine supplied through a Midwestern source. SA676.

According to Mullgrav, however, the proposal depended upon Ronald Washington ("Tinard") participating in the operation. Mullgrav immediately rejected the plan because he refused to work with Washington:

> Q: Was there a problem with the plan?
>
> A: Yes. He wanted me to involve another guy I grew up with named Tinard. We both grew up with Tinard. He wanted me to work with Tinard and I told him no.
>
> Q: Was Tinard a problem?

A: Yes, he was a problem.

SA677.

Mullgrav testified that Mizell spent much of the day attempting to change his mind, but he never relented. SA677-78. He further testified that although Mizell had previously supplied him with one- or two-kilogram quantities of cocaine, Mizell "wasn't a drug dealer. He just used it to make ends meet here and there." SA679. Mullgrav himself testified that he distributed approximately thirty to forty kilograms of cocaine each month through a Baltimore drug organization and later served approximately twelve years in federal prison for narcotics trafficking. SA682.

On cross-examination, Mullgrav confirmed that the proposed Baltimore transaction never occurred:

> Q: And he came to you for permission to put Tinard in Baltimore; am I right?
>
> A: Yes.
>
> Q: And you said no, right?
>
> A: Yes.
>
> Q: So no deal, right?
>
> A: **No deal.**

SA685. (emphasized)

Mullgrav never testified that Karl Jordan participated in the Baltimore discussions, attended any meeting with Mullgrav, knew of the proposal, communicated with Mullgrav, or otherwise played any role in the proposed transaction. His testimony established only that Mizell proposed a Baltimore cocaine venture involving Washington, Mullgrav refused to work with Washington, and the proposed transaction never came to fruition.

**b. Eric James**

Eric James, known as "Shake," testified that he had been one of Jason Mizell's closest friends for nearly twenty years and that they spoke almost daily. SA1272-73. James also testified that he sold cocaine from approximately 1985 until 2002 and was familiar with wholesale cocaine distribution. SA1277-80, SA1321.

James testified that, by the early 1990s, Mizell periodically sold cocaine and that the two discussed narcotics prices, suppliers, and distribution. At the same time, James distinguished Mizell's involvement from his own:

> Q: How would you describe your involvement in the drug trade when compared to Jason's, as you understood it?
>
> A: That's like really not what he did, you know what I'm saying. It's more what I did. He wasn't really like, you know, like a drug dealer like that.

SA1280.

According to James, in 2002, Mizell introduced him to a cocaine supplier known as "Unc" after James's previous source became unavailable. SA1280, SA1754.

James also testified about conversations involving Karl Jordan. He identified Jordan as "Little D" or "Noid" and stated that, during the summer of 2002, Jordan asked what cocaine was "going for" and asked James to tell Mizell to "put me on," which James understood as a request to receive cocaine from Mizell. SA1283-1285. James further testified that Mizell later told him he had given Jordan one ounce of cocaine "to try him out" and that Jordan had successfully sold it. SA1296-97.

James acknowledged, however, that he never personally observed Jordan possess or sell narcotics. His testimony concerning Jordan's alleged narcotics activity came entirely from conversations with Mizell rather than firsthand observation. SA1298, SA1333-34.

James further testified that Mizell discussed plans during the summer of 2002 to establish cocaine distribution in Baltimore using Ralph Mullgrav, Ronald Washington, and Jordan. SA1288-1305. However, James testified that Mizell never told him what ultimately became of those plans. SA1305.

James also recalled that, one or two days before the homicide, Mizell became upset during a telephone call. James remembered hearing only one

name: "Tinard" and observed that Mizell appeared visibly agitated afterward. SA1311-14. The district court limited James's testimony to those observations and excluded testimony concerning the substance of the conversation. SA1311-13.

On cross-examination, James acknowledged that he did not disclose Jordan's alleged inquiry about cocaine prices during his initial interview with investigators in 2018, first reporting it in a later interview in 2020. SA1335-37. He also confirmed that Jordan was Mizell's godson, appeared to have a good relationship with Mizell, and that James never personally observed Jordan possess or distribute cocaine. SA1298, SA1333-34.

James provided no firsthand evidence that Jordan participated in narcotics trafficking and expressly acknowledged that he did not know whether the proposed Baltimore venture ever came to fruition. Those two evidentiary gaps became central to the district court's later conclusion that the Government failed to establish the charged narcotics nexus beyond a reasonable doubt.

**c. John Gardiner**

John Gardiner testified that, in October 2003, while a reporter for *Newsday*, he conducted a telephone interview with Ronald Washington for a one-year anniversary article concerning Jason Mizell's murder. SA1230-31.

Gardiner never met Washington in person, and his testimony concerning the alleged narcotics activity was based entirely on Washington's statements during that interview. SA1230-31, SA1235.

According to Gardiner, Washington stated that, during the summer of 2002, he and Mizell traveled to Washington, D.C., where they met a narcotics supplier known as "Uncle" at a luxury hotel. Gardiner testified that Washington claimed "Uncle" fronted Mizell approximately $120,000 worth of cocaine, which Mizell transported to Baltimore, where the purchasers failed to repay him. SA1232. Gardiner further testified that Washington said an associate of "Uncle" was scheduled to meet with Mizell on or about the day before, or the day of, the homicide. SA1232-34.

Gardiner also testified that Washington denied reports that Mizell had been experiencing financial difficulties, stating that Mizell "always took care of" those around him. SA1233-34.

On cross-examination, Gardiner acknowledged that he did not independently verify the principal factual assertions made during the interview. SA1234-36. Washington never identified "Uncle" by name or identified the hotel where the alleged meeting occurred, leaving Gardiner unable to corroborate those details. SA1235. Gardiner further acknowledged that, while preparing the article, law enforcement sources advised him they

had found no evidence that Jason Mizell had been involved in narcotics trafficking before his death. SA1235-36.

Gardiner offered no firsthand evidence concerning the alleged narcotics conspiracy. His testimony consisted entirely of Washington's out-of-court statements, none of the critical details of which Gardiner independently verified. Moreover, the only information Gardiner personally received from law enforcement contradicted Washington's account, namely, that investigators had found no evidence that Mizell had been involved in narcotics trafficking before his death.

**d. Daynia McDonald**

Daynia McDonald testified that, in October 2002, she was romantically involved with Ronald Washington and saw him nearly every day. She also knew Karl Jordan, whom she knew as "Little D" or "Noid," from middle school and had occasionally seen him with Washington before October 2002. SA1087-88.

McDonald testified that she accompanied Washington to Hollis on October 30, 2002, and later traveled with him to Studio 24/7, where she met Jason Mizell for the first time. SA1089-91.

Before arriving at the studio, Washington briefly stopped at the home of a person McDonald described as the "chubby kid." When he returned to

the vehicle, she noticed a bulge in his pocket. Washington told her it was a gun but claimed it was not real. *Id.*

According to McDonald, Mizell was seated on a couch with a silver handgun in his waistband. She testified that Washington questioned Mizell about carrying the gun, telling him that if he had a problem, he should call Washington. Mizell then removed the handgun and placed it on the couch. SA1092-93, SA1165.

McDonald further testified that Washington and Mizell discussed an upcoming trip involving Connecticut and Baltimore before the conversation shifted to purchasing Hennessy, grapes, chocolate, and rolling papers. SA1093-94. Washington later left the studio, stopped at a pay phone to place a call that McDonald could not hear, and then unexpectedly instructed her to leave immediately. SA1095-97.

Later that evening, McDonald testified that Washington telephoned her and stated that Jason Mizell had been killed. When she asked how he knew, Washington responded, "Cause I was there." SA1097.

McDonald also testified that, during a later conversation at a hotel, Washington admitted killing Mizell. SA1099. During this testimony, however, the district court repeatedly sustained defense objections to a series of leading questions posed by the Government, struck both the questions and

answers, instructed the jury to disregard them, and later denied a mistrial after issuing a detailed curative instruction. SA1100-33, SA1141. When the Government resumed with open-ended questions, McDonald testified only that Washington said he had killed Jason Mizell. SA1141.

McDonald never testified that Jordan participated in any narcotics transaction, knew of the proposed Baltimore venture, communicated with any alleged supplier, or discussed any narcotics-related motive for the homicide.

McDonald also testified that, sometime after the homicide, several individuals, including Jordan, approached her outside the funeral of an individual known as "Little Max" and warned her not to speak with police about Mizell's homicide. SA1143-44.

Outside the jury's presence, however, Jordan produced Department of Correction records establishing that he was incarcerated from August 13 through September 16, 2003, together with Little Max's death certificate reflecting an August 31, 2003 death. SA1583; SA1692-93; SA1620-21. The Government did not dispute the authenticity of those records, arguing only that the precise date of the funeral had not been established. SA1676-77. Judge DeArcy Hall agreed that the records appeared to establish Jordan's

incarceration during the relevant period but declined impeachment because the defense had not yet established the funeral date itself. SA1219.

Defense counsel extensively impeached McDonald with her December 2002 police statement and her 2005 grand jury testimony, highlighting inconsistencies concerning the chronology of October 30, the sequence of events at Studio 24/7, the timing of telephone calls, and the length of time she remained at the studio. McDonald generally responded that she no longer remembered the precise timing of events but remained confident in her overall recollection. SA1154-63.

McDonald's testimony principally implicated Washington, not Jordan. She offered no evidence connecting Jordan to the alleged narcotics conspiracy or to any narcotics-related motive for the homicide. Her testimony concerning Jordan was further undermined by documentary evidence strongly suggesting that he could not have been present at the Little Max funeral, while cross-examination exposed numerous inconsistencies between her trial testimony and her prior statements.

**e. Christopher Burrell**

Burrell testified that, during the summer of 2002, he accompanied Mizell and Washington on several trips. While driving to a deejaying engagement in Manhattan, he overheard Mizell discuss obtaining narcotics

and having Washington "work it off," which Burrell understood to mean that Washington would sell narcotics for Mizell. SA942-43. Burrell acknowledged, however, that he did not know what type of narcotics were being discussed and that this was the first time he had ever heard Mizell discuss drugs. SA942-43.

Burrell also accompanied Mizell and Washington to Washington, D.C., where Mizell intended to meet an individual known as "Unc." SA946-47. Burrell testified that he believed the trip involved the delivery of jewelry rather than narcotics. SA947-48. He remained outside the hotel, never met "Unc," and could not identify the individual standing near the hotel entrance. SA949.

Burrell further testified that he accompanied Mizell to Baltimore, where Mizell attempted to locate Mullgrav (Yakim). SA943-46. The following day, Burrell overheard Mizell and Washington discuss plans for Washington to remain in Baltimore to sell narcotics. SA951. He nevertheless testified that he never observed narcotics during either the Washington or Baltimore trips. SA951.

After arriving in Baltimore, Burrell overheard a telephone conversation between Mizell and Yakim. Following a sidebar conference, Judge DeArcy Hall limited Burrell's testimony to statements he personally

heard. SA954. Burrell testified only that he heard Yakim say that if he saw Washington, he would kill him. SA955.

Finally, Burrell testified that he learned of Mizell's homicide by telephone on October 30, 2002, drove to Studio 24/7, and later observed Mizell's body being removed from the building by way of the fire escape. SA958-959.

Burrell's testimony principally concerned Washington's alleged narcotics activities. He never testified that Jordan participated in the Washington or Baltimore trips, observed Jordan engage in narcotics trafficking, or otherwise connected Jordan to the alleged Baltimore conspiracy. Moreover, Burrell never personally observed narcotics during either trip, and much of his testimony concerning the alleged conspiracy was based upon conversations he overheard rather than firsthand participation.

**f. Detective John Roberts**

Detective John Roberts testified that, in 2016, he and Detective Gary Haber reopened the investigation into Jason Mizell's homicide in conjunction with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the United States Attorney's Office. SA1544-45.

Roberts testified that on April 16, 2019, he, Detective Haber, and two ATF agents interviewed Ronald Washington at USP McCreary in Kentucky,

where Washington was serving a federal sentence. Washington waived his *Miranda* rights and agreed to speak with investigators. SA1545-49.

According to Roberts, Washington described an August 2002 trip with Jason Mizell and Christopher Burrell to Washington, D.C., where they allegedly met a supplier known as "Unc" at a Wyndham Hotel to discuss the purchase of ten kilograms of cocaine. SA1551-53. Washington stated that the plan was to transport the cocaine to Baltimore for distribution but explained that he was concerned because he and Mullgrav (Yakim) "did not get along." SA1553. Roberts did not testify that Washington ever stated the proposed Baltimore venture was completed.

Roberts further testified that Washington admitted being present at Studio 24/7 earlier on October 30, 2002, but denied being present when the homicide occurred. SA1554-55. According to Roberts, Washington became agitated near the end of the interview, characterized the investigators' file as "a book of lies," and remarked, "So you're not going to get the shooter; you're just going to get the guy who stood by the door." SA1555. Roberts also testified that Washington stated, "You guys are going to put me and another person on an indictment and see who rats first." SA1555-56.

Roberts further testified that Washington jokingly remarked that, because he owned two .40 caliber handguns, investigators should have believed he possessed ".80 caliber." SA1554.

On cross-examination, Roberts acknowledged that Washington consistently stated the proposed Baltimore venture concerned him because he and Yakim "did not get along." SA1559-60. Roberts also acknowledged that Washington described Daynia McDonald as unreliable. SA1562-63. Although Roberts initially testified that Washington disputed Lydia High's account, Judge DeArcy Hall sustained the Government's objection, struck that testimony, and instructed the jury to disregard it. SA1564, SA1581-82. Roberts further testified that Washington claimed, "Big D" (Jordan's father) shot at him the day after Mizell's homicide. SA1570.

Finally, Roberts confirmed that the investigation was conducted jointly by the New York City Police Department, the ATF, and the United States Attorney's Office, with Detective Gary Haber serving as the lead NYPD investigator. SA1579-80.

Roberts provided no firsthand evidence concerning either the alleged narcotics conspiracy or the homicide itself. His testimony simply recounted Washington's statements during a custodial interview conducted nearly seventeen years after the homicide. Even accepting those statements as true,

Washington described only a proposed Baltimore narcotics venture and did not state that it was ever completed.

**g. Stephon Watford**

Stephon Watford testified that he was Jason Mizell's first cousin and regarded him "like my older brother." SA494. During 2002, Watford lived at Mizell's childhood home in Hollis with other family members and Ronald Washington, who was staying there while attempting to "get back on his feet." SA498-99. Watford also worked with Mizell through JMJ Records and testified that he visited Studio 24/7 almost every day. SA495-96, SA517.

Watford identified both Jordan and Washington, whom he had known since childhood. He testified that Studio 24/7 ordinarily admitted visitors through a front-door buzzer system and that the rear fire escape was rarely used as an entrance. SA518-20.

Watford further testified that, shortly before the homicide, he observed Mizell carrying a handgun for the first time. SA522. He also testified that he never saw Mizell possess cocaine or engage in narcotics trafficking, other than smoking marijuana. SA522.

According to Watford, several days before the homicide, Washington asked whether he possessed any .40 caliber ammunition. SA523. Around the

same time, Washington told him, "Don't go to the studio today. Something bad is gonna happen." SA524. Watford testified that he did not take the statement seriously and never relayed it to Mizell. SA565.

Watford was not present at Studio 24/7 on October 30, 2002. SA526-27. After learning that Mizell had been shot, he traveled to the studio with Big D, arriving only after police had secured the scene. SA528-29. Later that evening, Watford testified that Washington returned to the house carrying a bottle of Hennessy and remarked, "Don't throw this bottle away because this is the last bottle that Jay drunk out of." SA530.

On cross-examination, Watford acknowledged that he did not witness the homicide and had no firsthand knowledge of the events inside Studio 24/7 that evening. SA544-45. He also confirmed that Jordan was not in Big D's vehicle and that he did not see Jordan at either the studio or the crime scene after arriving. SA573.

Watford's testimony principally concerned Washington's conduct before and after the homicide. He offered no firsthand testimony regarding the shooting itself, no evidence connecting Jordan to the alleged narcotics conspiracy, and no testimony placing Jordan at Studio 24/7 after the homicide.

He also testified that, despite his close relationship with Mizell, he never observed Mizell possess cocaine or engage in narcotics trafficking, other than smoking marijuana. Yusuf Abdur Rahaman testified that he met Ronald Washington while both men were incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn in approximately 2011. Although they were not close friends, Rahaman testified that they spent considerable time together and spoke frequently while incarcerated. SA1054-55.

According to Rahaman, Washington asked whether he recognized him from news reports concerning Jason Mizell's homicide and admitted that he had killed Mizell. SA1055. Rahaman identified a letter he wrote in 2011 recounting those conversations, which was admitted into evidence. SA1056-57; SA1691.

Rahaman initially testified that everything he remembered Washington saying was contained in that letter. SA1056. Following a sidebar conference, however, the Government impeached him with portions of his prior grand jury testimony, after which Rahaman acknowledged previously testifying that Washington also stated there had been "a black girl in the studio" who was left unharmed because "that wasn't what we were there to do." SA1059-63.

Rahaman further testified that, after receiving a subpoena to testify, he sent text and voice messages to investigators expressing anger because he believed they had previously assured him he would not have to testify. SA1063-67. Although those recordings were admitted into evidence, Rahaman maintained that his 2011 letter, grand jury testimony, and trial testimony were truthful. SA1067.

On cross-examination, Rahaman acknowledged that he had previously cooperated with the Government in an unrelated federal prosecution and received a reduced sentence. SA1068-69. He also admitted telling investigators that he may have fabricated Washington's alleged confession while incarcerated, explaining that he made those statements because he wanted to avoid testifying in this case. SA1074.

Rahaman's testimony concerned only Washington's alleged confession. He offered no testimony implicating Jordan, no evidence concerning the alleged narcotics conspiracy, and admitted that he had previously suggested he may have fabricated Washington's purported confession in an effort to avoid testifying. SA1074.

#### h. William Marshall

William Marshall testified that he was a former member of the Black Mafia Family ("BMF") who cooperated with the Government after pleading guilty to federal offenses. SA1429-30.

Marshall testified that Terry Flenory was commonly known within the BMF by the nicknames "Southwest T" and "Unc." He also identified photographs of Flenory introduced into evidence. SA1435-41.

On cross-examination, however, Marshall acknowledged that he did not know Jason Mizell, had never met him, never sold him narcotics or automobiles, never saw him with Terry or Demetrius Flenory, and never saw any photograph depicting Mizell with either Flenory brother. SA1446-47. Marshall also agreed that "Unc" is a common nickname and is widely used outside the Black Mafia Family. SA1442-43.

Marshall offered no testimony connecting Mizell, Jordan, or Washington to Terry Flenory or the Black Mafia Family. His testimony established only that Terry Flenory was sometimes known as "Unc," while acknowledging that the nickname is commonly used by many individuals.

### i. Special Agent Andrew Tummino

Special Agent Andrew Tummino of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified concerning business records, calendar entries, and a forensic extraction of a cellular telephone associated with Jason Mizell. SA1508-17.

Tummino reviewed records for an Erotic Money Entertainment, LLC account associated with Mizell and identified several transactions in Baltimore, Maryland, and Washington, D.C., during August 2002, together with an October 29, 2002, charge at a Courtyard by Marriott in Milwaukee, Wisconsin. SA1511-15. He also identified a calendar recovered from 90-10 Merrick Boulevard containing an October 28 entry referencing "Milwaukee," along with a Rusty Waters tour schedule. SA1513-15.

Tummino further testified that a forensic extraction of Mizell's cellular telephone revealed 219 contacts, including entries for "Yack," "Shake," "Lydia," "Big D," and "Unc." SA1517-19. He testified that "Yack" was associated with a Baltimore (410) telephone number and that "Unc" was associated with Los Angeles (213 and 323) telephone numbers. The extraction, however, contained no contact entry or telephone number associated with Karl Jordan.

On cross-examination, Tummino acknowledged the limits of the financial records. Although he described one Washington-area transaction as a hotel charge, he conceded that he had not contacted the business and therefore could not determine whether the charge reflected lodging, a restaurant purchase, or some other expense. SA1520-21.

Tummino's testimony authenticated financial and telephone records but did not establish the purpose of Mizell's travel, identify the individual listed as "Unc," or connect Jordan to any of the records recovered from Mizell's cellular telephone.

**3. Homicide Investigation Witnesses**

The Government's evidence concerning the events inside Studio 24/7 on October 30, 2002, came principally from Lydia High, Tony Rincon, Tanya Davis, Yarrah Concepcion, Randy Allen, Michael Rapley, Zaire Flournoy, and several law enforcement witnesses.

Collectively, those witnesses established that Mizell was present at Studio 24/7, located at 90-10 Merrick Boulevard in Jamaica, Queens, during the evening of October 30, 2002. They also established that multiple individuals were present in different areas of the studio complex when the shooting occurred.

As discussed below, however, the eyewitness testimony differed significantly with respect to the identity of the shooter, the number of participants, the route of entry and exit, and the events immediately preceding and following the homicide.

**a. Tanya Davis**

Tanya Davis testified that, in October 2002, she worked at a Primerica office on the second floor of 90-10 Merrick Boulevard. From her reception desk, she monitored the building's front entrance by video camera and could observe individuals walking down the hallway toward Studio 24/7. SA962-69.

On the evening of October 30, 2002, Davis first observed a young woman ask for directions to the recording studio. Shortly thereafter, she saw a second woman enter the building, followed closely by a tall, light-skinned Black male. SA970-75. Davis described the man as very tall and lanky, with braided hair and light facial hair or a "shadow" beard. She testified that the pair proceeded toward the studio but that she never obtained a clear view of the man's face. SA970-75, SA984.

A short time later, Davis heard gunshots and a woman's scream. SA977. She then observed the same tall man leave the area, walking rapidly

with unusually long strides, slightly dragging one leg, and holding his hands close to his body. SA978.

Davis never identified the man she observed. She did not identify Karl Jordan, Ronald Washington, Jay Bryant, or anyone else as the individual entering or leaving the studio. SA984.

On cross-examination, defense counsel established that Davis's recollection evolved over time. In her November 2002 statement, she reported that the second woman and the tall man appeared to be together. After reviewing that statement, Davis acknowledged making it. SA987-88, SA994-95. During later interviews in 2016 and 2022, however, she concluded that the two individuals merely appeared to be walking toward the same destination and did not necessarily appear to be acting together. SA993-95, SA1002.

Defense counsel also established that Davis had previously described the man as wearing a light-blue velour tracksuit and carrying an object close to his body while leaving the building.SA990-92. Finally, the Government stipulated that the second woman Davis observed entering the building was Lydia High, although Davis herself never identified the woman by name. SA996, SA1001.

Davis never identified the individual she observed entering or leaving the studio. Her testimony established only that a tall man matching her description was present immediately before and after the homicide. In summation, however, the Government argued that Davis's description was consistent with Jay Bryant. SA1594.

**b. Lydia High**

Lydia High testified that she had known Jason Mizell since childhood and, in October 2002, served as the business manager for JMJ Records. Although she primarily worked from the Manhattan office, she occasionally visited Studio 24/7 to obtain Mizell's signature on business documents. SA714-17.

High testified that she went to Studio 24/7 on October 30, 2002, because Run-DMC was scheduled to leave on tour the following day, and she needed Mizell to sign business documents. SA719. Upon entering the studio, she observed Mizell and Tony Rincon playing video games and noticed a handgun resting beside Mizell. SA720-22. When she questioned Mizell about the firearm, he told her not to worry about it and to focus on the paperwork. SA721.

While reviewing the signed documents, High became aware of someone entering the studio. She testified that the individual walked past her

toward Mizell. According to High, Mizell smiled, greeted the person with what she described as "a pound," began to rise, exclaimed "Oh, shit," and gunfire immediately followed. SA722.

High testified that she never saw the shooter's face and never saw the weapon fired. SA722-23. Instead, after the shooting began, she ran toward the doorway, where she encountered Ronald Washington, whom she had known since childhood. High testified that Washington stood in the doorway pointing a handgun at her and ordered her to "get down on the ground." SA723-24. While lying on the floor, she observed two individuals jump over her as they fled the studio. SA725.

On cross-examination, High acknowledged several limitations in her observations. She could not recall how she entered the building that evening or whether anyone entered with her. SA727-28. She also acknowledged that she never obtained a view of the shooter's face. SA722, SA735-49, SA772. After Judge DeArcy Hall ruled that the omission was proper impeachment, High acknowledged that, during her 2005 grand jury testimony, she testified that she saw only the shooter's back while he embraced Mizell and never saw the shooter's facial features. SA735-49. At trial, however, she testified for the first time that she recalled the shooter having a neck tattoo. SA725.

High also acknowledged that she could not say when Washington arrived at the doorway, whether he entered before or after the shooting began, or whether he arrived with the shooter. SA774-75. On redirect, she reaffirmed that Washington was the individual standing in the doorway pointing a handgun at her and testified that she withheld portions of the truth from investigators immediately after the homicide because she feared for her safety. SA782.

High never identified the shooter. She consistently testified that she never saw the shooter's face, and the record contains no evidence that she identified the shooter to Randy Allen, Derrick Parker, or anyone else in the immediate aftermath of the homicide. That omission is consistent with her own testimony and bears directly on the later testimony of Allen and Parker concerning what High allegedly told them after the shooting.

**c. Detective Thomas Lockwood**

Detective Thomas Lockwood, then assigned to the Queens Homicide Squad, testified that he administered a six-photograph array to Lydia High on July 31, 2003, approximately nine months after the homicide. SA296-98. The array, prepared by Detective Vincent Santangelo using the NYPD Photo Manager system, included Ronald Washington but did not include Karl Jordan. SA297-99.

Before displaying the photographs, Lockwood advised High that she might or might not recognize anyone depicted. According to Lockwood, High selected Washington's photograph, initialed it, and identified him as the individual who pointed a handgun at her and ordered her to the floor while another man shot Jason Mizell. SA302.

Lockwood further testified that he met with High shortly after the homicide, but she did not identify Washington or any other participant during those earlier interviews. The July 31, 2003, photo array was the first formal identification procedure in which High identified Washington. SA311.

On cross-examination, Lockwood acknowledged that former Detective Derrick Parker arranged for High to appear at the Queens District Attorney's Office and accompanied her there. SA307-10. He also acknowledged that, to his knowledge, Washington may have been the only person in the photo array whom High already knew. SA299-300.

High identified only Ronald Washington during the photo array. Jordan's photograph was not included, and the procedure did not identify the individual whom High testified actually shot Mizell.

### d. Derrick Parker

Derrick Parker, a retired New York City Police detective, testified that after retiring, he operated a private investigative and security business. He was not employed by the NYPD at the time of Jason Mizell's homicide and did not witness any of the events inside Studio 24/7. SA686, SA692-93.

Parker testified that he met Lydia High the day after the homicide and thereafter accompanied her to meetings with law enforcement, the grocery store, and the Queens District Attorney's Office. He described High as "very nervous, very concerned." SA686.

According to Parker, approximately two days after the homicide, High identified Ronald Washington as one of the participants, stating that Washington held her at gunpoint while another individual shot Jason Mizell. Parker acknowledged, however, that High did not identify the shooter during that initial conversation despite his asking her to do so. SA687-88.

Parker further testified that, approximately one to two weeks after Mizell's funeral, High identified "Little D," whom Parker understood to be Karl Jordan, as the shooter. SA689-90. Parker also testified that he accompanied High to the Queens District Attorney's Office on July 31, 2003, but acknowledged that he was not present during her interview with detectives or the photographic identification procedure. SA690-91.

On cross-examination, Parker acknowledged that he had no firsthand knowledge of the homicide and that everything he knew about the participants' identities came from conversations with others, principally Lydia High. SA692-93, SA697-99. He further acknowledged that, although he claimed High identified Jordan in 2003, he never communicated that information to the NYPD during the original investigation or to federal investigators after the case was reopened in 2016, despite providing investigators with his files and discussing the case. SA691, SA699-703.

Parker's testimony concerning Jordan's identity was based entirely on what High allegedly told him. Parker possessed no firsthand knowledge of the homicide, was not present during High's formal photographic identification, and acknowledged that he never disclosed High's alleged identification of Jordan to investigators during either the original investigation or the reopened federal investigation.

**e. Tony Rincon**

Tony Rincon testified that he met Jason Mizell when he was approximately 17 years old and, by 2002, was regularly assisting him with JMJ Records, artist promotions, transportation, and other business matters. He testified that he visited Studio 24/7 several times each week and was familiar with its layout. SA391-93, SA394, SA456.

Rincon testified that, at approximately 7:30 p.m. on October 30, 2002, he was seated beside Mizell in the studio lounge while they played video games. Lydia High was reviewing business documents nearby, while Randy Allen, Michael Rapley, and another individual were in the control room. Rincon testified that Mizell had placed a handgun on the armrest beside him before the shooting. SA399, SA438.

According to Rincon, Karl Jordan ("Little D") entered the lounge wearing a hooded sweatshirt. Rincon testified that he immediately recognized Jordan from prior encounters. SA402-03. He stated that Jordan approached Mizell as though greeting him, after which Mizell rose slightly from the couch, exclaimed "Oh, shit," and gunfire immediately followed. SA403, SA439.

Rincon acknowledged that he did not see the shots fired because Mizell stood between him and Jordan. SA403-04. He testified, however, that after Mizell fell, he saw Jordan push Mizell's body aside before fleeing and observed Jordan's profile and a tattoo on his neck. SA404-05.

Rincon also testified that Ronald Washington stood in the doorway holding a handgun and ordering Lydia High to remain on the floor. According to Rincon, Washington never entered the lounge, and he and Jordan fled together toward the rear fire escape. SA400-01.

One of the bullets struck Rincon in the leg. While attempting to assist Mizell, he called to Randy Allen, who emerged from the control room, picked up Mizell's handgun, and ran in the direction the two men had fled. SA411.

Rincon acknowledged that, despite recognizing both Jordan and Washington, he deliberately concealed their identities from responding officers, detectives, investigators, and even a newspaper reporter for approximately fifteen years because he feared retaliation against himself and his family. SA425-33. He testified that he privately identified Jordan and Washington to Randy Allen several days after the homicide, although Allen initially did not believe him. SA413-14. Rincon also testified that, approximately one week after Mizell's funeral, Jordan asked him whether he had seen who committed the homicide, to which Rincon falsely replied that he had not. SA416.

Rincon testified that he did not disclose the participants' identities to law enforcement until approximately 2017, explaining that he ultimately decided to cooperate because he believed Mizell's family deserved to know the truth. SA417.

On cross-examination, defense counsel established that Rincon repeatedly lied to law enforcement and the press for approximately fifteen

years concerning the identities of the participants and explored differences among his various accounts, including the extent to which he observed Jordan's face, profile, and neck tattoo. SA420-44. Rincon nevertheless maintained that, despite his prior false statements, he had never been mistaken about the identities of the individuals he observed inside the studio. On redirect, he reaffirmed that he identified both Jordan and Washington before the federal grand jury in 2017 and testified that he had no doubt Jordan shot Mizell.

Rincon was the Government's principal eyewitness identifying Jordan as the shooter. At the same time, he acknowledged that he never saw the shots fired, deliberately concealed the identities of the participants from law enforcement and the public for approximately fifteen years, and that aspects of his description—including his observations of Jordan's face and neck tattoo—evolved over time.

**f. Yarrah Concepcion**

Yarrah Concepcion testified that, on October 30, 2002, she came to Studio 24/7 to audition as a recording artist. After mistakenly entering the neighboring Primerica office, she was directed to the studio. SA581. Upon entering the lounge, she observed Jason Mizell seated on a couch playing

video games with another man and noticed a handgun lying beside him. SA582-84.

Concepcion testified that she then entered the control room with Randy Allen and Michael Rapley ("Mike B") to audition. The control room door remained nearly closed, allowing her to hear activity in the lounge but preventing her from seeing it. SA585. She heard the exterior door close, followed shortly thereafter by what she described as "tussling" and then two gunshots. SA586-87.

Concepcion testified that she never saw the shooting. Before taking cover behind a loveseat, however, she observed Mike B retrieve a handgun inside the control room. SA588-89. After the gunfire ended, she entered the lounge, where she observed Tony Rincon wounded and Jason Mizell lying on the floor. Together, they attempted to roll Mizell over, at which point she realized he had sustained catastrophic head injuries. SA589-91.

On cross-examination, Concepcion confirmed that she observed one handgun beside Mizell before the shooting and another in Mike B's possession afterward. SA595-96. She also testified unequivocally that she never saw who fired the shots and could not identify the individual she believed was the shooter. SA606.

Concepcion provided no eyewitness testimony identifying the individual who fired the shots. Her testimony established only the sequence of events she heard from inside the control room and the presence of multiple firearms immediately before and after the homicide.

### g. Randy Allen

Randy Allen testified that he had known Jason Mizell since childhood and eventually became vice president of JMJ Records, one of Mizell's principal music producers, and a member of the musical group Rusty Waters. His sister, Lydia High, managed Mizell's business affairs. Allen also testified that he had known Jordan, Washington, and Ralph Mullgrav for many years but had never heard of Jay Bryant before this case. SA786-99.

Allen testified that he arrived at Studio 24/7 shortly before 7:00 p.m. on October 30, 2002. Before entering the control room, he observed Mizell seated with Tony Rincon and noticed a handgun beside him on the couch. SA803, SA807-09.

While inside the control room with Michael Rapley and a vocalist, Allen heard two gunshots. SA810. When he entered the lounge moments later, he found Lydia High crying, Tony Rincon wounded, and Mizell lying on the floor. SA810. Allen picked up Mizell's handgun, ran outside in search

of the individual who fired the shots, placed the handgun on a nearby tire, and then ran to the 103rd Precinct to summon police. SA811-12. Although he and Rapley pursued the direction in which the participants had fled, neither caught nor identified anyone. SA812, SA895-96.

Allen testified that the rear fire escape was not ordinarily used to enter or exit the studio. SA806. He also testified that, although the studio security system had recording capability, he could not say whether it was recording on the night of the homicide, and the recording ultimately recovered was not from October 30, 2002. SA830, SA833.

Allen further testified that one or two days after the homicide, Tony Rincon told him that "Little D did it," which Allen understood to mean Karl Jordan. SA814-15. Allen also testified that Lydia High told him Ronald Washington held her at gunpoint and later told him the individual she believed fired the shots had a neck tattoo. SA815-16. Allen acknowledged, however, that High never identified that individual by name. SA851.

On cross-examination, Allen confirmed that he never saw who fired the shots, never saw Jordan inside the studio that evening, never saw Jordan holding a firearm, and never witnessed the homicide. SA825-26. He further acknowledged that, despite voluntarily meeting with investigators in 2004 and 2005, he never disclosed either Rincon's alleged identification of Jordan

or High's statement concerning the neck tattoo because he believed those were "their stories to tell." SA850-53.

Judge DeArcy Hall admitted Allen's contemporaneous October 30, 2002 statement under the Federal Rules of Evidence after concluding that it possessed sufficient guarantees of trustworthiness and was more probative than Allen's present recollection. SA868-77. That statement differed from portions of Allen's trial testimony, including the number of shots fired, the possible use of two firearms, the presence of a heavy-set Black male on the security monitor, and Lydia High's location immediately after the homicide. SA894-96.

Allen was not an eyewitness to the homicide. His testimony identifying Jordan was based entirely on what Tony Rincon allegedly told him after the shooting, while his testimony concerning Lydia High established only that she identified Washington and described the individual she believed fired the shots as having a neck tattoo—not that she identified Jordan by name. Moreover, Allen acknowledged that he withheld both accounts from investigators for years despite multiple opportunities to disclose them.

#### h. Michael Rapley

Michael Rapley, also known as "Mike B," testified that he grew up in Hollis, Queens, and became friends with Jason Mizell, who later produced music for him. SA618. He described Studio 24/7 as both a recording studio and a gathering place where friends recorded music, played video games, and socialized. SA618-23.

Rapley testified that he arrived at the studio during the afternoon of October 30, 2002, played video games with Mizell, and later entered the control room with Randy Allen and an aspiring vocalist to listen to a demonstration recording. Lydia High arrived shortly thereafter to obtain Mizell's signature on business documents. SA630-34.

Rapley testified that he never observed Mizell carrying a firearm that day, although he later heard someone say Mizell possessed one. SA631. He also testified that he never saw Mizell possess cocaine or engage in narcotics trafficking, stating that the only drug use he personally observed involved marijuana. SA632.

Approximately five to ten minutes after entering the control room, Rapley heard two or three gunshots. Because the control-room door remained closed, he could not see into the lounge and did not witness the homicide. SA634-35. After waiting briefly, he looked at the studio security

monitor but observed only indistinct figures in the hallway, whom he could not identify. SA635-36.

Rapley then entered the lounge, observed Mizell lying on the floor, and left the studio to locate Rodney Jones. SA636-37. He testified that, because of the trauma of the event, he could not clearly remember whether he exited through the front entrance or the emergency exit. SA637, SA656-57.

Rapley identified Karl Jordan as Mizell's godson and testified that they maintained a friendly relationship. He further testified, however, that Jordan "never really came and hung at the studio." SA640. He also identified Ronald Washington and testified that Washington occasionally visited the studio but was not involved in the music business. SA641-43.

On cross-examination, Rapley confirmed that he remained inside the control room throughout the homicide, never saw who fired the shots, never identified anyone leaving the studio, and could not identify the figures he observed on the security monitor. SA645, SA649-50.

Rapley provided no eyewitness testimony concerning the individual who fired the shots. He also testified that he never observed Mizell possess cocaine or engage in narcotics trafficking, knew that Jordan and Mizell

maintained a friendly relationship, and that Jordan rarely came to Studio 24/7.

**i. Marc Stay**

Marc Stay testified that in October 2002, he worked for Primerica Financial Services, whose offices were on the second floor of 90-10 Merrick Boulevard, adjacent to Studio 24/7. He explained that Primerica held regular Wednesday evening meetings and that visitors entered through the building's front entrance using a buzzer system. The office maintained a video intercom displaying the front entrance but did not record video. SA664-65.

On the evening of October 30, 2002, while preparing for a Primerica meeting, Stay heard what someone remarked sounded like a gunshot. Moments later, a visibly distraught woman entered the office screaming that "they shot him." Stay entered the hallway, observed Tony Rincon wounded and Jason Mizell lying inside the studio, and immediately called 911. SA668-70.

Stay also testified concerning the building's layout. Although he had worked at 90-10 Merrick Boulevard since approximately 1992 and was there several times each week, he testified that he did not know the building had a rear fire escape, had never used it, and had never seen anyone else use it.

SA666, SA674. He further testified that all Primerica visitors entered and exited through the front entrance using the buzzer system. SA666-67.

Stay had no firsthand knowledge of the homicide itself. His testimony established only the immediate aftermath of the shooting and supported the Government's evidence that visitors ordinarily entered the building through the front entrance, while also indicating that the rear fire escape was not commonly known or used by occupants of the building.

**4. Jordan's Alleged Confession**

Cherubin Bastien testified that, beginning in approximately 2004, he rented a room in the Hollis residence owned by Darren Jordan, Sr. ("Big D"), where Karl Jordan ("Little D") lived in the basement. Bastien testified that he saw Jordan almost daily and occasionally drove him and others to Upper Manhattan. SA1372-73.

According to Bastien, during one of those trips, he overheard Jordan state, in reference to Jason Mizell, "If I get to kill him, I'll kill him again." SA1846.

Bastien also testified that, during a separate argument outside the residence, he heard Jordan tell a woman, "I'll do you exactly just like him." SA1376. Judge DeArcy Hall sustained defense objections during this testimony and prohibited the Government from introducing the surrounding

conversation or permitting Bastien to interpret whom the pronoun "him" referred to. SA1375-76.

Bastien acknowledged that he did not report these alleged statements to law enforcement until approximately 2021—nearly seventeen years after they allegedly occurred. SA1383-84, SA1389-90, SA1393-94. He further testified that, after being deported to Haiti following a 2007 drug conviction, he received approximately $1,000 per month in Government witness assistance while living in the Dominican Republic, together with visa and travel assistance to testify at trial. SA1383-84.

On cross-examination, Bastien also acknowledged that he was a daily heroin user during the period in which the alleged statements were made, although he maintained that his drug use did not impair his memory or ability to function. SA1388-89, SA1393.

Bastien's testimony concerned alleged statements he claimed to have heard approximately seventeen years earlier. The district court limited the scope of that testimony, and Bastien acknowledged that he did not report the statements until 2021, after receiving substantial Government assistance and despite years of prior contact with law enforcement.

### 5. Evidence that Jay Bryant was the Shooter and Two Confessions

The trial record contained both direct and circumstantial evidence supporting the conclusion that Jay Bryant—not Karl Jordan—was the individual who fired the fatal shots. That evidence included eyewitness testimony concerning the appearance of the individual entering and leaving Studio 24/7 (Tanya Davis, discussed *supra*), Bryant's DNA on a knit hat recovered at the crime scene, discussed below, and testimony concerning Bryant's own admissions. Notably, this evidence was introduced by the Government during its case-in-chief.

#### a. Raymond Bryant

The Government called Raymond Bryant, Jay Bryant's uncle, as a witness during its case-in-chief. Raymond testified that he and Bryant maintained a close personal relationship over many years. He described Bryant as approximately 6'4" or 6'5" and testified that Bryant had walked with a noticeable limp for more than twenty years as the result of an earlier gunshot wound. SA1009.

According to Raymond, in approximately 2003 or 2004, he and Bryant had a private conversation while visiting relatives in the Bronx. During that conversation, Bryant admitted that "he did it" in reference to Jason Mizell's homicide. SA1012-13. Raymond further testified that Bryant

stated he would not have shot Mizell if Mizell had not reached for a gun. SA1034-35.

During direct examination, Judge DeArcy Hall repeatedly sustained defense objections when the Government attempted to characterize or embellish Raymond's testimony. SA1014-28, SA1032-34. After further proceedings outside the jury's presence, the court required the Government to proceed through open-ended questions based solely on Raymond's recollection. SA1032. When the jury returned, Raymond again testified that Bryant stated he would not have shot Mizell if Mizell had not reached for a gun. SA1034-35. In response to questions from the court, Raymond clarified that Bryant was the person who "wouldn't have done it" and that Jason Mizell was the person who reached for the gun. SA1032-34.

Raymond also testified about a second conversation in approximately 2016, after investigators identified Bryant's DNA on the knit hat recovered from the crime scene. According to Raymond, Bryant stated that investigators had found his hat at the scene and that he had been arrested because of it. Raymond testified that this later conversation concerned the recovery of the hat and did not revisit the details of the homicide. SA1013-14.

On cross-examination, Raymond reaffirmed that Bryant personally admitted to shooting Jason Mizell and again confirmed that Bryant stated he would not have done so had Mizell not reached for a gun. SA1038. Defense counsel concluded by asking Raymond directly whether Jay Bryant had confessed to murdering Jason Mizell, to which Raymond answered unequivocally, "Yes." SA1043.

The Government itself introduced testimony that Jay Bryant admitted to shooting Jason Mizell. Raymond Bryant did not testify that Karl Jordan planned the homicide, participated in it, supplied a weapon, or otherwise acted together with Bryant. Judge DeArcy Hall later considered this testimony, together with the physical evidence connecting Bryant to the crime scene, in evaluating the overall strength of the Government's homicide case.

**b. Criminalist Lisa Faber**

Lisa Faber, a criminalist assigned to the NYPD Police Laboratory Hair and Fiber Unit, testified that she examined the two knit hats recovered during the investigation, including the blue knit hat later associated with Jay Bryant through DNA testing. SA1399.

Faber testified that she visually examined both hats, performed tape-lift procedures to recover hairs and fibers, and preserved biological material

for later DNA testing. SA1404-07. She explained that trace-evidence testing preceded DNA testing in order to preserve fragile evidence. SA1404, SA1410.

On cross-examination, Faber confirmed that she examined both the interior and exterior of the blue knit hat and forwarded all recovered hairs for possible DNA testing. SA1408-10. On redirect, she explained that when a suitable DNA profile can be obtained from epithelial cells, additional testing of hairs is ordinarily unnecessary because skin-cell DNA is capable of identifying a specific individual. SA1411.

Faber's testimony established only the collection and preservation of trace evidence. The identification of Jay Bryant through DNA resulted from subsequent DNA testing performed by OCME, not from Faber's examination.

#### c. Assistant Director Tiffany Vasquez

Tiffany Vasquez, Assistant Director of the Department of Forensic Biology at the Office of the Chief Medical Examiner ("OCME"), testified as an expert in DNA analysis. Although she did not perform the original testing, she independently reviewed the laboratory file, underlying data, and subsequent DNA testing and reached her own conclusions. SA346-61.

Vasquez explained that DNA testing cannot determine when DNA was deposited on an object and that the absence of detectable DNA does not establish that an individual never touched it. SA352, SA383.

OCME initially detected a DNA mixture from at least three male contributors on the interior of the blue knit hat recovered from the scene but could not identify the contributors using the technology available in 2002. SA368-73. Following advances in DNA testing, OCME reanalyzed the preserved sample in 2016, identified Jay Bryant as the major contributor through CODIS, and confirmed the match using Bryant's buccal swab. Vasquez testified that the resulting DNA profile would be expected to occur in approximately **one out of 87.3 billion individuals**. SA373-81 (emphasized).

After comparing court-authorized buccal swabs from Karl Jordan and Ronald Washington, OCME excluded both Jordan and Washington as contributors to the DNA recovered from the interior of the blue knit hat. SA374-81. On cross-examination, Vasquez reaffirmed that the identification of Bryant and the exclusion of Jordan and Washington were reached pursuant to OCME's standard accredited procedures. SA387-88.

### 6. Government's Attempt to Connect Bryant to Jordan

#### a. Lewis Gonzalez

Lewis Gonzalez testified that he met Jay Bryant in approximately 2011 through Bryant's uncle, Raymond Bryant. SA908-09. Over time, Gonzalez became friends with Bryant and occasionally served as his driver. He identified Bryant in photographs admitted into evidence and described him as approximately 6'4", heavy-set, and walking with a noticeable limp resulting from an earlier gunshot wound. SA909-12.

Gonzalez testified pursuant to a non-prosecution agreement with the Government. SA915-17. He admitted that, during the COVID-19 pandemic, he drove Bryant between New York and Pennsylvania while Bryant transported cocaine and that Bryant paid him for those services. He also testified that he rented vehicles for Bryant using Bryant's money. SA913-15.

Gonzalez further testified that, in approximately 2022, he accompanied Bryant to the Baisley Park Houses and locations associated with Atif Heatherington ("Tif"). SA917. He identified photographs depicting Bryant, Heatherington, and the two together. SA910, SA919, SA926.

Neither Jordan nor Washington cross-examined Gonzalez.

Gonzalez's testimony concerned events occurring nearly twenty years after the homicide. He offered no testimony connecting Jordan to Bryant, to Heatherington, or to the events of October 30, 2002.

**b. Zaire Flournoy**

Zaire Flournoy testified that he grew up in the Baisley Houses in South Jamaica, Queens, had known Jay Bryant since childhood, and that his brother was Atif Heatherington. SA610-11.

Flournoy identified photographs of Bryant and Karl Jordan, whom he knew as "Noid." SA612, SA614-15. He testified, however, that despite knowing both Bryant and his brother, he had never seen Bryant with Heatherington and had never seen Jordan with Heatherington. Although Jordan and Heatherington both grew up in Hollis, Flournoy testified that he had never personally observed them together. SA612-14.

When the Government suggested that Flournoy had previously told investigators otherwise, Flournoy denied making any such statement. Judge DeArcy Hall sustained the defense's objections to the Government's attempted impeachment based on investigative notes and directed the Government to move on. SA613-14.

Flournoy also acknowledged prior involvement with an organization known as "Blackout," which he described as a record label. When asked

whether Blackout was a narcotics trafficking organization, he responded that it was "what the U.S. government said it was," while maintaining that he regarded it as a record label. SA615. Neither Jordan nor Washington cross-examined him. SA616.

Neither Jordan nor Washington cross-examined him.

Apart from identifying Jordan by the nickname "Noid," Flournoy offered no testimony connecting Jordan to Bryant, Heatherington, or any alleged conspiracy. Indeed, despite personally knowing all three individuals, he affirmatively testified that he had never seen Bryant with Heatherington or Jordan with Heatherington.

**7. Law Enforcement Response and Crime Scene**

**a. Lieutenant William Egan**

Lieutenant William Egan, then the supervisor of the Street Narcotics Enforcement Unit assigned to the 103rd Precinct, testified that he responded immediately after Randy Allen ran into the precinct reporting that Jason Mizell had been shot. Egan and Officer William Foley ran to Studio 24/7, entered the building, and proceeded upstairs after being buzzed inside. SA249-51.

Upon entering the studio, Egan observed Mizell lying on the floor, Tony Rincon wounded nearby, and Lydia High crying hysterically. After

determining that no immediate threat remained, he secured the scene until additional officers and investigators arrived. SA252-57.

Egan testified that he immediately asked Rincon who had shot him, but Rincon did not identify anyone, stating only that he had been shot and needed help. Egan likewise received no contemporaneous information identifying the participants or the route they took to flee. SA260-64.

Egan further testified that he neither investigated the homicide nor processed the crime scene, his role being limited to securing the premises. SA256-57. He also testified that he did not observe a firearm inside the studio during his initial response and did not recover the .380 caliber handgun later found in the nearby municipal parking lot. SA249.

The first responding officer received no contemporaneous identification of any participant and no information concerning the route by which the participants left the studio.

**b. Detective James Lusk**

Detective James Lusk was among the first detectives to respond to Studio 24/7 after the homicide, arriving within approximately one minute after learning of the shooting. SA154-56. He observed Mizell lying on the floor, Tony Rincon wounded nearby, and Lydia High in an emotionally distressed condition. SA161-62.

Lusk testified that investigators recovered two discharged shell casings from behind Mizell's body after it was moved by the Medical Examiner. They also documented two apparent bullet strikes—one in a decorative radiator cover and another beneath an air-conditioning unit—and recovered a deformed projectile from behind the radiator. SA163, SA165, SA167-68, SA242-45.

On cross-examination, Lusk acknowledged that he was not qualified as a firearms or ballistics expert, possessed no specialized training in trajectory analysis, and confirmed that both apparent bullet strikes were low to the floor. SA169-70, SA190.

Lusk also described the rear fire escape but acknowledged that investigators obtained no contemporaneous photographs of it, did not process it for fingerprints or DNA, and did not obtain surveillance footage from the nearby bus depot that might have documented anyone entering or leaving by that route. He further acknowledged that, had investigators received information that the participants fled by way of the fire escape, preserving such evidence ordinarily would have been important. SA157-60, SA187-89, SA199-200.

Finally, Lusk testified that, although the studio contained a surveillance system that displayed the front entrance, stairwell, hallway, and

rear fire escape, investigators recovered no surveillance recording from October 30, 2002. SA175, SA180, SA192-94. During a subsequent search, investigators recovered the blue knit hat that was subsequently submitted for DNA testing. SA182-83, SA194.

Lusk's testimony established that investigators recovered no surveillance recording of the homicide and preserved no forensic evidence from the rear fire escape despite later testimony suggesting that the participants fled by that route.

#### c. Detective Robert Sorensen

Detective Robert Sorensen, a member of the NYPD Crime Scene Unit, testified that Crime Scene personnel documented Studio 24/7, photographed the scene, prepared diagrams, recovered physical evidence, processed latent fingerprints, and preserved biological evidence for laboratory testing. SA201-22.

Among the items recovered were two discharged shell casings, a blue knit hat, a second knit cap, a pair of eyeglasses, and the .380 caliber handgun recovered from the nearby municipal parking lot. The knit hats were submitted for DNA testing, and the handgun was secured for ballistics examination. SA207-18, SA221-22. Sorensen also testified that a .380 caliber handgun cannot chamber or fire a .40 caliber cartridge. SA218.

On cross-examination, Sorensen acknowledged that Crime Scene personnel took no contemporaneous photographs of the rear fire escape or the exterior route leading from the building and performed no documented forensic processing of that area, despite extensively processing the interior of the studio. SA226-29.

Although Crime Scene thoroughly documented the interior of Studio 24/7, investigators collected no documented forensic evidence from the rear fire escape or the route the Government later contended the participants used to leave the building.

**d. Detective William Lappe**

Detective William Lappe, assigned to the NYPD Technical Assistance Response Unit ("TARU"), testified that he was dispatched to Studio 24/7 to recover the studio's surveillance videotape. SA266.

After reviewing the videotape, Lappe immediately determined that it did not depict October 30, 2002. The recording displayed a different date and showed individuals dressed in shorts and T-shirts, conditions inconsistent with the night of the homicide. SA266. Although he generated still-frame photographs illustrating the surveillance system's camera views, TARU recovered no surveillance recording depicting the homicide or the

arrival or departure of any participant through the front entrance, rear fire escape, or any other route. SA266, SA270-74.

The surveillance system produced no recording of the events of October 30, 2002.

**e. Detective Lydia Cruz-King**

Detective Lydia Cruz-King, a member of the NYPD Crime Scene Unit, participated in the supplemental ("A-run") search of Studio 24/7 conducted pursuant to a search warrant on November 1, 2002. SA239.

The search focused on recovering additional ballistic evidence from inside the lounge. Investigators recovered a deformed lead projectile lodged in a radiator but were unable to recover a second projectile despite opening the wall where investigators believed it had traveled. SA239-46.

Cruz-King's testimony was limited to the interior search. She identified no effort to photograph, process, or collect forensic evidence from the rear fire escape or the exterior route the Government later contended the participants used. SA239-46.

The supplemental crime-scene search likewise yielded no forensic evidence from the rear fire escape or the building's exterior.

### f. Detective John Reynolds

Detective John Reynolds testified that he and his partner canvassed approximately fourteen locations surrounding 90-10 Merrick Boulevard in an effort to locate surveillance footage depicting individuals entering or leaving Studio 24/7 on October 30, 2002. SA276-80.

The canvass produced no useful surveillance footage. Thirteen locations had no video equipment, and the only recording recovered—from the Queens Public Library—was too dark to identify anyone despite review by the TARU. SA279-81, SA292.

On cross-examination, Reynolds confirmed that investigators also searched locations behind the building, including the municipal bus terminal area, but recovered no surveillance footage that identified anyone entering or leaving Studio 24/7 or corroborated any particular route of escape. SA284-94.

The neighborhood video canvass yielded no surveillance footage identifying any participant or corroborating the route by which the participants entered or left the building.

**g. Detective Jessica Ortiz**

Detective Jessica Ortiz, an expert latent-print examiner, testified that she independently reviewed and analyzed the latent print evidence recovered from Studio 24/7 after the original examiner retired. SA317-25.

Ortiz explained that latent-print analysis cannot determine when a print was deposited and that a person may touch an object without leaving a recoverable print. SA317-19, SA333-34.

Investigators recovered latent prints from several items inside the studio, including a plastic cup, the studio door, a Sprite bottle, the .380 caliber handgun, and its magazine. SA328-34. Ortiz identified prints belonging to Randy Allen, Lydia High, and Joseph Edwards on several items. SA328-34.

Ortiz testified that the latent print recovered from the handgun itself was unsuitable for comparison. A latent palm print recovered from the magazine was suitable for analysis, but neither Karl Jordan, Jay Bryant, nor Joseph Edwards matched it. Ronald Washington, Randy Allen, and Jason Mizell could not be compared because no known palm-print exemplars were available. SA328-33.

On cross-examination, Ortiz confirmed that she compared Jordan's known prints with every latent print suitable for comparison and **excluded** him as the source of each one. SA334-38 (emphasized).

No latent fingerprint or palm print recovered from the crime scene was identified as belonging to Jordan.

#### h. Examiner Therese Moynihan

Therese Moynihan, an ATF firearm and toolmark examiner, testified that the two .40 caliber cartridge cases recovered inside Studio 24/7 were fired from the same firearm. SA1251.

She further testified that a .40 caliber cartridge case recovered on February 3, 2003 (purportedly related to Jordan), was **excluded** as having been fired from that same firearm. SA1255-56 (emphasized).

Moynihan also examined the bullet core recovered from the studio, projectile fragments recovered during Mizell's autopsy, and a bullet and fragment recovered in May 2003. She testified that none contained sufficient microscopic markings to associate them with any particular firearm and that the remaining comparisons were inconclusive. SA1252-55, SA1267-68.

On cross-examination, Moynihan reaffirmed that her report accurately reflected those conclusions. SA1261-68.

The only definitive firearms conclusion was that the two cartridge cases recovered inside Studio 24/7 had been fired from the same firearm. The remaining projectile evidence could not be associated with any particular weapon.

**i. Dr. Corinne Ambrosi**

Dr. Corinne Ambrosi, a forensic pathologist with the Office of the Chief Medical Examiner, performed Jason Mizell's autopsy on October 31, 2002. SA457.

Dr. Ambrosi testified that Mizell died from a single gunshot wound to the head. The bullet entered behind his left ear, exited above his right ear, and traveled left to right, upward, and back to front through his body. SA462-63. She also testified that stippling indicated the firearm was discharged from relatively close range, although she could not determine the precise muzzle distance. SA471-72.

During the autopsy, Dr. Ambrosi recovered two metallic projectile fragments and documented injuries consistent with a single gunshot wound. Toxicology detected cannabinoids but no other significant intoxicants. SA466, SA474, SA476-82.

On cross-examination, Dr. Ambrosi confirmed that her opinions were limited to the bullet's path through Mizell's body. She offered no opinion

regarding the shooter's location, the bullet's trajectory through the studio, or its path after exiting Mizell's body. SA484-89. Consistent with those limitations, Judge DeArcy Hall sustained defense objections when the Government attempted to use a demonstrative exhibit depicting the shooter's position and bullet trajectory. SA483.

Dr. Ambrosi expressed no opinion regarding the location of the shooter or the bullet's trajectory through Studio 24/7.

#### j. Jagjeet Bains, Gunshot Residue Expert

Jagjeet Bains, a former NYPD criminalist assigned to the Trace Unit, testified as an expert in gunshot residue analysis and muzzle-to-target distance determination. He examined Jason Mizell's hooded sweatshirt and jeans for the presence of gunshot residue. SA1478-91.

Bains testified that two holes in the hooded sweatshirt were caused by a single bullet passing through two folded layers of fabric. Based on the presence and distribution of gunshot residue, he concluded that the firearm was discharged at contact or near-contact range, with the muzzle approximately two inches or less from the garment. SA1496-99.

Bains detected no gunshot residue associated with two holes in Mizell's jeans and therefore could not determine whether those holes were caused by a bullet. SA1499.

On cross-examination, Bains acknowledged that his analysis could not identify the caliber of the bullet or the firearm that caused the damage to the sweatshirt, nor could he determine whether the holes in the jeans were caused by gunfire or associated with any particular weapon. SA1501-08.

Bains's testimony established only that the fatal shot was fired from close range. It did not identify the firearm, the caliber of the bullet, or the individual who fired it.

### 8. Ammunition Experts

#### a. Steven Rodgers

Steven Rodgers, Product Safety Manager for Vista Outdoor, testified as an expert concerning Federal-brand ammunition and the general behavior of bullets after impact. SA1448-52. He did not examine the physical evidence, visit Studio 24/7, or participate in the investigation. His opinions were based entirely on photographs and reports supplied by investigators. SA1452-59.

Rodgers testified that the recovered cartridge cases were consistent with Federal-brand .40 Smith & Wesson ammunition and that the recovered bullet core was inconsistent with .380 caliber ammunition. He further explained that bullets may deform, fragment, and change direction after striking objects or passing through the human body. SA1454-61.

Applying those general principles, Rodgers testified that it was possible for a bullet traveling upward through a person's head to lose energy and lodge in the radiator inside Studio 24/7. SA1461-63. Judge DeArcy Hall, however, declined to permit the Government to use a demonstrative exhibit depicting the relative positions of the shooter and victim and a proposed bullet trajectory because the exhibit had not been prepared by Rodgers and did not accurately reflect the evidence. SA1464-65.

On cross-examination, Rodgers acknowledged that he never visited Studio 24/7, measured the scene, performed trajectory analysis, reconstructed the shooting, or knew Mizell's precise position when he was shot. He further acknowledged that projectile behavior varies depending on the circumstances and that he performed no case-specific reconstruction. SA1466-70.

Rodgers offered only general opinions regarding bullet behavior. He performed no reconstruction of the shooting and expressed no opinion regarding the position of the shooter or the bullet's actual path through Studio 24/7.

**b. George Kass**

George Kass, founder of Forensic Ammunition Service, Inc., testified as an expert in ammunition identification. He was asked to identify

manufacturers that produced or marketed .40 Smith & Wesson ammunition between 1994 and 2003. SA1471-72.

Kass testified that approximately twenty to twenty-five companies manufactured or marketed .40 Smith & Wesson ammunition during the relevant period. He identified the recovered cartridge cases as Federal-brand .40 Smith & Wesson ammunition but did not associate the ammunition with any particular purchaser, retailer, firearm, or geographic location. SA473-75.

On cross-examination, Kass testified that millions of Federal-brand .40 Smith & Wesson cartridges were manufactured and commercially available during the relevant period. SA1474-76.

Kass's testimony established only that the recovered ammunition was commercially available Federal-brand .40 Smith & Wesson ammunition. He did not connect the ammunition to any firearm, purchaser, location, or participant in this case.

**9. Case Agent Kristy Doerner**

Special Agent Kristy Doerner of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that she joined the investigation into Jason Mizell's homicide in approximately August 2020 and later became the lead case agent. SA1525-26.

Doerner testified that she observed Jay Bryant on multiple occasions during 2022 and estimated his height at approximately 6'3" to 6'5". SA1526-27. She also testified that Bryant walked with a noticeable limp (as described by Gonzalez and Raymond Bryant) but that she did not observe a neck tattoo. SA1526-28.

Doerner identified Karl Jordan in photographs taken in 2003 and 2020 and in a brief television news clip recorded outside Studio 24/7 after the homicide, where Jordan appeared among the crowd gathered at the scene. She testified that Jordan was wearing a hooded Florida Marlins jacket. SA1534-36.

Doerner further testified that Bryant's residence in the Baisley Houses and Atif Heatherington's residence were approximately one and one-half blocks apart. SA1530-31. She also identified portions of Ronald Washington's Bureau of Prisons telephone calls and testified that "MDR" referred to Randy Allen's rap name. SA1531-36.

On cross-examination, Doerner acknowledged that she did not become involved in the investigation until 2020 and that her knowledge of the earlier investigation came from reviewing the existing case file and evidence gathered by prior investigators. SA1537-40.

Doerner offered no firsthand testimony concerning the 2002 homicide. Her testimony primarily summarized later investigative work and established Bryant's physical characteristics, including his height and noticeable limp, while noting that she did not observe a neck tattoo.

### 10. Notable Stipulations

Throughout the trial, the parties entered written stipulations authenticating documentary and physical evidence, establishing chain of custody, and eliminating the need for numerous foundational witnesses. Judge DeArcy Hall instructed the jury that stipulated facts constituted evidence and were to be accepted as true.

The parties stipulated that Government Exhibits 809 and 811 were authentic Bureau of Prisons telephone calls and that the accompanying transcripts accurately reflected the recordings. They further stipulated that, in Government Exhibit 811A, the individual Ronald Washington referred to as "My Little Man" was Karl Jordan. SA1523-24.

The parties also stipulated that Karl Jordan measured **5 feet 9½ inches** and Ronald Washington measured 5 feet 10 inches. SA1522 (emphasized). They further stipulated that investigators recovered: (1) a .40 caliber shell casing from Ronald Washington on August 9, 2002, manufactured by a different company than the shell casings recovered at Studio 24/7; (2) a .40

caliber shell casing and eighty-three .40 caliber cartridges from Jordan's residence on February 3, 2003; and (3) a .40 caliber bullet and bullet fragment associated with Jordan on May 14, 2003. SA1044-46.

The stipulations authenticated those recoveries but did not establish that any firearm or ammunition constituted the murder weapon.

The parties likewise stipulated to the authenticity of various business records, including Chase Bank records for Erotic Money Entertainment LLC, Meta (Instagram) subscriber records, New York tax judgments relating to Jason Mizell, and foreclosure records concerning Mizell's residence. SA1047-49.

The parties further stipulated that Ronald Washington and Yusuf Rahaman were housed in adjacent cells at the MDC during March and April 2011, providing the factual basis for Rahaman's testimony concerning conversations with Washington. SA1077-78.

The parties stipulated that Karl Jordan was not present in Queens between August 31 and September 16, 2003, and authenticated the death certificate of Max-Eddy Isralon ("Little Max"). SA1689, SA1583-84.

They also stipulated that, if called, Darnell Smith would testify that, between approximately 2:00 p.m. and 3:00 p.m. on October 30, 2002,

Ronald Washington entered a Jamaica barbershop and stated, "If anybody asks where I was all day, I was here at the barbershop." SA1050.

The jury subsequently convicted Jordan and Washington on Counts One and Two.

## F. Post-Trial Motions and Decision

Following the verdict, Jordan and Washington moved for judgments of acquittal under Rule 29, and Jordan separately moved for a new trial under Rule 33. The Government opposed both motions. DE 292, 293 (sealed), 294, 296, 297 (sealed), 301, 302.

### 1. Rule 29

Judge DeArcy Hall granted Jordan's Rule 29 motion as to Counts One and Two. In doing so, the court did not conclude that the Government failed to prove a narcotics conspiracy or that no rational juror could find Jordan participated in the homicide. Rather, the court held that the Government failed to present sufficient evidence that Jordan himself killed Jason Mizell because of the charged narcotics conspiracy, as required by 21 U.S.C. § 848(e)(1)(A).

The court carefully distinguished the evidence relating to Ronald Washington from the evidence relating to Jordan. It concluded that, although the Government presented evidence from which a rational juror could infer

that Washington possessed a narcotics-related motive arising from the failed Baltimore venture, it failed to establish the evidentiary link necessary to infer that Jordan shared that motive or otherwise acted for a narcotics-related purpose. The court therefore rejected each of the Government's proposed motive theories as speculative as applied to Jordan.

The Rule 29 judgment materially altered the procedural posture of the case because Counts One and Two—the charges that had principally supported Jordan's detention—were dismissed.

**2. Rule 33**

Judge DeArcy Hall denied Jordan's motion for a new trial under Rule 33. A170-75. That ruling nevertheless remains significant because, in addressing the motion, the court carefully reviewed the trial evidence concerning the identity of the individual who fired the fatal shot.

Jordan argued that the weight of the evidence pointed to Jay Bryant as the individual who fired the shots, relying on, among other things, Bryant's DNA recovered from the blue knit hat, eyewitness descriptions of a tall individual, Bryant's physical characteristics, and testimony concerning Bryant's admissions. Although the court concluded that Rule 33's demanding standard had not been satisfied, it recognized that the evidence supporting Bryant's role in the homicide warranted careful consideration.

Accordingly, by the time the district court later considered Jordan's renewed application for release, its evaluation of the homicide evidence rested not on the indictment or Government proffers, but on a comprehensive assessment of the complete trial record developed over five weeks of testimony.

## G. <u>Second Bond Application</u>

After the Rule 29 ruling, Jordan renewed his application for release. DE 331. Jordan proposed a substantial bail package, including a one-million-dollar bond, numerous financially responsible suretors, multiple properties pledged as security, location monitoring, and stringent conditions. He emphasized his lifelong ties to New York, his family support, his lack of passport or foreign resources, his nearly six years in federal custody without violent incident, the age of the Government's alleged violent conduct, and the district court's Rule 29 ruling.

The Government opposed release. DE 332. It argued that the presumption remained applicable, that Counts One and Two still mattered because the Government had appealed the Rule 29 ruling, that Counts Three through Eleven remained serious, that uncharged conduct supported dangerousness, and that the bond package did not adequately mitigate danger or flight risk.

The district court held two hearings and expressly recognized the statutory presumption. A198, A241. The court directed defense counsel to address how the presumption had been rebutted. The court also acknowledged the seriousness of Counts Three through Eleven and the potential penalties attached to those counts. On April 6, 2026, Judge DeArcy Hall granted release. The court found that Jordan rebutted the presumption, that the Government failed to establish dangerousness by clear and convincing evidence, and that the Government failed to establish flight risk by a preponderance of the evidence. The court also found that the proposed conditions adequately addressed any remaining concerns.

The Government appealed. DE 338.

## SUMMARY OF ARGUMENT

First, the district court applied the correct legal standard. Judge DeArcy Hall expressly recognized the statutory presumption, required Jordan to rebut it, considered the factors set forth in 18 U.S.C. § 3142(g), and concluded that the Government failed to carry its burden. The Government identifies no legal error. Instead, it asks this Court to reweigh the evidence and substitute its judgment for that of the district court.

Second, the district court properly reassessed detention in light of materially changed circumstances. The Government's assertion that Judge

DeArcy Hall "reversed" herself ignores the dramatically different record that existed before the court in 2026. By then, the court had presided over a five-week trial, resolved extensive evidentiary disputes, granted Jordan's Rule 29 motion on Counts One and Two, considered the Rule 33 record, and evaluated Jordan's conduct during nearly six years of federal detention. The Bail Reform Act required the court to assess detention based on that materially expanded record, not the pretrial record that existed in 2022.

Third, the Government's challenge to Counts One and Two identifies no clear error. Judge DeArcy Hall carefully considered the Government's evidence, the jury's verdict, and the complete post-trial record before concluding that the Government failed to prove the narcotics-motive element required by 21 U.S.C. § 848(e)(1)(A). That ruling fundamentally altered the detention analysis.

Fourth, the district court likewise acted well within its discretion in evaluating Counts Three through Eleven and the Government's allegations of uncharged conduct. After considering the seriousness of the remaining charges, the age of the alleged misconduct, Jordan's nearly six years of incident-free detention, and the proposed release conditions, the court reasonably concluded that the Government failed to establish that no

condition or combination of conditions could reasonably assure Jordan's appearance and the safety of the community.

Ultimately, the Government's appeal rests on a single proposition: that Judge DeArcy Hall should have weighed the evidence differently. But disagreement with the district court's predictive judgment is not clear error. Because the district court applied the correct legal standard, carefully considered the statutory factors, and reached a reasoned decision supported by the record, its release order should be affirmed.

## ARGUMENT

### I. APPLICABLE LAW AND STANDARD OF REVIEW

The Bail Reform Act permits detention only if, after a hearing, the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). As this Court has recognized, "[o]nly a limited group of offenders should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citation modified).

In making that determination, Congress directed courts to consider four factors: (1) the nature and circumstances of the charged offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant;

and (4) the nature and seriousness of the danger posed by release. 18 U.S.C. § 3142(g).

The Government bears the ultimate burden of persuasion. To establish risk of flight, it must prove by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance. *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987). To establish dangerousness, it must prove by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Sabhnani*, 493 F.3d at 75.

Although the rebuttable presumption of § 3142(e)(3) shifts a burden of production to the defendant, it does not shift the ultimate burden of persuasion, which always remains with the Government. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). Even after rebuttal, the presumption remains only one factor to be weighed together with the remaining § 3142(g) factors. *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

The Government also invokes 18 U.S.C. § 3143(c), which governs release when the Government appeals a judgment of acquittal. Br. 45-46.

That provision expressly directs courts to evaluate release "in accordance with section 3142." 18 U.S.C. § 3143(c). Consistent with the statute, Judge DeArcy Hall repeatedly applied § 3142 in evaluating Jordan's renewed application for release.

A district court's determinations regarding dangerousness and risk of flight are reviewed only for clear error. *United States v. English*, 629 F.3d 311, 319-20 (2d Cir. 2011); *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000). Legal conclusions are reviewed de novo, but the district court's factual findings and ultimate assessment of dangerousness and flight risk are entitled to substantial deference. *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004).

That deference reflects the district court's unique ability to evaluate both the defendant and the evidence after presiding over the proceedings. Reversal is warranted only if the reviewing court is left with the "definite and firm conviction that a mistake has been committed." *Sabhnani*, 493 F.3d at 75 (quoting *Shakur*, 817 F.2d at 195). Where two permissible views of the evidence exist, the district court's choice between them cannot be clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

## II. THE DISTRICT COURT DID NOT CLEARLY ERR IN RULING THAT THE GOVERNMENT FAILED TO MEET ITS BURDEN OF PERSUASION TO PROVE THAT JORDAN POSED A DANGER TO THE COMMUNITY AND WAS A FLIGHT RISK

Jordan reapplied for release on bail after the district court ruled that the evidence was insufficient as a matter of law to convict him of murder while engaged in a narcotics conspiracy, 21 U.S.C. § 848(e)(1)(A), and firearm-related murder, 18 U.S.C.§ 924(j)(1). To secure his release, the renewed bail application proposed a $1,000,000 bond, secured by seventeen sureties, in addition to three properties and location monitoring. DE 331.

Pursuant to section 3142(e), in considering Jordan's renewed bail application, the district court undertook a two-step inquiry. First, the court determined that besides Counts One and Two, *only* Counts Three and Four triggered the statutory rebuttable presumption against release on bail. A204-205. *See also* 18 U.S.C. § 3142(e)(3). Consequently, Jordan bore a "limited" burden of production to rebut the presumption. *See Mercedes*, 254 F.3d at 436.

### A. The Nature and Circumstances of the Charged Offenses, Together with the Weight of the Evidence, Favored Release

#### 1. Preliminary Statement

The Government's principal theme is that Judge DeArcy Hall "reversed" her earlier detention ruling. Br. 4, 56. That characterization misstates both the record and the Bail Reform Act.

At the March 13, 2026 bail hearing, the Government argued that, although the district court had rejected its narcotics-motive theory under Rule 29, it had not reconsidered whether Jordan committed the homicide. A217. Judge DeArcy Hall immediately responded, "That's not the question I was asked on Counts One and Two." *Id.* When the court asked whether the Government was inviting it to express a view on Jordan's guilt, the Government acknowledged that it did "not even need to get there," instead relying principally on the remaining counts. A217-18.

At the April 6, 2026 hearing, the district court again made clear that it had fully considered Counts One and Two, explaining: "Having presided over Mr. Jordan's trial on Counts One and Two, there was insufficient evidence to find him guilty of those Counts." A248.

The Government's assertion that the district court merely reconsidered the same record is therefore incorrect. Between the original detention hearing and the renewed application for release, the district court presided

over years of additional litigation, including extensive in limine proceedings, a five-week trial, the Rule 29 and Rule 33 motions, and the renewed detention proceedings. The Bail Reform Act required the court to evaluate detention based upon that materially expanded record—not the preliminary record that existed before trial. *See* 18 U.S.C. § 3142(f).

The hearing transcripts confirm that Judge DeArcy Hall expressly recognized the statutory presumption, required Jordan to rebut it, reconsidered each § 3142(g) factor in light of the post-trial record, and ultimately concluded that the Government failed to satisfy its burden of persuasion. A204-05, A209, A244, A246, A253.

That conclusion necessarily reflected a different evidentiary record. By the time the court ruled on Jordan's renewed application, it was no longer evaluating allegations contained in an indictment or Government proffers. It had heard the witnesses, observed their demeanor, ruled on objections, resolved extensive evidentiary disputes, considered impeachment, and evaluated the parties' competing interpretations of the evidence.

The district court explained why its assessment changed: "When the court denied Mr. Jordan's prior bail application ... it unquestionably made its

decision primarily because of the offenses charged in Counts One and Two...." A248.

The court then explained why the post-trial record materially altered that analysis:

"Having since presided over Mr. Jordan's trial on Counts One and Two, the court believes that there is insufficient basis to support a finding of probable cause to believe Mr. Jordan committed Counts One and Two." *Id.* The court further reaffirmed the reasoning underlying its Rule 29 ruling, explaining that "the government failed to present evidence during the trial that would support any drug related motive to Mr. Jordan, and ... failed as well to support Count Two." *Id.*

Finally, Judge DeArcy Hall made clear that the Government's appeal did not alter her assessment of the evidence: "Although the government is appealing these rulings, it does not change the court's view of the evidence...." A249.

Accordingly, this appeal does not present a district court that "reversed" itself. It presents a district court that faithfully applied the Bail Reform Act to a materially different procedural posture and a substantially expanded evidentiary record. The Government's disagreement with that reassessment does not establish clear error.

### 2. Rule 29 Dismissal of Counts One and Two

The Government argues that Judge DeArcy Hall's Rule 29 ruling left intact the jury's conclusion that Jordan was the individual who fired the fatal shot and faults the district court for failing to give sufficient weight to that conclusion. Br. 8, 45-51. That argument mischaracterizes both the Rule 29 decision and the release order.

Judge DeArcy Hall did not disregard Counts One and Two. To the contrary, she evaluated those charges in light of the complete trial record and concluded that the Government failed to prove the narcotics-purpose element required by 21 U.S.C. § 848(e)(1)(A). That ruling necessarily altered the weight of the evidence for purposes of the Bail Reform Act. See 18 U.S.C. § 3142(g)(2).

Nor does this appeal present the merits of the Government's forthcoming appeal from the Rule 29 judgment. That appeal will be fully briefed separately. The question here is considerably narrower: whether Judge DeArcy Hall clearly erred in concluding that her Rule 29 ruling materially changed the procedural posture of the case and the weight of the evidence relevant to detention.

She did not.

Judge DeArcy Hall accepted every inference the law required her to draw in the Government's favor. She concluded that the evidence permitted a rational jury to find that: (1) the charged narcotics conspiracy existed; (2) Jordan participated in that conspiracy; and (3) the conspiracy continued through the time of Mizell's homicide. A157-61.

The district court did not reject the jury's verdict, disregard circumstantial evidence, reweigh witness credibility, or impose a heightened burden on the Government. Rather, it concluded that the Government failed to prove the one element that transformed the homicide into a violation of § 848(e)(1)(A): that Jordan himself killed Jason Mizell because of the charged narcotics conspiracy. A161-70.

That missing nexus—not whether Jordan participated in the homicide—controlled the Rule 29 ruling. Judge DeArcy Hall was entitled to consider that ruling, together with the complete post-trial record, when reassessing detention under the Bail Reform Act. The Government's disagreement with that assessment does not establish clear error.

**a. The Failure to Prove Jordan's Narcotics-Related Motive**

The Government's principal theory was that Ronald Washington became enraged after Ralph Mullgrav refused to include him in the proposed Baltimore cocaine venture. SA153.1-53.9, SA1590, SA1607, SA1616-17;

1682; DE 297. As discussed above, that theory rested principally on the testimony of Mullgrav, Burrell, Gardiner, Roberts, and other witnesses describing Washington's role in the proposed Baltimore transaction and his alleged grievance following its collapse.

Judge DeArcy Hall accepted that the evidence permitted a rational juror to infer that Washington possessed a narcotics-related motive. The problem, as she explained, was that the Government failed to establish the evidentiary link necessary to infer that Jordan shared that motive.

Mullgrav testified that Mizell proposed a Baltimore cocaine venture only if Washington participated. Mullgrav immediately rejected the proposal because he refused to work with Washington. After extensive discussion, the proposal ended exactly where it began:

> Q: So no deal?
>
> A: **No deal.**

SA685 (emphasized).

Burrell described conversations between Mizell and Washington concerning placing Washington in Baltimore. SA942-SA57. Gardiner recounted Washington's own description of the proposed transaction. SA1228-37. Detective Roberts later repeated Washington's account during his 2019 custodial interview. SA1158-97. Collectively, those witnesses

established a Baltimore dispute centered on Washington. None established that Jordan shared Washington's alleged grievance.

Indeed, the Government introduced no evidence that Jordan participated in the Baltimore negotiations, knew Mullgrav rejected Washington's participation, expected to profit from the proposed venture, expressed frustration over its collapse, or otherwise adopted Washington's alleged narcotics-related motive. Judge DeArcy Hall did not invent that distinction—it arose directly from the Government's own evidence.

Nor was the Baltimore evidence an isolated example. Throughout the trial, the Government repeatedly introduced testimony concerning Washington's alleged motive while presenting no comparable evidence concerning Jordan.

Daynia McDonald described Washington's conduct before and after the homicide but offered no testimony connecting Jordan to any narcotics-related motive. Stephon Watford testified about Washington's request for .40 caliber ammunition and his warning that "something bad" would happen, but testified that he never saw Jordan at Studio 24/7. SA518, SA523-24, SA544-45. Gardiner, Roberts, and Rahaman likewise recounted Washington's statements without supplying evidence that Jordan shared Washington's alleged motive. SA1052-72, SA1228-48, SA1543-82.

The Government did present two witnesses—Tony Rincon and Cherubin Bastien—who implicated Jordan in the homicide itself. But neither witness supplied any testimony concerning Jordan's alleged narcotics motive. Their testimony, even if fully credited, did not establish the element that distinguishes an intentional homicide from a violation of § 848(e)(1)(A).

Only Eric James provided testimony arguably connecting Jordan to narcotics activity. James testified that Jordan once asked about cocaine prices, asked Mizell to "put me on," and that Mizell later told him he had provided Jordan with one ounce of cocaine "to try him out." SA1283-85, SA1296-98. James nevertheless acknowledged that he never observed Jordan possess or distribute narcotics, that his testimony concerning Jordan's alleged narcotics activity came entirely from conversations with Mizell, and—most importantly—that Mizell never told him what became of the proposed Baltimore venture.

> Q: Did he ever tell you what happened with the Baltimore deal specifically?
>
> A: No.

SA1305.

Even accepting James's testimony in its entirety, it does not establish that Jordan committed the homicide because of the charged narcotics conspiracy.

Recognizing the weakness of the Baltimore theory as applied to Jordan, the Government advanced several alternative motive theories. It argued that Jordan sought to eliminate Mizell as a middleman, increase his narcotics profits, or obtain cocaine or drug proceeds. SA 1590, 1607; DE 297. Judge DeArcy Hall carefully examined each theory and found the record wanting. A168.

No witness testified that Jordan sought to replace Mizell within the alleged conspiracy, expected increased narcotics profits after Mizell's death, communicated directly with suppliers, knew narcotics or drug proceeds would be present at Studio 24/7, or attempted to obtain drugs or money after the homicide. Those theories, therefore, rested not on affirmative evidence but on speculation. Judge DeArcy Hall correctly concluded that speculation could not satisfy the Government's burden.

**b. Lack of Proof of Motive**

The Government portrays the Rule 29 ruling as an extraordinary departure from the jury's verdict. In its merits brief, it principally argues that Judge DeArcy Hall failed to follow *United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003), and improperly distinguished this Court's decisions in *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), *United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016), *United States v. Campbell*, 850 F. App'x 102 (2d

Cir. 2021), and *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015), because those cases allegedly did not require direct evidence of motive. A339-48.

That argument mischaracterizes both the Rule 29 opinion and the governing precedent. Judge DeArcy Hall did not require direct evidence of motive. To the contrary, she expressly recognized that a conviction under 21 U.S.C. § 848(e)(1)(A) may rest entirely upon circumstantial evidence. A163. The question before her was not whether motive could be inferred; it was whether the Government introduced sufficient evidence from which a rational jury could infer Jordan's narcotics-related motive without resorting to speculation.

The Government's own authorities answer that question. As this Court explained in *Vernace*, "[w]here the government asks the jury to find an element of the crime through inference, the jury may not be permitted to conjecture or to conclude upon pure speculation." 811 F.3d at 615 (citation omitted). Likewise, *Glenn* recognized that circumstantial evidence may suffice, but only where it supports—not merely permits—the inferential chain necessary to establish guilt beyond a reasonable doubt. 312 F.3d at 70.

That is precisely the principle Judge DeArcy Hall applied.

The Government's theory required the jury to infer that because Washington allegedly became angry after Yakim refused to participate in the proposed Baltimore transaction, Jordan necessarily shared that grievance and therefore murdered Mizell for a narcotics-related purpose. After carefully reviewing the trial record, the district court concluded that the factual predicates necessary to support those inferences simply did not exist. As the court observed, the Government itself acknowledged that there was "no trial testimony or physical evidence that Jordan's role in the narcotics conspiracy was dependent on Washington's role in Baltimore," and "no evidence that Jordan was told he could not distribute in Baltimore." A163-64. Having noted those concessions, the court asked the dispositive question: "From what evidence, then, could the jury have reasonably inferred that Jordan sought to retaliate against Mizell for the failure of the Baltimore deal?" A164.

Its answer was equally direct: **"There was none."** *Id.* (emphasized).

That conclusion accurately reflects the trial record.

Mullgrav testified only that Mizell proposed placing Washington in Baltimore, that Mullgrav refused because he would not work with Washington, and that the proposal ended with "No deal." Burrell described conversations between Mizell and Washington concerning Baltimore, but

did not place Jordan in those discussions. Gardiner recounted Washington's own description of the failed transaction, and Detective Roberts later repeated Washington's account during his 2019 interview. None of those witnesses testified that Jordan participated in the Baltimore discussions, knew of Mullgrav's refusal, or shared Washington's alleged grievance.

Nor did the remaining evidence supply the missing link. The Government introduced no evidence that Jordan knew Yakim, knew of the proposed Baltimore distribution arrangement, knew Yakim rejected Washington, believed Baltimore profits were lost because of Mizell, or expected personally to benefit by retaliating against him. Likewise, no witness testified that Jordan sought to replace Mizell as the conspiracy's middleman, expected increased narcotics profits following Mizell's death, knew Mizell was meeting with "Unc," knew narcotics or proceeds would be present at Studio 24/7, or intended to obtain drugs or money after the homicide. As the district court correctly concluded, those theories rested not on evidence, but on successive assumptions. A164-70.

The Government's reliance on *Glenn* is therefore misplaced. There, despite acknowledging "holes in the Government's proof of motive," this Court found sufficient that the defendant personally believed he had been cheated out of narcotics proceeds. *Glenn* at 65. The evidence established that

he arranged the robbery, expected a share of the drugs, confronted the victim, searched unsuccessfully for the missing narcotics, and knew the victim had lied about the amount stolen. 312 F.3d at 65. However, even then, this Court ultimately reversed the conviction because the Government failed to prove identity beyond a reasonable doubt. *Id.* at 69-70.

Here, by contrast, there was no comparable evidence that Jordan personally suffered any narcotics-related grievance. As Judge DeArcy Hall observed, unlike *Glenn*, there was simply no evidence that Jordan "felt cheated by the failure of the Baltimore deal, was disappointed by the proceeds he received from the conspiracy, or sought to steal cocaine from Mizell." A166.

Nor does *Campbell* assist the Government. There, the evidence established an obvious connection between the attempted robbery of a gang's marijuana stash house and the subsequent homicide. Specifically, the conspirators immediately tracked the victim's movements, committed the homicide within days of the attempted robbery, and fled together with marijuana, distribution paraphernalia, and the ammunition used in the killing. 850 F. App'x at 103-07. Those facts supplied the evidentiary bridge between the narcotics conspiracy and the homicide. Here, the district court correctly found that "the record in this case is bereft of such an 'obvious

link,' or any link, between the failed Baltimore deal and Jordan's decision to participate in Mizell's murder two months later." A166-67

The Government likewise overreads *Pierce*. *Pierce* held only that liability under § 848(e)(1)(A) does not require the defendant to have been actively distributing narcotics at the precise moment of the killing and that the Government need prove only that one motive for the homicide was narcotics-related. 785 F.3d at 839, 844-45. Judge DeArcy Hall never held otherwise. To the contrary, she expressly found that Jordan remained a member of the conspiracy, that the conspiracy continued after Baltimore, and that Jordan had not withdrawn. A157-61.

The issue was not Jordan's membership in the conspiracy. The issue was whether the Government proved that one of Jordan's motives for the homicide was narcotics-related. Unlike *Pierce*, where a cooperating witness testified that the gang leader ordered the murder because the victim was selling counterfeit crack cocaine and was suspected of informing, 785 F.3d at 839, the Government introduced no comparable evidence linking Jordan's motive to narcotics.

The Government's remaining authorities reinforce rather than undermine the Rule 29 ruling because each involved objective evidence

connecting the defendant himself to the narcotics-related purpose for the homicide.

In *United States v. Walker*, 142 F.3d 103 (2d Cir. 1998), the Government proved that the defendants jointly planned to rob a rival drug dealer, discussed obtaining drugs and money, anticipated the victim's death, prepared through target practice, and carried out the homicide to advance the narcotics enterprise. *Id.* at 112-16. Those facts established the defendants' shared knowledge of the narcotics objective before the homicide occurred. Judge DeArcy Hall repeatedly found no comparable evidence here.

Likewise, *United States v. Arrington*, 941 F.3d 24 (2d Cir. 2019) involved evidence that the defendant knowingly served as an enforcer for the narcotics enterprise, attended retaliation meetings, armed himself in anticipation of retaliatory violence, understood the ongoing narcotics conflict, and acted to protect the enterprise's interests. *Id.* at 36-39. Even then, the Second Circuit described the enterprise-motive issue as a "close call." *Id.* at 38. Here, the district court found no evidence that Jordan attended planning meetings, discussed Washington's alleged grievance, received instructions concerning Mizell, or otherwise demonstrated through his own conduct that he understood the alleged narcotics purpose for the homicide.

*United States v. Kemp*, No. 21-CR-1684(CON), 2023 U.S. App. LEXIS 2009 (2d Cir. Jan. 26, 2023) likewise did not rest on generalized conspiracy membership. The defendant coordinated with heroin dealers, accepted customer referrals, defended the organization's territory, received protection from conspiracy leaders, was directed to retaliate against rivals, and received the firearm used in the homicide from the conspiracy itself. *Id.* at *4. Again, the district court found no comparable evidence connecting Jordan to Washington's alleged narcotics objective.

Nor does *United States v. Desinor*, 525 F.3d 193 (2d Cir. 2008) assist the Government. Although *Desinor* held that the Government need prove only that one motive for the homicide was narcotics-related, *Id.* at 202-03, it affirmed because the record contained abundant evidence that the participants themselves understood the attack to be undertaken, at least in part, to defend the organization's narcotics territory. *Id.* at 203-04. Judge DeArcy Hall accepted that legal principle. She concluded only that the Government failed to produce comparable evidence establishing that Jordan himself knew of and adopted Washington's alleged narcotics motive. A157, A162. That factual determination—not disagreement with *Desinor*'s legal standard—lies at the heart of this appeal.

*United States v. Santos*, 541 F.3d 63 (2d Cir. 2008) likewise illustrates why the district court granted Rule 29. There, the Second Circuit affirmed because the Government introduced direct evidence that Santos himself learned the victims had stolen hundreds of thousands of dollars in cocaine proceeds, questioned others about the narcotics conspiracy, expressed interest in the operation, and declared his intention to kill immediately after learning those facts. *Id.* at 66-75.

No comparable evidence exists here. No witness testified that Jordan knew about Baltimore, knew Yakim rejected Washington, knew of the alleged cocaine debt, expected narcotics proceeds, or shared Washington's alleged grievance. Judge DeArcy Hall therefore did not reject *Santos*. She applied it.

*United States v. Aguilar*, 585 F.3d 652 (2d Cir. 2009) is equally distinguishable. There, the Second Circuit sustained the conviction because the defendant affirmatively used the conspiracy as the means to procure the murder—forgiving drug debts, promising future narcotics supplies, and compensating participants with drugs. *Id.* at 660-62. The Court emphasized that the defendant "used the conspiracy as a tool" to accomplish the homicide. *Id.* Here, the district court repeatedly found no evidence that Jordan used drug debts, narcotics proceeds, suppliers, or any other aspect of

the charged conspiracy to facilitate Mizell's homicide. *Aguilar* therefore illustrates the very evidentiary bridge that the district court found missing.

The Government's reliance on *United States v. Nina,* 734 F. App'x 27 (2d Cir. 2018), is likewise unpersuasive. As an initial matter, *Nina*, like many of the Government's authorities, is a nonprecedential summary order. More importantly, the evidence established an ongoing territorial dispute between rival drug organizations, repeated threats directed at competing dealers, the defendant's personal participation in defending the Crew's narcotics territory, his provision of the firearm used in the shooting, and his direct involvement in deciding whether he or another Crew member would carry out the attack. *Id.* at 30-32. Applying *Desinor*, the Court concluded that a rational jury could find that one motive for the shooting was to protect the Crew's narcotics enterprise. *Id.* Judge DeArcy Hall accepted that legal principle. She concluded only that the Government failed to introduce comparable evidence establishing that Jordan himself knew of and adopted Washington's alleged narcotics motive or otherwise acted to advance the charged conspiracy.

The Government's reliance on *Smith v. United States,* 508 U.S. 223 (1993), is similarly misplaced. *Smith* did not address Rule 29, conspiracy proof, or the evidentiary sufficiency of a narcotics-murder conviction.

Rather, the Supreme Court construed the phrase "during and in relation to" in 18 U.S.C. § 924(c), explaining that the firearm must facilitate—or have the potential to facilitate—the underlying offense and that its presence cannot be merely accidental or coincidental. *Id.* at 237-40. Judge DeArcy Hall embraced that principle. Her Rule 29 ruling turned not on disagreement with the governing nexus requirement, but on the factual conclusion that the Government failed to prove the required substantive connection between Jordan's participation in the homicide and the charged narcotics conspiracy. *Smith* therefore supports the requirement of an actual evidentiary nexus rather than the Government's invitation to infer one through speculation.

The Government likewise misreads *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998). There, the Second Circuit emphasized that conspiracy liability requires proof that the defendant agreed to the essential nature of the criminal plan and shared knowledge of the conspiracy's unlawful objectives. *Id.* at 147. Mere association with conspirators was insufficient. *Id.* at 151. Instead, the Court cataloged extensive objective evidence demonstrating each defendant's personal knowledge of the enterprise's criminal purpose, including terrorist training, bomb manuals, coordinated travel, coded communications, false identities, logistical planning, and continuing participation in the plot. *Id.* at 153-57.

The same principle appears in *United States v. Heinemann*, 801 F.2d 86 (2d Cir. 1986), where the Court explained that conspiracy requires not only knowing participation but also "some knowledge of the unlawful aims and objectives of the scheme." *Id.* at 93 (internal quotation marks omitted). Likewise, *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976), upheld a conspiracy conviction because the Government introduced objective evidence demonstrating the participants' awareness of the broader narcotics operation through common suppliers, common customers, mutual dependence, and continuing relationships. *Id.* at 452-53.

Judge DeArcy Hall employed precisely that methodology. She accepted that the jury could find the charged conspiracy existed and that Jordan participated in it. What she found missing was the next inferential step: objective evidence demonstrating that Jordan knew of Washington's alleged narcotics grievance and adopted it as his own reason for participating in the homicide. Nothing in *Salameh*, *Heinemann*, or *Panebianco* suggests that conspiracy membership alone establishes knowledge of another conspirator's motive for murder.

The same pattern appears throughout the Government's remaining conspiracy authorities. In *United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014), the Court affirmed because objective evidence established the

defendant's own knowing participation in the narcotics conspiracy. *Id.* at 69-73. *United States v. Klein*, 913 F.3d 73 (2d Cir. 2019), relied upon numerous mutually reinforcing facts—not a single ambiguous statement—to establish criminal intent. *Id.* at 78-81. *United States v. Sureff*, 15 F.3d 225 (2d Cir. 1994), rested on coded conversations, surveillance, expert testimony, drug-price negotiations, and false exculpatory statements. *Id.* at 227-29. *United States v. Djibo*, 850 F. App'x 52 (2d Cir. 2021), affirmed only after the Government introduced the defendant's own WhatsApp messages, emails, travel arrangements, advance payments, courier instructions, and other communications demonstrating that he knowingly adopted the conspiracy's criminal objective. *Id.* at 55-59. Likewise, *United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005), upheld the conviction because the surrounding circumstances objectively established the defendant's knowledge of the unlawful scheme. *Id.* at 187-95.

The Government's reliance on *United States v. Lewis*, 62 F.4th 733 (2d Cir. 2023), and *United States v. Snow*, 462 F.3d 55 (2d Cir. 2006), is equally revealing. Both decisions interpret § 924(c) and require proof of a specific nexus between the firearm and the narcotics offense. *Lewis* expressly rejected the proposition that the mere presence of a firearm near narcotics automatically satisfies the "in furtherance of" requirement, holding

instead that the Government must establish a specific evidentiary connection. 62 F.4th at 745-46. *Snow* likewise affirmed only because the Government introduced objective evidence linking the defendants to an ongoing narcotics enterprise through controlled purchases, repeated drug transactions, stash locations, drug proceeds, packaging materials, loaded firearms, and the defendants' own conduct. 462 F.3d at 59-73.

The district court accepted those same legal principles. It concluded only that the Government failed to produce comparable objective evidence establishing that Jordan knew of and adopted Washington's alleged narcotics motive or otherwise acted because of the charged conspiracy.

Again, the Government did not establish that Jordan knew Yakim, knew of the Baltimore dispute, knew Yakim rejected Washington, participated in discussions concerning Mizell's alleged interference with the conspiracy, or engaged in planning meetings, coded communications, admissions, or any other conduct demonstrating that he personally adopted Washington's alleged narcotics objective.

Instead, the Government repeatedly asks this Court to infer Jordan's knowledge from Washington's knowledge. None of the conspiracy authorities it cites authorizes that inferential shortcut.

The Government's reliance on general Rule 29 deference cases likewise does not alter the analysis. *United States v. Truman*, 688 F.3d 129 (2d Cir. 2012), reversed a Rule 29 judgment because the district court rejected the credibility of the Government's principal witness—its cooperating accomplice—and substituted its own assessment for that of the jury. *Id.* at 139-44. Judge DeArcy Hall did nothing comparable. She accepted that a rational jury could find the existence of the charged narcotics conspiracy, Jordan's participation in that conspiracy, the continuation of the conspiracy through October 2002, and Jordan's participation in the homicide itself. The Rule 29 ruling turned on the much narrower question whether the Government's evidence, taken as true and viewed in the light most favorable to the prosecution, established beyond a reasonable doubt that Jordan murdered Mizell because of the charged narcotics conspiracy. *Truman* therefore does not undermine the district court's reasoning.

By contrast, *United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019), reinforces the Rule 29 analysis employed here. The Second Circuit affirmed a judgment of acquittal because, even viewing the evidence in the light most favorable to the Government, proof of an essential element rested on impermissible speculation rather than evidence from which a rational jury could find guilt beyond a reasonable doubt. *Id.* at 656-57. The Court

emphasized that reasonable inferences must rest on specific evidence, not conjecture, and that courts "give no deference to impermissible speculation." *Id.* at 657. That is precisely what Judge DeArcy Hall concluded here.

The same principle distinguishes *United States v. Carson*, 702 F.2d 351 (2d Cir. 1983). There, the Second Circuit affirmed because the Government introduced extensive evidence of the defendant's own knowing participation in the narcotics enterprise. Carson repeatedly admitted that she was Wilkins's "partner," discussed heroin sources, negotiated future transactions, acted as a lookout during an ongoing sale, and otherwise demonstrated a direct stake in the success of the conspiracy. *Id.* at 356-65. Here, the district court found no comparable evidence that Jordan knew of or adopted Washington's alleged narcotics objective.

Several additional authorities simply address different issues. *United States v. O'Connor*, 650 F.3d 839 (2d Cir. 2011), concerns severance and prejudicial spillover, not Rule 29, § 848(e)(1)(A), or aiding-and-abetting liability. *Id.* at 843, 859. *United States v. Plitman*, 194 F.3d 59 (2d Cir. 1999), involved tax evasion proved through extensive documentary evidence. *Id.* at 66-67. *United States v. Stanley*, 928 F.2d 575 (2d Cir. 1991), affirmed because objective evidence established the defendant's own knowing participation in a narcotics operation through his conduct, location,

and the testimony of a cooperating witness. *Id.* at 577-78. None undermines the district court's conclusion that the Government failed to produce comparable evidence establishing that Jordan acted because of the charged narcotics conspiracy.

The Government nevertheless argues that the district court should have disregarded the legal significance of its Rule 29 judgment when reconsidering detention. That argument fails. Having concluded that the Government failed to prove the essential narcotics-motive element beyond a reasonable doubt, the district court was entitled to assign different weight to Counts One and Two than it had before trial.

By the time it ruled on Jordan's renewed application for release, the district court had the benefit of the complete trial record and had concluded that the Government's narcotics-motive theories were "impermissibly speculative and just conjecture." A165. Those findings necessarily informed its evaluation of the seriousness of Counts One and Two and Jordan's present dangerousness under the Bail Reform Act.

Ultimately, the Government's disagreement is not with the legal standard the district court applied, but with the weight it assigned to the evidence after presiding over every significant stage of this prosecution.

Under settled clear-error review, that disagreement provides no basis for reversal.

### c. Further Discussion of Count Two

The Government's challenge to the district court's Rule 29 ruling on Count Two begins from a mistaken premise. It argues that the jury was not required to agree unanimously on the particular narcotics-related motive underlying Jordan's use of the firearm and that different jurors could have relied upon different drug-related purposes for the homicide. A351-53. However, that argument responds to a ruling the district court never made.

Judge DeArcy Hall did not hold that the jury was required to agree whether Jordan shot Mizell to punish him, steal cocaine, obtain narcotics proceeds, or increase his role in the alleged conspiracy. Nor did she suggest that disagreement among jurors concerning alternative narcotics-related motives defeated unanimity.

Instead, she addressed the argument the Government actually advanced below.

In opposing the Rule 29 motions, the Government expressly argued that "the same evidence" supporting Count One also established that Jordan used a firearm "during and in relation to" the charged narcotics conspiracy because "[a]ll of the motives previously described afforded some advantage

to the narcotics conspiracy." A169-70. Accepting that premise, the district court explained that it had "already found that the Government's purported motives underlying Count One to be insufficient" and that "[t]he Court's reading of that evidence is no different when viewed through the lens of Count Two." A170. It therefore concluded that "the Government's theories of Jordan's drug-related motive to kill Mizell or drug offense-related motive to use a firearm are impermissibly speculative and just conjecture." *Id.*

That is a straightforward Rule 29 determination. It is not a ruling concerning jury unanimity, alternative means, or competing narcotics-related motives.

Accordingly, the Government's reliance on *Richardson v. United States*, 526 U.S. 813 (1999), and *United States v. Aller*, 646 F. App'x 21 (2d Cir. 2016), misses the point. Those decisions address whether jurors must unanimously agree on alternative means of satisfying an element after sufficient evidence exists to submit that element to the jury. Judge DeArcy Hall never held that the jury was required to agree upon a single narcotics-related motive. She held that the Government failed to introduce sufficient evidence from which any rational jury could conclude beyond a reasonable doubt that Jordan's use of the firearm furthered the charged narcotics

conspiracy. Neither *Richardson* nor *Aller* addresses that antecedent evidentiary question.

Nor do the Government's substantive authorities demonstrate any legal error.

In *United States v. Finley*, 245 F.3d 199 (2d Cir. 2001), the required nexus existed because objective evidence established that the defendant actively conducted narcotics sales from the residence, possessed cocaine packaged for distribution, and kept a shotgun adjacent to the location from which those sales occurred. *Id.* at 202-03. Those facts objectively connected the firearm to the narcotics offense. The district court repeatedly found no comparable evidence here.

Likewise, *United States v. Wallace*, 447 F.3d 184 (2d Cir. 2006), merely identifies the elements of § 924(j), including the requirement that the firearm be used during and in relation to the underlying drug trafficking offense. *Id.* at 187. Judge DeArcy Hall accepted those legal principles and concluded only that the Government failed to establish the required factual connection between Jordan's use of the firearm and the charged narcotics conspiracy.

The Government's reliance on *United States v. Walker*, 142 F.3d at 103, and *United States v. Santos*, 541 F.3d at 63, fares no better. As

discussed above, both decisions were affirmed only after identifying substantial objective evidence that the defendants themselves knew the narcotics objective of the homicide and intentionally acted to further it. *Walker*, at 112-16; *Santos*, at 71-74. Judge DeArcy Hall found no comparable evidence here.

Indeed, the Government's own appellate argument implicitly acknowledges that such proof is required. After advancing three alternative narcotics-related motives, it ultimately argues that Count Two may be sustained because Washington acted for one of those motives "and Jordan knew that motive and shot Mizell as part of that plan." A353. That is precisely the factual proposition Judge DeArcy Hall found the Government failed to establish.

Accordingly, the Government identifies no legal error in the district court's Rule 29 analysis of Count Two. It merely repackages the same speculative motive theories rejected under Count One, recasts them as alternative narcotics-related motives, and then argues that unanimity was unnecessary. But the district court never held otherwise. It concluded that each theory rested on speculation rather than evidence and therefore failed to satisfy the Government's burden under Rule 29. Because Count Two depended upon the same evidentiary showing as Count One, the district

court correctly concluded that the Government's proof failed for the same reason.

That conclusion is consistent with *United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004). There, the Second Circuit affirmed a Rule 29 judgment because, once the underlying predicate offenses failed for lack of sufficient evidence, the derivative theory of liability necessarily failed as well. *Id.* at 224. The same principle applies here. Having concluded that the Government failed to establish the evidentiary nexus necessary to sustain Count One, the district court correctly held that the same evidentiary deficiency required judgment of acquittal on Count Two.

**d. Recent Rule 29 Decisions**

Three recent Second Circuit decisions likewise reinforce the district court's analysis.

In *United States v. Cole*, 158 F.4th 113 (2d Cir. 2025), the Government sought to preserve criminal convictions by advancing alternative factual theories supposedly consistent with the jury's verdict. The Second Circuit rejected that approach, emphasizing that courts should not "strain[] to postulate hypertechnical and unrealistic grounds" for a verdict but instead must examine the actual trial record to determine what the evidence truly established. *Id.* at 123-24. The same practical approach

governs here. The Government repeatedly proposes hypothetical explanations for Jordan's conduct. Judge DeArcy Hall examined the evidence actually presented at trial and concluded that those hypothetical links found no support in the record.

Likewise, *Johnson v. United States*, 144 F.4th 133 (2d Cir. 2025), rejected the Government's effort to preserve a conviction by hypothesizing that the jury might have relied upon an alternative, legally valid theory. The Second Circuit held that appellate courts must evaluate the actual evidentiary strength supporting the legally valid theory rather than preserve criminal judgments through hypothetical reconstruction. *Id.* at 144-46. Judge DeArcy Hall employed precisely that discipline. She did not ask whether the Government's theories of Jordan's motive were conceivable. She examined the evidence supporting those theories and concluded that the record failed to establish the objective evidentiary bridge required by 21 U.S.C. § 848(e)(1)(A) or 18 U.S.C. § 924(j).

Most recently, *United States v. MacKey*, 143 F.4th 129 (2d Cir. 2025), reaffirmed that conspiracy liability requires proof of the defendant's own knowing agreement. Although the defendant engaged in conduct consistent with the alleged conspiracy, the Second Circuit reversed because the Government failed to establish that he knowingly joined the unlawful

agreement. *Id.* at 139-46. The Court emphasized that mere association with those engaged in criminal conduct, or conduct merely consistent with conspiracy, does not establish knowing participation where the record equally supports independent action. *Id.* at 144-46.

The same evidentiary gap exists here. The Government argues that Jordan's alleged participation in the homicide permits the further inference that he necessarily knew and adopted Washington's alleged narcotics motive. Judge DeArcy Hall concluded that the record did not support that inferential leap. Under *MacKey*, that gap cannot be filled through speculation.

Finally, although not binding authority, Judge Jesse Furman's comprehensive Rule 29 opinion in *United States v. Blondet*, No. S13 16-CR-387 (JMF), 2022 U.S. Dist. LEXIS 217762 (S.D.N.Y. Dec. 2, 2022), is particularly instructive because it synthesizes decades of Second Circuit precedent addressing enterprise motive. After surveying decisions including *Vernace*, *Glenn*, *MacPherson*, *Pauling*, *United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999), *United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004), *United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), *United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999), *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015), and *United States v. Santiago-Ortiz*, No. 17-cr-0149 (LAK), 2018 U.S. Dist.

LEXIS 144280 (S.D.N.Y. Aug. 23, 2018), Judge Furman concluded that enterprise-motive convictions are consistently upheld only where the Government introduces objective evidence demonstrating that the defendant acted to advance the enterprise's criminal objectives, protect its interests, or otherwise further its unlawful purposes. *Blondet*, 2022 U.S. Dist. LEXIS 217762, at *29-54.

Conversely, where the Government proves only enterprise membership and a violent act arising from a personal dispute, but asks the jury to infer the required enterprise motive without objective evidentiary support, Rule 29 requires acquittal. *Id.* at *44-52. Although *Blondet* involved VICAR rather than § 848(e)(1)(A), its methodology mirrors Judge DeArcy Hall's. Both opinions compare the Government's proof against the objective evidentiary patterns found sufficient in controlling precedent. Both conclude that the missing evidentiary bridge cannot be supplied through conjecture.

Accordingly, the Government's own authorities—and the most recent decisions of this Court—confirm that Judge DeArcy Hall applied the correct Rule 29 standard. She did not reject circumstantial evidence, disregard the jury's verdict, or impose a heightened burden of proof. She concluded only that the Government failed to present objective evidence from which a rational jury could find, beyond a reasonable doubt, that Jordan himself

killed Jason Mizell because of the charged narcotics conspiracy. That conclusion faithfully applies Second Circuit precedent and provides no basis for reversal.

**e. The Equipoise Rule**

The Government argues, only in a footnote, that Judge DeArcy Hall implicitly applied the so-called "equipoise rule" in granting Rule 29 relief. Br. 61 n.16. That argument fails for two independent reasons.

First, the Government has not properly presented the issue. Rather than developing the argument in the body of its brief, it relegates the point to a lengthy footnote. This Court has repeatedly declined to consider arguments raised only in footnotes. *See*, *e.g.*, *Delaney v. Farley*, 623 F. App'x 14, 17 (2d Cir. 2015) ("Generally, we do not consider arguments raised only in footnotes, *see Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).").

Second, even if the Court reaches the issue, the argument attacks a rationale the district court never employed. Judge DeArcy Hall never cited the equipoise doctrine, never stated that the evidence equally supported guilt and innocence, and never concluded that she was unable to choose between competing reasonable inferences.

The Government's own authorities demonstrate why its characterization is mistaken.

In *United States v. MacPherson*, 424 F.3d at 183, the Second Circuit rejected a sufficiency challenge because the Government introduced substantial objective evidence supporting the disputed inference. The Court emphasized that competing innocent inferences do not undermine a conviction where the Government has presented sufficient evidence supporting the jury's finding. *Id.* at 190-95.

Likewise, *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018), upheld the conviction only after cataloging extensive objective evidence connecting the murders to the narcotics enterprise, including repeated threats to the victim, advance planning, recruitment of accomplices, statements that the victim was interfering with the defendant's "money business," and post-crime admissions establishing the narcotics-related motive. *Id.* at 44-48.

The same is true of *United States v. White*, 7 F.4th 90 (2d Cir. 2021). There, the Second Circuit held that the district court improperly relied upon the equipoise doctrine because the record contained ample objective evidence that the defendant acted to maintain or increase his position within the gang, including repeated statements about "putting in work," participation with another gang member, an ongoing gang rivalry, and the circumstances of the shooting itself. *Id.* at 101-05. The Court explained that

the evidence was not "nonexistent or so meager" as to preclude the inference supporting the verdict. *Id.* at 103.

Those decisions reinforce, rather than undermine, the district court's analysis. Judge DeArcy Hall did not conclude that the evidence was in equipoise or that equally reasonable competing inferences prevented the jury from reaching a verdict. She concluded that, even viewing the evidence in the light most favorable to the Government, the record failed to contain the objective evidence necessary to establish the missing statutory element: that Jordan himself acted because of the charged narcotics conspiracy.

That is not an application of the equipoise doctrine. It is the ordinary constitutional sufficiency analysis required by *Jackson*, 335 F.3d at 170, and consistently applied by this Court.

The Government also errs in suggesting that Rule 29 required the district court to identify some alternative explanation for the homicide before granting judgment of acquittal. It did not. Rule 29 imposed no burden on the district court to speculate about an alternative motive. The burden rested entirely with the Government to prove beyond a reasonable doubt that Jordan acted because of the charged narcotics conspiracy.

Accordingly, the Government's footnote argument should be rejected because it is both procedurally improper and substantively incorrect.

### f. Newly Advanced Aiding-and-Abetting Theory

The Government's final effort to salvage Counts One and Two is its contention that, even if the evidence was insufficient to prove Jordan himself violated 21 U.S.C. § 848(e)(1)(A), the convictions nevertheless may be sustained because Jordan aided and abetted Washington's violation of that statute. A361-67. That argument fails for three independent reasons.

First, it was not the theory on which the Government tried the case or meaningfully defended the verdict before the district court. Second, it conflicts with the Supreme Court's decision in *Rosemond v. United States,* 572 U.S. 65 (2014), and this Court's aiding-and-abetting jurisprudence. Third, it effectively reads Congress's narcotics-motive element out of § 848(e)(1)(A).

The Government's appellate argument begins from a false premise. Judge DeArcy Hall did not overlook aiding-and-abetting liability. She addressed the theory that the Government actually litigated.

From opening statement through rebuttal, the Government consistently argued that Jordan himself possessed the narcotics-related motive required by § 848(e)(1)(A). In the opening statement, it argued that Jordan wanted "a bigger piece" of the Baltimore cocaine operation and therefore murdered Mizell out of greed and revenge arising from the

narcotics conspiracy. SA153.1-53.9. Summation followed the same theory, repeatedly arguing that Jordan personally wanted to "get on" in the drug business, personally sought a larger role in the Baltimore venture, and personally killed Mizell because of that conspiracy. SA1590, SA1607-17. Rebuttal likewise argued that Jordan "wanted to get on" and "that's why this happened." SA1670, SA1681-83.

What is notably absent is the theory now advanced on appeal—that Jordan could be convicted even if he lacked knowledge of the narcotics-related motive so long as Washington possessed that motive and Jordan intentionally assisted the homicide.

The Government's Rule 29 opposition confirms the point. After devoting approximately sixty pages to defending the sufficiency of the evidence establishing Jordan's own narcotics motive, it devoted only a single paragraph to aiding and abetting, asserting without analysis that "[t]he same evidence is sufficient to convict either Jordan or Washington as aiding and abetting Counts One and Two," citing only *United States v. Walker,* 142 F.3d at 103, in a footnote. DE 297 at 61. It never discussed *Rosemond*, never analyzed § 848(e)(1)(A)'s unique motive element, and never argued that Jordan could be convicted without proof that he knew of and adopted the alleged narcotics objective.

Judge DeArcy Hall therefore committed no error by deciding the case the Government actually presented. The Government cannot preserve the verdict by materially reframing its theory for the first time on appeal.

Even if the Court reaches the newly expanded theory, it fails on the merits.

The Government repeatedly argues that aiding-and-abetting liability does not require proof that the aider personally satisfies every statutory element. That proposition is unremarkable. But it is only half of the Supreme Court's holding in *Rosemond*, 572 U.S. at 65.

The Court expressly distinguished between an aider's conduct and his intent. Although an accomplice need not personally perform every element of the offense, he must participate with intent to facilitate "the specific and entire crime charged" and with "full knowledge of the circumstances constituting the charged offense." *Id.* at 76-77. "An intent to advance some different or lesser offense is not, or not usually, sufficient." *Id.*

Those principles foreclose the Government's argument here.

Section 848(e)(1)(A) does not criminalize intentional homicide generally. Congress criminalized an intentional killing committed because of a qualifying narcotics conspiracy. That narcotics-related purpose is therefore part of the "specific and entire crime charged." *Rosemond* does not permit

the Government to prove only that Jordan intentionally assisted a homicide while relieving it of its burden to establish that he intended to facilitate the narcotics-related homicide Congress defined.

This Court's decision in *United States v. Framp*ton, 382 F.3d at 213, is even more directly on point. There, although the Government proved that Johnson intentionally participated in the assault resulting in the victim's death, the Court nevertheless reversed his aiding-and-abetting conviction because the Government failed to prove that Johnson knew Frampton's racketeering objective and acted to advance that specific purpose. *Id.* at 222-25. The Court held that aiding-and-abetting liability requires more than knowledge that one's conduct advances "some nefarious purpose"; the defendant must intend to facilitate the principal's commission of the specific crime charged. *Id.*

That reasoning mirrors Judge DeArcy Hall's analysis. She did not question whether Jordan intentionally participated in the homicide. She concluded only that the Government failed to prove Jordan knew and adopted Washington's alleged narcotics-related objective. Under *Frampton*, that evidentiary deficiency is fatal.

The Government's remaining authorities point in the same direction. *United States v. Heras*, 609 F.3d 101 (2d Cir. 2010), teaches that mere

knowledge of a criminal objective is insufficient; the defendant must knowingly and intentionally facilitate that objective. *Id.* at 107. Likewise, *United States v. Santos*, 541 F.3d at 63, and *United States v. Walker*, 142 F.3d at 103, affirmed only after identifying extensive evidence that the defendants themselves understood the narcotics objective and intentionally acted to advance it. As discussed above, the district court found no comparable evidence here.

The Government's remaining authorities: *United States v. Archer*, 977 F.3d 181 (2d Cir. 2020); *United States v. Caraballo*, 658 F. App'x 595 (2d Cir. 2016); *United States v. Abozid*, 257 F.3d 191 (2d Cir. 2001); and *United States v. Peterson*, 768 F.2d 64 (2d Cir. 1985), address securities fraud, § 924(j), harmless instructional error, and jury unanimity, respectively. None addresses whether the Government may dispense with proof that an alleged aider intended to facilitate the narcotics-related homicide Congress specifically defined in § 848(e)(1)(A).

The consequences of the Government's theory demonstrate why *Rosemond* and *Frampton* require otherwise. Under the Government's approach, once Washington possessed a narcotics-related motive, anyone who knowingly assisted the homicide could be convicted under § 848(e)(1)(A), regardless of whether that person knew the homicide was

being committed because of the charged narcotics conspiracy. Congress did not enact such a statute.

Accordingly, the Government's newly expanded aiding-and-abetting theory neither cures the evidentiary deficiencies identified by the district court nor identifies any legal error. Instead, it confirms that the Government now seeks to preserve the verdict on a materially different theory from the one it presented to the jury and to the district court. Neither the record nor governing precedent permits that result.

#### g. The Homicide Evidence Was Not One-Sided

The Government's appeal repeatedly treats the homicide evidence as though it were undisputed. Judge DeArcy Hall, having presided over the five-week trial and the post-trial proceedings, reached a different conclusion.

In addressing Jordan's Rule 33 motion, the district court recognized that the conclusion that Jay Bryant—not Jordan—fired the fatal shot "could" be "reasonable—even more reasonable." A173. Although the court ultimately denied Rule 33 relief under that rule's demanding standard, its analysis confirms that the district court's understanding of the homicide evidence materially evolved after trial.

That point answers the Government's repeated assertion that Judge DeArcy Hall simply "reversed" herself. She did not reconsider the same

record and reach a different result. By the time she ruled on Jordan's renewed application for release, she had presided over the trial, observed every witness, evaluated impeachment, resolved extensive evidentiary disputes, considered the Rule 29 and Rule 33 motions, and assessed the complete post-trial record. The Bail Reform Act required her to evaluate detention in light of that materially expanded record.

Jordan's Rule 33 motion emphasized, among other things, that: (1) Jay Bryant admitted shooting Jason Mizell and acknowledged that the blue knit hat recovered at the scene belonged to him; (2) eyewitness Tanya Davis described a very tall, lanky man with braided hair entering and leaving Studio 24/7 immediately before and after the homicide; and (3) Bryant's DNA was identified as the major contributor to the DNA recovered from the interior of the blue knit hat. DE 292-1 at 29-34.

The point for present purposes is not whether the district court ultimately should have granted Rule 33 relief. It is that, by the time Judge DeArcy Hall reconsidered detention in 2026, her assessment of the homicide evidence rested on the complete trial record—not on the indictment, Government proffers, or the preliminary record that existed in 2022.

### B. The District Court Did Not Clearly Err in Assessing Count Three Through Eleven

The Government next argues that, because Jordan remained charged in Counts Three through Eleven, the district court was required to assign those counts the same weight it assigned them before trial. Br. 51-59.

Neither the Bail Reform Act nor this Court's decisions impose such a rule. Section 3142(g) requires the district court to determine, at the time of the detention decision, whether the Government has established by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community. That inquiry is necessarily individualized, forward-looking, and based upon the record before the court when it rules.

Judge DeArcy Hall did not minimize the seriousness of Counts Three through Eleven. She expressly acknowledged that narcotics trafficking and firearms offenses may support detention and recognized that the statutory presumption continued to apply. A246-50. The question before her, however, was whether those charges, considered together with the entire post-trial record and the proposed release conditions, established that no conditions could reasonably assure community safety.

The Government relied principally on allegations that Jordan historically carried a firearm while engaging in narcotics trafficking. A212-

14. Yet no firearm associated with Counts Three through Eleven was recovered, and the Government identified no photographs, videos, or comparable physical evidence depicting Jordan possessing a firearm. Instead, it represented that approximately three, four, or five witnesses would testify concerning historical narcotics transactions involving firearms. A214. The district court was entitled to consider the limited nature of that proffer when evaluating the weight of the evidence under § 3142(g).

The court also properly considered Jordan's conduct during nearly six years of federal detention. During that period, the Government introduced no evidence that Jordan engaged in violent conduct, despite the fact that he himself had been the victim of a violent assault in which he sustained multiple wounds. A221.

Judge DeArcy Hall further recognized that, although Counts Three and Four continued to support the statutory presumption, narcotics trafficking history "is not dispositive." A249. She concluded that, after more than five years of incarceration, "the danger associated with the then ongoing or alleged ongoing drug trafficking scheme or conspiracy has been blunted." *Id.* She likewise recognized that the Rule 16 evidence supporting Counts Three through Eleven no longer carried the significance it possessed

before trial because it no longer supported the mandatory-minimum exposure that had originally driven the detention decision. A249-50.

Finally, the Government overlooks that, before trial, Judge DeArcy Hall had already carefully scrutinized much of the evidence underlying Counts Three through Eleven during extensive in limine proceedings. After more than a year of briefing and hearings, she resolved fifty-two separate evidentiary requests, excluding or limiting numerous categories of the Government's proposed proof. DE 215. By the time she reconsidered detention in 2026, her assessment rested not on the Government's pretrial proffers, but on years of evidentiary litigation, the complete trial record, and the parties' post-trial submissions.

Accordingly, the district court did not disregard Counts Three through Eleven. It assigned them the weight it concluded they deserved after considering the complete record before it. The Government's disagreement with that assessment does not establish clear error.

### C. The District Court Did Not Clearly Err in Assessing the Government's Uncharged-Conduct Evidence

The Government next argues that Judge DeArcy Hall erred by assigning insufficient weight to Jordan's alleged uncharged conduct, principally firearm-related incidents from 2003 and 2004. Br. 59-61. The district court did not hold that this evidence was irrelevant. It treated its

remoteness as one factor in evaluating present dangerousness. That is precisely what § 3142(g) requires.

Section 3142(g) asks whether release would pose a danger at the time of the detention decision. The Government isolates the age of the alleged conduct from the broader inquiry and relies on readily distinguishable authorities.

For example, *United States v. Marino*, 396 F. App'x 728 (2d Cir. 2010), a nonprecedential summary order, involved evidence that the defendant remained an active leader of the Gambino crime family in addition to his history of violence. *Id.* at 730-31. *United States v. Holmes*, 858 F. App'x 429 (2d Cir. 2021), was a compassionate-release case decided under 18 U.S.C. § 3582(c)(1)(A), not the Bail Reform Act. Neither addresses the question presented here.

The Government likewise overreads *United States v. Rodriguez*, 950 F.2d at 85. There, the Second Circuit reversed because the district court committed legal error by discounting an uncharged kneecap shooting on the mistaken belief that it lacked a sufficient connection to the charged narcotics conspiracy. *Id.* at 88-89. Judge DeArcy Hall made no comparable mistake. She did not disregard the alleged uncharged conduct because it lacked a

narcotics nexus; she considered it and assigned it the weight she concluded it deserved.

Nor does *United States v. Leon*, 766 F.2d 77 (2d Cir. 1985) support the Government. *Leon* affirmed detention because the defendant personally threatened identifiable witnesses while carrying loaded firearms, creating an immediate risk of witness intimidation. *Id.* at 81. The Court nevertheless emphasized that, although narcotics trafficking is inherently dangerous, "the degree of that danger remains critical." *Id.* Judge DeArcy Hall applied precisely that individualized assessment.

Indeed, *United States v. Zhe Zhang*, 55 F.4th 141 (2d Cir. 2022) confirms that the Bail Reform Act does not prescribe the weight to be assigned any particular § 3142(g) factor. Rather, "[t]he weight given to each factor will inevitably vary from case to case," and the district court remains "free to determine the appropriate weight" based upon the circumstances presented. *Id.* at 149-50. That is exactly what occurred here.

The Government's remaining dangerousness cases likewise involved materially different records. *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993), involved active leadership of an ongoing Colombo family shooting war. *Id.* at 632-33. *United States v. Millan*, 4 F.3d 1038 (2d Cir. 1993), involved defendants who continued directing a large-scale heroin

organization and ordering violence against witnesses. *Id.* at 1046-49. *United States v. Barone*, 387 F. App'x 88 (2d Cir. 2010), involved continued murder-for-hire planning while cooperating with authorities, possession of firearms and body armor, and ongoing dangerousness. *Id.* at 90-91. *United States v. Belardo*, No. 20-CR-126-LTS, 2020 U.S. Dist. LEXIS 61450 (S.D.N.Y. Apr. 7, 2020), arose under § 3142(i) and involved a defendant with an extensive violent criminal history. None resembles the record before Judge DeArcy Hall.

The Government's remaining authorities are even further afield. *United States v. Dillard*, 214 F.3d 88 (2d Cir. 2000) addressed whether a felon-in-possession charge constitutes a "crime of violence" for purposes of triggering a detention hearing. *United States v. Patterson*, 25 F.4th 123 (2d Cir. 2022) concerns Fourth Amendment suppression. *United States v. Florez*, 447 F.3d 145 (2d Cir. 2006), addresses statutes of limitation, Rule 29 review, and sentencing. None concerns the discretionary weighing of dangerousness under § 3142(g).

The Government also emphasizes alleged witness intimidation, particularly Jordan's conversation with Tony Rincon after Mizell's funeral and alleged conduct by Jordan's father, "Big D." Judge DeArcy Hall did not ignore that evidence. She heard the testimony, considered the surrounding

circumstances, and concluded that it did not establish a present danger of witness intimidation requiring detention in 2026. A229-33. She had likewise already considered many of those allegations during extensive in limine proceedings, in which she required the Government to clarify and particularize its witness-intimidation evidence before ruling on its admissibility. DE 215; A230-31.

Nor did the district court clearly err in refusing to attribute "Big D's" alleged conduct to Jordan. The distinction between acts performed on someone's behalf and acts performed at someone's direction is critical. The Government's evidence may have supported an inference that family members acted independently or protectively. It did not compel the conclusion that Jordan directed their conduct.

That distinction is entirely consistent with this Court's precedents. *United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985), affirmed detention because the defendant directed violent criminal activity through subordinates. *Id.* at 97-101.

Further, *United States v. Ferranti*, 66 F.3d at 540, involved proof that the defendant personally participated in a fatal arson, tampered with witnesses, and directed others to intimidate, assault, and murder on his behalf. *Id.* at 542-44. And *United States v. Dono*, 275 F. App'x 35 (2d Cir.

2008), involved recorded organized-crime violence and overwhelming evidence that the defendants remained dangerous. *Id.* at 36-38. *United States v. Mercedes*, 254 F.3d at 433, reaffirmed that the statutory presumption remains only one factor and affirmed detention based upon contemporaneous armed robbery, repeated weapons offenses, violations of release, and other current evidence of dangerousness. *Id.* at 436-38.

No comparable evidence exists here.

Ultimately, the Government's argument reduces to a single proposition: that Judge DeArcy Hall should have drawn the Government's preferred inferences from the evidence. That is not clear-error review.

The district court knew this record better than anyone. It ruled on the evidence for years, presided over the five-week trial, heard every witness, resolved the post-trial motions, and evaluated Jordan's institutional conduct during nearly six years of detention. It then concluded that the Government failed to prove by clear and convincing evidence that no combination of release conditions could reasonably assure community safety.

The Government identifies no legal error comparable to *Rodriguez*, no continuing command authority comparable to *Colombo* or *Ferranti*, no active organized-crime leadership comparable to *Marino* or *Orena*, and no contemporaneous violence comparable to *Dono*, *Mercedes*, or *Barone*. It

asks only that this Court draw different factual inferences from a record Judge DeArcy Hall knew better than anyone.

That is not a basis for reversal.

### D. The District Court Did Not Err Regarding Flight Risk

When the district court questioned the Government regarding flight risk, the Government effectively acknowledged the strength of Jordan's proposed release package. Counsel conceded that the package contained the factors ordinarily supporting release:

> Yes, Your Honor. If we're making a checklist of things that would support the bail application, then those would fall into the bucket of things that support his release. But the Government is not of the opinion that there are enough of those things to support his release.

A226.

The district court then asked counsel about the Government's cited flight-risk authorities. Counsel candidly acknowledged that Jordan's circumstances were not materially similar to those cases, remarking, "Sometimes, if we have too much time, we write too much." A228 (citation modified).

The Government's principal flight-risk argument cannot be reconciled with *United States v. Sabhnani*, 493 F.3d at 63. *Sabhnani* involved defendants who presented an extraordinary risk of flight. They possessed

millions of dollars in assets, maintained extensive foreign business interests, enjoyed significant overseas family ties, and faced lengthy prison sentences. Even so, this Court vacated the detention order because the Government failed to satisfy the second requirement of § 3142(e): proving that no combination of conditions could reasonably assure the defendants' appearance. *Id.* at 74-79.

The Court emphasized that, once a comprehensive package of release conditions existed, continued detention could no longer be justified merely because the defendants presented some risk of flight. *Id.*

That reasoning strongly supports affirmance here.

Judge DeArcy Hall expressly recognized Jordan's potential sentencing exposure, including the possibility that Counts One and Two could be reinstated and the seriousness of Counts Three and Four. A244-48. She nevertheless concluded that, considered together with the comprehensive release package and the materially different procedural posture of the case, the Government failed to establish that no combination of conditions could reasonably assure Jordan's appearance.

*Sabhnani* also distinguished *Orena*, 986 F.2d at 628, because *Orena* involved materially different crimes, dangers, monitoring arrangements, and

factual circumstances. *Sabhnani* at 77-78. Those same distinctions apply here.

The Government's remaining authorities fare no better.

*United States v. Khusanov*, 731 F. App'x 19 (2d Cir. 2018), a nonprecedential summary order, involved terrorism charges, extensive foreign contacts, recorded evidence, and extraordinary sentencing exposure. *Id.* at 21-23. More importantly, the Court reiterated that the weight assigned to each § 3142(g) factor rests with the district court and that disagreement with that weighing does not establish clear error. *Id.* at 20-23.

*United States v. Scali*, 738 F. App'x 32 (2d Cir. 2018), likewise involved release pending sentencing under § 3143(a), not detention under § 3142. The Court affirmed because the district court reasonably relied on the defendant's Guidelines range, advanced age, serious health concerns, and perjury conviction in evaluating flight risk. *Id.* at 33.

Finally, *United States v. Liebowitz*, 669 F. App'x 603 (2d Cir. 2016), involved kidnapping and murder-for-hire conspiracies, dual United States-Australian citizenship, extensive foreign ties, substantial overseas resources, and repeated violations of release conditions. *Id.* at 604-05.

These cases establish only that sentencing exposure is a relevant consideration—not that it is dispositive. Judge DeArcy Hall expressly

recognized that principle. She simply declined to elevate sentencing exposure above the remaining § 3142(g) factors. That determination falls squarely within the discretion Congress entrusted to the district court.

### E. The District Court Did Not Clearly Err in Finding the Bail Package Adequate

Despite bearing the burden of persuasion, the Government relied largely on generalized assertions of dangerousness and flight risk while giving little attention to the specific conditions of Jordan's proposed release or the materially changed circumstances presented by his renewed application. Its principal contention—that no release package could adequately protect the community "in light of the charges of which he was convicted," (Br. 65)—misstates the procedural posture. By the time Jordan renewed his application for release, the district court had entered a Rule 29 judgment of acquittal on Counts One and Two. Jordan therefore stood before the court with no criminal convictions.

The district court nevertheless approved only a comprehensive package of release conditions designed to assure both Jordan's appearance and the safety of the community. Those conditions included a $1 million bond secured by seventeen financially responsible sureties and pledged real property, electronic location monitoring, inspection and approval of the proposed residence by Pretrial Services, and strict prohibitions against

contact with Washington, trial witnesses, or any alleged victims. The district court reasonably concluded that, considered together, those conditions satisfied the Bail Reform Act.

That conclusion is strongly supported by *United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020). There, despite allegations that the defendants threw a Molotov cocktail into an unoccupied police vehicle, this Court affirmed their release on conditions, emphasizing their lack of criminal records, strong family and community ties, and substantial financial sureties. *Id.* at 290, 294-96. The Court concluded that it was not "left with a firm conviction that the district court erred in finding those conditions sufficient to assure public safety." *Id.* at 296.

The same reasoning applies here. Like the defendants in *Mattis*, Jordan has no adult criminal record, longstanding community ties, and numerous family members and friends willing to assume substantial financial responsibility for his compliance with the conditions of release. Seventeen sureties agreed to secure a $1 million bond, exposing themselves to significant financial liability if Jordan violated any condition of release. On this record, the district court reasonably concluded that the proposed conditions adequately protected the community and assured Jordan's appearance.

The Government's reliance on *United States v. Ferranti*, 66 F.3d at 540, is again misplaced. *Ferranti* involved a defendant accused of intentionally setting a fatal apartment-building fire, lying to investigators, intimidating witnesses, and who also had a prior criminal record. *Id.* at 541-44. The proposed release conditions consisted principally of a $1 million bond and a stay-away order, which this Court concluded would not have prevented additional acts of arson, assault, or murder. *Id.* at 544.

Jordan's circumstances bear little resemblance to *Ferranti*. He has no criminal record, and the district court found no credible evidence that he engaged in violent conduct during the more than twenty years following Mizell's homicide. Unlike the limited conditions proposed in *Ferranti*, the district court imposed electronic location monitoring, intensive Pretrial Services supervision, a $1 million bond secured by seventeen sureties and pledged real property, and strict no-contact provisions. Viewed through the framework established in *Mattis*, rather than the markedly different facts presented in *Ferranti*, the district court did not clearly err in concluding that these conditions reasonably assured both Jordan's appearance and the community's safety.

## CONCLUSION

The Government's final argument that no release package could reasonably mitigate Jordan's alleged dangerousness or risk of flight, like the remainder of its appeal, rests on a single premise: that Judge DeArcy Hall should have assigned different weight to the evidence before her.

The Bail Reform Act asks a different question. It requires the district court to determine whether "no condition or combination of conditions" will reasonably assure the defendant's appearance and the safety of the community. 18 U.S.C. § 3142(e). Judge DeArcy Hall answered precisely that question after presiding over years of litigation, extensive in limine proceedings, a five-week trial, the Rule 29 and Rule 33 motions, and Jordan's renewed detention hearing. She did so as the judge who observed the witnesses firsthand, evaluated the evidence, entered a judgment of acquittal on Counts One and Two, and, if necessary, will sentence Jordan on the remaining counts. Few judges are better positioned to evaluate the significance of the evidence and the practical consequences of the remaining charges.

The Government identifies no legal error. It does not credibly contend that the district court misunderstood § 3142, failed to apply the statutory presumption, overlooked Jordan's sentencing exposure, ignored the

proposed release conditions, or applied the wrong legal standard. Instead, it argues only that she should have weighed the evidence differently.

That is not clear-error review.

Nor does the Government meaningfully confront the release package the district court approved. Instead, it attacks each condition in isolation—GPS monitoring, financial sureties, home confinement, and family supervision. But Congress did not require the district court to determine whether any single condition eliminates every conceivable risk. Section 3142 requires the court to evaluate whether a combination of conditions will reasonably assure the defendant's appearance and the safety of the community.

Judge DeArcy Hall faithfully applied that standard. She considered the cumulative effect of a substantial secured bond, seventeen financially responsible sureties, pledged real property, electronic monitoring, home confinement, intensive Pretrial Services supervision, strict no-contact provisions, Jordan's nearly six years of exemplary institutional conduct, the completion of the homicide trial, the Rule 29 judgment of acquittal, and the materially different procedural posture that exists now.

Ultimately, the Government asks this Court to replace the district court's individualized assessment with its own preferred weighing of the same record. The clear-error standard does not permit that result.

Whether another judge might have reached a different conclusion is not the question before this Court. The question is whether Judge DeArcy Hall clearly erred. After years of supervising this prosecution and carefully applying every factor set forth in 18 U.S.C. § 3142(g), she plainly did not.

The order granting Jordan's release should therefore be affirmed.

Dated: Brooklyn, New York
July 16, 2026

MICHAEL HUESTON, ESQ.
26 Court Street, Suite 1504
Brooklyn, New York 11242
(718) 246-2900
/s/ Michael Hueston
MICHAEL HUESTON

EMILEE A. SAHLI, ESQ.
195 Broadway, 4th Floor
Brooklyn, NY 11211
(347) 378-8132
/s/ Emilee A. Sahil
EMILEE A. SAHLI

JOHN A. DIAZ, ESQ.
225 Broadway, Suite 715
New York, NY 10007
(212) 227-8208
/s/ John A. Diaz
JOHN A. DIAZ

MARK S. DEMARCO, ESQ.
100 Lafayette Street, Ste. 501
New York, NY 10013
(718) 239-7070
__/s/ Mark S. Demarco________
MARK S. DEMARCO

*Attorney for Defendant-Appellee*
*Karl Jordan, Jr.*

## **Certificate of Compliance with F.R.A.P. 32**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Second Circuit Rule 32.1(a)(4), and this Court's order of June 30, 2026, permitting the filing of an oversized brief of no more than 30,000 words because the brief contains 27,533 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: Brooklyn, New York
July 16, 2026

/S/Michael Hueston

Michael Hueston